1  RILEY SAFER HOLMES & CANCILA LLP
2  Keyonn L. Pope (*pro hac vice*)
   kpope@rshc-law.com
3  Monique B. Howery (*pro hac vice*)
   mhowery@rshc-law.com
4  70 West Madison St., Suite 2900
   Chicago, Illinois 60602
5  Telephone: (312) 471-8700
   Facsimile: (312) 471-8701
6
7  RILEY SAFER HOLMES & CANCILA LLP
   Stephen M. Hankins (SBN 154886)
8  shankins@rshc-law.com
   456 Montgomery Street, 16th Floor
9  San Francisco, California 94104
   Telephone: (415) 275-8550
10 Facsimile: (415) 275-8551

11 Attorneys for Defendants The Hershey Company
   and ONE Brands, LLC
12

13              **IN THE UNITED STATES DISTRICT COURT**
             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
14                      **OAKLAND DIVISION**

15 **THE COOKIE DEPARTMENT, INC.**, a          **Case No.: 4:20-cv-09324-KAW**
   California Corporation,
16                                             **DECLARATION OF KEYONN L. POPE IN**
                        Plaintiff,             **SUPPORT OF DEFENDANTS' MOTION**
17                                             **TO STRIKE JURY DEMAND**
          vs.
18                                             Hearing: October 20, 2022
   **THE HERSHEY COMPANY**, a Delaware         Time: 1:30pm
19 Corporation; **ONE BRANDS, LLC**, a Foreign  Judge: Hon. Kandis A. Westmore
   Limited Liability Company; AND DOES 1 TO
20 50, INCLUSIVE,

21                      Defendants.

22

23

24

25

26

27

28

I, Keyonn L. Pope, hereby declare as follows:

1.      I am an attorney at law admitted *pro hac vice* to the Northern District of California and a partner with the firm of Riley Safer Holmes & Cancila LLP, counsel of record for Defendants The Hershey Company and One Brands, LLC.

2.      A true and correct copy of Plaintiff's Amended Supplemental Rule 26(a)(1) Initial Disclosures, dated April 29, 2022, is attached hereto as Exhibit A.

3.      A true and correct copy of the deposition transcript of Akiva Resnikoff in this matter, taken April 28, 2022, is attached hereto as Exhibit B.

4.      A true and correct copy of the deposition transcript of Andrea Kirschner in this matter, taken April 29, 2022, is attached hereto as Exhibit C.

5.      A copy of an excerpt from the Expert Report of Jeff Anderson, provided by Plaintiff as part of its expert witness disclosures on May 31, 2022, is attached as Exhibit D.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 15th day of September, 2022, in Chicago, Illinois.

Dated: September 15, 2022              RILEY SAFER HOLMES & CANCILA LLP


                                      By:  */s/ Keyonn L. Pope*
                                           Keyonn L. Pope
                                           Attorneys for Defendants THE HERSHEY
                                           COMPANY and ONE BRANDS, LLC

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I caused the above document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record in the above-captioned matter.

Dated: September 15, 2022

*/s/ Keyonn L. Pope*

Keyonn L. Pope
4890-1498-5011, v. 1

# Exhibit A

SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION
Sanjiv N. Singh (SBN 193525)
1650 S. Amphlett Blvd. Suite 220
San Mateo, CA 94402
Phone: (650) 389-2255
Email: ssingh@sanjivnsingh.com

INDRAJANA LAW GROUP, A PROFESSIONAL LAW CORPORATION
Michael B. Indrajana (SBN 258329)
1650 S. Amphlett Blvd. Suite 220
San Mateo, CA 94402
Phone: (650) 597-0928
Email: michael@indrajana.com

Attorneys for Plaintiff The Cookie Department, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| **THE COOKIE DEPARTMENT, INC.,** a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>**THE HERSHEY COMPANY,** a Delaware Corporation; **ONE BRANDS, LLC**, a Foreign Limited Liability Company; AND DOES 1 TO 50, INCLUSIVE.<br><br>Defendants. | Case No.: 4:20-cv-09324-KAW<br><br>**PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) INITIAL DISCLOSURES** |

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) INITIAL DISCLOSURES

**PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(a)(1) INITIAL DISCLOSURES**

Plaintiff The Cookie Department, Inc. ("TCD") by and through counsel, respectfully submits these Supplemental Initial Disclosures pursuant to Rule 26(e)(1) of the Federal Rules of Civil Procedure. Since the Initial Disclosure TCD served on March 19, 2021, TCD has since discovered additional witnesses and documents not listed on TCD's Initial Disclosures, and is now supplementing its initial disclosure.

These supplemental disclosures are made without waiver of attorney-client privilege, attorney work product doctrine or any other applicable privilege. TCD reserves the right to object to the production and/or introduction into evidence of any documents or evidence described herein or testimony by any of the disclosed witnesses on the basis of privilege, relevance or otherwise, as appropriate. TCD also reserves the right to add to, or amend, this disclosure, as appropriate and necessary, particularly as additional information is obtained through depositions, interrogatories, or otherwise.

1.      **Individuals Likely to Have Discoverable Information (Rule 26(a)(1)(A))**

The individuals listed below are likely to have discoverable information relevant to this lawsuit:

- From Plaintiff The Cookie Department, Inc.:
    - Akiva Resnikoff (CEO and founder of TCD and creator of the TOUGH COOKIE® mark): Information relating to TCD's history; information relating to the infringement of TCD's trademark; information relating to injury caused to TCD's brand caused by trademark infringement; information relating to TCD's damages; and any topics discussed in the deposition of said witness.
    - Isaac Resnikoff (TCD's Designer of branding and packaging): Information relating to TCD's history; information relating to the infringement of TCD's trademark; information relating to the TOUGH COOKIE® brand use and design.

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) X INITIAL DISCLOSURES

1    
2    
3    

- o   Andrea Kirschner (TCD's Chief Financial Officers): information relating to TCD's profits and losses during the relevant time period; and any topics discussed in the deposition of said witness.

4    

- From Defendant ONE Brands, LLC:

5    
6    
7    
8    
9    
10    
11    

- o   Ron McAfee Jr. (ONE Brands, LLC co-founder): Information relating to ONE Brands LLC history; information relating to the TOUGH COOKIES ONLY mark; information relating to ONE Brands' marketing and advertising strategy relating to the ONE Bar product line including the Chocolate Chip Cookie Dough Flavored Protein Bar; information relating to ONE Brands' trademark policy; information relating to ONE Brands' acquisition by Hershey; information relating to ONE Brands' profits.

12    
13    
14    
15    
16    
17    
18    
19    
20    

- o   Peter J. Burns (Former ONE Brands, LLC Chief Executive Officer): Information relating to ONE Brands LLC history; information relating to the TOUGH COOKIES ONLY mark; information relating to ONE Brands' marketing and advertising strategy relating to the ONE Bar product line including the Chocolate Chip Cookie Dough Flavored Protein Bar; information relating to ONE Brands' trademark policy; information relating to ONE Brands' acquisition by Hershey; information relating to ONE Brands' profits; and any other topics discussed in the deposition of said witness.

21    
22    
23    
24    
25    
26    
27    

- o   David Ziegert (Former ONE Brands, LLC Chief Operating Officer): Information relating to ONE Brands LLC history; information relating to the TOUGH COOKIES ONLY mark; information relating to ONE Brands' marketing and advertising strategy relating to the ONE Bar product line including the Chocolate Chip Cookie Dough Flavored Protein Bar; information relating to ONE Brands' trademark policy; information relating to ONE Brands' acquisition by Hershey; information relating to

28

ONE Brands' profits;  and any other topics discussed in the deposition of said witness.

- o  Terri Lindley (ONE Brands LLC's former Chief Financial Officer): Information relating to Hershey's acquisition of ONE Brands LLC and the ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar; Information relating to ONE Brands LLC's profits relating to the ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar; information relating to Hershey's due diligence on the ONE Brands acquisition including the ONE Bar Chocolate Chip Cookie Dough's TOUGH COOKIES ONLY mark.

- o  Erin Costa: (Former ONE Brands LLC's Vice President of Marketing): Information relating to the ONE Bar brand relaunch in 2017 in which the infringing TOUGH COOKIES ONLY phrase was introduced in September 2017; information relating to ONE Brands LLC's marketing activities relating to TOUGH COOKIES ONLY after learning about TCD's TOUGH COOKIE trademark application; information relating too ONE Brands LLC's marketing activities relating to TOUGH COOKIES ONLY after TCD litigation commenced on December 23, 2020; and any other topics discussed in the deposition of said witness.

- o  Travis Bowe (former ONE Brands LLC's Vice President of Finance and Accounting): Information relating to ONE Brands' financials, sales, revenues, profits, expenditures, and other relevant financial information relating to the sales of the ONE Chocolate Chip Cookie Dough Protein Bar.

- o  Maggie Lowry (ONE Brands LLC's Manager, Digital Marketing): Information regarding ONE Brands LLC's website development and SEO practices; and any other topics discussed in the deposition of said witness.

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) X INITIAL DISCLOSURES

1          o  Jannelle Knaus (Former ONE Brands LLC's Director of Creative

2              Services): Information relating to the ONE Bar brand relaunch in 2017 in

3              which the infringing TOUGH COOKIES ONLY phrase was introduced in

4              September 2017; information relating to ONE Brands LLC's marketing

5              activities relating to TOUGH COOKIES ONLY after learning about

6              TCD's TOUGH COOKIE trademark application; information relating too

7              ONE Brands LLC's marketing activities relating to TOUGH COOKIES

8              ONLY after TCD litigation commenced on December 23, 2020; and any

9              other topics discussed in the deposition of said witness.

10        o  Lisa Wells (Former ONE Brands LLC's Vice President, Marketing):

11             Information relating to the ONE Bar brand relaunch in 2017 in which the

12             infringing TOUGH COOKIES ONLY phrase was introduced in

13             September 2017.

14    •  From Defendant The Hershey Company:

15        o  Kristen Riggs (Hershey's Senior Vice President, Chief Growth Officer):

16             Information relating to Hershey's marketing strategy for ONE Bar's

17             Chocolate Chip Cookie Dough and TOUGH COOKIES ONLY mark;

18             information relating to Hershey's acquisition of ONE Brands LLC and the

19             ONE Bar product line; information relating to ONE Brands' marketing

20             strategy under Hershey's relating to the ONE Bar Chocolate Chip Cookie

21             Dough Flavored Protein Bar; information relating to Hershey's profits

22             relating to ONE Brands LLC and the ONE Bar Chocolate Chip Cookie

23             Dough Flavored Protein Bar.

24        o  James Turoff (Hershey's Vice President, Acting General Counsel):

25             Information relating to Hershey's acquisition of ONE Brands LLC and the

26             ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar;

27             information relating to Hershey's trademark policy, including trademark

28             search strategy and infringement prevention; information relating to

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) X INITIAL DISCLOSURES

Hershey's due diligence on the ONE Brands acquisition, including ONE Bar's Chocolate Chip Cookie Dough's TOUGH COOKIES ONLY mark; information relating to Hershey's Intellectual Property policy.

o   Jeffrey Lilla (Hershey's Vice President, Sales Integration): Information relating to Hershey's acquisition of ONE Brands LLC and the ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar; Information relating to Hershey's profits relating to ONE Brands LLC and ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar; Information relating to Hershey's marketing strategy relating to the ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar; information relating to Hershey's acquisition of ONE Brands LLC and the ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar; information relating to ONE Brands' marketing strategy of the ONE Bar Chocolate Chip Cookie Dough Flavored Protein Bar under Hershey; information relating to Hershey's due diligence on the ONE Brands acquisition including the ONE Bar Chocolate Chip Cookie Dough's TOUGH COOKIES ONLY mark; and any other topics discussed in the deposition of said witness.

o   Kara Zioba (Hershey's Global IP Manager): Information relating to Hershey's initial discovery of TCD's TOUGH COOKIE® trademark application on or around January 16, 2020; information relating to when Hershey disclosed the information to ONE Brands, LLC when it discovered TCD's TOUGH COOKIE® trademark application; information relating to Hershey's trademark policy, including trademark search strategy and infringement prevention; information relating to Hershey's due diligence on the ONE Brands acquisition, including ONE Bar's Chocolate Chip Cookie Dough's TOUGH COOKIES ONLY mark; information relating to Hershey's Intellectual Property policy and ONE

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) X INITIAL DISCLOSURES

Brands' Intellectual Property policy after the Hershey acquisition; and any other topics discussed in the deposition of said witness.

- Other Third Party Witnesses:
  - o Stevie Clements (CAVU Ventures Chief Brand Architect): Information relating to the ONE Bar brand relaunch in 2017 in which the infringing TOUGH COOKIES ONLY phrase was introduced in September 2017; and any other topics discussed in the deposition of said witness.
  - o Jonathan Hyman (Former ONE Brands LLC Trademark/Intellectual Property Counsel): Information relating to ONE Brands' trademark filings prior to the acquisition, trademark searches conducted in 2017-2019, and diligence disclosures to Hershey during the 2019 Hershey acquisition of ONE Brands.
  - o Gail Dosik (Former Owner of One Tough Cookie, Inc.): Information relating One Tough Cookie Inc.'s trademark registration, and subsequent retirement and winding down of One Tough Cookie, Inc.
- Any and all other witnesses and people identified in Defendants' Initial Disclosures, including as supplemented.

**2.      Documents (Rule 26(a)(1)(B))**

TCD may use the following documents to support its claims in this action:

- Representative samples of the packaging and marketing materials (including physical, digital, and online materials) of ONE Protein Chocolate Chip Cookie Dough Protein Bar from 2017 to present;
- Documents produced by TCD to Defendants;
- Documents produced by Defendants to TCD;
- Documents produced by third parties to TCD;
- Documents produced by third parties to Defendants;
- Transcripts and exhibits of depositions taken by TCD;
- Transcripts and exhibits of depositions taken by Defendants;

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) X INITIAL DISCLOSURES

- TCD's responses to Defendants' Interrogatories;
- Defendant's responses to TCD's Interrogatories;
- Publicly available trademark applications and registrations; and
- Publicly available SEC filings relating to the acquisition of ONE Brands, LLC by Hershey.
- Publicly available data on the marketing of TCD's TOUGH COOKIE® line of cookies.
- Publicly available data on the marketing of Defendants TOUGH COOKIES ONLY slogan and marketing of related products including but not limited to the ONE® brand CHOCOLATE CHIP COOKIE DOUGH Flavored Protein Bar.

**3.      Damages. (Rule 26(a)(1)(C))**

Among the categories of damages that TCD seeks are:

1. All profits earned by Defendants from their unlawful actions;
2. All damages sustained by TCD as a result of Defendants' unlawful actions;
3. All damages to TCD's trademark caused by Defendants' unlawful actions;
4. The cost of corrective advertising, or other actions taken to monitor, address and repair the damage to TCD's trademark resulting from Defendants' unlawful actions;
5. A reasonable royalty for the unlawful use of TCD's trademark; and
6. All costs, including attorneys' fees, incurred by TCD to stop Defendants' unlawful actions.

It is expected that the calculations of some of these categories of damages will be done through engagement of a damages expert or economist as well as possibly a domain expert on the particular vertical markets in question.

**4.      Insurance (Rule 26(a)(1)(D))**

TCD is not aware of any insurance agreement under which any person or entity carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

Respectfully Submitted by,

Dated:  April 29, 2022             SANJIV N. SINGH, A PROFESSIONAL LAW
                                   CORPORATION

                                   /s/ Sanjiv N. Singh
                                   Sanjiv N. Singh

Dated:  April 29, 2022             INDRAJANA LAW GROUP, A PROFESSIONAL
                                   LAW CORPORATION

                                   /s/Michael B. Indrajana
                                   Michael B. Indrajana

                                   Attorneys for PLAINTIFF THE COOKIE
                                   DEPARTMENT, INC.

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) X INITIAL
DISCLOSURES

**CERTIFICATE OF SERVICE**

1.  I am over the age of 18 and not a party to this action. I am a resident of or employed in the county where the mailing occurred.

2.  My residence or business address and my electronic address is:

    Indrajana Law Group, A PLC
    1650 S. Amphlett Blvd. Suite 220
    San Mateo, CA 94402

3.  I electronically served the following document:

    Plaintiff The Cookie Department Inc.'s Amended Supplemental Rule 26(A)(1) Initial Disclosures.

4.  I electronically served the document listed in No.3 on April 29, 2022 to the following persons through their listed email address as follows:

    RILEY SAFER HOLMES & CANCILA LLP
    Keyonn Pope (kpope@rshc-law.com)
    Monique Howery (mhowery@rshc-law.com)
    Rachel Sifuentes (rsifuentes@rshc-law.com)
    Andrew Wu (awu@rshc-law.com)
    Edgar Matias (ematias@rshc-law.com)
    Attorneys for Defendants THE HERSHEY COMPANY and ONE BRANDS, LLC

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 29, 2022                      /s/Michael B. Indrajana
                                          Michael B. Indrajana

PLAINTIFF THE COOKIE DEPARTMENT INC.'S AMENDED SUPPLEMENTAL RULE 26(A)(1) X INITIAL DISCLOSURES

# Exhibit B

1

1    UNITED STATES DISTRICT COURT
2    NORTHERN DISTRICT OF CALIFORNIA
3    OAKLAND DIVISION
4    THE COOKIE DEPARTMENT, INC.,  )  Case No.
     a California Corporation,     )  4:20-cv-09324-KAW
5                                  )
             Plaintiff,            )
6                                  )
         vs.                       )
7                                  )
     THE HERSHEY COMPANY, a Delaware )  Volume I
8    Corporation, ONE BRANDS, LLC, a )
     Foreign Limited Liability     )
9    Company, AND DOES 1 TO 50,    )
     INCLUSIVE,                    )
10                                 )
             Defendants.           )
11   _____ )  Pages 1 - 278
12
13       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
15                  AKIVA RESNIKOFF
16                   APRIL 28, 2022
17
18
19   Reported by:
20   TARA SANDFORD, RPR, CSR #3374
21   ------------------------------------------------
22              JAN BROWN & ASSOCIATES
23      WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES
24   701 Battery St., 3rd Floor, San Francisco, CA 94111
25        (415) 981-3498 or (800) 522-7096

2

1                    I N D E X
2                                        PAGE
3    Examination by Mr. Pope              7
4    Examination by Mr. Singh             262
5    Reporter's Certificate               278
6
7
8                E X H I B I T S
9    DEPOSITION NO.                       PAGE
10   Exhibit 1  Defendant's The Hershey Company    13
11       And ONE Brands LLC's Notice of
12       Rule 30(b)(6) Deposition of
13       Plaintiff The Cookie Department
14   Exhibit 2  Defendant's The Hershey Company    17
15       and ONE Brands LLC's Amended
16       Notice of Rule 30(b)(1) and
17       30(b)(6)Deposition
18       of Plaintiff The Cookie Department
19   Exhibit 3  Resnikoff's LinkedIn Profile    50
20   Exhibit 4  California Secretary of State    66
21       Printout re The Cookie Department
22   Exhibit 5  California Secretary of State    84
23       Printout re The Cookie Department
24   Exhibit 6  1/31/22 California Secretary of    87
25       State Printout re The Cookie Department

3

1                E X H I B I T S
2                  (CONTINUED)
3    DEPOSITION NO.                       PAGE
4
5    Exhibit 7  PowerPoint Slide Deck "The Cookie    111
6        Department"
7    Exhibit 8  17-page production by Plaintiff    127
8        on 4/28/22
9    Exhibit 9  Wayback Machine printout 10/21    133
10   Exhibit 10  Article "The Cottage Industry of    141
11       High-Energy Food . . ." (2 pages)
12   Exhibit 11  1/29/12 USPTA Prosecution History    147
13       printout for Tough Cookie
14   Exhibit 12  10/22/18 USPTO Prosecution History
15       printout for Tough Cookie    184
16   Exhibit 13  Text Messages (TCD 018245-47)    205
17   Exhibit 14  Text Messages (1 page)    211
18   Exhibit 15  10/11/18 Article: "The Cookie    225
19       Department: Healthy Treats . . ."
20   Exhibit 16  Review for investment round    229
21       (12 pages)
22   Exhibit 17  2019 TCD Balance Sheet    237
23   Exhibit 18  2020 TCD Balance Sheet    239
24   Exhibit 19  Excel document - 2012-2019
25       Individual Cookies Sales    249

4

1        BE IT REMEMBERED that, pursuant to Notice
2    of Deposition, on Thursday, April 28, 2022, commencing
3    at the hour of 9:02 a.m. PST, via Zoom, before me, Tara
4    Sandford, a certified shorthand reporter in the State of
5    California, there personally appeared
6
7                  AKIVA RESNIKOFF,
8
9    called as a witness by the Defendants, who being by me
10   first duly sworn, was thereupon examined and
11   interrogated as is hereinafter set forth.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**5**

A P P E A R A N C E S

SANJIV N. SINGH, Attorney at Law, of SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION, 1650 South Amphlett Boulevard, Suite 220, San Mateo, California, 94402, appeared as counsel on behalf of the Plaintiff
Tel: 650.389.2255
Email: ssingh@sanjivnsingh.com

MICHAEL B. INDRAJANA, Attorney at Law, of the INDRAJANA LAW GROUP, 1650 South Amphlett Boulevard, Suite 220, San Mateo, California 94402, appeared as counsel for Plaintiff.
Tel: 650.597.0928
Email: michael@indrajana.com

KEYONN L. POPE, Attorney at Law, of RILEY, SAFER, HOLMES & CANCILA, LLP, 70 West Madison Street, Suite 2900, Chicago, Illinois 60602, appeared as counsel on behalf of the Defendants.
Tel: 312.471.8700
Email: kpope@rshc-law.com

Also Present: O'Bryant Muralles, Videographer

**6**

SAN MATEO, CALIFORNIA  -  THURSDAY, APRIL 28, 2022
9:02 A.M. PST
P R O C E E D I N G S

THE VIDEOGRAPHER:  We are going on the record. This starts the beginning of the video-recorded deposition of Akiva Resnikoff, taken in the matter of The Cookie Department versus the Hershey Company, in the United States Northern District Court of California for Oakland Division.  This is Case Number 4:20-cv-09324-KAW.
Today's date is April the 28th, 2022, and the time is 9:02 a.m.
This deposition is being held remotely via Zoom.  The videographer is O'Bryant Muralles of Jan Brown & Associates, and the court reporter is Tara Sandford, also from Jan Brown & Associates.
Could counsel please identify themselves and state who you represent.
MR. POPE:  Keyonn Pope on behalf of the defendants, the Hershey Company and ONE Brands.
MR. SINGH:  Sanjiv Singh representing plaintiff, The Cookie Department, also the witness Akiva Resnikoff.
MR. INDRAJANA:  Michael Indrajana, appearing

**7**

for plaintiff, The Cookie Department.
THE VIDEOGRAPHER:  Thank you.
If there are no stipulations, the court reporter may swear in the witness.

AKIVA RESNIKOFF,
having been duly sworn by the reporter,
testified as follows:

EXAMINATION
BY MR. POPE:
Q.  Good morning, Mr. Resnikoff.
A.  Good morning, Mr. Pope.
Q.  Thank you for being here.  Just to orient, I wanted to just start with some deposition basics and ground rules.
Have you ever been deposed before in the past?
A.  I have not.
Q.  Have you been a party to a lawsuit in the past?
A.  No.
Q.  So depositions are, while they might feel conversational, are a bit different than conversations. I'm sure your counsel has already gone over this with you, so forgive me if I'm being a bit redundant, but it is sort of formality.

**8**

But very different than typical conversation. It is essentially sworn testimony just as if you were in court.  So, you know, answer truthfully.  And we don't want you to speculate.  If there is something that you don't know, you should say that.  There might be times where you don't know and I will try to refresh your recollection by showing you documents or be it other means or I might ask you to try to narrow it in so you might not know down to the penny what amount is in an account, but is it more or less than this, is it between these numbers, that kind of thing.
The court reporter is probably the most important person here, is capturing everything that we're saying.  And so, again, in conversation we often will interpose statements as one another are talking just because that's the way we interact as humans.  But here I'll try to be mindful of it, and ask you to do the same so that we won't talk over one another.
And this will lend itself to our court reporter being able to neatly capture everything that's said during -- during our time together.
There might be times where Mr. Singh may interpose objections.  A good practice is to just take a beat before responding to my question to give him a second to get in any objections that he might have

9

09:05 1    before you start answering.  Again, that just lends
2    itself to a cleaner record.
3         Also, while this is captured via video, we rely
4    heavily on the transcript that's being captured by our
09:06 5    court reporter.  So obviously, I can see you nodding
6    your head and making other inaudible gestures, right, if
7    you were to do those and I would clearly understand.
8         But, again, for purposes of ensuring we have a
9    clean record, we'll need -- ask you to respond audibly.
09:06 10   And also, I know we use colloquialism, uh-huh, uh-uh
11   and, again, I understand it perfectly, but for purposes
12   of the record, we'll need fulsome responses as opposed
13   to some of those colloquialisms.  All clear so far?
14        **A. 100 percent.**
09:06 15        MR. SINGH:  Mr. Pope, may I interject
16   respectfully for two things logistical.  We sent you
17   just this morning about 20 pages of documents that we
18   came across during preparation so that you can have them
19   for questioning today.  They will be part of an official
09:06 20   supplemental production tomorrow, just FYI.  They should
21   be in your group's email box as of right now.
22        And, number two, we will designate this
23   deposition provisionally highly confidential, attorney's
24   eyes only, similar to the manner in which you have.
09:07 25   However, we will then be designating the appropriate

10

09:07 1    portions thereafter.
2         MR. POPE:  Fantastic.  Thank you.
3         THE WITNESS:  May I ask a question?
4         MR. POPE:  Sure.
09:07 5         THE WITNESS:  Sanjiv, did you mention about
6    my --
7         MR. SINGH:  Hold on.  If you need to consult
8    with me privately -- oh, yeah, I know what he's
9    referring to.
09:07 10        Akiva has chronic back issues, so he'll need to
11   take a break about once every hour.  I told him, without
12   waiving privilege, that's typically where we're at
13   anyway.  Just FYI.  We will try to be a little more
14   meticulous about it in his case just so we don't have a
09:07 15   flare-up of back pain or anything like that.
16        MR. POPE:  Absolutely, which is a great segue.
17   That is where I was going next anyway.
18        Q.  I was going to say that we typically try to
19   take breaks on the hour.  But Mr. Resnikoff, of course,
09:07 20   if there is a time you need a break sooner than that, by
21   all means say so and we'll take a break.
22        The only caveat there is to the extent there is
23   a pending question, we would ask that you answer the
24   question before we -- before we go on break.
09:08 25        There is one exception to that pending

11

09:08 1    question, sort of, rule, if you will, and that's if
2    there is an issue of privilege.  If your -- if your
3    counsel raises an issue of privilege or if you on your
4    own think oh, boy, something I'm being asked about could
09:08 5    creep into privilege territory and you need to have an
6    offline with your counsel, you can always say that and
7    we'll break no matter if there is a pending question.
8         **A. Okay.**
9         Q.  Okay?  Any -- any reason -- you mentioned the
09:08 10   back pain.  Is that something that would prevent you
11   from proceeding with today's deposition and providing
12   truthful testimony?
13        **A. Absolutely not.**
14        Q.  Okay.  Any other reasons that you might not be
09:09 15   able to proceed today and provide truthful testimony?
16        **A. No.**
17        Q.  Just for example, illness or you're under -- on
18   medication or anything of the like?
19        **A. No.**
09:09 20        Q.  Okay.  All good.
21        So when did you first learn you would be
22   deposed, Mr. Resnikoff?
23        **A. It was when I received the subpoena.  I believe**
24   **it was two or three months ago.  I'm not exactly aware**
09:09 25   **of the exact date.**

12

09:09 1    Q.  Okay.  But roughly, two to three months ago?
2         **A. Roughly.**
3         Q.  Okay.  And how -- how did you learn that you
4    would be deposed?
09:09 5         MR. SINGH:  I am going to caution the witness
6    to not disclose privileged information.  To the extent
7    that you can answer that without disclosing privileged
8    information, please go ahead and do so.
9         THE WITNESS:  Yes.  If -- if I disclosed -- I
09:10 10   can't say just based on privileged information.
11        Q.  BY MR. POPE:  Okay.  Let me -- and your counsel
12   may respond to this, and he should.  But typically
13   privilege doesn't -- it includes the substance of
14   communications that you had with your counsel and not
09:10 15   necessarily that you communicated with your counsel.
16        **A. Can you repeat the question?**
17        Q.  How did you learn that you would be deposed?
18        MR. SINGH:  I'm just going to caution the
19   witness not to disclose privileged communication.
09:10 20   Keyonn, if you are looking for him just to acknowledge
21   it came from counsel, as long as there is a waiver of
22   privilege that you are going to try to argue based on
23   that, I am fine with having him answer that.
24        MR. POPE:  I don't -- yes, that's what I'm
09:10 25   angling at.

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

13

09:10  1      Q. Did it come from counsel?
       2         MR. SINGH: You can go ahead and answer.
       3         THE WITNESS: Yes, it came from counsel.
       4      Q. BY MR. POPE: And what's your understanding of
09:11  5   the purpose of today's deposition?
       6      A. To hear my side of the story.
       7         MR. POPE: Okay. Let me share our first
       8   exhibit.
       9         (Whereupon, Exhibit 1 was marked
09:11 10         for identification by the Court Reporter
      11         and attached hereto.)
      12         MR. POPE: I just dropped an exhibit into the
      13   chat. It should be Exhibit Number 1. I will also share
      14   my screen here.
09:11 15      Q. Mr. Resnikoff, it is totally your choice. Our
      16   practice has been, for most witnesses anyway, to -- some
      17   witnesses prefer to view the share screen. Others
      18   prefer to actually download the document from the chat
      19   and scroll through it at their own pace as they see fit.
09:12 20         Do you have a preference?
      21      A. Share screen is better for me.
      22      Q. Okay.
      23         MR. SINGH: And, Keyonn, what we'll do is if we
      24   think it's easier, we will ask you for, you know, on a
09:12 25   particular exhibit to give him time to download.

14

09:12  1         THE WITNESS: Can it be bigger?
       2      Q. BY MR. POPE: Yeah, I'll blow it up.
       3      Is that okay?
       4      A. That's perfect.
09:12  5      Q. Certainly, I will scroll through -- my practice
       6   will be to scroll through these. I will try to pick a
       7   speed that is reasonable, but, certainly, if I am going
       8   too fast or not fast enough, you can say that, and I
       9   will adjust accordingly.
09:12 10      I am sticking in front of you Exhibit Number 1,
      11   which you will see is titled "Defendant's The Hershey
      12   Company And ONE Brands LLC's Notice of Rule 30(b)(6)
      13   Deposition of Plaintiff The Cookie Department."
      14      Do you see that?
09:13 15      A. Yes.
      16      Q. Does this, at least this portion of the
      17   document, look familiar?
      18      A. Yes.
      19      Q. Was this what you were referring to earlier
09:13 20   when you referenced the subpoena, having received the
      21   subpoena?
      22      A. That is correct.
      23      Q. Okay. I am just going to scroll through and
      24   again, let me know if I am going to fast or too slow,
09:13 25   but it talks about, you know -- again, it references the

15

09:13  1   30(b)(6) deposition to be taken by Hershey and ONE and
       2   we would examine plaintiff The Cookie Department, Inc.
       3   Or TCD on April 4, 2022, at 9:00 a.m.
       4      Do you see that?
09:13  5      A. Yes.
       6      Q. Obviously, I will show you the amended one. It
       7   is often the case that these are served. Dates are kind
       8   of proposed and those dates shift around, which has
       9   happened here. But this was the original. This was the
09:14 10   original notice. You can see that was served on
      11   February 10, 2022; right?
      12      Is that February 10, 2022, consistent with
      13   about the time that you recall getting notice?
      14      A. That is correct.
09:14 15      Q. Okay. And it goes down and provides a ton of
      16   definitions and instructions. I can go through these.
      17   It's painful, but I can scroll through these as slowly
      18   or as fast as you want.
      19      I'll tell you what I'm angling at. Under these
09:14 20   definitions and instructions are a list of topics which
      21   you likely have already seen. But that's really where I
      22   want to spend our time. So I will scroll through these.
      23   Again, tell me if I'm going too fast or too slow.
      24      And then we come to the topics that I
09:15 25   mentioned. And does this -- I know you can only see the

16

09:15  1   first five. But does this list of topics, at least what
       2   you can see, look familiar?
       3      A. Yes.
       4      Q. Is it your understanding that you are
09:15  5   designated on certain topics here, in particular from
       6   what we can see here, Topics 1, 2 and 3?
       7      A. Yes.
       8      Q. Okay. And then you are not designated on
       9   Topics 4 and 5 which relate to revenues and other
09:16 10   financial related topics for The Cookie Department.
      11      But then I believe you're designated on the
      12   balance of the topics, so Topics 6 through 35. And I'll
      13   give a minute so that you can peruse, if you need to.
      14      A. Yep.
09:16 15         MR. SINGH: Mr. Pope, just for clarification,
      16   your office sent us an amended notice yesterday. We
      17   assumed the only substantive amendment on that notice
      18   was regarding the date and location and platform and not
      19   anything in the topics; correct?
09:16 20         MR. POPE: That's correct. That's where I'm
      21   heading next is to put that one up and confirm the same.
      22         MR. SINGH: Thank you.
      23         THE WITNESS: Yes.
      24      Q. BY MR. POPE: Mr. Resnikoff, that was a "yes"
09:16 25   for Topics 10 through 15?

4 (Pages 13 to 16)

17

09:17  1      A. Yes.
2      Q. Now 16 through 22.
3      A. Yes.
4      Q. Okay. And 23 through 27.
09:17  5      A. Yes.
6      Q. This should be the balance, 28 through 35.
7      A. Yes.
8      Q. Just to recap, are you designated on Topics
9   1 through 3?
09:18 10      A. Yes.
11      Q. And also Topics 6 through 35?
12      A. That is correct.
13      Q. Are you prepared to testify -- do you possess
14   the knowledge to testify on each of these topics?
09:18 15      A. I do.
16      MR. POPE: Mr. Singh, I saw you gesture.
17      MR. SINGH: That's fine. It was the way you
18   worded it, but it doesn't matter.
19      MR. POPE: Okay. I am going to stop sharing
09:18 20   and put up the amended notice which we have had some
21   discussion about.
22      (Whereupon, Exhibit 2 was marked
23        for identification by the Court Reporter
24        and attached hereto.)
09:19 25      Q. BY MR. POPE: Okay, Mr. Resnikoff, I have put

18

09:19  1   up another document that is formatted very similarly to
2   Exhibit 1. We will call this one Exhibit 2.
3      You will see here the title is slightly
4   different. "Defendants The Hershey Company and ONE
09:19  5   Brands, LLC, Amended Notice of Rule 30(b)(1) and
6   30(b)(6) Deposition of Akiva Resnikoff."
7      Do you see that?
8      A. I do.
9      Q. Does this portion of the document look similar
09:19 10   to something you've seen before?
11      A. Yes.
12      Q. Okay. Just to explain a bit, I think the prior
13   Exhibit 1 only referenced 30(b)(6) deposition. And
14   without boring you, that -- that is a rule under which
09:20 15   we're allowed to take depositions of entities or
16   companies; right?
17      A. Uh-huh.
18      Q. And the topics that we talked about 1 through 3
19   and 6 through 35 are the topics on which we -- you're
09:20 20   designated for purposes of our inquiry for The Cookie
21   Department.
22      Do you see that make sense?
23      A. Yes.
24      Q. Okay. And this reference to 30(b)(1) is,
09:20 25   again, without boring you, is a rule that allows us to

19

09:20  1   take the deposition of an individual in their personal
2   capacity. So just based on whatever you know.
3      Does that make sense?
4      A. (Nods head affirmatively.)
09:20  5      Q. So your counsel and I have -- I saw you shake
6   your head. I understood it, but I want to make sure
7   that the court reporter captures it, Mr. Resnikoff.
8      Does that make sense what I described about the
9   Rule 30(b)(1)?
09:20 10      A. Yes.
11      MR. SINGH: And I'll just note for the record,
12   we noted the absence of the reference to 30(b)(1). We
13   are not going to make hay of it. We know that it is
14   fair and reasonable for you to depose him as a 30(b)(1)
09:21 15   witness and a 30(b)(6) in the same way we did your
16   witnesses, so we obviously expected you to be deposing
17   him as a 30 (b)(1) witness.
18      MR. POPE: I think in the original notice, at
19   that point I don't know that we had reached an agreement
09:21 20   on that.
21      MR. SINGH: There will be no controversy from
22   us on that. He is prepared to go as both.
23      MR. POPE: Fantastic.
24      Q. I am going to scroll through in a similar
09:21 25   manner, Mr. Resnikoff. And you probably heard me and

20

09:21  1   Mr. Singh already discuss that this document, Exhibit 2,
2   is for all intents and purposes the same as Exhibit 1.
3   The only changes are this caption here that we just
4   talked about and then the time; right?
09:22  5      I think before Exhibit 1 reflected April 4.
6   Now, as normal in cases like this, there is some
7   rejiggering of dates and times and even locations
8   required. We landed on today, April 28, which is
9   reflected here and a start time of 9:00 a.m. Pacific.
09:22 10      And again, same topics you are designated on,
11   Topics 1 through 3 and Topics 6 through 35. And then
12   also noting that we will also have leave to inquire and
13   examine you in your personal capacity, as well.
14      Does that make sense?
09:22 15      A. Yes, it does.
16      Q. Okay. And then this was served yesterday, so
17   April 27, the date. And I'll scroll again. Same drill
18   here, some boring definitions and instructions. And
19   I'll represent to you that these are the same
09:23 20   definitions and instructions that you saw in the prior
21   exhibit. I'll scroll.
22      And then as we come to the end of the
23   instructions and definitions section near the bottom of
24   page 4 of the documents, that begins the topics. And
09:23 25   again, I'll scroll, but I'll represent to you that we've

5 (Pages 17 to 20)

21

09:23  1    made no changes to these topics. They're the same as
       2    the ones that you reviewed on Exhibit 1.
       3         So again, you are designated on Topics
       4    1 through 3. You're not designated on 4 and 5. But you
09:23  5    are also designated from 6 through 35.
       6         Again, this was served yesterday.
       7         Does this -- are you familiar with this
       8    document, Mr. Resnikoff? Let me rephrase that.
       9         Have you seen this document?
09:24 10    A.   Yes.
      11    Q.   Okay. When did you begin preparing for your
      12    deposition?
      13    A.   I was part of the -- heavily part of the
      14    discovery process preparing documents for that process.
09:24 15    And so ultimately, you know, when submitting, you know,
      16    key documents, I was in observance of all of those
      17    documents and assumed that I would be deposed.
      18         So in addition to that, I've spent the last
      19    week and a half, approximately, on reviewing all of the
09:25 20    documents, re-reviewing all of the documents as far as
      21    the topics are concerned.
      22    Q.   Okay. Let's -- let's unpack that a little bit.
      23    When you talk about your involvement in the discovery
      24    process, can you be more specific? What role did you
09:25 25    play?

22

09:25  1         MR. SINGH: I am just going to caution the
       2    witness, as you give your answer, please do not include
       3    references to "my attorney told me this," et cetera, et
       4    cetera. Just describe what you did without describing
09:25  5    attorney-client communications, please.
       6    THE WITNESS: I downloaded documents, emails,
       7    pdf's for the discovery process.
       8    Q.   BY MR. POPE: Okay. Anything else that you did
       9    during the discovery process?
09:26 10    A.   No.
      11    Q.   Were there other non-attorneys involved in the
      12    discovery process?
      13    MR. SINGH: Object to form.
      14         You can go ahead and answer.
09:26 15    THE WITNESS: Not that I recall.
      16    Q.   BY MR. POPE: So were the only -- aside
      17    from your counsel, you were the only person involved in
      18    the discovery process?
      19    A.   Oh. I'm sorry. Let me rephrase. My
09:26 20    bookkeepers supplied spreadsheets.
      21    Q.   Okay. Who are your bookkeepers?
      22    A.   Currently, Kathryn Limprecht.
      23    Q.   Can you spell that for us?
      24    A.   K-A-T-H -- K-A-T-H-R-Y-N. I don't have the
09:27 25    spelling of her last name on me at this moment.

23

09:27  1    Q.   Okay. Say it -- it was with an L; right?
       2    A.   Limprecht.
       3    Q.   Okay. We will figure it out on a break.
       4         Does Miss Limprecht, does she work for a
09:27  5    company?
       6    A.   Yes. At the time of discovery she was working
       7    for a company called Tax Force, Inc.
       8    Q.   Has that changed now?
       9    A.   Yes.
09:27 10    Q.   Who does she work for now?
      11    A.   She owns her own business called PrimeTime
      12    Bookkeeping. I can get you more information on her.
      13    Q.   Was Miss Limprecht -- is she your only
      14    bookkeeper?
09:28 15    A.   She is my only bookkeeper at this time.
      16    Q.   Have there been past bookkeepers?
      17    A.   Tax Force, Inc., formerly Profit Trackers.
      18         MR. SINGH: Mr. Pope and Madam Court Reporter
      19    and O'Bryant, does Mr. Resnikoff's voice seem a little
09:28 20    soft to you? Are you able to hear him?
      21         MR. POPE: I can hear him fine.
      22         MR. SINGH: Okay. And on the video it's
      23    projecting -- okay.
      24         Oh, you know what it is? I think my volume is
09:28 25    down so as to minimize feedback since my office is

24

09:28  1    adjacent to the conference room. Okay, that's fine.
       2    Q.   BY MR. POPE: Okay. Okay. So, Mr. Resnikoff,
       3    I think you mentioned that Profit Tracker was your
       4    prior -- one of your prior bookkeepers?
09:29  5    A.   That is correct.
       6    Q.   During what time period was Profit Tracker your
       7    bookkeeper? Go ahead and answer. Sorry.
       8    A.   I believe dating back to 2011, 2012, and that
       9    ended at the end of 2021.
09:29 10    Q.   Profit Tracker was The Cookie Department's
      11    bookkeeper; right?
      12    A.   That is accurate.
      13    Q.   That might sound like a silly question, and I
      14    understood it that way, but I just wanted to make it
09:30 15    clear for the record that you weren't saying Profit
      16    Tracker was your personal bookkeeper as opposed to The
      17    Cookie Department's.
      18    A.   That is accurate.
      19    Q.   So approximately, 2011 -- or 2012, and that
09:30 20    relationship ended in 2021?
      21    A.   That is correct, for bookkeeping, yes.
      22    Q.   Okay. Did Profit Tracker perform other
      23    functions for The Cookie Department?
      24    A.   Yes.
09:30 25    Q.   What other functions?

6 (Pages 21 to 24)

25

```
09:30   1        A.  Tax preparing.
        2        Q.  Any others?
        3        A.  No.
        4        Q.  During what time period did Profit Tracker
09:30   5    provide tax preparation services for The Cookie
        6    Department?
        7        A.  Since the beginning, 2011, 2012, approximately,
        8    to present.
        9        Q.  Just to be clear, the relationship with Profit
09:31  10    Tracker ended with respect to bookkeeping in 2021?
       11        A.  That correct.
       12        Q.  They continue -- "they" being Profit Tracker
       13    continues to provide tax preparation services for The
       14    Cookie Department?
09:31  15        A.  That is true.
       16        Q.  You mentioned since the beginning.  And then I
       17    think you gave the 2011, 2012 time frame.  What were you
       18    referencing being the beginning of?
       19        A.  I'm sorry.  I actually started the company in
09:31  20    2009.
       21        Q.  What was your "since the beginning" reference?
       22        A.  It was -- it was just a time frame thing.  A
       23    misstep on wording.
       24        Q.  Okay.  Who handled your bookkeeping in 2009?
09:32  25        A.  I handled it.
```

26

```
09:32   1        Q.  The same in 2010?
        2        A.  Correct.
        3        Q.  Then you eventually hired Profit Tracker in
        4    2011?
09:32   5        A.  Roughly, yes.
        6        Q.  What was the motivation for hiring Profit
        7    Tracker to handle the bookkeeping?
        8        A.  It was -- I decided -- we decided to
        9    incorporate, and at the time sales were starting to
09:32  10    grow, and I felt it was necessary to become grownups.
       11        Q.  Okay.  So prior to 2011 you were not
       12    incorporated?
       13        A.  I had an LLC.
       14        Q.  Okay.  Is it safe to assume in 2009 and 2010,
09:33  15    you also did your own tax preparation, as well?
       16        A.  Yes, I believe so.
       17        Q.  And same motivation for hiring Profit Tracker
       18    to take over the tax prep?
       19        A.  That is accurate.
09:33  20        Q.  Aside from Miss Limprecht's involvement in
       21    discovery, any others?  Any other entities or people
       22    involved?
       23        A.  Andrea Kirschner, my CFO.
       24        Q.  Okay.  And what was the nature of her
09:34  25    involvement?
```

27

```
09:34   1        A.  She overlooks all the finances.
        2        Q.  Can you -- can you be more specific about her
        3    involvement in discovery?
        4        A.  I believe she may have reviewed -- I think she
09:34   5    worked with -- I believe, if I remember correctly, she
        6    worked with -- directly with Kathryn and -- on -- on
        7    submitting documents.
        8            MR. SINGH:  Mr. Pope, just for clarity of the
        9    record, when you are referring to discovery, are you
09:35  10    referring to his preparation for the deposition or
       11    discovery, i.e., producing documents?
       12            MR. POPE:  I'm using the words that
       13    Mr. Resnikoff used.
       14            MR. SINGH:  Okay, okay.
09:35  15        Q.  BY MR. POPE:  Any other -- any other
       16    individuals involved in discovery, Mr. Resnikoff?
       17        A.  No.
       18        Q.  Any other companies or entities involved in
       19    discovery?
09:35  20        A.  No.
       21        Q.  How -- how many hours would you say you spent
       22    preparing for today's deposition?
       23        A.  I would venture to guess about 100 -- 110, 120.
       24        Q.  And is that including the time that you
09:36  25    described spent on discovery?
```

28

```
09:36   1        A.  Yes.
        2        Q.  Okay.  If you take that out, what would you be
        3    left with?
        4        A.  I would venture to say about 20 or 30 hours.
09:36   5        Q.  If you had to break down that 20 to 30 hours,
        6    how much of it was spent meeting with your counsel?
        7        A.  About 20.
        8        Q.  You said 20 to 30 hours, and 20 of it was spent
        9    meeting with counsel, which leaves, roughly, 10 hours,
09:37  10    give or take.
       11            Would you agree?
       12        A.  Yes.
       13            MR. SINGH:  Object to form.
       14        Q.  BY MR. POPE:  So how would you describe -- how
09:37  15    would you categorize the way you spent the remaining 10
       16    or so hours?
       17        A.  Reviewing documents.
       18        Q.  Okay.  What -- what documents did you review?
       19        A.  I reviewed the interrogatories, the topics on
09:38  20    the subpoena.
       21        Q.  Did you review any other documents?
       22            Mr. Resnikoff, I see you looking down.
       23            Do you have notes?
       24        A.  I have images.
09:38  25        Q.  What kind of images?
```

29

09:38  1      A.  I have packages.
       2      Q.  Do you have any -- any notes?
       3      A.  I have the subpoena.
       4      Q.  Any other notes?
09:38  5      A.  I do.  I have the ingredients -- former
       6  ingredients of our product.
       7      Q.  Anything else?
       8      A.  I have some financials in front of me.
       9      Q.  Anything else?
09:39 10      A.  I have my prep notes.
      11      Q.  Okay.  Are those handwritten notes?
      12      A.  Typed.
      13      Q.  Okay.  When did you -- when did you prepare
      14  those?
09:39 15      A.  I prepared those during my deposition prep.
      16      MR. POPE:  Okay.  Mr. Singh, we can take this
      17  offline, but I think we have a right to those notes.
      18      MR. SINGH:  You absolutely do.  How would you
      19  like to handle it?  I can tell you that some of them
09:39 20  were part of what we sent you this morning; for example,
      21  the package image was sent to you this morning.
      22      We can quickly pause.  I can get Michael to
      23  facilitate taking a picture.  We did not control what he
      24  was going to have with him, so I just learned this
09:40 25  myself.  So, I can -- and you are absolutely correct, if

30

09:40  1  we were in an in-person depo, you would probably pause
       2  the depo and say, I would like a copy of that, et
       3  cetera, et cetera.
       4      Would you like us to pause and provide you
09:40  5  copies?  We can probably do it in five, 10 minutes.
       6      MR. POPE:  Let's -- let's do that.  Just --
       7  just to be clear on the record, I don't -- obviously, I
       8  am handicapped.  I don't know what he has; right?  But
       9  you know --
09:40 10      MR. SINGH:  We can have him -- we can have him
      11  hold up right now.  I'm not in the room he is in.  And
      12  quite deliberately, so for various reasons, including
      13  health reasons.
      14      How would you like to handle it?  It is all
09:40 15  yours.  The stage is yours.  You tell us what would make
      16  you comfortable.
      17      MR. POPE:  No.  I guess I am just going to be
      18  looking for some type of attestation that we are getting
      19  everything because I have no way of knowing that.
09:41 20      MR. SINGH:  Sure.  Obviously, we will have
      21  to -- we are going to go into the room.  And I will put
      22  my face mask on and go into the room.  We'll pause, and
      23  we will go off record, and then come back ASAP.
      24      MR. POPE:  Okay, let's do that.
09:41 25      MR. SINGH:  Mr. Indrajana, I will need your

31

09:41  1  assistance on this.
       2      THE VIDEOGRAPHER:  The time is 9:41 a.m. and we
       3  are now off the record.
       4      (Recess taken 9:41 a.m. to 10:04 a.m.)
10:04  5      THE VIDEOGRAPHER:  The time is 10:04 a.m. and
       6  we are now back on the record.
       7      MR. POPE:  Thank you.
       8      THE WITNESS:  Keyonn, I just wanted to go back
       9  on the record, if I may, and go back to that question
10:04 10  where you asked me about the amount of time I reviewed
      11  documents.
      12      Q.  BY MR. POPE:  Sure.
      13      A.  I did, after mulling it over, I did spend
      14  closer to about 40 hours on reviewing documents between
10:05 15  the review on discovery, as well as taking detailed
      16  notes, as well, on my own personal time, that is.
      17      Q.  Okay.  I appreciate that clarification.
      18      I think I had asked you a question when you
      19  gave the 20- to 30-hour -- you initially gave a 20- to
10:05 20  30-hour estimate; right?
      21      A.  Right.
      22      Q.  I think I asked you about how that 20 to 30
      23  hours broke down.  You said originally that, roughly --
      24  roughly, 20 hours of that you spent meeting with
10:05 25  counsel?

32

10:05  1      A.  Yes.
       2      Q.  Is that still the case?
       3      A.  Yes, yes.
       4      Q.  Okay.  And then I think you mentioned that 10
10:05  5  hours you spent reviewing documents.
       6      Is that still the case?
       7      A.  No, no.  I mean 40 hours of my own time
       8  reviewing documents through the discovery process,
       9  right, and reviewing what I was submitting, as well as
10:06 10  taking pretty detailed notes on my own time.
      11      Q.  Okay.  I want to make sure I'm following you.
      12      A.  20 hours -- 20 hours with -- with counsel.
      13      Q.  Okay.
      14      A.  And roughly about 40 hours of my own time
10:06 15  reviewing documents and taking notes, and as well as
      16  taking notes and preparing with counsel.
      17      Q.  Okay.  So give me the aggregate number of hours
      18  you spent total on preparing for today?
      19      A.  Roughly, 60 hours.
10:06 20      Q.  60 hours, okay.
      21      A.  Yeah.
      22      Q.  And 20 of those hours you estimate were spent
      23  with counsel?
      24      A.  Correct.
10:06 25      Q.  And then the 40 hours balance was you preparing

33

10:06   1   notes and reviewing docs?
2       A. Correct.
3       Q. Okay. When you say you met with counsel, you
4   spent, roughly, 20 hours with counsel. Who specifically
10:07   5   are you referring to?
6       A. Sanjiv Singh and Michael Indrajana.
7       Q. Okay. Any other -- any other counsel involved?
8       A. No.
9       Q. Were there -- were those meetings in person?
10:07  10       A. Some were in person. Some were over Zoom.
11       Q. And were both Mr. Indrajana and Mr. Singh
12   present for all the meetings?
13       A. No.
14       Q. Can you describe how those -- how it broke
10:07  15   down, who was present for which meetings?
16       MR. SINGH: I am just going to caution the
17   witness. You can be as detailed as you want, but just
18   don't disclose privileged attorney-client
19   communications, please.
10:07  20       THE WITNESS: Can you repeat the question?
21       Q. BY MR. POPE: I was asking for a breakdown of
22   the meetings -- let's start here.
23       How many meetings did you have with counsel,
24   roughly?
10:08  25       A. Roughly, four or five.

34

10:08   1       Q. Okay. Do you remember when the first meeting
2   occurred?
3       A. First, I believe in -- in regards to this
4   deposition, specifically?
10:08   5       Q. Yes, specifically with regard to prepping for
6   this deposition.
7       A. Okay.
8       Q. The deposition today.
9       A. I believe the first meeting was in person on
10:08  10   Saturday of last week.
11       Q. So that would have been April 23?
12       A. Yes. I don't have a calendar in front of me at
13   this moment.
14       Q. But if we were to imagine -- so two days from
10:09  15   today is Saturday; right? So it was a week prior to
16   that; right?
17       A. A week prior.
18       MR. SINGH: Mr. Pope, we have a clawback issue.
19   Mr. Indrajana needs to clawback the -- one of the emails
10:09  20   he just sent, so he is going to handle that right now.
21       It's frankly -- candidly, it is what it is, but
22   I am not too worried about it. But he'll handle the
23   clawback. It will go on realtime unless you are about
24   to use those notes to ask the question.
10:09  25       MR. POPE: No. I mean, I've only had a chance

35

10:09   1   to preliminarily peruse.
2       MR. SINGH: Just for the sake of time, this is
3   what I would recommend, if you are comfortable with it,
4   Mr. Indrajana will handle the clawback right now as you
10:09   5   continue with your questioning. We would just ask you
6   if you could maybe take a moment to let your staff or
7   anyone else working on that email with you know that it
8   is subject.
9       Mr. Indrajana, you should issue that clawback
10:10  10   immediately, please. He will do that. The only thing
11   that is going to change, there was one privileged
12   redaction which our client had advice from us in his
13   notes. It was redacted in his notes, but for some
14   reason it is showing on the .pdf. And so Mr. Indrajana
10:10  15   will clean that up and then will -- we'll just let you
16   know when that is being cleaned up and when the cleaned
17   version is sent to you. It will be identical except the
18   redaction will be sufficient this time.
19       MR. POPE: Okay. I do recollect in flipping
10:10  20   through what was produced there was a section that
21   appeared to be sort of marked through.
22       MR. SINGH: It is only one. It's just that one
23   redaction. And the redaction was not done sufficiently
24   so that -- usually on our scanner, the scanner has an
10:10  25   enhancement that makes sure that even if you have done

36

10:10   1   it with pen, it kind of re-redacts. And for some
2   reason, it did not do it on this. So please do not look
3   at it until we can give you the sanitized version.
4       MR. INDRAJANA: I am emailing you the clawback.
10:11   5       MR. SINGH: Keyonn, I am not saying this to you
6   personally. I have to do this for the record. I am
7   asking you in accordance with professional rules, local
8   rules governing clawback that you and your office comply
9   with our request, and we will handle it appropriately.
10:11  10       MR. POPE: Candidly, I looked at it before,
11   knowing about the clawback in my perusal, so I probably
12   already have a general idea of what that stuff says.
13   Now, when Mr. Indrajana sent the email, it went to my
14   entire team, so I have no idea whether they've already
10:11  15   digested it, et cetera.
16       I haven't had an opportunity to, sort of,
17   consider whether the clawback is even proper. I mean,
18   it was in notes he brought to his deposition. Part of
19   me feels like it might not be proper.
10:12  20       MR. SINGH: Hold on. That's absolutely not
21   correct. You know that. A client can in their notes
22   include recommendation or advice from counsel. That is
23   attorney-client communication.
24       MR. POPE: It shouldn't be -- it shouldn't be
10:12  25   brought to a deposition, though, and that constitutes a

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

37

10:12  1    waiver.
       2         MR. SINGH:  Hold on a second.  It does not
       3    constitute a waiver.  He had a redacted copy with him.
       4    So the problem is you asked for a copy of it, so that is
10:12  5    where the rub is.
       6         Anyway, we don't have to debate it now.  We are
       7    not going to agree on the record.
       8         I am asking you, at least right now to -- this
       9    is -- this is becoming more controversial than I
10:12 10    expected it to be because I thought it was going to be
      11    very straightforward.
      12         You do as you are going to do.  We are going to
      13    handle the clawback.  And if you decide to comply,
      14    great.  If you don't, we will seek judicial relief on
10:12 15    this.
      16         MR. POPE:  Let me do this because I am not
      17    logged into my email right now because I don't want to
      18    have pop-ups in the middle of me sharing my screen.
      19         Let's go back off the record.  Let me send my
10:13 20    team a note to give them a heads-up about this clawback
      21    issue.
      22         MR. SINGH:  Mr. Indrajana, have you sent the
      23    clawback right now?
      24         MR. INDRAJANA:  I am drafting it as we speak.
10:13 25         MR. POPE:  Let's go off the record, please.

38

10:13  1    Let's pause and give me two minutes to send out the
       2    email to my team.
       3         THE VIDEOGRAPHER:  The time is 10:13 a.m. and
       4    we are now off the record.
10:13  5         (Recess taken at 10:13 a.m. - 10:20 a.m.)
       6         THE VIDEOGRAPHER:  The time is 10:20 a.m. and
       7    we are now back on the record.
       8         MR. SINGH:  Mr. Pope, with your indulgence, can
       9    I just make a comment that we were just talking about
10:20 10    offline?
      11         MR. POPE:  Sure.
      12         MR. SINGH:  So upon further review of the
      13    actual redacted one line, it was just one sentence on
      14    the notes that my client had in front of him.  The
10:20 15    actual line itself, on close review, does not appear to
      16    be a privileged attorney-client communication.  And so
      17    our clawback issue and the clawback, which Mr. Indrajana
      18    issued, he will essentially clawback the clawback, and
      19    you can go on.  And I don't think we have any further
10:20 20    issue.  Of course, you can question the witness as much
      21    as you want about it.
      22         MR. POPE:  Thank you, Mr. Singh.
      23         MR. SINGH:  And without -- obviously, we don't
      24    waive any privilege rights whatsoever in connection with
10:21 25    this issue.  Thank you.

39

10:21  1         MR. POPE:  We reserve our rights.  Candidly, I
       2    haven't had time to do a deep dive because we were
       3    trying to keep the deposition moving as best we can, so
       4    we reserve our rights.
10:21  5         MR. SINGH:  Thank you.
       6         MR. POPE:  Okay, thank you.
       7    Q.   Okay, sorry for the interruptions,
       8    Mr. Resnikoff.
       9         I think we were discussing -- still discussing
10:21 10    your preparation for today's deposition.  And we were
      11    beginning to walk through the meetings that you had.
      12    And I believe you said you had, roughly, four to five
      13    meetings; correct?
      14    A.   That is accurate.
10:21 15    Q.   Okay.  And I think you had already described
      16    that the first meeting was in person on last Saturday
      17    which, if my calculation is correct, was April 23;
      18    right?
      19    A.   That is accurate.
10:21 20    Q.   Where was that meeting held?
      21    A.   That was held at my counsel's office in San
      22    Mateo.
      23    Q.   And who was present?
      24    A.   Sanjiv Singh and Michael Indrajana.
10:22 25    Q.   Anyone else?

40

10:22  1    A.   No.
       2    Q.   Did anyone participate remotely?
       3    A.   No.
       4    Q.   And about how long did you meet?
10:22  5    A.   It was about five or so hours.
       6    Q.   Did you review documents during this meeting?
       7    A.   I believe we reviewed the topics on the
       8    subpoena.
       9    Q.   Any other -- any other written materials that
10:23 10    you reviewed during that session?
      11    A.   I believe --
      12         MR. SINGH:  I am going to caution the witness,
      13    again, in answering these questions, please be careful
      14    not to disclose actual attorney-client communications.
10:23 15         THE WITNESS:  We did review some of the
      16    documents in discovery.
      17    Q.   BY MR. POPE:  Do you remember which ones?
      18         MR. SINGH:  Same -- same caution.
      19         THE WITNESS:  I believe we reviewed a -- a
10:23 20    cease-and-desist document.
      21         We also reviewed trademark -- trademark
      22    registration applications, the timeline on trademark
      23    applications.
      24         MR. SINGH:  I am going to caution the witness.
10:24 25    He is asking for documents.  Be careful about disclosing

41

10:24  1    communications or discussions between you and counsel,
       2    please.
       3         THE WITNESS:  (Nods head affirmatively.)
       4         I think that's, in my memory at this moment,
10:24  5    that's to the best of my knowledge, what we discussed.
       6         Q.  BY MR. POPE:  Okay.  Are you going from memory
       7    right now?
       8         A.  Yes.
       9         Q.  So why are you looking down?
10:25 10         A.  I just looked down -- it is not on the notes.
      11    I just like to look down.
      12         Q.  Okay.
      13         MR. SINGH:  He does have the notes in front of
      14    him, just FYI.  As I told you, we put it back.  What we
10:25 15    provided you, we put it back in front of him.
      16         MR. POPE:  No, that's fine.  That's fine.
      17         MR. SINGH:  We are not trying to hide anything.
      18    Just so you know, he has the notes in front of him.  He
      19    has the financials on his screen, so just as we
10:25 20    disclosed.
      21         MR. POPE:  No objection to that.  All I asked
      22    was that we get a copy of everything that he has in
      23    front of him, which, I think, we're entitled to.  And
      24    you have represented you have done that.  And,
10:25 25    obviously, we can't see, so we have to take you at your

42

10:25  1    word.
       2         THE WITNESS:  Would you like me to show you on
       3    the camera what I was looking at?
       4         MR. POPE:  Sure.
10:26  5         THE WITNESS:  It's the one with the redaction.
       6         MR. SINGH:  The misredaction.
       7         THE WITNESS:  The non-redaction.
       8         MR. SINGH:  It was the clawback that was the
       9    clawback to the clawback.
10:26 10         THE WITNESS:  To the clawback.
      11         Q.  BY MR. POPE:  So you mentioned a -- you listed
      12    the cease-and-desist document; right?
      13         A.  Uh-huh.
      14         Q.  Is that a "yes"?
10:26 15         A.  Yes.
      16         Q.  I understood you, but I'm just trying to be
      17    cognizant of the record.
      18         A.  The record, right.
      19         Q.  And you mentioned various trademark
10:26 20    registration applications?
      21         A.  (Nods head affirmatively.)
      22         That is accurate.
      23         Q.  And I think the last thing you mentioned was a
      24    timeline on various trademark applications; right?
10:26 25         A.  Correct.

43

10:26  1         MR. SINGH:  Mr. Resnikoff, can you speak up a
       2    little bit louder?  I feel like -- I know the
       3    videographer said it was adequate, but I don't want to
       4    have a recording later we find is not adequate.  If you
10:27  5    could, speak up a bit.  Thank you.
       6         THE WITNESS:  Sure.
       7         Q.  BY MR. POPE:  And can you tell me more about
       8    the cease-and-desist document that you mentioned?
       9         A.  Yes.  It was a cease and desist that we sent
10:27 10    out in 2015 for a -- for a company called Tough Cookiez
      11    with a Z.
      12         Q.  So spelled the traditional way cookies is
      13    spelled except replace the S with a Z?
      14         A.  Yes.
10:27 15         Q.  What types of products were Tough Cookiez
      16    offering?
      17         A.  They had baked goods and protein -- protein
      18    baked goods.  Protein-infused baked goods.
      19         Q.  Okay.  Cookies?
10:28 20         A.  Yes, I believe so.
      21         Q.  Where were they located, do you remember?
      22         A.  They were in Florida.
      23         Q.  Okay.  Any idea where they were selling their
      24    goods?
10:28 25         A.  They were selling their goods to gyms.

44

10:28  1         Q.  Okay.  In Florida?
       2         A.  In Miami.
       3         Q.  Anywhere outside of Miami?
       4         A.  I don't believe so.
10:28  5         Q.  You sent -- when I say "you," I'm talking about
       6    The Cookie Department issued a cease-and-desist letter
       7    in 2015 to Tough Cookiez; right?
       8         A.  Uh-huh.  Correct.
       9         Q.  What was the demand?  What was the demand?
10:29 10         A.  The demand is that we wanted them to change
      11    their name.
      12         Q.  Okay.  Did they comply?
      13         A.  They did.
      14         Q.  Okay.  Do you recall what they changed their
10:29 15    name to?
      16         A.  They used OG and added "Tough Cookiez Miami" to
      17    their product and made it very, very small.  So their
      18    main emphasis was "OG."
      19         Q.  And is it still Tough Cookiez with a Z, same
10:29 20    spelling?
      21         A.  Yes.
      22         MR. SINGH:  Object to form.  Object to form.
      23         THE WITNESS:  They are actually no longer in
      24    business.
10:29 25         Q.  BY MR. POPE:  Okay.  Do you know when they went

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

45

10:29  1    out of business?
       2        A.  I believe in 2019, roughly.  That was when
       3    their Secretary of State -- their dissolution.
       4        Q.  Okay.  How did you become aware of Tough
10:30  5    Cookiez?
       6        A.  I don't recall.
       7        Q.  Was it you that became aware?
       8        A.  Yes.
       9        Q.  Do you remember when you became aware?
10:30 10        A.  It was right around the time we sent the
      11    cease-and-desist.
      12        Q.  Okay.  And who drafted the cease-and-desist?
      13        MR. SINGH:  I am going to caution the witness.
      14    You can answer -- if you can answer that question
10:30 15    without disclosing privileged information, please go
      16    ahead and do so.
      17        THE WITNESS:  My counsel, Sanjiv Singh.
      18        Q.  BY MR. POPE:  Okay.  Okay.  So going back to
      19    the -- your preparation, we got the first meeting, which
10:31 20    was this -- this past Saturday, the 23rd.
      21        When was the second meeting?
      22        A.  Monday.
      23        Q.  This week?
      24        A.  That is correct.
10:31 25        Q.  April 25; right?

46

10:31  1        A.  Uh-huh, correct.
       2        Q.  Where did you meet?
       3        A.  On Zoom.
       4        Q.  And who participated?
10:31  5        A.  Sanjiv Singh and Michael Indrajana.
       6        Q.  Anyone else?
       7        A.  No.
       8        Q.  And how long did you meet?
       9        A.  Roughly, five hours.
10:31 10        Q.  And did you review any materials?
      11        A.  We reviewed the topics.  And the questions they
      12    asked me were based on --
      13        MR. SINGH:  Hold on.  I am going to caution you
      14    again.  He is entitled to know about documents, not
10:32 15    substantive communications between us.
      16        THE WITNESS:  (Nods head affirmatively.)
      17        MR. SINGH:  So please answer the question being
      18    mindful of privilege.  And I actually -- if you are
      19    confused about that, and you want guidance from counsel,
10:32 20    you can ask for guidance, and we can go off record, and
      21    I can give you guidance.  But if you feel comfortable,
      22    then go ahead and answer.
      23        THE WITNESS:  I would like to go off the record
      24    and get guidance on this question.
10:32 25        MR. SINGH:  I would like to confer with my

47

10:32  1    client just for the purpose of defining for him what is
       2    privileged and what isn't.  I think that will help you,
       3    Mr. Pope, because I think it will streamline the
       4    answers.
10:33  5        MR. POPE:  Okay, thank you.
       6        O'Bryant, let's go off the record.  I don't
       7    want to chew up time.
       8        THE WITNESS:  The time is 10:33 a.m. and we are
       9    now off the record.
10:33 10        (Brief recess taken at 10:33 a.m. - 10:38 a.m.)
      11        THE VIDEOGRAPHER:  The time is 10:38 a.m.  We
      12    are now back on the record.
      13        Q.  BY MR. POPE:  Mr. Resnikoff, we were still
      14    walking through your preparation.  I think we were on
10:38 15    your second meeting with your counsel that occurred
      16    Monday of this week.  Is that right?
      17        A.  Yes.
      18        Q.  Okay.  And I think we were talking through the
      19    materials that you reviewed during Monday's meeting.
10:38 20        A.  Yes.  So we went down the line of topics and
      21    reviewed a lot of documents in reference to those, as
      22    well as emails as part of them, spreadsheets,
      23    financials, looking at marketing channels, specific
      24    social media pages.  The list goes on.  It was a lot of
10:39 25    documents.

48

10:39  1        Q.  And then your third meeting, when did that
       2    occur?
       3        A.  That occurred Tuesday of last week -- this
       4    week, rather.  Sorry.
10:39  5        Q.  That was the 26th; right?
       6        A.  Uh-huh.
       7        MR. SINGH:  It certainly couldn't be the
       8    Tuesday of the previous week.  I can tell you that.
       9        MR. POPE:  No comment.
10:39 10        MR. SINGH:  I was on my back.  That's all I can
      11    tell you.
      12        Q.  BY MR. POPE:  Okay.  Where did you meet?
      13        A.  That was on Zoom.
      14        Q.  Okay.  Who attended?
10:40 15        A.  Sanjiv Singh.
      16        Q.  Anyone else?
      17        A.  I believe not, no.
      18        Q.  Okay.  How long did you meet?
      19        A.  We met for five hours, roughly.
10:40 20        Q.  Did you review any materials during that
      21    meeting?
      22        A.  Yes, the same things.  We scored -- scored
      23    the -- we went through all the facts -- sorry.  All the
      24    topics and reviewed -- went line by line on emails that
10:40 25    were part of discovery and reviewed them in detail.

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

49

10:41  1     Q.  And when was your fourth meeting with counsel?
       2     A.  Yesterday.
       3     Q.  And where did you meet?
       4     A.  In their office in San Mateo.  Counsel --
10:41  5     Q.  Got it.  Mr. Singh's -- at Mr. Singh's and
       6  Mr. Indrajana's office?
       7     A.  Correct.
       8     Q.  Who was present?
       9     A.  Sanjiv Singh and Michael Indrajana.
10:41 10     Q.  Anyone else present?
      11     A.  No.
      12     Q.  How long did you meet?
      13     A.  About five hours, as well.
      14     Q.  Okay.  And review any materials?
10:41 15     A.  Review any materials?  No, not that day.  It
      16  was more of a --
      17        MR. SINGH:  Hold on.  I caution the witness not
      18  to disclose substantive privileged communications.
      19        You can otherwise try to answer.
10:42 20        THE WITNESS:  No.  Yesterday we did not go over
      21  specific documents.
      22     Q.  BY MR. POPE:  Okay.  More dialogue?
      23     A.  Yes.
      24     Q.  Okay.  All right.  And you said there were four
10:42 25  or five meetings.  As we've gone through, are you -- was

50

10:42  1  there a fifth meeting?
       2     A.  No.  It was four.
       3     Q.  It was four, okay.
       4        Did you meet today?
10:42  5     A.  Aside from coming in for this deposition, no.
       6     Q.  Okay.  All right.
       7        I will drop another exhibit in the chat.
       8        MR. SINGH:  I ordered him an Egg McMuffin and
       9  he didn't take it.
10:42 10        (Whereupon, Exhibit 3 was marked
      11         for identification by the Court Reporter
      12         and attached hereto.)
      13        MR. POPE:  No comment.  All right, I just
      14  uploaded another exhibit.  I will share my screen.
      15     Q.  Mr. Resnikoff, do you recognize this document
      16  that I have up which we will refer to as Exhibit 3?
      17     A.  Uh-huh, yes.
      18     Q.  Do you recognize it to be a copy of your
      19  LinkedIn page?
10:43 20     A.  Yes.
      21     Q.  We just pulled this from online in the last
      22  several days.  I just want to -- I'll scroll through it
      23  briefly and, you know, we'll just ask you to, as you
      24  look through it, to see if it seems consistent with your
10:43 25  LinkedIn profile as you know it to be.

51

10:44  1     A.  Can you slow down?
       2        Okay.  Okay.
       3        MR. SINGH:  Is this Exhibit 3 or 2?
       4        MR. POPE:  This is 3.
10:44  5        MR. SINGH:  What was 2?
       6        MR. POPE:  2 is the amended dep notice.
       7        MR. SINGH:  Got you.  Okay.  Thank you.
       8     Q.  BY MR. POPE:  Okay.  Does this -- does this
       9  document seem consistent with what you know to be on
10:44 10  your LinkedIn profile, Mr. Resnikoff?
      11     A.  Yes.
      12     Q.  When is the last time you updated your
      13  LinkedIn?
      14     A.  I updated it, I believe, in late 2021.
10:45 15     Q.  Okay.  So I just want -- I want to walk through
      16  very briefly your employment history.  I will do it in
      17  reverse chronological order.
      18        I see in, according to your LinkedIn, in 2006
      19  you founded or co-founded something called Sedition Magazine.
10:45 20        What is that magazine's focus or what was its
      21  focus?
      22     A.  It was an art magazine, a zine, a free zine.
      23     Q.  Say that again.  I'm sorry.
      24     A.  A zine.  It is basically a free magazine we
10:45 25  produced.

52

10:45  1     Q.  That is a term of art in the magazine world?
       2     A.  Yes.
       3     Q.  Got it.
       4        Who were your fellow co-founders?
10:46  5     A.  A gentleman by the name of Stephen Alexander.
       6  And I am actually blanking on my other co-founder, it's
       7  been so long.  I don't recall the original co-founder,
       8  the other co-founder.
       9        You're on mute.
10:46 10        MR. POPE:  Okay.  Can you hear me now?
      11        THE WITNESS:  Yes.
      12        MR. POPE:  I'm on this headset, thinking
      13  clarity will be better.  But every now and then my
      14  headset conks out and I have to unplug and replug it.
10:46 15        MR. SINGH:  It looks good, so roll with it.  It
      16  works.
      17        THE WITNESS:  Very circa '90s.
      18        MR. SINGH:  Come on, Akiva, give him a break.
      19        MR. POPE:  I am channeling my inner Bobby
10:47 20  Brown.
      21     Q.  I was asking you when my mic cut out what was
      22  the magazine's focus.
      23     A.  Oh, I'm sorry.  The magazine's focus was local
      24  Oregon, Portland, Oregon art.  It was from sculpture to
10:47 25  food review.

13  (Pages 49 to 52)

53

10:47  1    Q.  Got it.  Got it.
2        I think you -- based on your LinkedIn profile,
3    it shuttered in 2007; right?
4        A.  Yeah.  But I -- I -- actually, it didn't
10:47  5    shutter in 2007.  I left in 2007.  I don't know when it
6    actually shuttered.
7        Q.  Got it.  But it is no longer in operation now?
8        A.  No.
9        Q.  What was -- what was the reason for your
10:48  10   departure?
11       A.  I ended up -- so the position above that, Viso
12   Beverage Company, they were an advertiser in our
13   magazine, and they approached me to go to work for them.
14       Q.  Got it.  Got it.  Okay.
10:48  15       Which is a perfect segue to Viso.  What kind of
16   beverages did Viso offer?
17       A.  Viso is a company, or at least at the time was
18   a company making functional beverages, beverages that
19   contain vitamins and minerals.
10:48  20       Q.  Okay.  And is that functional beverages, is
21   that a term of art?
22       A.  No.
23       Q.  Is that folks who -- forgive my ignorance, I
24   don't necessarily live in the food and beverage space.
10:49  25   I know that you live in that space, so this is a bit

54

10:49  1    educational for me.
2        But is -- do folks who frequent the food and
3    beverage space sort of use the "functional beverage" as
4    a term and sort of know what it means?
10:49  5        A.  Repeat the question?
6        Q.  Do -- do -- is the term "functional beverage"
7    one commonly used by people who are familiar with the
8    food and beverage space?
9        A.  Yes.
10:49  10       Q.  What is it?  Describe what you mean by
11   functional beverage.
12       A.  Functional beverages are beverages, whether
13   it's a juice or a soda, maybe an energy drink,
14   basically.  It's basically a beverage that is -- has
10:50  15   functional benefits added to it in the form of
16   ingredients.
17       Q.  Give me some examples of some of the functional
18   benefits that might -- that a functional beverage might
19   have.
10:50  20       A.  For example, Viso had vitamins and minerals.
21   Aside from hydrating you, it contained vitamins and
22   minerals.
23       Q.  Got it.  Okay.
24       And your role there was in the vein of
10:50  25   marketing?

55

10:50  1    A.  Sales.  Sales and marketing.
2        Q.  Got it.  Got it.
3        And then you left there in December of 2008.
4    What -- what was the reason for your departure?
10:50  5        A.  The reason for my departure was I got a better
6    offer from the Cuba Beverage Company.
7        Q.  Got it.  Okay.  Is Viso still in operation?
8        A.  I don't -- I'm not aware.
9        Q.  Okay.  So you leave Viso, you go to Cuba
10:51  10   Beverage Company.
11       Were your job duties at Cuba similar to those
12   at Viso?
13       A.  Yes.
14       Q.  Okay.  Were they competitors of one another?
10:51  15       A.  No.
16       Q.  Okay.  What -- what types of beverages or -- I
17   won't assume they are beverages.  But what types of
18   products did Cuba offer?
19       A.  Cuba Beverage Company offered flavored seltzers
10:51  20   similar to like the flavored Crystal Geyser sodas.
21       Q.  Okay.  Did you --
22       A.  Actually, some of them had -- I believe they
23   had energy ingredients in them like natural -- natural
24   caffeines in them, as well.
10:52  25       Q.  Would you categorize some of the products or

56

10:52  1    any of the products that Cuba offered as functional
2    beverages?
3        A.  Yes.
4        Q.  And you left there in December of 2008.  Why
10:52  5    did you leave?
6        A.  The company was having financial issues, and I
7    got furloughed and not paid, so I eventually left.
8        Q.  Got it.
9        Are they still in operation?
10:52  10       A.  I am unaware.
11       Q.  So you left there.  You landed at Metropolis
12   Baking Company in January of 2009?
13       A.  That is accurate.
14       Q.  What types of products does Metropolis offer?
10:53  15       A.  Metropolis is a bread -- artisan bread company.
16       Q.  I see they are located in Berkeley.  Do they
17   have just one location?
18       A.  They are a manufacturer, and they supply bread
19   to the restaurant industry in the Bay Area.
10:53  20       Q.  Got it.  Got it.
21       Do they distribute beyond the Bay or just in
22   the Bay?
23       A.  Just in the Bay Area.
24       Q.  And similar sales role there as what you had
10:53  25   previously done at Cuba and Viso?

14 (Pages 53 to 56)

57

10:53  1    A.  Yes.  Less -- less marketing, more sales.
       2    Q.  Got it.  Got it.
       3    And why did you leave?
       4    A.  I left because I -- while I was doing that, I
10:53  5  was also starting my cookie company and wanted to focus
       6  more on my cookie company and less so on having a
       7  part-time job.
       8    Q.  Got it.  Is Metropolis still in operation?
       9    A.  I'm -- I'm not sure.  I am unaware.  I have not
10:54 10  checked in with them in a long time.
      11    Q.  Okay.  I think I saw somewhere a relative of
      12  yours owns it or owned it at one point?
      13    A.  Owned it at one point, yes.
      14    Q.  No longer owns it?
10:54 15    A.  Correct.
      16    Q.  Okay.  I will leave The Cookie Department until
      17  last because, obviously, that's where we'll spend the
      18  most time, and I am going a little bit out of
      19  chronology.  But talk to me a little bit about ShipCause
10:54 20  and what kind of company it is.
      21    A.  ShipCause is a -- is a shipping cooperative
      22  where a group of brands that take volumes of shipping
      23  for our companies and group them together to afford us
      24  lesser cost on shipping labels.
10:55 25    I don't -- I don't have any ownership in it,

58

10:55  1  but I am basically -- myself through my business, I'm a
       2  company ambassador, if you want to call it that.  I
       3  basically look for other brands to join us in joining
       4  our cooperative to, you know, get -- raise the volume of
10:55  5  our overall shipping and lower our costs.
       6    Q.  Got it.  What's the typical profile of
       7  companies that you are looking to attract?
       8    A.  Food and beverage mainly.
       9    Q.  Okay.  Is there -- what about in terms of size
10:55 10  of the company?
      11    A.  I mean, no.  It's all sorts -- all sizes.
      12    Q.  Even sort of larger, you know, say, a
      13  corporate -- a large publicly traded corporate entity?
      14    A.  No, that's -- that's not -- yeah.  Thank you.
10:56 15  So thank you for clarifying the question.
      16    It's mainly smaller to medium size companies.
      17    Q.  Okay, that makes sense.  And what are your
      18  duties there?  I think you kind of described it as, you
      19  know, essentially an ambassador and trying to attract
10:56 20  others to, sort of, join the fold; right?
      21    A.  Yeah.
      22    Q.  Any other responsibilities?
      23    A.  No.
      24    Q.  How -- how did you obtain that role?
10:56 25    A.  I joined the cooperative as a brand, as The

59

10:57  1  Cookie Department, and I -- you know, I loved the costs
       2  I was getting on the shipping labels so I told friends
       3  about them and -- other friends in the industry that had
       4  food and beverage brands, and eventually they came to me
10:57  5  and said would you like to do it on a consulting basis.
       6    Q.  Is it a paid consultancy?
       7    A.  Yes.
       8    Q.  What are the financial details?
       9    A.  It is commission.
10:57 10    Q.  What percentage?
      11    A.  It is 25 cents to 50 cents per label.
      12    Q.  How much would you estimate you've generated in
      13  this role?
      14    MR. SINGH:  Object to form.
10:58 15    THE WITNESS:  In what time period?
      16    Q.  BY MR. POPE:  From beginning to now,
      17  September 2021 to the present.
      18    A.  I don't have that information in front of me.
      19  I would venture to say 10- or 11,000.
10:58 20    Q.  Okay.  And that's total for the eight months or
      21  so that you have been doing it?
      22    A.  Correct.
      23    Q.  Does that revenue go to you personally?
      24    A.  That is correct.
10:59 25    Q.  So it doesn't go to The Cookie Department?

60

10:59  1    A.  Correct.
       2    Q.  And finally, your current baby, The Cookie
       3  Department, I think we talked about already.  You began
       4  it in January of 2009?
10:59  5    A.  Correct.
       6    Q.  I'll ask this open endedly.  Candidly, I'm a
       7  fan of entrepreneurs and I love the passion to hear them
       8  tell their beginning stories.  I will ask an open-ended
       9  question about, sort of, how you got going with The
10:59 10  Cookie Department?
      11    A.  You want me to just start talking about how?
      12    Q.  Yeah.  I -- I'm -- you might think I am BS'ing,
      13  but I'm not.  I've seen folks give their elevated
      14  pitches about something they've grown and it is almost
11:00 15  always infectious, the passion.  That is why I am asking
      16  it open-ended.  I would just love to hear your origin
      17  story with The Cookie Department beginning in January of
      18  2009.
      19    A.  So in 2009, while working as a part-time sales
11:00 20  manager at Metropolis Baking Company, at the time my
      21  cousin's bread bakery, and actually, as well, formerly
      22  doing sales and marketing for functional beverage
      23  companies and in addition, I had a certificate at --
      24  from a community college in pastry arts.
11:00 25    So I really wanted to -- I kind of had the

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

61

11:00 1 entrepreneurial juices and really wanted to start my own
2 company. And so I took all those experiences and came
3 up with the first functional cookie which is called
4 "Awaken baked." And it was a double chocolate cookie
11:01 5 that had a cup of coffee added to it as far as caffeine
6 contents.
7 And I did that for a while and sold to --
8 actually worked -- baked part-time in my cousin's bread
9 bakery and then delivered those cookies to coffee shops
11:01 10 and started to kind of have a name for myself as the
11 cookie guy in Berkeley. Baked the cookies myself and
12 delivered them to the coffee shops.
13 And soon after that decided to come out with
14 more functional cookies that had added benefits, classic
11:01 15 cookie formulations. My elevator pitch at the time was
16 taking classic cookie formulations and fortifying them
17 with functional ingredients like protein and super foods
18 and antioxidants and caffeine. So I came out with more
19 and more product and just kind of grew from there.
11:02 20 Q. Thank you for that.
21 Was -- I think you mentioned that Awaken Baked
22 was the first product that you -- that The Cookie
23 Department released; right?
24 A. That is correct.
11:02 25 Q. You described it as a functional cookie. What

62

11:02 1 do you mean by that? And again, I have sort of seen the
2 term on your website and such but I am not a commoner in
3 your space so I would love for you to educate me on what
4 you mean by a functional cookie.
11:03 5 A. Well, similar to the energy drinks or the
6 vitamin beverages, we were taking a cookie in the
7 simplest fashion, taking your traditional ingredients in
8 a cookie and then adding an ingredient that adds
9 functional aspects. So, you know, wakes you up in the
11:03 10 morning. You know, contains, you know, ingredients that
11 are, you know, have superfood benefits. So basically
12 that's what it is.
13 Q. Got it, got it. And were there other -- are
14 you aware of other functional cookie companies at the
11:03 15 time that you launched in January of 2009?
16 A. I -- I wasn't aware in 2009 of any competing
17 brands, no.
18 Q. Are you aware of any now sort of having spent
19 time in the space, are you aware, sort of looking
11:04 20 backward, that there were other players in the space
21 back in January of 2009?
22 A. Yes. Oh, oh, well, no. I mean, knowing now --
23 can you please repeat that question? Sorry.
24 Q. So my initial question was at the time you
11:04 25 started The Cookie Department, right, January 2009, were

63

11:04 1 you aware of other companies producing functional
2 cookies?
3 A. At that time, no.
4 Q. You have been in the space now for 13-plus
11:04 5 years. I am sort of asking you to look in the rearview
6 mirror, right, backward looking and I'm sure you have
7 acquired a ton of knowledge of other players in the
8 space.
9 As you look back, sort of sitting here now,
11:05 10 have you become aware of folks that were in the space
11 back in January of 2009?
12 A. Yes.
13 Q. Who are some of those companies?
14 A. There was a company called Lenny and Larry's.
11:05 15 Q. And they were already around in 2009?
16 A. I believe so, yes.
17 Q. Any others?
18 A. No, not to my recollection, no.
19 Q. Since 2009, are there other companies that have
11:05 20 begun to produce functional cookies?
21 A. Yes. But not in my recollection of having kind
22 of the whole array of functional products --
23 Q. Okay.
24 A. -- that we have.
11:06 25 Q. Got it. Give me an example. Unpack that for

64

11:06 1 me a little bit.
2 A. I don't know of any other cookie companies
3 marketing a coffee-infused caffeinated cookie, for
4 example, or a cookie that has Maca, for example. One of
11:06 5 your chocolate chip cookies contains Maca, which is a
6 Peruvian superfood. So I am unaware of any companies
7 specifically producing the menu of fully functional
8 cookies.
9 Q. Got it. That's helpful.
11:06 10 What companies are you aware of -- well, let
11 me -- what functional features do the companies offer
12 that you are thinking about?
13 A. Protein.
14 Q. What companies are those?
11:07 15 A. I do know that Lenny and Larry's is still in
16 existence. There is a company -- I'm not sure if they
17 are still doing cookies. I know that they expanded
18 their line. It's called Buff Bake.
19 Q. B-U-F-F?
11:07 20 A. Correct. There's a company called Munk Pack.
21 M-U-N-K P-A-C-K. They are traditionally a protein bar
22 company. Maybe it is not a protein bar. A specific
23 brand, but it's -- they do like energy bars and they
24 came out with a cookie product.
11:08 25 There is NuGo; which is a energy bar. They

65

11:08  1   also have cookies now.
       2      Q.  Can you spell NuGo?
       3      A.  N-U-G-O.  I believe there is a company called
       4   Tri O Plex.  I am not sure how to spell that, though.
11:08  5      Q.  Okay.
       6      A.  Those are the main companies that come to mind.
       7      Q.  Okay.  The companies that you mentioned, are
       8   all these here in the U.S.?
       9      A.  I am unaware of where their -- where their
11:08 10   corporate headquarters are specifically.
      11      Q.  Okay.  Do they distribute their products here
      12   in the U.S.?
      13      A.  That is correct.
      14      Q.  Are the companies that you listed, are these --
11:09 15   would you include them -- would you consider them as
      16   competitors of The Cookie Department?
      17      MR. SINGH:  Object to form.
      18      Q.  BY MR. POPE:  I'm sorry, I missed your
      19   response, Mr. Resnikoff.
11:09 20      A.  Yes.
      21      Q.  Are there any other companies you would view as
      22   competitors other than the ones you listed?
      23      A.  I mean it's -- protein bars are competition, if
      24   you think about it.
11:09 25      Q.  Okay.  Why -- why do you -- so all the

66

11:09  1   companies that you listed offer some type of protein
       2   cookie; right?
       3      A.  Correct.
       4      Q.  Okay.  And is that the basis for them being --
11:10  5   or you considering them competitors?
       6      MR. SINGH:  Object to form.
       7      THE WITNESS:  No.  The fact that they have
       8   protein, they are a protein snack is why they're
       9   competitors, because they have other products aside from
11:10 10   cookies.
      11      MR. POPE:  Okay.  I will share another
      12   document.
      13      (Whereupon, Exhibit 4 was marked
      14       for identification by the Court Reporter
11:10 15       and attached hereto.)
      16      MR. POPE:  This is my internal Exhibit 12 but
      17   it will be Exhibit 4 for the deposition.  I will share
      18   my screen.
      19      Q.  So Mr. Resnikoff, this is a printout from the
11:11 20   California Secretary of State.  I don't think it matters
      21   whether you have seen it or not.
      22      As you can see, a search was done for The
      23   Cookie Department and yielded two hits, which is what I
      24   want to focus on.  And I think you actually already made
11:11 25   a passing mention to this.  You mentioned sort of

67

11:11  1   starting originally as an LLC and then pivoting to a
       2   corporation; right?
       3      A.  Uh-huh, correct.
       4      Q.  Does this date for the LLC, August 11, 2009,
11:12  5   strike you as about accurate for when you organized the
       6   LLC?
       7      A.  Yes, that is correct.
       8      Q.  Okay.  Now I think your LinkedIn mentioned you
       9   actually started the company in January of 2009.  So is
11:12 10   it safe to assume that between January and August you
      11   were operating without the LLC?
      12      A.  That is correct.  Sole proprietor.
      13      Q.  Later on, according to this entry in January --
      14   January 17 of 2012, you created the corporation; right?
11:12 15      A.  That is accurate.
      16      Q.  What was the impetus for creating the
      17   corporation?
      18      MR. SINGH:  I am going to caution the witness,
      19   if you can answer that question without disclosing
11:12 20   privileged information, go ahead.  Otherwise, if you
      21   can't, then you should not answer.
      22      THE WITNESS:  I can't answer that question
      23   without disclosing privileged information.
      24      Q.  BY MR. POPE:  Okay.  I didn't expect that to be
11:13 25   a controversial topic.  So --

68

11:13  1      MR. SINGH:  Let me try -- Keyonn, let me just
       2   encourage my witness.  If there are things you can share
       3   with Mr. Pope beyond what was discussed with your
       4   counsel at that time, go ahead and share them.  Just be
11:13  5   careful not to disclose privileged information.  Let me
       6   see if that instruction helps.
       7      THE WITNESS:  Okay.  The impetus was I brought
       8   on a co-founder and the goal was to, you know, play with
       9   the adults in the room and take investment, so we
11:14 10   decided to incorporate.
      11      Q.  BY MR. POPE:  When did you take on the
      12   co-founder?
      13      A.  Just prior to that date, around mid-2011,
      14   started working with this co-founder.  Well, this person
11:14 15   who then became a co-founder.  She had a lot more
      16   experience at the time of being a CEO.  I was more -- at
      17   the time, more of a, you know, the creator of the
      18   product, more involved with sales.  And she had a lot of
      19   success with her company that she was a prior part of.
11:14 20   It was a company called LifeFactory.  It is a very, very
      21   large entity that recently got acquired.  So she just
      22   had, you know, a lot more experience with growing a
      23   company than I did.  So I brought her on as a founder.
      24      Q.  Who was your counsel at the time that you
11:15 25   established the corporation?

**69**

11:15  1    A.  That was a gentleman by the name of Micah.  I
       2  don't recall his last name.
       3    MR. SINGH:  I can provide it, Mr. Pope, if you
       4  want it, but obviously you want to depose the witness,
11:15  5  not me.
       6    THE WITNESS:  I can provide you that
       7  information, if you would like.
       8    MR. POPE:  That would be great.  Micah is
       9  M-I-C-A-H?
11:15 10    A.  I believe so, yes.
      11    MR. POPE:  Okay.  Yeah, it would be great if we
      12  can close the loop on a break.  Or, Mr. Singh, if it is
      13  easier for you to provide it here and he can confirm
      14  whether or not that refreshes his recollection.
11:16 15    MR. SINGH:  It is a little unorthodox.
      16    MR. POPE:  It is.  Nevermind.  Nevermind.
      17    MR. SINGH:  Do you want me to do it?
      18    MR. POPE:  It's fine.  It's okay.
      19    MR. SINGH:  We will get it to you at a break.
11:16 20  We will get it to you at a break.
      21    MR. POPE:  No problem.  I am just making a
      22  note.
      23    Q.  Okay.  So what was the co-founder's name?
      24    A.  Her name was Pamela Marcus.
11:16 25    Q.  Okay.  And you said that her prior company

**70**

11:16  1  was -- what was the name of her prior company?
       2    A.  Called LifeFactory.
       3    Q.  LifeFactory?
       4    A.  One word.
11:16  5    Q.  Got it.  And you mentioned LifeFactory having
       6  been acquired but I wasn't clear on the time.
       7    Was that just before you brought her on as a
       8  co-founder?
       9    A.  No.
11:17 10    Q.  When -- when was that?  When was that acquired?
      11    A.  I don't know the exact date but it was more
      12  recently.  I don't know the exact time frame.
      13    Q.  What kind of company was LifeFactory, or is
      14  LifeFactory?
11:17 15    A.  LifeFactory, you probably have seen their
      16  bottles everywhere.  They make glass water bottles with
      17  silicone sleeves that have holes, like circles in the
      18  silicone sleeves.  They are pretty much in every --
      19  every yoga studio imaginable, I would imagine.
11:17 20    Q.  Okay.  So what -- what -- did Miss Marcus make
      21  an investment when you brought her on?
      22    A.  She did.
      23    Q.  How much did she invest?
      24    MR. SINGH:  I am going to caution -- I am
11:18 25  actually going to instruct the witness to not disclose

**71**

11:18  1  information that may be subject to third-party rights of
       2  privacy.  And obviously, you can act accordingly.
       3    THE WITNESS:  I am going to follow counsel on
       4  that.
11:18  5    MR. SINGH:  I am not instructing -- let me just
       6  be very clear.  I am not instructing him not to answer
       7  because I don't, myself, have knowledge of the
       8  relationships with these investors but I know enough
       9  transactionally that investors have third-party rights
11:18 10  of privacy, either written or oral or reasonable
      11  expectation of privacy in their investment.  I am
      12  instructing him but he can decide.
      13    MR. POPE:  But Sanjiv, this is relevant -- this
      14  isn't some side investment that is outside The Cookie
11:18 15  Department.  This is an investment in the company
      16  itself.  So this is very relevant.  I have a very
      17  different view.
      18    MR. SINGH:  How is it relevant -- we can meet
      19  and confer right now just briefly on the record, which I
11:19 20  believe is probably appropriate.  How is it relevant to
      21  liability in this case, to damages in this case?
      22    MR. POPE:  It's relevant to the financial
      23  stature of the company at or around the time that the --
      24  that the product at issue was developed and launched.
11:19 25  Yeah.

**72**

11:19  1    MR. SINGH:  Well, you can ask him the total
       2  amount of investment he took and we will fully permit
       3  that, the total amount of investment he took at any
       4  period of time.  Go free.  Go wild.
11:19  5    But as for disclosing individual holders'
       6  shares or entitlements, that's where the problem is
       7  because there's third party rights of privacy.  These
       8  are private investments.  So without consulting with
       9  each and every one of those investors on disclosure, I
11:20 10  would counsel my client not to disclose that.  It may
      11  create liability either for him or for the company
      12  because he would have to go back and review the
      13  arrangement with each one of those investors.
      14    So -- but to be cooperative, since you raised
11:20 15  what your -- since you have explained what you are
      16  seeking, I do agree with you, understanding the
      17  financial resources of the company and its financial
      18  profile at any given point in time, you are entitled to
      19  probe that.
11:20 20    So my recommendation would be -- and you may
      21  not agree with me but at least a partial Band-Aid to
      22  this issue for the purpose of proceeding with the
      23  deposition would be to see what information you can
      24  obtain from this witness about the general amounts of
11:20 25  money in play at any given point in time and where it

73

11:20  1    came from, et cetera.
       2         But I will respect my client's desire not to
       3    disclose private investor-specific information for any
       4    individual investor or debt holder.
11:21  5         MR. POPE:  Look, I'm sensitive to that.  And it
       6    sounds like we have a different view of it.  I know that
       7    we've had specific discovery requests covering this --
       8    this issue.
       9         And to the extent that there were, you know,
11:21 10    third-party permissions necessary, those should have
      11    been sought or should have been raised that, you know,
      12    you were not going to seek them to just not respond to
      13    the discovery requests unilaterally.  That's not okay.
      14         MR. SINGH:  He's not -- he's not just not
11:21 15    responding unilaterally.  He is more than willing to
      16    provide you general investment information but he is not
      17    going to do it -- at least I -- Mr. Resnikoff, as I
      18    understand it, you don't feel comfortable to do it by
      19    investor; is that correct?
11:21 20         THE WITNESS:  That is correct.
      21         MR. SINGH:  I understand his position and I
      22    think there is a sound legal basis for it.  For the sake
      23    of moving on with the deposition, I think we've
      24    clarified our positions and I encourage you to ask him
11:22 25    the general questions so you can get those dollar

74

11:22  1    amounts.
       2         MR. POPE:  I will inquire but just note our
       3    objection.  This isn't any random investor.  This is
       4    someone that he's characterized as a co-founder and
11:22  5    that's significant.  So even if -- even if you didn't
       6    feel compelled to go and chase down every random
       7    investor, at a minimum this one should be chased down
       8    and should have already been chased down and the
       9    permission sought.
11:22 10         MR. SINGH:  Hold on a second.  If you give me a
      11    moment to confer with my client.  So are you saying your
      12    distinction is I'm not looking for every single investor
      13    because obviously there are other investment rounds.
      14    You want the co-founder's skin in the game?  Is that
11:22 15    what you're saying?
      16         MR. POPE:  Well, I am not waiving our right.  I
      17    think we have a legitimate basis for all investors but
      18    we are not going to settle that right here.
      19         But what I am saying is Miss Marcus is somebody
11:23 20    he is describing as somebody as a co-founder.  There is
      21    zero way that it is not okay to seek whatever
      22    permissions are necessary to disclose.  And that should
      23    have already been sought, you know.
      24         So to -- to instruct the witness not to answer
11:23 25    here and not have already ironed that out when there is

75

11:23  1    discovery that's been propounded on this very subject is
       2    troubling.
       3         MR. SINGH:  Well, what is also troubling is you
       4    knew about Pam Marcus.  She's been in discovery.  She
11:23  5    has been in discovery responses and you have been quite
       6    busy sending out third-party subpoenas.  You easily
       7    could have third-party subpoenaed her.
       8         MR. POPE:  We shouldn't -- we shouldn't have
       9    to.  We shouldn't have to.
11:23 10         MR. SINGH:  We did not -- if you are trying to
      11    seek her private information, I disagree with you.  But
      12    again -- here's what I will do.  On Miss Marcus I will
      13    meet and confer with him.  I can either do it now, or
      14    not meet and confer with him.  I will consult with my
11:24 15    client.  I will either do it now or I will do it at
      16    lunch break.  You decide.
      17         MR. POPE:  Let's keep rolling.  I don't want to
      18    chew up more time.
      19         MR. SINGH:  I will let you know if we change
11:24 20    our position on that.
      21         MR. POPE:  Yep.
      22    Q.  So, Mr. Resnikoff, in 20 -- was it 2011 or 2012
      23    when you brought Miss Marcus on?
      24    A.  It was, roughly, around 2011.  Excuse me.  I
11:24 25    would like to restate that.  We were not -- I didn't

76

11:24  1    bring her on in 2011.  It was -- it was -- it was when
       2    we incorporated that she came on as co-founder.
       3    Q.  Okay.  So she formally came on on the date of
       4    the incorporation which, as seen here on Exhibit 4, was
11:24  5    January 17, 2012?
       6    A.  I don't recall the exact date she came on board
       7    but it was in early 2012 that she came on board.
       8    Q.  Okay.  No, that's fine.  And I wasn't being
       9    cute there.  I noticed that January 17th is very close
11:25 10    to the beginning of the year and you said she had come
      11    on early, before that date, so it could have easily been
      12    late 2011 or early 2012.  That is why I was trying to
      13    clarify.  Thank you for that.
      14         Did you bring on any other investors in 2012?
11:25 15    A.  We did.  I'm not 100 percent exact on the date
      16    that we brought on other investors, but we did do a
      17    first round soon after incorporating.  It was a friends
      18    and family round.
      19    Q.  Got it.  Okay.  Any other investments in --
11:26 20    well, let me ask.  Was the friends and family round in
      21    2012?
      22    A.  I -- I'm not 100 percent on that date.
      23    Q.  Okay.  Was it later than 2013?
      24    A.  No, I don't believe.
11:26 25    Q.  So it would have had to be -- that's your

77

11:26 1  recollection, it is 2012?
2    A.  Yeah, within 2012.
3    Q.  So your recollection is it was in 2012?
4    A.  2012, correct.
11:26 5    Q.  Okay, okay.  That's helpful.
6  Any other investments other than -- in 2012,
7  other than Miss Marcus and the friends and family round?
8    A.  No.
9    Q.  How much did you raise total in the friends and
11:26 10  family round?
11    A.  35,000.
12    Q.  And what was the structure of that round?
13    A.  It was a convertible note.
14    Q.  What is a convertible note in layperson's
11:27 15  terms?
16    A.  Convertible note is a debt instrument that at a
17  later date can be converted into equity or paid back at
18  the determined interest.
19    Q.  What -- do you recall the interest on that
11:27 20  friends and family round?
21    A.  It was --
22    MR. SINGH:  Object to form.
23    THE WITNESS:  Can you repeat the question?
24    Q.  BY MR. POPE:  Do you recall the -- the details
11:27 25  of the return on the convertible note?

78

11:28 1    A.  I believe it was between 6 and 8 percent.  I
2  don't recall the exact number.
3    Q.  Did you enter into agreements, written
4  agreements with the participants in the family and
5  friends round?
6    A.  Repeat the question?
7    Q.  Were there -- did you enter into written
8  agreements with the participants in the family and
9  friends round?
11:28 10    A.  If you are -- if you're -- if you mean notes,
11  actual -- the actual notes, yes.  We had notes.
12    Q.  No, I guess I'm asking about, were there
13  written agreements memorializing the terms of the family
14  and friends investment?
11:28 15    A.  Yes.
16    MR. SINGH:  Object to form.
17    Q.  BY MR. POPE:  So you had written agreements
18  with each individual that participated in the friends
19  and family round?
11:29 20    A.  Yes.
21    Q.  And the same with Miss Marcus, when she came on
22  as a co-founder, there was a written agreement?
23    A.  I don't recall.  I believe -- no, I don't
24  recall the specifics to that agreement.
11:29 25    Q.  I'm not asking about the details of the

79

11:29 1  agreement.  I'm just asking whether there was a written
2  agreement between you and Miss Marcus when she came
3  aboard as a co-founder?
4    A.  I don't recall.
11:29 5    Q.  Was there a written agreement between you --
6  when I say you, I'm -- let me ask it two different ways.
7  Was there a written agreement between you,
8  Akiva Resnikoff, and Miss Marcus at the time she came
9  aboard as a co-founder?
11:30 10    A.  I don't believe so, no.
11    Q.  Okay.  Was there a written agreement between
12  The Cookie Department and Miss Marcus at the time she
13  came aboard as a co-founder?
14    A.  I don't recall.
11:30 15    Q.  What would you do -- is there any way I could
16  refresh your recollection?
17    A.  Repeat the question.
18    MR. POPE:  Madam court reporter, can you read
19  the question?
11:31 20  (Record read as follows:
21  "Q  Was there a written
22  agreement between The Cookie
23  Department and Miss Marcus at
24  the time she came aboard as a
11:31 25  co-founder?

80

11:31 1  "A  I don't recall.
2  "Q  Is there any way I could
3  refresh your recollection?")
4  THE WITNESS:  I don't want to speculate.
11:31 5  That's my issue.
6    Q.  BY MR. POPE:  Do you have records where you
7  could be sure?
8    A.  Yes.
9    Q.  What records would allow you to be sure?
11:32 10    A.  I don't have them in front of me.  Is that what
11  you're referring to?
12    Q.  No, I'm just asking generally, where would you
13  go look to be sure?
14    A.  That would be on my desktop computer.
11:32 15    Q.  Okay.  And what's -- what's the uncertainty?
16  What is it that you're uncertain about?
17    A.  I'm just not sure of the exact agreement that
18  may exist.
19    Q.  But there is a written -- go ahead.  I'm sorry.
11:32 20    A.  Just as far as -- as far as what the specific
21  agreement may be.
22    Q.  Between Miss Marcus and The Cookie Department?
23    A.  Correct.
24    Q.  But there is some written agreement you are
11:32 25  saying between The Cookie Department and Miss Marcus?

20  (Pages 77 to 80)

81

11:32  1   A.  I believe so.
2   Q.  I'm not a transactional person but typically
3   when funds are being invested, there is some
4   memorialization of whatever the agreement is.  And so
11:33  5   I'm assuming that probably was the case here but trying
6   to confirm it with you.
7   A.  Yeah, I assume that to be the case but I don't
8   recall the specifics on it.
9   Q.  Okay.  Do you recall a written agreement at the
11:33  10  time that Miss Marcus invested -- at the time
11  Miss Marcus made her investment?
12  A.  Do I recall now that that happened when she
13  made her investment?
14  Q.  Yes.
11:34  15  A.  I don't -- it was a long time ago.  I don't --
16  I don't recall specifically.
17  Q.  Okay.  I want to focus a second on the LLC.
18  During the time that -- from August 11, 2009, when the
19  LLC was formed, to the time of its termination, did you
11:34  20  bring on any partners during that time?
21  A.  No.
22  Q.  Okay.
23  A.  I'm sorry, I don't mean to interrupt but my
24  back is starting to -- I need to stretch.  Can we take a
11:35  25  six-minute break so I can stretch?

82

11:35  1   MR. POPE:  Absolutely.
2   MR. SINGH:  Can I just ask the court reporter,
3   before we go off the record, how much time have we been
4   on the record?
11:35  5   THE VIDEOGRAPHER:  I currently have us here at
6   about 1 hour and 57 minutes.
7   MR. SINGH:  Okay, great.
8   THE VIDEOGRAPHER:  The time is 11:35 a.m. and
9   we are now off the record.
11:35  10  (Recess taken at 11:35 a.m. - 11:46 a.m.)
11  THE VIDEOGRAPHER:  The time is 11:46 a.m. and
12  we are now back on the record.
13  THE WITNESS:  Keyonn, I just wanted to bring up
14  the fact that Pam Marcus is no longer -- no longer has
11:47  15  an active role in the company.  She was settled out.
16  Q.  BY MR. POPE:  I appreciate that.
17  What do you mean by settled out?
18  A.  She received her initial investment --
19  MR. SINGH:  I just want to caution the witness
11:47  20  to describe the arrangement at high level but to be
21  cognizant of possible confidentiality restrictions in
22  any such settlement agreement.
23  THE WITNESS:  Her initial -- the initial money
24  she put into the company was returned.
11:47  25  Q.  BY MR. POPE:  Okay.  What were the --

83

11:47  1   A.  And her investment was diluted -- I mean her
2   equity in the company was diluted.
3   Q.  Okay.  What was her equity in the company?
4   A.  What was it originally?
11:48  5   Q.  Yes.
6   A.  She owned 40 percent.
7   Q.  Okay.  What was it at the time that she parted
8   ways with the company?
9   A.  8 -- 8.5 percent.
11:48  10  Q.  When you say it was diluted -- is that what you
11  said, it was diluted, her equity?
12  A.  Yeah.  It was brought down to a lower amount.
13  Q.  Okay.  What amount was that?
14  A.  8.5.
11:48  15  Q.  And when did the dilution occur?
16  A.  It was approximately 2015.  It was either end
17  of 2014 or beginning of 2015.
18  Q.  Okay.  And why -- why did the dilution occur?
19  MR. SINGH:  I am going to caution the witness
11:49  20  in answering your question, please be mindful of any
21  confidentiality restrictions you have and please also
22  caution as to privileged communications with counsel.
23  THE WITNESS:  I do believe, actually, that was
24  confident -- confidential as to why.
11:49  25  Q.  BY MR. POPE:  Okay.  Was there -- is there a

84

11:49  1   written agreement memorializing the dilution, Miss
2   Marcus' dilution of equity?
3   A.  Yes.  There is.
4   Q.  So you're saying in that agreement there are
11:49  5   confidentiality clauses that prevent you from disclosing
6   certain details?
7   MR. SINGH:  I am going to caution the witness
8   on commenting on the content of the agreement, to be
9   careful to follow any confidentiality restrictions.
11:49  10  THE WITNESS:  Yes, there's confidential
11  language in the document.
12  Q.  BY MR. POPE:  Okay.  So when -- when did
13  Miss Marcus officially cease to be involved with The
14  Cookie Department?
11:50  15  A.  It was either late 2014 or early 2015.
16  Q.  Is she -- does she still own equity with the
17  company?
18  A.  Yes.
19  Q.  And is that the 8 and a half percent you
11:50  20  mentioned?
21  A.  That is correct.
22  Q.  Okay.  I will put up another
23  document.
24  (Whereupon, Exhibit 5 was marked
11:51  25  for identification by the Court Reporter

85

11:51   1      and attached hereto.)
     2          MR. POPE: I will share my screen. This is
11:51 3    another printout from the California Secretary of
     4    State's website. I showed you before there were two
11:51 5    entries when we searched The Cookie Department on the
     6    prior exhibit, Exhibit 4.
     7          (Clarification by the reporter.)
     8      Q. BY MR. POPE: I was describing this document
     9    from the California Secretary of State's website which
11:52 10   gives a more in-depth snapshot into some of the
    11    pertinent dates around the forming and the winding down
    12    of the LLC.
    13          So we had previously talked about the LLC being
    14    created on August 11 of 2009, which you see here at the
11:52 15   top right?
    16      A. Yes.
    17      Q. The inactive date is December 23, 2014. Do you
    18    see that?
    19      A. Yes.
11:53 20     Q. There appears to be some overlap, right,
    21    between -- what I am getting at is the LLC and the
    22    corporation were sort of simultaneously active for a
    23    period; right?
    24          MR. SINGH: Object to form.
11:53 25     Q. BY MR. POPE: I didn't hear your answer.

86

11:53   1      A. The --
     2          MR. SINGH: May I just request of my witness,
     3    please give me a chance to get my objections in before.
     4    I don't have many, as you noticed today, but just if you
11:53 5    can. Thank you. Object to form.
     6          THE WITNESS: Repeat the question.
     7          MR. POPE: Can you read it back, Madam court
     8    reporter?
     9          (Record read as follows:
11:53 10         "Q There appears to be some
    11          overlap, right, between -- what
    12          I am getting at is the LLC and
    13          the corporation were sort of
    14          simultaneously active for a
11:53 15         period; right?")
    16          THE WITNESS: So the LLC as a -- like as an
    17    active company, day-to-day company, that LLC was not
    18    active. We were acting like as a business. We were
    19    working under the incorporate -- the C corporation. It
11:54 20   just was more of a clerical error on our end to dissolve
    21    the LLC.
    22      Q. BY MR. POPE: Okay, that makes sense. So the
    23    intent -- I am trying to paraphrase but keep me honest.
    24    The intent was at the time you started the corporation
11:54 25   then to, you know, formally wind down the LLC?

87

11:54   1      A. That is correct. Yes, that is correct.
     2      Q. Okay. But that -- that was just a clerical
     3    oversight that didn't occur?
     4      A. Yes.
11:54 5      Q. And then you realized that in December of '14
     6    and cured it?
     7      A. Correct.
     8      Q. That is helpful. I will stop sharing.
     9          MR. POPE: Madam court reporter, I am causing
11:55 10   more pain. This is my internal Exhibit 5 but I think it
    11    is our Exhibit 6 for purposes of the deposition. I will
    12    try to call that out to keep us both honest.
    13          MR. SINGH: That is now Exhibit 6; correct?
    14          MR. POPE: That's correct.
11:55 15         (Whereupon, Exhibit 6 was marked
    16          for identification by the Court Reporter
    17          and attached hereto.)
    18          MR. POPE: I'll share my screen. Still
    19    California Secretary of State's screenshot and now we're
11:56 20   focused on more of the important dates on the
    21    corporation, so Tough Cookie -- I'm sorry, The Cookie
    22    Department, Inc.
    23      Q. We previously discussed and you see at the top
    24    right January 17, 2012, it was established. It looks
11:56 25   like its status is active and in good standing; correct?

88

11:56   1      A. That is correct.
     2      Q. Okay. So we talked a little bit at the time --
     3          MR. POPE: Mr. Singh, are we stopping right at
     4    noon on the nose?
11:56 5          MR. SINGH: No, no. If you are in the middle
     6    of a line of questioning, my witness just took a break.
     7    We're fine if you want to --
     8          MR. POPE: All right.
     9      Q. So we talked, Mr. Resnikoff, about some of the
11:57 10   investment activity that transpired at the time or after
    11    the corporation was formed; right?
    12      A. Correct.
    13      Q. Particularly, we talked about Miss Marcus --
    14    Miss Marcus' investment; right?
11:57 15     A. Correct.
    16      Q. And then we talked about the friends and family
    17    investment which was, you know, structured as a
    18    convertible note; right?
    19      A. Correct.
11:57 20     Q. Any other -- were there any other investments
    21    that you took on after establishing the corporation?
    22      A. Yes.
    23      Q. To whom? From whom, rather, I should say?
    24      A. From whom? We did a round in 2017.
11:58 25     Q. Okay.

22  (Pages 85 to 88)

89

11:58  1     MR. SINGH: I am just going to note based on my
2 witness' prior testimony, I am just going to caution you
3 to remain consistent in disclosing at high level without
4 disclosing individual identities. Obviously Mr. Pope
11:58  5 has made it clear he doesn't agree with that position
6 but I am noting that for consistency.
7     MR. POPE: Mr. Singh, I thought your position
8 before was with not disclosing amounts. Now you're
9 saying he can't even disclose the identities of the
11:58 10 investors?
11     MR. SINGH: No, no. I am not instructing him
12 to do anything. He expressed a position about privacy
13 and identity of the -- about privacy of the investors.
14 I will let him make the decision whether or not the
11:58 15 identity is or is not something that he believes he has
16 an obligation on. And the amounts, it appears he
17 already expressed an opinion on that, so I am just
18 cautioning him to remain consistent. I am not
19 instructing him not to answer.
11:59 20    Q. BY MR. POPE: Mr. Resnikoff, are you
21 comfortable disclosing the identities of individual
22 investors?
23    A. Not the identities, no.
24    Q. Okay. And is that because of confidentiality
11:59 25 obligations?

90

11:59  1    A. Yes, that's -- that is true. That is accurate.
2    Q. With each of the investors in question, do you
3 have written instruments with them, written agreements
4 with them?
11:59  5    A. That is accurate.
6    Q. And is there language in those agreements
7 forbidding you from disclosing their identities?
8    MR. SINGH: Object to form.
9    THE WITNESS: Yes, I believe so.
11:59 10    Q. BY MR. POPE: You've -- when was the last time
11 you reviewed those agreements?
12    A. It was in 2019, I believe.
13    Q. Okay. Have you shared these agreements with
14 your counsel?
12:00 15    MR. SINGH: I am going to caution the witness.
16 You can answer that question, just don't disclose
17 attorney-client communications, but whether or not you
18 have shared them.
19    THE WITNESS: Yes.
12:00 20    Q. BY MR. POPE: Yes, you've shared them with your
21 counsel?
22    A. Yes.
23    Q. So all agreements with investors you've shared
24 with your counsel?
12:00 25    A. Yes.

91

12:00  1    Q. Including Miss Marcus?
2    A. Yes.
3    Q. Okay. When did you share those with your
4 counsel?
12:01  5    A. Which ones are you referring to?
6    Q. Any of the investor agreements.
7    A. I don't recall specific dates.
8    Q. General time frame?
9    A. Around the times that we went out for
12:01 10 investment.
11    Q. Okay. And the counsel that you shared it with,
12 is that Mr. Singh?
13    A. Yes, that is accurate.
14    Q. And Mr. Indrajana, as well?
12:01 15    A. No.
16    Q. Is Mr. Singh your counsel for purposes of
17 taking in these investments -- investments?
18    MR. SINGH: I am going to object to form.
19    THE WITNESS: He's not counsel specifically for
12:02 20 that, but he -- in those transactions he was counsel.
21    Q. BY MR. POPE: So he served as counsel for each
22 of the investment transactions?
23    MR. SINGH: Object to form.
24    THE WITNESS: Repeat the question.
12:02 25    MR. POPE: Madam court reporter, can you read

92

12:02  1 the question for me?
2    (Record read as follows:
3    "Q So he served as counsel for
4    each of the investment
12:02  5    transactions?")
6    THE WITNESS: He -- yes. He reviewed
7 documents. He reviewed the documents as counsel.
8    Q. BY MR. POPE: At the time the investments were
9 taken on?
12:03 10    A. Not specifically at the time the investments
11 were taken on but prior to it while -- prior to it while
12 we were reviewing documents to use for the investments.
13    Q. Got it now. Understood.
14    And is it safe to assume you are also
12:03 15 uncomfortable disclosing the amount of investment made
16 by each individual?
17    MR. SINGH: I am going to try and -- I am going
18 to object to form but the witness -- and encourage the
19 witness to disclose high level as much as possible.
12:03 20    THE WITNESS: I don't feel comfortable
21 specifying the amounts per investor and I don't feel
22 comfortable disclosing their actual names, but I can
23 tell you at a high level what the total amount was that
24 was invested.
12:04 25    MR. POPE: Okay. I'll note our objections to

23 (Pages 89 to 92)

93

12:04 1  that and we can revisit it later.  But for the sake of
2  efficiency, we'll keep moving.
3      Q.  So you mentioned, I think -- so we've talked
4  about the investment from Miss Marcus; right?  And we've
12:04 5  talked about the friends and family round.
6      When was that friends and family round, by the
7  way?
8      A.  2017.  No, no.  The original friend and family
9  round?
12:04 10     Q.  Yes.
11     A.  I thought you were referring to the prior one,
12  the other one I mentioned.  Friends and family round, it
13  was around 2012.  It was either mid- to late 2012 or
14  early 2013, in that ballpark.
12:04 15     Q.  Okay.  So just -- I'm trying to frame this
16  chronologically.
17     So you've established the LL -- or the
18  corporation in January 2012.  And then shortly
19  thereafter Miss Marcus comes along and makes her
12:05 20  investment; is that right?
21     A.  That's correct.
22     Q.  That was in 2012, as well?
23     A.  That is correct.
24     Q.  Did Miss Marcus' investment predate the initial
12:05 25  friends and family round?

94

12:05 1      A.  That is correct.
2      Q.  Okay.  So when was -- what was the timing of
3  the next investment you took in after -- after the
4  2012-2013 friends and family round?
12:05 5      A.  That was in 2017.
6      Q.  So no investments taken in between the
7  35,000-dollar friends and family round and 2017?
8      A.  That is correct.
9      Q.  What was the total amount of the 2017
12:06 10  investments?
11     A.  210,000.
12     Q.  Was that friends and family, as well?
13     A.  It was a mix of friends and family and -- I
14  guess it was considered friends and family because it
12:06 15  was friends of friends.
16     Q.  Okay.
17     A.  Six degrees of separation.
18     Q.  Got it.  Was that structured as a convertible
19  note, as well?
12:06 20     A.  That is accurate.
21     Q.  What was the percentage on that?
22     A.  That was 6 percent.
23     Q.  Okay.
24     A.  By the way, you are referring to the interest
12:06 25  only; correct?

95

12:06 1      Q.  Yes.  Following the 2017 investment that was
2  2000 -- 210,000, when was the next investment taken in?
3      A.  Roughly, late 2019 was a round, yeah.  Late
4  2019.
12:07 5      Q.  Okay.  And what was -- what was the total on
6  that round?
7      A.  Roughly, 97,000.
8      Q.  Okay.  Friends and family again?
9      A.  No.
12:07 10     Q.  Where did those funds come from?
11     A.  That was through a crowd funding round through
12  a company called Wefunder.
13     Q.  Okay.  Convertible note, as well?
14     A.  That is correct.
12:07 15     Q.  What was the percentage?
16     A.  Six percent.
17     Q.  What's the timing on the conversion of the
18  note?
19     A.  That one was three years.
12:08 20     Q.  Three years?
21     A.  Uh-huh.
22     Q.  How about the 2017 round?  What was the timing?
23     A.  36 months.
24     Q.  And how about the 2012 friends and family
12:08 25  round?

96

12:08 1      A.  36 months.
2      Q.  Okay, we are at late 2019.  When was the next
3  investment?
4      A.  There has not been any other investments.
12:08 5      Q.  Okay.  So none since late 2019?
6      A.  That is accurate.
7      Q.  Okay.  All right.  Let me back up.
8      When you had the LLC, did you have any
9  employees?
12:09 10     A.  No.
11     Q.  Were you an employee?
12     A.  During the LLC?
13     Q.  Yes.
14     A.  No.
12:09 15     Q.  You were a contractor?
16     MR. SINGH:  I am going to caution -- well,
17  object to form.
18     THE WITNESS:  I was the owner.
19     Q.  BY MR. POPE:  Okay.  Did you draw a salary?
12:09 20     A.  No.
21     Q.  How did you pay yourself?
22     A.  I -- at the time, actually I was not paying
23  myself.
24     Q.  Okay.  Did you have contractors working for you
12:10 25  at the time you had the LLC?

97

12:10  1     A.  Yes, I believe so.
       2     Q.  Who were they?
       3     A.  I don't recall their names.
       4     Q.  What were their functions?
12:10  5     A.  The functions, helping me bake.
       6     Q.  Okay.  Any other contractors performing
       7  functions outside of baking?
       8     A.  No.
       9     Q.  Okay.  How about with the corporation?  Did --
12:10 10  I guess, do you currently have employees?
      11     A.  I am the only employee.
      12     Q.  Okay.  Have there been any other employees from
      13  the time that you created the corporation until now?
      14     A.  Pam Marcus was an employee.
12:11 15     Q.  Okay.
      16     A.  And then we had contractors.
      17     Q.  Okay.  Do you pay yourself, currently?
      18     A.  Pay myself now?
      19     Q.  Yes.
12:11 20     A.  In this moment in time at present, I do not.
      21     Q.  Okay.  When was the last time you paid
      22  yourself?
      23     A.  I don't recall a specified -- specific dates
      24  that I last paid myself.  I would refer to Andrea on
12:11 25  that question.

98

12:11  1     Q.  Okay.  What was the -- what was the amount of
       2  your last compensation?
       3     A.  I don't recall the exact amount but the last
       4  time I was paid -- no, I don't recall.  I don't want to
12:12  5  speculate.  It was -- I can say it was under -- it was
       6  under 100,000.
       7     Q.  Okay.  Was it more than 50,000?
       8     A.  I don't believe so but I can't -- I can't
       9  recall a hundred percent.
12:12 10     Q.  Okay.  And then you mentioned, just to be
      11  clear, during the entirety of the existence of the
      12  corporation you've only had two employees, yourself and
      13  Miss Marcus?
      14     A.  That is accurate.
12:13 15     Q.  Okay.  Do you recall Miss Marcus' compensation?
      16     A.  I believe it was between -- between 20- and
      17  40,000.
      18     Q.  Per year?
      19     A.  Not per year.  I think she was paid one year
12:13 20  out of the time she was there.
      21     Q.  Got it.  Why wasn't she paid the other years?
      22     A.  I think we were using the money -- we were
      23  reinvesting the money into the company.
      24     Q.  Okay.  But her agreed compensation was between
12:14 25  20-and 40K?

99

12:14  1     A.  It wasn't an agreed upon compensation package,
       2  per se.  It was basically at that time we decided to pay
       3  ourselves.
       4     Q.  Got it.  You mentioned some contractors that
12:14  5  you -- let's start with currently.  What contractors do
       6  you currently have?
       7     A.  Andrea Kirschner who is my CFO.  I have Kathryn
       8  Limprecht who is the bookkeeper.  Nicki Kovacs,
       9  K-O-V-A-C-S, she is the tax preparer.  And Bridget
12:14 10  Jacobs, and she is the graphic designer.
      11     MR. SINGH:  Mr. Pope, is now a time we can
      12  break for lunch?  I wanted to give you some leeway there
      13  with your questioning but --
      14     MR. POPE:  I appreciate it.  Can I ask one more
12:15 15  and then we can cut it off.  I was just going to ask
      16  about Miss Kovacs' affiliation.
      17     MR. SINGH:  Go ahead.
      18     Q.  BY MR. POPE:  Is -- is Miss Kovacs employed by
      19  Profit Tracker?
12:15 20     A.  She was.  They changed their name to Tax Force,
      21  Inc.
      22     Q.  Got it.  Okay.  We can pause there.
      23     MR. SINGH:  Great.
      24     THE VIDEOGRAPHER:  The time is 12:15 p.m. and
12:15 25  we are now off the record.

100

12:18  1     (Lunch recess taken at 12:15 p.m.)
       2
       3
       4
       5
       6
       7
       8
       9
      10
      11
      12
      13
      14
      15
      16
      17
      18
      19
      20
      21
      22
      23
      24
      25

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

101

12:27  1              San Mateo, California
       2              Thursday, April 28, 2022
       3                    1:01 p.m.
       4
12:28  5         THE VIDEOGRAPHER:  The time is 1:01 p.m. and we
       6  are now back on the record.
       7
       8              EXAMINATION (resumed)
       9  BY MR. POPE:
01:01 10    Q.  Mr. Singh, I know we stuck a pin in the issue,
      11  two issues, one related to --
      12      I will ask Mr. Resnikoff.  Mr. Resnikoff, I
      13  know we had talked about your prior attorney by the
      14  first name of Micah.  I don't know -- we didn't --
01:02 15    A.  Micah Jacobs.
      16    Q.  Jacobs.
      17    A.  Not related to Bridget Jacobs.
      18    Q.  Got it.  Thank you.
      19    MR. POPE:  Mr. Singh, I was going to ask you.
01:02 20  I know you mentioned potentially reaching out to
      21  Miss Marcus about the ability to disclose her investment
      22  amount, in view of the confidentiality issues.
      23      Have you had a chance to do that?
      24    MR. SINGH:  Not during the lunch hour, but I
01:02 25  will do it today.  I will tell you this.  I mean, we are

102

01:02  1  happy to be cooperative on this, but we just have to be
       2  cautious.  And I will tell you just from my personal
       3  experience.  Private investors get very, very, very
       4  protective about their privacy and where they invest.
01:02  5      That's why we're being -- I can understand why
       6  Mr. Resnikoff is being cautious, and I have had
       7  consistent experiences with private investors.  We will
       8  try to reach out to her or her counsel, I should say,
       9  and try to get back to you.
01:03 10    MR. POPE:  Okay.  All good.
      11    THE WITNESS:  Keyonn, do you mind if I just
      12  clarify something?  You were asking originally about
      13  contractors.  I just want to --
      14      Do you mind if I say something?
01:03 15    Q.  BY MR. POPE:  Sure.
      16    A.  I just want to clarify a couple of things.
      17  Putting the legal term aside of what contractors are, we
      18  do, in addition to the stated contractors that I
      19  mentioned earlier, we have contract manufacturers that
01:03 20  we work with to produce our cookies.
      21      We have brokers that we use to go out and
      22  represent our brand and sell them, sell the product.
      23      We have, you know, packaging companies that we
      24  buy from.  So, you know, we have a lot more people that
01:04 25  we rely on to -- to run our daily operations.

103

01:04  1    Q.  I understand.
       2    A.  I wanted to clarify that.
       3    Q.  I appreciate that clarification.
       4      To that end, let's follow that lead and talk a
01:04  5  little bit about each of those additional buckets of
       6  contractors that you -- that you remembered.
       7      I think the first bucket, I'm paraphrasing, but
       8  I understood it to be, sort of, like co-manufacturers.
       9  Is that sort of one bucket?
01:04 10    A.  That is accurate.
      11    Q.  Who are those?
      12    A.  A current one that we use is called Petit Pain.
      13  P-E-T-I-T, space, P-A-I-N.  Pain is French for bread.
      14    Q.  Where are they based?
01:04 15    A.  They are based in Burlingame, California.
      16    Q.  How long have you been using Petite Pain, is
      17  it?
      18    A.  "Pain."
      19    Q.  "Pain."
01:05 20    A.  We have been engaged with them since early
      21  2021, very early.
      22    Q.  Prior to that, who were you using as a co-man?
      23    A.  Prior to that I was with a company called -- it
      24  had two names:  BumbleBar and Clean Copack.
01:05 25    Q.  You were using the two of those simultaneously?

104

01:05  1    A.  No.  It's one company.  They just refer to them
       2  as BumbleBar and Clean Copack.  It is very confusing.
       3    Q.  What time frame were you engaged with
       4  BumbleBar/Clean Copack?
01:05  5    A.  That was '21.  Did I -- Did I --
       6      Let me go back.
       7      Petit Pain, when did I say?  When did I say
       8  that?
       9    Q.  I noted early 2021.
01:06 10    A.  I'm sorry.  It was early 2022.  I just got the
      11  dates mixed up.
      12    Q.  Thanks for that clarification.
      13      BumbleBar/Clean Copack, give me those dates
      14  again, please.
01:06 15    A.  That was 2021.
      16    Q.  So began engaging with them --
      17      Do you remember what month in 2021?
      18    A.  I want to say we started engaging, roughly,
      19  January, February, so definitely in Q1.
01:06 20    Q.  Your engagement with them ended when?
      21    A.  At the end of 2021.
      22    Q.  Prior to BumbleBar, who was your co-man, or did
      23  you have one?
      24    A.  That was called Bake Works.
01:06 25    MR. SINGH:  Madam Court Reporter, can you

26 (Pages 101 to 104)

105

```
01:06  1    please read back Mr. Pope's question, please?
       2        (Record read as follows:
       3        "Q  Prior to BumbleBar, who was your
       4        co-man or did you have one?")
01:07  5    MR. SINGH:  Who was your --
       6    MR. POPE:  Short for co-manufacturer.
       7    MR. SINGH:  Got you.  Thank you.  Mr. Pope is
       8  getting slick with the lingo.
       9    MR. POPE:  I have heard that lingo used.  It's
01:07 10  slick.  It's good.
      11    THE WITNESS:  I'm impressed, Keyonn.
      12    MR. SINGH:  It made you sound like you were on
      13  it.
      14    MR. POPE:  It's all smoke and mirrors, man.
01:07 15  Q.  Mr. Resnikoff, are you okay if I refer to the
      16  co-manufacturers as co-man?  You know what I'm talking
      17  about?  You're cool?
      18  A.  Only for you.
      19  Q.  Thank you, sir.  You're too kind to me.
01:08 20      I think you said after BumbleBar -- prior to
      21  BumbleBar/Clean Copack, you used Bake Works as your
      22  co-man?
      23  A.  Yes.
      24  Q.  What were the dates on that?
01:08 25  A.  There was early engagement on going through R&D
```

106

```
01:08  1  and testing and stuff, but really ultimately circa
       2  August 2019 until the end of 2020.
       3  Q.  Prior to Bake Works, who did you use?
       4  A.  We are going way back.
01:08  5      Prior to Bake Works, we were at a company
       6  called Smith Baking Company, and they are owned by a
       7  company called U.S. Bakery.
       8  Q.  What dates for them?
       9  A.  That was, I believe, 2016 to 2019.
01:09 10  Q.  How about before Smith?
      11  A.  Before Smith was City Baking.
      12  Q.  Do you remember the years?
      13  A.  That was about 2014, '15 through 2016 is until
      14  we switched over to Smith.
01:10 15  Q.  I know I'm pressing, but how about before City
      16  Baking?
      17  A.  Pastry Smart.  That was 2012 to the time we
      18  went to City Baking.
      19  Q.  Got it.  Okay.  Let me just finish my line of
01:10 20  question before I pivot.  Anyone before Pastry Smart?
      21  A.  My hands.
      22    MR. SINGH:  It's not a company.
      23    MR. POPE:  Thank you.
      24  Q.  I think the second, sort of, bucket of
01:11 25  contractors that you mentioned were brokers?
```

107

```
01:11  1  A.  Yes.
       2  Q.  When you say brokers, what do you mean?
       3  A.  Basically, contracted sales reps, third-party
       4  sales reps.  Those brokers represent other brands, and
01:11  5  we are one of those brands.
       6  Q.  So these brokers are going out seeking new
       7  accounts and such on the company's behalf?
       8  A.  Correct.
       9  Q.  Who is the current broker?
01:11 10  A.  The current broker is a company called Absolute
      11  Food Sales.
      12  Q.  What's the time period -- what's the time
      13  period for your engagement with Absolute?
      14  A.  I don't know the exact time -- the exact year
01:12 15  but it was around, I want to say, 2013, 2014 to present.
      16  Q.  Do you currently use a new, another broker?
      17  A.  Not at the moment, no.
      18  Q.  Was there a broker that predated Absolute that
      19  you used?
01:12 20  A.  No.
      21  Q.  Have you used any other broker at any time?
      22  A.  Yes.
      23  Q.  Who have you used?
      24  A.  We used a company -- well, she didn't have a
01:12 25  company at the time.  She was under her own name.  Was a
```

108

```
01:12  1  Melissa Pashko.  P-A-S-H-K-O, I believe.
       2  Q.  Where was Miss Pashko based?
       3  A.  She was based on the East Coast.
       4  Q.  Do you remember which state?
01:13  5  A.  New York.
       6  Q.  What's the time frame for your engagement with
       7  Miss Pashko?
       8  A.  That was in and around August 2019 through, I
       9  want to say midway through 2020?
01:13 10  Q.  Any other brokers you've used?
      11  A.  Yes.  There was a Joe Gallasso.
      12  Q.  Can you spell "Gallasso"?
      13  A.  G-A-L-L-A-S-S-O, I believe.  I don't know the
      14  exact spelling.
01:14 15  Q.  Was Joe or Mr. Gallasso operating in his
      16  personal capacity?
      17  A.  He was a broker.  But I don't -- I don't
      18  remember the name of his business.
      19  Q.  Okay, that's what I was asking, if he had a
01:14 20  business.
      21  A.  I may be able to track that information down
      22  and provide it to you.
      23  Q.  That would be helpful.
      24  A.  Would you like to know the years?
01:14 25  Q.  Yes, please.  Thank you.
```

109

01:14   1      A.  That was, I believe, circa, I want say 2016.
        2      Q.  That was the beginning of the engagement?
        3      A.  Yeah, yeah.  I believe it was only within 2016.
        4      Q.  Do you remember when it began, roughly, in
01:15   5  2016?
        6      A.  I don't.
        7      Q.  So less than a year?
        8      A.  Yes.
        9      Q.  How about any -- any additional brokers that
01:15  10  you've used?
       11      A.  I had a broker called Advanced Food Group.  I
       12  believe that was his name.  Advanced -- let me get back
       13  to you on the name of that company, if you don't mind.
       14      Q.  No problem.
01:15  15      A.  That was for -- I believe that was 2017 and
       16  2018.  Sorry.  The years aren't 100 percent.  It's like,
       17  you know --
       18      Q.  We're going a ways back, so no worries.
       19          You said 2017 or 2018 or was that began in 2017
01:16  20  through 2018?
       21      A.  I believe -- I believe it was a portion of 2017
       22  and a portion of 2018.
       23      Q.  Any other brokers that you can recall?
       24      A.  Not to my recollection, no.
01:16  25      Q.  Is a list of brokers included in the notes that

110

01:16   1  you have?
        2      A.  No.
        3          MR. POPE:  I am going to load the next
        4  exhibit --
01:16   5          Actually, let me finish this thought.
        6      Q.  I think the last bucket of contractors you
        7  mentioned was packaging companies.
        8          Can you run me through those, as well?
        9      A.  Yeah.  There was American Packaging, and they
01:17  10  were based out of the Bay Area.  Again, a long time ago.
       11  Fuzzy on dates, but it was probably 2012.  Probably
       12  2012, 2013.
       13      Q.  Okay.  Was that 2012 through 2013?
       14      A.  You know, I -- I -- I don't have a recollection
01:17  15  on the ending, but it was definitely 2012 and into 2013.
       16      Q.  How about after American?
       17      A.  After American Packaging I believe was Realm
       18  West.
       19      Q.  What -- do you recall their dates?
01:17  20      A.  That was 2014 -- part of 2013 and then into
       21  2015, I believe.
       22      Q.  Prior to American Packaging, were you
       23  personally doing -- handling the packaging in-house?
       24      A.  Yes, I was.
01:18  25      Q.  How about after Realm West?  Say that five

111

01:18   1  times fast.
        2      A.  After Realm West was -- I believe we went to a
        3  company called Revere Group.
        4      Q.  Do you recall the years?
01:18   5      A.  Portion of 2015, '16, '17, '18, a portion of
        6  2019.
        7      Q.  So 2015-ish through sometime in 2019?
        8      A.  Correct.
        9      Q.  How about after Revere?
01:19  10      A.  After Revere was something called ePACK.
       11      Q.  I didn't ask because I kind of assumed on
       12  Revere.  What's the spelling, do you recall?
       13      A.  R-E-V-E-R-E.
       14      Q.  That's what I thought.  Thank you.
01:19  15          Do you recall the years for ePACK?
       16      A.  A portion of 2019, 2020, '21, and we're still
       17  using them.
       18          (Whereupon, Exhibit 7 was marked
       19           for identification by the Court Reporter
01:20  20           and attached hereto.)
       21          MR. POPE:  Madam Court Reporter, this is my
       22  internal Exhibit 6, but I think it is going to be our
       23  Exhibit 7, if I'm tracking them correctly.
       24          MR. SINGH:  I don't think you put it in the
01:20  25  chat.

112

01:20   1          What is the exhibit number?
        2          MR. POPE:  It should be Deposition Exhibit
        3  Number 7.
        4      Q.  Mr. Resnikoff, does this -- does the cover here
01:21   5  ring a bell at all?
        6      A.  Yes.
        7      Q.  I'll flip through slowly.
        8          MR. SINGH:  Keyonn, the file that you uploaded,
        9  was it supposed to be a .pdf?
01:22  10          MR. POPE:  Yes.
       11          MR. SINGH:  Okay.  For some reason the way your
       12  files are downloading is --
       13          I don't see Bates stamps on this.
       14          MR. POPE:  It will be produced.  It hasn't
01:22  15  been.
       16          MR. SINGH:  You obtained this from publicly
       17  available information or elsewhere?
       18          MR. POPE:  Yes.
       19      Q.  I have gone through the slides.  Does this ring
01:22  20  a bell at all?  Does it look familiar, Mr. Resnikoff?
       21      A.  Yes.
       22      Q.  What is it?
       23      A.  It's an investor doc.
       24      Q.  Do you -- do you recall who created it?
01:23  25      A.  Yes.

113

01:23  1      Q.  Who -- who was that?
       2      A.  I believe -- actually, let me restate.  I'm not
       3  sure if it was my brother, Isaac Resnikoff, or my
       4  current designer, Bridget Jacobs.
01:23  5      Q.  Okay.  What -- now when you name -- I'm going
       6  to call him Isaac because I don't want to confuse him
       7  with Mr. Resnikoff that I'm talking to.
       8          But when you say either Isaac or -- I'm drawing
       9  a blank now.
01:24 10      A.  Bridget Jacobs.
      11      Q.  When you say Isaac or Miss Jacobs, one of them
      12  created it, are you talking about the content of it?
      13      A.  The design.
      14      Q.  The design.  Who created the content?
01:24 15      A.  It was a blend.
      16      Q.  Of whom?
      17      A.  Of myself, Andrea Kirschner, and also I had a
      18  former interim CMO, Renae.
      19      Q.  Anyone else involved?
01:24 20      A.  And then myself.
      21      Q.  Okay.  I've got Andrea, Renae and yourself.
      22      A.  Yes.
      23      Q.  Anyone else involved in creating the content?
      24      A.  I think my wife may have copy edited some of
01:25 25  the text.

114

01:25  1      Q.  What's your wife's name?
       2      A.  Elannah Cramer.  E-L-A-N-N-A-H.  C-R-A-M-E-R.
       3      Renae's last name is Scott.
       4      Q.  Thank you.
01:25  5          I wasn't going to ask you to spell your wife's
       6  name.  I didn't want to get you in trouble if you drew a
       7  blank there.
       8      A.  At the time her last name was Miss Cramer, and
       9  now it is Resnikoff.
01:25 10      Q.  He put a ring on it.  I like it.
      11          And you said that the purpose of this deck, it
      12  was to present to investors?
      13      A.  That is correct.
      14      Q.  Do you remember the time frame of this deck?
01:26 15      A.  I want to say it was for the 2017 round.  But I
      16  don't know the exact date it was actually created for
      17  that round.  I just know it was around that period of
      18  time.
      19      Q.  Do you remember when -- when the 2017 round
01:26 20  occurred, when you began sort of shopping for it, if you
      21  will?
      22      A.  I don't recall the exact period of time.
      23      Within that year.
      24      Q.  Is it safe to say the deck was likely prepared
01:26 25  sometime in 2017?

115

01:26  1      A.  Possibly.  Maybe late in 2016.  I just -- I'm
       2  not -- I'm not 100 percent sure exactly when it was
       3  produced.  But it was produced for the 2017 round.
       4      Q.  Got it.  I am going to take you to some
01:27  5  financials here which might help refresh your
       6  recollection.
       7          It appears that --
       8          Can you see these financials?
       9      A.  Yeah.
01:27 10      Q.  So it looks like --
      11      A.  I guess it was -- I guess I was wrong.  I guess
      12  it was -- I guess it was for 2018.
      13      Q.  And what -- what makes you say that?
      14      A.  Because we have full year financials.
01:27 15      Q.  For 2017?
      16      A.  Correct.
      17      Q.  And then 2018, 2019 and 2020 are all
      18  projections; right?
      19      A.  Correct.
01:28 20          Wait.  Hold on.  I'm sorry.
      21          MR. SINGH:  I am going to caution the witness
      22  not to speculate.
      23          THE WITNESS:  You know, I -- I don't want to
      24  speculate.
01:28 25      Q.  BY MR. POPE:  Up at the top left, can you see

116

01:28  1  my cursor?
       2      A.  Yes.
       3      Q.  And it reads, "3 year P&L projections 2018 to
       4  2020"; right?
01:28  5      A.  Yes.
       6      Q.  Which?
       7      A.  Yes, those are projections, 2018 through 2020.
       8      Q.  So 2017 are actuals; right?
       9      A.  Correct.
01:28 10      Q.  So this would have had to be sometime after
      11  2017?
      12      A.  Correct.
      13      Q.  But likely before you had actuals, full-year
      14  actuals for 2018?
01:28 15      A.  Correct.
      16      Q.  So we're probably sometime -- somewhere in 2018
      17  when this was put together, just based on looking at the
      18  financials?
      19      A.  That is correct.
01:29 20      Q.  Okay.  I want to walk through some of the
      21  products featured in the deck.
      22          I will go to page 12, so I am out a little bit.
      23          This is your Awaken Baked, which we talked
      24  about a little bit earlier.  Is this -- the attributes
01:29 25  here, is that a fair description of the product?

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

117

01:29    1    A.  Yes.
2    Q.  Do you recall the date that you first sold the
3    Awaken Baked?
4    A.  I don't know the exact date.  But it was in
01:29    5    20- -- in 2009.
6    Q.  Do you still sell this product?
7    A.  It is currently being re-released, this
8    quarter.
9    Q.  When is the last time you sold it?
01:30   10    A.  The last time I sold it was end of 2019.
11    Q.  This is your Chocolate Chip Nookie product and
12    some of the attributes is -- I got a good laugh out of
13    Mr. Singh there.
14    MR. SINGH:  It is about having a clear mind.
01:30   15    That's the attribute.
16    THE WITNESS:  Yes, those are accurate
17    attributes.
18    Q.  BY MR. POPE:  Do you recall when you began
19    offering this, the Chocolate Chip Nookie product?
01:30   20    A.  It was around 2010.
21    Q.  Do you still offer --
22    A.  Can I rephrase?  The name Chocolate Chip
23    Nookie, that was a name change in 2012.  Prior to that
24    it was called Sexy Cookie.
01:31   25    Q.  The subtle approach, I like it.

118

01:31    1    MR. SINGH:  I did not know that.  I thought I
2    knew your company well.  I did not know that.  That is
3    good to know.
4    Q.  BY MR. POPE:  What were the years it was called
01:31    5    Sexy Cookie?
6    A.  2010 through 2011.  As I said, it stopped us
7    from getting into certain retailers.
8    Q.  I'm shocked.
9    Do you still sell the Chocolate Chip Nookie?
01:31   10    A.  This one, as well, we will be re-releasing this
11    quarter.
12    Q.  When was the last time you sold it?
13    A.  I want to say either late 2019 or very early
14    2020.
01:32   15    Q.  The re-release, will it be as we see it here?
16    A.  That is correct.
17    Q.  I guess the same question with the Awaken
18    Baked, it is in the form we saw?  I will go back to
19    slide 12.
01:32   20    A.  Yes.
21    Q.  I only ask because it appeared just from
22    peeking at your website, some products are being, sort
23    of, re-released under the keto line, which we'll talk
24    about later, but . . .
01:32   25    So that's why I'm asking.  Yeah.

119

01:32    1    A.  Currently, it's re-releasing under the fully
2    functional.
3    Q.  Go to page 14, the Great Full.  Attributes are
4    active -- accurate, rather?
01:33    5    A.  Yes.
6    Q.  When did you first sell this product?
7    A.  2011, as well.
8    Q.  Do you still sell it?
9    A.  That one is also being re-released on our
01:33   10    website.
11    Q.  When is the last time you sold it?
12    A.  Again, it was late 2019 or early 2020.
13    Q.  Let's see.  The Snap Back.  Attributes
14    active -- accurate?  I don't know why I keep saying
01:34   15    that.  Attributes accurate?
16    A.  Yes.
17    Q.  When did you begin selling Snap Back?
18    A.  Snap Back was 2011.
19    Q.  Is it still currently offered?
01:34   20    A.  It is being re-released this quarter.
21    Q.  When did you last sell it?
22    A.  Late 2019 or very early 2020.
23    Q.  And then the Mint Condition was coming soon.
24    Do you recall -- do you recall when this one released?
01:34   25    A.  We couldn't get this one into the quality that

120

01:34    1    I need our products to be, so the R&D did not go as well
2    as I wanted it to.
3    Q.  Got it.  So never released this one.
4    A.  Under -- can I just clarify?
01:35    5    Q.  Sure.
6    A.  Under this specific type of product.  But Mint
7    Condition as a keto product did release.
8    Q.  Thank you for that clarification.
9    When was that?
01:35   10    A.  The release of the keto?
11    Q.  Yes.
12    A.  Circa August 2019.
13    Q.  I noted just from, sort of, doing my own
14    digging, there's some products that aren't featured in
01:35   15    here, and I just wanted to walk through those in a
16    similar manner.
17    I'll start with the Cake Walk.  When did you
18    first begin offering Cake Walk?
19    A.  August 2019.
01:36   20    Q.  Was that in the fully functional line?
21    A.  No.  That was under our keto line.
22    Q.  Are you currently selling Cake Walk?
23    A.  That is true.
24    Q.  How about Champion Chip?
01:36   25    A.  Champion Chip came around in 2020.

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

121

01:36  1    Q.  Do you remember when?

2    A.  I believe October, November of 2021.  Sorry.

3    2020.

4    Q.  Is that keto, as well?

01:36  5    A.  Yes.

6    Q.  You still currently sell it?

7    A.  Yes.

8    Q.  How about Cherry Bomb?

9    A.  Cherry Bomb was a product, I believe it was

01:36 10   around 2014 and 2015, give or take.  And we don't sell

11   that anymore.  That was another fully functional one.

12    Q.  When did you stop selling it?

13    A.  I want to say around 2015, maybe -- maybe part

14   of 2016.  I just don't recall the exact ending date.

01:37 15    Q.  All good.

16       How about Peanut Power?

17    A.  Peanut Power was the name prior to Tough

18   Cookie.  And that was 2010, 2011 to 2000 -- right before

19   2012.

01:37 20    Q.  So 2010 through early 2012?

21    A.  Peanut Power?

22    Q.  Yes.

23    A.  I don't recall the exact switch, the exact

24   date.

01:38 25    Q.  Was there -- when you phased into calling the

122

01:38  1   Peanut -- what was previously known as Peanut Power, and

2   you changed it to Tough Cookie, were there periods where

3   the two were in the marketplace at the same time?

4    A.  No, I don't believe so.

01:38  5    Q.  How about Smart Cookie?

6    A.  Smart Cookie was the previous name before Great

7   Full.

8    Q.  What were the years?

9    A.  That was 2011, roughly, to through 2012 -- no.

01:39 10   Sorry.  Right before we launched the Great Full in 2012.

11    Q.  Same -- same question about the overlap:  Were

12   the two products in the market at the same time?

13    A.  No.

14    Q.

01:39 15       The only one I think I have left is the Tough

16   Cookie, which I left for last for obvious reasons.

17       Can you think of any other product names we

18   haven't discussed?

19    A.  No.

01:39 20    Q.  Who -- for each of these names, who developed

21   the names?

22    A.  Would you like me to list the names and then

23   tell you -- do you want to maybe just ask me which name?

24   It will be a little easier.

01:40 25    Q.  Why don't I walk through them in alpha order.

123

01:40  1    A.  Sure.

2    Q.  Awaken Baked?

3    A.  That would be me.

4    Q.  How about Cake Walk?

01:40  5    A.  That would be me.

6    Q.  Champion Chip?

7    A.  Me.

8    Q.  Cherry Bomb?

9    A.  Me.

01:40 10    Q.  Which ones didn't you do?

11    A.  Let's see.  The Snap Back, I believe my brother

12   named that.

13    Q.  Okay.  Isaac Resnikoff?

14    A.  Yes.  Sorry.

01:40 15       I believe he named Chocolate Chip Nookie.

16    Q.  Okay.

17    A.  And he named Great Full.

18       I want to say Sexy Cookie, but I'm not

19   100 percent on that one.  And possibly Smart Cookie, as

01:41 20   well.  But everything else I created.

21    Q.  You created the Tough Cookie name, as well?

22    A.  I created it.

23    Q.  At the time new product names are developed,

24   does -- does The Cookie Department have a process for

01:42 25   clearing those names?

124

01:42  1       MR. SINGH:  I'm going to caution the witness

2   that you can answer the question, just being careful not

3   to disclose privileged information.  I am not

4   instructing you not to answer.  You can answer the

01:42  5   question without disclosing privileged information.

6       THE WITNESS:  Can you clarify the question?

7    Q.  BY MR. POPE:  Which portion of it?

8    A.  What do you mean by "clearing"?

9    Q.  With respect to potential legal issues.

01:42 10    A.  We consult our counsel.

11    Q.  Does The Cookie Department have a written

12   process for adopting names?

13       MR. SINGH:  Object to form.

14       THE WITNESS:  No.

01:43 15    Q.  BY MR. POPE:  At the time -- so, has it always

16   been The Cookie Department's process to consult with

17   counsel when adopting new names?

18    A.  In -- before 2012, I did not have a counsel.  I

19   did not have counsel, so at that time that was not the

01:43 20   case.

21    Q.  Okay.  Was that the process at the time you

22   adopted the Tough Cookie name?

23    A.  That was the process.

24       MR. SINGH:  I am going to just object

01:43 25   retroactively.  You said was that the process.  And then

125

01:44  1   he answered, but it is unclear from both of you what
       2   process you're referring to. I will just leave it at
       3   that. If you want to clean up the record, it is up to
       4   you.
01:44  5          MR. POPE: I will clean it up. I think --
       6          MR. SINGH: I don't mean that to be disruptive.
       7   I was just saying I think it was unclear.
       8      Q. BY MR. POPE: It's fine.
       9          Mr. Resnikoff, you and I had some dialogue
01:44 10   about the process The Cookie Department uses when it is
      11   looking to adopt a new product name; right?
      12      A. Yes.
      13      Q. I think you, sort of, generally described that
      14   process as you consult with counsel; right?
01:44 15      A. Yes.
      16      Q. I am going to refer to that consult with
      17   counsel piece as the process.
      18          MR. SINGH: Got it. Thank you.
      19      Q. BY MR. POPE: I will ask the question again.
01:45 20          At the time you adopted the Tough Cookie name,
      21   was the process -- had the process already been adopted?
      22      A. Yes.
      23      Q. Okay. Who was your counsel at the time the
      24   Tough Cookie name was adopted?
01:45 25      A. That would be Bruno Tarabichi.

126

01:45  1      Q. Did you hire -- it is Mr. "Tarabichi"?
       2      A. "Tarabichi."
       3      Q. Tarabichi.
       4          Did you hire Mr. Tarabichi?
01:45  5      A. I did not personally hire Mr. Tarabichi. The
       6   Cookie Department hired Mr. Tarabichi.
       7      Q. Who on behalf of The Cookie Department hired
       8   Mr. Tarabichi?
       9      A. That would be my former co-founder, Pamela
01:45 10   Marcus.
      11      Q. Mr. Tarabichi was formally retained to
      12   represent The Cookie Department?
      13      A. Okay.
      14      Q. When did you first offer the Tough Cookie
01:46 15   product for sale?
      16      A. Early 2012.
      17      Q. Are you still selling the Tough Cookie?
      18      A. It is in the process of being re-released under
      19   the fully functional line in this quarter.
01:46 20      Q. When is the last time that you sold it?
      21      A. End of 2019.
      22          MR. POPE: I will advance another.
      23          I just uploaded another exhibit, which is our
      24   internal Exhibit 29 but is Deposition Exhibit 8.
01:48 25      Q. You will likely recognize this because you

127

01:48  1   probably have it in front of you as your notes from
       2   today; right?
       3      A. Can you share screen?
       4          (Whereupon, Exhibit 8 was marked
01:48  5           for identification by the Court Reporter
       6           and attached hereto.)
       7      Q. BY MR. POPE: I will represent to you this is a
       8   verbatim copy of what Mr. Indrajana shared with us
       9   earlier, which are the notes that you have in front of
01:48 10   you, at least one of the two files.
      11          MR. SINGH: I am getting confused, guys. You
      12   haven't share screened this yet. Is that it?
      13          MR. POPE: No, it's on screen.
      14      Q. Mr. Resnikoff, can you see what I'm sharing?
01:49 15      A. Let me put my glasses on.
      16          MR. SINGH: I see. I got confused because what
      17   you did you took -- you said notes, and I thought you
      18   were just focused on the note document. You are putting
      19   in front of him a collection of everything that was in
01:49 20   front of him.
      21          MR. POPE: This is the complete first file that
      22   Mr. Indrajana shared. I didn't want to tinker with it
      23   at all, so I put it up there in its totality. Of
      24   course, I'll direct the witness to the appropriate
01:49 25   pages.

128

01:49  1          THE WITNESS: Does this have my notes in it?
       2      Q. BY MR. POPE: Yes.
       3      A. I actually don't have it in front of me.
       4      Q. You had it in front of you earlier; right?
01:49  5      A. Yeah.
       6      Q. I wanted to talk through the various iterations
       7   of the Tough Cookie product, and that's why I came here,
       8   because I had a recollection that there were some shots
       9   in here with some years. I thought that would make it
01:50 10   easier.
      11      A. I have that. I don't have --
      12          Anyways, continue.
      13          MR. SINGH: Also, the email we sent you this
      14   morning, the one that was sent to you before the
01:50 15   deposition started, also has screenshots there, too, as
      16   well, just so you know.
      17          MR. POPE: No. I appreciate it. This one has
      18   the years and just makes it easier.
      19          MR. SINGH: Yeah, yeah, because he annotated.
01:50 20   That's right. Yeah, yeah.
      21      Q. BY MR. POPE: I want to walk through it.
      22          You said that the Tough Cookie product released
      23   in early 2012 sometime, and looking at the exhibit which
      24   came from your notes, I thought this would make it
01:50 25   easier. Is this a fair and accurate -- accurate

129

01:50  1   depiction of the Tough Cookie product at the time of its
       2   release?
       3       A.   This is one of those -- it's one version of it,
       4   yes.  There are two versions, the difference between the
01:51  5   virgins is --
       6       Pardon me my French.  I meant to say versions,
       7   not virgins.  Sorry.
       8       This one is our break size.  This was our
       9   smaller version of the original.  The packaging looks
01:51 10   the same, with the exception of instead of 5 grams of
      11   protein in it, it has 10 grams of protein.
      12       Q.   Got it.  This one is half the size of the
      13   normal size, we'll say?
      14       A.   Correct.
01:51 15       They were both launched in early 2012.
      16       Q.   That's all.  Thank you.
      17       2015 -- did you -- did you discontinue with the
      18   product here on page 12 of the exhibit?
      19       A.   This specific one?
01:52 20       Q.   Yes.
      21       MR. SINGH:  Miss Court Reporter, I think we are
      22   getting feedback from your end of the world because it
      23   lit up.
      24       THE VIDEOGRAPHER:  My apologies.
01:52 25       THE WITNESS:  Yeah, the break size we stopped

130

01:52  1   using.
       2       Q.   BY MR. POPE:  So this is an accurate depiction.
       3   It's on page 11 is an accurate depiction of the
       4   packaging for the Tough Cookie from 2015 to 2017?
01:52  5       A.   That is accurate.
       6       Q.   I note it says "break size" here, as well.
       7       A.   But it was in that packaging we stopped using.
       8       Q.   Got it, got it.
       9       You were still offering the break size during
01:53 10   these years --
      11       A.   Just the packaging that was formerly shown.
      12       Q.   Got it.
      13       Did the regular size, the 3-ounce Tough Cookie,
      14   also have packaging similar to this during 2015 to 2017?
01:53 15       A.   That is correct.
      16       Q.   And then in 2018 you shifted to the packaging
      17   shown on slide 10 of the exhibit; right?
      18       A.   Correct.
      19       Q.   Okay.  Was the break size still being offered
01:53 20   between 2018 and 2019?
      21       A.   I don't recall.  I know there was some stock we
      22   were selling off, but I don't recall the exact date that
      23   stock got sold off officially.
      24       Q.   Got it.
01:53 25       And then the last picture here is labeled 2022.

131

01:54  1   Is it safe to assume this is a fair and accurate
       2   depiction of the planned re- -- re-release of the Tough
       3   Cookie?
       4       A.   With the exception of a couple of changes.
01:54  5       Q.   Okay.  What are those changes?
       6       A.   It won't be a white chocolate macadamia cookie.
       7   It is a white chocolate almond cookie.  And the grams of
       8   protein is lower than what it will be.
       9       Q.   Okay.  So the 5 grams that is shown on the
01:54 10   slide -- or page 9 is inaccurate on what it will be
      11       A.   And the size of the cookie is inaccurate.  The
      12   size of this cookie is 1.5-ounce.  The size of the
      13   cookie will be 2 ounces, and the protein content is
      14   different.
01:54 15       Q.   What will the protein content be?
      16       A.   7 grams.
      17       Q.   I notice in going from the picture on -- the
      18   packaging on page 9 of the exhibit, which is 2022, and
      19   the latest date on the slide -- the prior slide, slide
01:55 20   10 is 2019.  Do you see that?
      21       A.   Correct.
      22       Q.   So explain the gap between 2019 and 2022?
      23       A.   The gap was that we decided in late 2019 to
      24   start reformulating our fully functional line to keto.
01:55 25       Q.   Okay.  Were there -- so the reformulation was

132

01:56  1   completed in 2022?
       2       A.   No.  The launch -- the current launch that
       3   we're slated for this quarter is the fully functional
       4   one, not the keto.
01:56  5       Q.   So in 2019 you began -- a decision was made to
       6   reformulate to keto?
       7       A.   Yes.
       8       Q.   Is that process still in place?
       9       A.   No.  No.  We have postponed that.
01:56 10       Q.   When is the slated launch of the keto?
      11       A.   We don't know at this moment.
      12       Q.   And what flavor was the keto version slated to
      13   be?
      14       A.   We were considering originally a double
01:57 15   chocolate.  That changed.  We were then working on --
      16   well, it was actually -- sorry.
      17       Originally, we were considering trying to do
      18   peanut butter, and then down the road double chocolate.
      19   Yeah.  Sorry.
01:57 20       Q.   Did you -- are there mock-ups of the packaging
      21   for the keto version of the Tough Cookie?
      22       A.   I don't have those in front of me, but, yeah,
      23   we did have mock-ups.
      24       Q.   For both the double chocolate, as well as the
01:57 25   peanut butter?

133

01:57 1    A.  I don't believe we had it for the peanut
2    butter.
3    Q.  Okay.
4    A.  I'd have to check.  I don't recall.
01:58 5        MR. POPE:  I put another document in the chat.
6    Q.  You will see -- are you familiar with the
7    Wayback Machine, Mr. Resnikoff?
8    A.  Wayback Machine, no.
9    Q.  It is a colloquialism for a website called the
01:58 10   Internet Archive or a company called the Internet
11   Archive, which over time stores snapshots of various
12   websites.  And you can visit the Internet Archive to see
13   what a particular website might have depicted at a
14   certain time.  You can see --
01:59 15       I will represent to you this is a printout from
16   the Wayback Machine, and the web address is there, and
17   from The Cookie Department's website as of October 20,
18   2021.
19       Across here you see the 2021.  You see the 10,
01:59 20   which represents October, and then the 20, which
21   represents the 20th.  The rest of the dates are just
22   generated as part of the address.
23       (Whereupon, Exhibit 9 was marked
24       for identification by the Court Reporter
01:59 25      and attached hereto.)

134

01:59 1    Q.  BY MR. POPE:  It says "Baking this summer," and
2    it has a couple of cookies here.
3        On the left of page 2 of the exhibit is the
4    double chocolate protein Tough Cookie.  Is that the
01:59 5    packaging that you were describing as the -- as one of
6    the options for the planned keto release of Tough
7    Cookie?
8    A.  That is true.
9    Q.  I think you confirmed that the peanut butter
02:00 10   flavor you had not developed packaging for; right?
11   A.  Right.
12   Q.  When was this double chocolate protein Tough
13   Cookie developed?
14   A.  Well, it was developed over the pandemic,
02:00 15   actually.  It started development in 2021.
16   Q.  You said in 2021?
17   A.  Yeah.  We started -- I'm sorry.  2020 we
18   started -- and then -- yeah, we started in 2020.
19       Sorry.  I got my dates wrong.
02:00 20   Q.  Is that in your notes, as well, Mr. Resnikoff?
21   A.  That is in my notes.
22   Q.  Where in your notes is it?
23   A.  Under "Reformulation of Tough Cookie."
24       MR. SINGH:  It's blurred the way he is showing
02:01 25   it.  Just tell him.

135

02:01 1        Keyonn, I don't know.  He was trying to show it
2    to you but it's blurred.
3    Q.  BY MR. POPE:  Okay, I see it.
4        I will go back for the record.  I think what
02:01 5    you were probably showing was page 14 of the prior
6    exhibit.
7    A.  Yep.
8    Q.  Which bullet answers that question,
9    Mr. Resnikoff?
02:02 10   A.  Well, we started in 2020.
11   Q.  Which bullet is that?
12   A.  2020, pandemic hit and put a pause on
13   reformulation.
14   Q.  That's the third bullet; right?
02:02 15   A.  That is accurate.
16   Q.  So development of -- of the double chocolate
17   chip Tough Cookie product began in 2020.
18   A.  Yes.
19   Q.  Has -- has the product development been
02:02 20   completed?
21   A.  No.
22   Q.  Why not?
23   A.  Because we had supply chain issues due to the
24   pandemic.  We had labor issues with our co-packer, and
02:02 25   we tried to restart the formulation process with our

136

02:03 1    co-packers, and they weren't able to get a recipe that
2    we -- that we were happy with.
3    Q.  Okay.  How about the white chocolate macadamia
4    flavored Tough Cookie; when did development of that
02:03 5    begin?
6    A.  That began in early 2020.
7    Q.  And is development complete?
8    A.  Development is complete but, like I mentioned
9    in our last questions, that it is no longer a white
02:03 10   chocolate macadamia cookie.  It is a white chocolate
11   almond cookie.
12   Q.  When did -- when did development become final?
13   A.  Development became final last week.
14   Q.  Why the change from macadamia to almond?
02:04 15   A.  The cost was a big factor.
16   Q.  Any other reasons?
17   A.  No.  That's it.
18   Q.  Why the change from -- for purposes of the
19   Tough Cookie from the peanut butter flavored Tough
02:04 20   Cookie to a white chocolate Tough Cookie?
21   A.  Because our current co-packer is a peanut-free
22   facility.
23   Q.  Did -- did the peanut variety of -- or the
24   peanut flavored Tough Cookie have nuts in it?
02:04 25   A.  Yes.

137

02:05   1      Can we take a stretching break and a bathroom
2  break?
3      MR. POPE:  Let's do it.
4      THE WITNESS:  I appreciate it.
02:05   5      THE VIDEOGRAPHER:  The time is 2:05 p.m. and we
6  are off the record.
7      (Recess taken at 2:05 p.m. - 2:17 p.m.)
8      THE VIDEOGRAPHER:  The time is 2:17 p.m. and we
9  are now back on the record.
02:18   10      MR. POPE:  Thank you.  Madam Court Reporter
11  graciously pointed out that I neglected to, on the
12  record, name the last exhibit or number the last
13  exhibit.  So it's our internal Exhibit 10, but it's
14  Deposition Exhibit 9, which I'll put on the screen just
02:18   15  for clarity.
16      It's the Wayback Machine exhibit I just wanted
17  to note that for clarity.  Thank you, Madam Court
18  reporter.
19      MR. SINGH:  What's the internal exhibit number?
02:18   20      MR. POPE:  It's internal Exhibit 10 and
21  Deposition Exhibit 9.  I have shared my screen so,
22  hopefully, you can see it now.
23      Q.  Mr. Resnikoff, I know we talked about the
24  persons responsible for naming each of your products.
02:19   25  But who -- who is responsible for developing the

138

02:19   1  recipes?
2      A.  I am.
3      Q.  For all the products?
4      A.  Yes.
02:19   5      Q.  We have talked about a few different, sort of,
6  formulations of the Tough Cookie.  Do each of those have
7  different nutritional properties?
8      A.  Yes.
9      Q.  Do you have -- do you have the nutrition labels
02:19   10  for each of the versions that we discussed?
11      A.  I don't have them on me, no.
12      Q.  Would that be something you can get on one of
13  the breaks?
14      A.  I don't think I can get it during the break
02:20   15  because it is not -- I don't have my computer with me.
16      Q.  Okay.
17      A.  But I can definitely consult with counsel in
18  getting that to you.
19      Q.  That would be helpful.  Do you --
02:20   20      I don't want to spend a lot of time on this if
21  you don't have recollection.  But do you -- do you know
22  some of the key nutritional properties, off the top of
23  your head, if we were to walk through the various
24  formulations?
02:20   25      A.  I'll do my best.

139

02:20   1      Q.  Okay.
2      Let's try it and see what we get.  So for -- I
3  am going to share my screen.  Sorry.
4      We are back on Exhibit 8 now, which is from
02:21   5  your notes.  I'm on page 12 of Exhibit 8.
6      The Tough Cookie break size formulation from
7  2012 to 2014, do you remember how many calories are in
8  this one?
9      A.  I want to say they are between 100 to 150, but
02:21   10  I cannot -- I cannot specify the exact amount.
11      Q.  How about fat?
12      A.  I don't recall.
13      Q.  What about sugar?
14      A.  I feel like I'd be speculating if I guessed.
02:21   15      Q.  Just to streamline, I don't want to -- I was
16  going to go through a similar line of question for --
17  questioning for the products that appear on page 11,
18  which I'm showing you page 10, which is the peanut
19  butter toffee variety from 2018 to 2019 and then the
02:22   20  white chocolate macadamia variety for 2022.
21      Again, just to cut across the field a bit,
22  would you recall similar questioning if I asked you
23  about those products?
24      A.  Yeah, it's similar, in the sense I don't have
02:22   25  the exact grams of sugar or fat, and, yes, correct.

140

02:22   1      Q.  Okay.
2      A.  I can provide you with that information.
3      MR. SINGH:  Keyonn, I am comfortable with him
4  giving reasonable approximations that we can then verify
02:22   5  and, obviously, discovery closes tomorrow.  We are happy
6  to work with you to make sure you get this information.
7  You let me know how you want us to do it.
8      MR. POPE:  Look, I don't want to -- I don't
9  think it's critical to have Mr. Resnikoff speculate
02:23   10  about it.  It's fine.  It's not that critical.  What
11  would be better probably for him and for us would be
12  just to have copies of the labels for each.
13      MR. SINGH:  We will work on that and work to
14  get it to you in an appropriate time.
02:23   15      The only thing is, because of him traveling and
16  whatnot, maybe we can work something out if it has to be
17  given to you after tomorrow.  We will leave it up to
18  you.
19      MR. POPE:  That's fine.  It is not critical to
02:23   20  have it before tomorrow.  That's fine.
21      MR. SINGH:  Okay.
22      MR. POPE:  Thank you.  That allows me to
23  truncate a lot of my questioning, so that's good.  Just
24  making a note.
02:24   25      Q.  Have consumers ever raised concerns about the

141

02:24 1 nutritional properties of The Cookie Department's
2 products?
3   **A. Not that I'm aware of, no.**
4     **(Whereupon, Exhibit 10 was marked**
02:24 5     **for identification by the Court Reporter**
6     **and attached hereto.)**
7     MR. POPE: I am going to load the next
8 exhibits. It is internal Exhibit 20, and I believe it's
9 Depo Exhibit 10. I will share my screen momentarily.
02:25 10    MR. SINGH: I misnumbered. We are now at Depo
11 Exhibit 10; is that correct?
12    MR. POPE: That's right. My internal 10 was 9
13 for the depo. And now my internal 20 is 10 for the
14 depo.
02:25 15    MR. SINGH: Gotch you.
16    MR. POPE: I am now sharing my screen.
17   Q. It is an article dated at the top left May 29,
18 2014.
19    Do you see that, Mr. Resnikoff?
02:25 20  **A. I do.**
21   Q. Have you seen this article before?
22  **A. It's been a while.**
23   Q. But you have seen it at some point. I am not
24 asking if you remember vividly everything in it.
02:26 25  **A. I don't remember vividly, but it looks familiar**

142

02:26 1 to me, yes.
2   Q. I can scroll through this if you want to read
3 it in its entirety. I am happy to do that.
4    My line of questioning is going to be about
02:26 5 specific passages, but I am happy to do whatever you
6 prefer.
7  **A. You can skip.**
8    MR. SINGH: Just let us know the page you are
9 on.
02:26 10   MR. POPE: Will do. I'm finding it myself.
11   MR. SINGH: Are there only two pages on this?
12   MR. POPE: Yes.
13   MR. SINGH: The scrolling is kind of funny.
14   MR. POPE: I have got it zoomed in, hoping that
02:26 15 Mr. Resnikoff and the videographer can see it.
16   Q. This -- I'm on page -- I'm still on page 1. I
17 will highlight the block I want to focus in on right
18 now.
19    I will read it for a record.
02:27 20    "For a while SpoonRocket started offering
21 dessert with its health-centric meals, teaming with the
22 cookie brand, The Cookie Department, but it decided to
23 replace the cookies with smoothies and more salads to
24 maximize its nutritious offering. "We have programmers
02:27 25 here and we love them. They don't necessarily take care

143

02:27 1 of themselves. We know their focus on life is work;
2 it's the passion of their lives and their loss. So what
3 we do is we try to take care of them,' says Wong."
4    And Wong, I think up above, was identified as
02:27 5 someone affiliated with SpoonRocket.
6    Who is SpoonRocket, by the way?
7  **A. SpoonRocket was a customer of ours for a while.**
8  **They are no longer in business, but at the time they**
9  **were, early on, to the gig economy of delivering fresh**
02:28 10 **meals to consumers and offices.**
11   Q. Got it. That's helpful.
12    I am scrolling down, still on page 1. I'll
13 highlight the sections I want to focus in on.
14    It goes on, still on Exhibit 10 here, "That is
02:28 15 not to say that The Cookie Department's cookies are
16 empty calories. 'You get your indulgence with butter,
17 and flour and sugar, but you also get with each cookie,
18 you get a benefit of, you know, protein, to
19 coffee-caffeine, to probiotics, antioxidants,
02:28 20 detoxifying spices, superfoods,' says Akiva Resnikoff,
21 The Cookie Department's co-founder."
22    I will go on and complete the quote.
23    "'You know, we basically create a product that
24 goes beyond just selling an indulgence product. It
02:28 25 actually becomes a healthier option for the average

144

02:29 1 consumer,' Resnikoff says. The protein-packed Tough
2 Cookie is a popular option at gyms."
3    Did you see that?
4  **A. Yes. I look back at it now and wish I had**
02:29 5 **better grammar, but hey.**
6   Q. Just to understand -- to make sure I'm
7 understanding, you all were -- The Cookie Department was
8 providing its cookies to SpoonRocket; right?
9  **A. That is correct.**
02:29 10   Q. But SpoonRocket decided to replace The Cookie
11 Department's cookies for more nutritious offerings;
12 right?
13    MR. SINGH: Object to form.
14    THE WITNESS: I can't speculate if -- if our
02:29 15 cookies were less nutritious than the offering they
16 replaced it with.
17   Q. BY MR. POPE: That's what the article says;
18 right?
19    MR. SINGH: Object to form.
02:29 20    THE WITNESS: Well, no, the article says in
21 their opinion it was a nutritious offering so . . .
22    But I'm not a food scientist.
23   Q. BY MR. POPE: I am going to read -- I will read
24 the language back to you, and I have my cursor here, and
02:30 25 I am hoping you can see it.

---

145

02:30  1     "But it decided to replace the cookies with
2     smoothies and more salads to maximize its nutritious
3     offerings."
4           **A.   Yes, they decided to replace our product with**
02:30  5     **salads and smoothies.**
6           Q.   And the rest of that is "to maximize its
7     nutritious offerings"; right?
8                MR. SINGH:  Object to form.
9                THE WITNESS:  I don't know what they were
02:30  10    thinking when they wrote that.
11          Q.   BY MR. POPE:  That's what the article says;
12    right?
13               MR. SINGH:  Object to form.
14               THE WITNESS:  That's what the article -- that's
02:30  15    what the person who wrote the article says, yes.
16          Q.   BY MR. POPE:  Did you ever receive any feedback
17    from SpoonRocket on the nutritional values of The Cookie
18    Department's products?
19          **A.   I don't recall, no, not in my recollection.  It**
02:31  20    **was a long time ago, no.**
21          Q.   You don't recall or no, you never got the
22    feedback?
23          **A.   I don't recall.**
24          Q.   It could have happened?
02:31  25          **A.   It could have happened.**

---

146

02:31  1           Q.   I am going to share my screen again.  Same
2     exhibit.
3                MR. SINGH:  Madam Court Reporter, I am going to
4     get a belated objection on the record to Mr. Pope's
02:31  5     previous question.  My client answered very fast, which
6     is object to form.
7           Q.   BY MR. POPE:  It's the same exhibit, still on
8     page 1.
9                It says, "Google stocks up on cookies from The
02:32  10    Cookie Department for its employees."
11               "'Google was just the start of our tech
12    take-over in Silicon Valley,' wrote Resnikoff in an
13    email to us.  In a recent update post for its original
14    KickStarter backers, he announced that it seemed like he
02:32  15    was adding about one tech campus every week to his
16    client base, counting Westfield Labs and Sony
17    PlayStation among his various tech customers.  The
18    company delivers to everywhere in the U.S. and Canada
19    and plans to expand more this year."
02:32  20               It goes on, still on page 1, same exhibit, "To
21    keep its customers on the healthy side, The Cookie
22    Department scaled down its coffees" -- "its cookies,"
23    rather, by half to a 'break size.' Resnikoff says he
24    made the change in direct response to feedback he got
02:33  25    from Google, which, he notes, is conscious of supplying

---

147

02:33  1     its employees with healthy food options.  His original
2     Awaken Baked cookie contains 300 calories, but the
3     snack-sized version has only 170.  Even with its
4     regular-sized cookies, The Cookie Department recommends
02:33  5     only eating half for the right snack-sized portion."
6                Did I read that accurately?
7           **A.   Yes.**
8                MR. POPE:  I will upload my next exhibit, so
9     this is internal Exhibit 13 but Deposition Exhibit 11.
02:34  10               (Whereupon, Exhibit 11 was marked
11                for identification by the Court Reporter
12                and attached hereto.)
13               MR. SINGH:  I seem to be having a little bit --
14    maybe it is just on my end.  You put up Exhibit 13;
02:34  15    correct?
16               MR. POPE:  Right.  Internal Exhibit 13,
17    Deposition Exhibit 11.
18               MR. SINGH:  For some reason, when I am double
19    clicking on your exhibit -- you know what?  Just go
02:34  20    ahead.  I don't want to hold you up.  I will figure it
21    out, and if I need to come back to you, I will figure it
22    out.
23               MR. POPE:  Let me know.  It's sizeable.  It is
24    24, 25 --
02:35  25               MR. SINGH:  That's not the issue.  You are

---

148

02:35  1     naming this Exhibit 11?
2                MR. POPE:  Yes.
3                MR. SINGH:  Got it.  Let me see if it
4     straightens out.
02:35  5           Q.   BY MR. POPE:  Mr. Resnikoff, I will represent
6     to you that this is a printout from the U.S. Patent and
7     Trademark Office of the entire file history for The
8     Cookie Department's 2012 trademark application for the
9     Tough Cookie mark.
02:35  10               Does it look familiar at all?  I will start
11    there.
12          **A.   It does.**
13          Q.   Here the top right, you will see it says "Tough
14    Cookie," which is the mark that was applied for.
02:36  15               The filing date was January 29, 2012.
16               Does that sound right for the timing of
17    the filing what I'll call the first Tough Cookie
18    trademark application?
19          **A.   Yes.**
02:36  20          Q.   Are you okay as I refer to it as the first
21    Tough Cookie trademark application?  Is that okay with
22    your understanding I'm referring to what I'm showing you
23    now in Exhibit 11?
24          **A.   Yes.**
02:36  25          Q.   You see it's got serial number 85528080.  And

---

149

02:36  1   then here it's got an abandonment date of June 3, 2013.
       2       Do you see that?
       3       A. Yes.
       4       Q. If we go down further under the section that
02:37  5   says "Goods and Services," we see it says, "For:
       6   Cookies." And then "International Class 30" is noted
       7   and then the basis is "1B."
       8       We will come back to that.
       9       I will represent to you that there are a bunch
02:37 10   of different basis you can file an application, and 1B
      11   corresponds with intent to use. I will be able to shore
      12   that up and show you that in another place in this
      13   document.
      14       Also this is ITU, filed as ITU. That
02:37 15   corresponds at 1B and the intent to use. And, again, I
      16   will show it to you in plainer English as we scroll
      17   through this. Is that consistent with -- at the time
      18   this application was filed on January 29, 2012, had you
      19   begun using the Tough Cookie mark?
02:38 20       A. Yes.
      21       Q. Why was the application filed as an intent to
      22   use application?
      23       MR. SINGH: I am going to caution the witness
      24   to not disclose privileged information. If you can
02:38 25   answer that without disclosing privileged information,

150

02:38  1   go ahead and do so.
       2       THE WITNESS: If I say anything, I will
       3   disclose privileged information; therefore, I can't
       4   answer.
02:38  5       Q. BY MR. POPE: You would agree it was filed on
       6   an intent to use basis?
       7       MR. SINGH: Object to form.
       8       THE WITNESS: I can't speak on that. This was
       9   handled by my co-founder at the time.
02:38 10       Q. BY MR. POPE: But -- okay. We'll come back to
      11   that.
      12       The application was -- the owner is listed as
      13   The Cookie Department, Inc., correct?
      14       A. Yes.
02:39 15       Q. And the attorney is Bruno Tarabichi. Forgive
      16   me. You pronounced this earlier. I am going to butcher
      17   it, though. What was his last name?
      18       A. I don't know. Just kidding. Tarabichi.
      19       Q. Tarabichi, okay. You talked about that he was
02:39 20   engaged to -- he was former -- formerly engaged to
      21   represent The Cookie Department; correct?
      22       A. Yes.
      23       Q. Was Mr. Tarabichi -- do you know whether he was
      24   paid to represent The Cookie Department?
02:39 25       A. He was.

151

02:39  1       Q. When was the last time you had any
       2   communication with Mr. Tarabichi?
       3       A. I never had any communication with Mr.
       4   Tarabichi.
02:40  5       Q. Even throughout the process of this application
       6   being filed?
       7       A. I wasn't part of the communication. That was
       8   my co-founder at the time.
       9       Q. So we talked a little bit about it being an
02:40 10   intent to use.
      11       I'll jump to page 66. I think it's more
      12   clearly shown there. So on page 66, the same exhibit,
      13   Exhibit 11, you see here -- I'll put a box around it or
      14   I'll highlight it.
02:40 15       "For specific filing basis information for each
      16   item, you must view the display with the input table."
      17       And it says, "International Class 30:
      18   Cookies."
      19       Right, we saw that also above.
02:41 20       And then it reads, "Intent to use. The
      21   applicant has a bona fide intention to use or use
      22   through the applicant's related company or licensee the
      23   mark in commerce on or in connection with identified
      24   goods and/or services."
02:41 25       And then it cites to a certain section of the

152

02:41  1   U.S. Code.
       2       Do you see that?
       3       A. I do.
       4       Q. Did I read that accurately?
02:41  5       A. Yes, I read -- you read what was on the page.
       6       Q. Okay. All right.
       7       Let me go back up. I am going up to page 2 of
       8   Exhibit 11, the section entitled "Prosecution History."
       9       And, Mr. Resnikoff, I will represent to you
02:41 10   that in the intellectual properties space, namely
      11   patents and trademarks, is where prosecution probably
      12   has a different connotation than what we think about it
      13   as sort of more casually, right.
      14       We think about it, typically, in the context of
02:42 15   criminal law. But in trademark law prosecution refers
      16   to the process of engaging with the trademark office
      17   to -- in an attempt to secure certain trademark rights.
      18       So this reference to trademark history is
      19   simply the history of this application, right, from the
02:42 20   time it was filed until, in this case, the abandonment.
      21       A. Uh-huh.
      22       Q. So we saw up above it was filed in January 29,
      23   2012. I won't read all of these, but on February 1, two
      24   days -- yes, two days, three days later, February 1,
02:43 25   2012, there is an entry for the application being

153

02:43  1    entered into the trademark system.
      2          And subsequently, May 8, 2012, the application
      3    was assigned to an examiner, so on and so forth.
      4          What I want to focus us on is this November 9
02:43  5    entry, one of the November 9 entries.  "TEAS response to
      6    office action received."
      7          Actually, no.  I'm jumping ahead.  I'm sorry.
      8          It's this -- it's one of the November -- May 9,
      9    yeah, the May 9 entries.  It is "Examiner's
02:44 10    amendment/priority action emailed."
     11          I jumped down, and I wanted you to see the
     12    whole history and I will be poking -- pointing to
     13    various points within the history.
     14          You see the day this is directed to The Cookie
02:44 15    Department, but it looks like it's going to The Cookie
     16    Department's attorney at the time.  The subject is the
     17    Tough Cookie -- the first application, first Tough
     18    Cookie application.  And the date is May 9, 2012.
     19          Do you see that, Mr. Resnikoff?
02:44 20    A.  I do.
     21    Q.  I will scroll down, and it's giving some
     22    examination about how the examiner searched and more
     23    information about the same.  There's a picture of the
     24    mark.  Actually, I forgot these are in reverse order.
02:45 25          Here, page 44, similar setup.  This went to

154

02:46  1    your attorney or to The Cookie Department's attorney at
      2    the time.  It was sent on May 9, 2012.  It's got the
      3    application serial number 85528080.  The mark is Tough
      4    Cookie.
02:46  5          Still at the bottom of page 44 under the
      6    heading "Priority Action" it reads, "The trademark
      7    examining attorney has searched the USPTO's database of
      8    registered and pending marks and has found no
      9    conflicting marks that would bar registration under
02:46 10    Trademark Action 2(d)."
     11          It goes on, "Issues the applicant must address
     12    on May 9, 2012, the trademark examining attorney and
     13    Bruno Tarabichi discussed the issues below.  Applicant
     14    must timely respond to these issues.  The assigned
02:47 15    examining attorney has reviewed the referenced
     16    application and determined the following."
     17          It says, "Summary of issues that must be
     18    addressed."  And there's one which is "likelihood of
     19    confusion."
02:47 20          Do you see that, Mr. Resnikoff?
     21    A.  I see that.
     22    Q.  If we scroll down under -- it steps through the
     23    analysis of likelihood of confusion under this section.
     24    "Comparison of Marks."
02:47 25          I will just jump down.  It says, "The

155

02:47  1    applicant's proposed mark is Tough Cookie for cookies
      2    and the registrant's referenced mark is One Tough Cookie
      3    for cakes."
      4          Do you see that?
02:48  5    A.  Yes.
      6    Q.  That's on page 45.  Let me jump down just so we
      7    can complete this One Tough Cookie.  I want to show
      8    where it's referenced here and tie it in with the owner
      9    and specific reference to the cited mark.
02:48 10          On page 48, after it's given the analysis of
     11    the rejection, it provides a copy of the registration.
     12    So it's Registration Number 3164109.
     13          Do you see that, Mr. Resnikoff?
     14    A.  I do.
02:48 15    Q.  And, again, the word mark is One Tough Cookie.
     16          Do you see that?
     17    A.  I do.
     18    Q.  And the date registered October 24, 2006;
     19    correct?
02:48 20    A.  Yes.
     21    Q.  It goes on, "The owner is One Tough Cookie,
     22    Inc., based in New York.  Good and services, IC,"
     23    standing for International Class, "30.  Business and
     24    services is cakes."  And the date of first use is listed
02:49 25    as May of 2005.  Did I read all that correctly?

156

02:49  1    A.  That is accurate.
      2    Q.  Before this -- did you ever see this office
      3    action at the time it was issued?
      4    A.  I don't recall.
02:49  5    Q.  When did you first become aware of One Tough
      6    Cookie Bakery?
      7    A.  You know, I don't recall if it was at the time
      8    in 2012 during the application or later down the road.
      9    I don't recall the exact date.
02:49 10    Q.  Okay.  If it was later down the road when --
     11    when might that have been?
     12    A.  I just don't -- I don't recall the
     13    conversation, if a conversation with my co-founder was
     14    had over this situation.  I just don't recall.
02:50 15    Q.  Is there anything that would reflect --
     16    refresh, excuse me, your recollection about when you
     17    first became aware of One Tough Cookie, Inc.?
     18    A.  Possibly in an email.  I don't know.  I don't
     19    know.
02:50 20    Q.  Who would that email be between?
     21    A.  I venture to guess.  I venture to assume my
     22    co-founder and myself, but I don't know.
     23    Q.  Did you search for emails in connection with
     24    discovery for this case?
02:50 25    A.  Did I search for emails?

157

02:50  1    Q.  Yes.
       2    A.  I did.
       3    Q.  Would your search have turned up an email like
       4  the one you described?
02:50  5    A.  I -- I looked at a lot of discovery, and I
       6  can't determine if that specific email was in there.
       7    Q.  Do you recall turning over an email like the
       8  one you described to your -- to your counsel?
       9    A.  I don't remember, no.
02:51 10    Q.  Do you have a sense of the latest date you
      11  would have become aware of One Tough Cookie?
      12    MR. SINGH:  I object to form.  Actually, Madam
      13  Court Reporter, can you read back Mr. Pope's question,
      14  please?
02:51 15    (Record read as follows:
      16    "Q  Do you have a sense of the
      17    latest date you would have
      18    become aware of One Tough
      19    Cookie?")
02:51 20    MR. SINGH:  Did you say the latest?
      21    THE REPORTER:  Yes.
      22    MR. SINGH:  Object to form.
      23    Q.  BY MR. POPE:  You can answer, if you can.
      24    A.  Sorry?
02:52 25    Q.  I said you can answer, if you can.

158

02:52  1    A.  I can't recall.
       2    Q.  Did you know about Tough Cookie prior to this
       3  application being filed?
       4    MR. SINGH:  Object to form.
02:52  5    THE WITNESS:  Did I know --
       6    Q.  BY MR. POPE:  Let me rephrase that.  That was
       7  bad.
       8    MR. SINGH:  You just misspoke.
       9    Q.  BY MR. POPE:  I did.
02:52 10    Did you know about One Tough Cookie, Inc.,
      11  prior to the first Tough Cookie trademark application
      12  being filed?
      13    A.  One Tough Cookie prior.  I don't recall.  Me
      14  personally, I don't recall.
02:52 15    Q.  Is there anything that would help refresh your
      16  recollection?
      17    A.  It was so long ago, to be honest with you.
      18  Again, in discovery I looked at many, many, many
      19  thousands of documents, and I just don't recall
02:53 20  specifically.  I don't want to speculate.
      21    Q.  I appreciate that.
      22    You referenced earlier that a potential email
      23  between yourself and Miss Marcus that might refresh your
      24  recollection on when you became aware of One Tough
02:53 25  Cookie, Inc.; right?

159

02:53  1    MR. SINGH:  Object to form.
       2    THE WITNESS:  I was referring to it because
       3  that's the way we usually communicated.  But I don't
       4  recall exactly specifically an email about this topic,
02:53  5  no.
       6    Q.  BY MR. POPE:  Okay.  Just for purposes of the
       7  record when I'm -- are you okay if I refer to One Tough
       8  Cookie, Inc., as just One Tough Cookie going forward?
       9    A.  I am.
02:54 10    MR. SINGH:  Did we lose someone?  Sorry.  That
      11  was weird.
      12    Q.  BY MR. POPE:  On page 45 of Exhibit 11, again,
      13  it talks about the application being rejected, the first
      14  Tough Cookie application being rejected on likelihood of
02:54 15  confusion grounds.
      16    Do you see that here where my cursor is?
      17    A.  Yes.
      18    Q.  And I won't -- this is legal speak, so I won't
      19  bore you by going through it, each -- the nitty-gritty
02:55 20  details of each, but I do want to go through and just
      21  point out that it is sort of the -- excuse me -- the
      22  section of the analysis related to likelihood of
      23  confusion.
      24    Do you see there is a section related to the
02:55 25  "Comparison of the Marks"; is that right?

160

02:55  1    A.  I see that.  But I'm not a trademark attorney,
       2  so it is very difficult for me to speculate on any of
       3  this.
       4    Q.  Yeah, no, look, I am not asking you to
02:55  5  interpret anything here.  I am merely pointing out that
       6  this section heading here and just confirming that I'm
       7  seeing it correctly.
       8    MR. SINGH:  I am going to object to form.
       9    THE WITNESS:  I see that.  I'm sorry.  My back
02:55 10  is just acting up right now.
      11    MR. POPE:  Do you need a break, Mr. Resnikoff?
      12    THE WITNESS:  Could I take a break to stand up
      13  and stretch?
      14    MR. POPE:  Do you just need a quick one or do
02:56 15  you want to take a more extended one to get loose?
      16    THE WITNESS:  Can you give me, like, 5 to 10?
      17    MR. POPE:  Yes.
      18    THE WITNESS:  I appreciate that.  Thank you.
      19    THE VIDEOGRAPHER:  The time is 2:56 p.m.  We
02:56 20  are now off the record.
      21    (Recess taken at 2:56 p.m. - 3:06 p.m.)
      22    THE VIDEOGRAPHER:  The time is 3:06 p.m.  We
      23  are now back on the record.
      24    Q.  BY MR. POPE:  Mr. Resnikoff, when we left off
03:06 25  we were on Deposition Exhibit 11, which is the May 9,

161

03:06   1    2012, office action in connection with the first Tough
      2    Cookie trademark application.
      3       I've still got it on the screen.  I am on page
      4    45 of the exhibit.  We were beginning to walk through,
03:07   5    at least, some of the headings related to the finding --
      6    the examiner's finding of likelihood of confusion.
      7       Do you recall that?
      8    **A.  Yes.**
      9    Q.  Okay.  I think before the break you were
03:07  10    explaining to me because you are not a trademark
    11    attorney that it was difficult for you to opine on, sort
    12    of, the substance of the -- the analysis with respect to
    13    likelihood of confusion.
    14       MR. SINGH:  Object to form.
03:07  15       THE WITNESS:  I just don't understand this --
    16    this -- this explanation because I'm not an attorney,
    17    not a trademark attorney.
    18    Q.  BY MR. POPE:  Okay.  Are you an attorney at
    19    all?
03:07  20    **A.  No.**
    21    Q.  So you have no opinion on any of the substance
    22    of this document?
    23    **A.  I just can't comment on it because I don't -- I**
    24    **don't understand it.  It's not something I'm versed in.**
03:08  25    Q.  Understood.

162

03:08   1       If I were to, for example, highlight this
      2    section just under the "Likelihood Of Confusion"
      3    section -- feel free.  I'll zoom in.  Take your time to
      4    review it, and then I'll ask my question.
03:09   5    **A.  Okay.**
      6    Q.  Okay.  Is it -- do you have an opinion on what
      7    the highlighted language means?
      8    **A.  No.**
      9    Q.  And that's because you're not a trademark
03:09  10    attorney?
    11    **A.  That is accurate.**
    12    Q.  So the heading just above the section
    13    highlighted here on page 45 of Exhibit 11, the heading
    14    just above is "Likelihood of Confusion."
03:09  15       If we go down there's another heading that
    16    reads "Comparison of the Marks."
    17       Do you see that?
    18    **A.  I do.**
    19    Q.  I am going to do a similar thing here, just
03:09  20    highlight that language.  And take whatever time you
    21    need to review it and let me know when you're done.
    22    **A.  Okay.**
    23    Q.  Similar question with the section above.  If I
    24    were to ask you -- do you have an opinion on the meaning
03:10  25    of the highlighted language?

163

03:10   1    **A.  I don't have an opinion.**
      2    Q.  Why not?
      3    **A.  Because I'm not a trademark attorney.**
      4    Q.  Okay.  The next section is "Comparison of
03:10   5    Goods."  I am on the bottom of page 45 of Deposition
      6    Exhibit 11.
      7       Do you see that heading "Comparison of Goods"?
      8    **A.  Okay.**
      9    Q.  This section, the text under it sort of breaks
03:10  10    across and spills over into Section 45.  I'll highlight
    11    as much as I can to begin with and give you a chance to
    12    review it similarly.
    13    **A.  Thank you.  Okay.**
    14    Q.  A similar question:  Do you have an opinion on
03:11  15    the interpretation or meaning of the text I have
    16    highlighted?
    17    **A.  I don't.**
    18    Q.  Now just for completion, I will highlight the
    19    balance of the comparison of goods section, which are
03:12  20    the first two full paragraphs at the top of page 46 of
    21    Deposition Exhibit 11.  I will give you a minute to read
    22    that.
    23    **A.  Okay.**
    24    Q.  The same question:  Any interpretation on the
03:12  25    meaning of the highlighted language?

164

03:12   1    **A.  No.**
      2    Q.  Why not?
      3    **A.  I'm not a trademark attorney.**
      4    Q.  There is a section here under "Examiner
03:12   5    Amendment."  Do you see the Examiner's Amendment section
      6    here on page 46 of Exhibit 11?
      7    **A.  I see it.**
      8    Q.  I am going to highlight -- I am just going to
      9    highlight the Disclaimer section for you to read.
03:13  10    **A.  Okay.**
    11    Q.  Any -- any opinion on the interpretation of the
    12    highlighted language?
    13    **A.  No.**
    14    Q.  Why not?
03:13  15    **A.  Because I'm not a trademark attorney.**
    16    Q.  All right.  Let me stop sharing for a second.
    17       I am sharing again, same exhibit, still on
    18    Exhibit 11.  I just needed time to orient on the page.
    19    I am at page 34 of Exhibit 11, and the caption here is
03:14  20    "Response to Office Action."
    21       Do you see that across the top?
    22    **A.  Yes.**
    23    Q.  The date down at the bottom here, the bottom of
    24    page 34 is November 9, 2012.
03:14  25       Do you see that?

165

```
03:14   1      A.  I do.
        2      Q.  And then the signature section shows Bruno
        3  Tarabichi's name.
        4      Do you see that?
03:14   5      A.  I do.
        6      Q.  And Mr. Tarabichi is listed as attorney of
        7  record, and it notes that he's a member of the
        8  California Bar.
        9      Do you see that?
03:14  10      A.  I do.
       11      THE VIDEOGRAPHER:  Mr. Pope, can you zoom out a
       12  little bit, please?
       13      THE WITNESS:  Yes.  I'm starting to remember my
       14  age.
03:15  15      MR. POPE:  O'Bryant, let me know if you need me
       16  to scroll slowly.
       17      THE VIDEOGRAPHER:  You are doing fine so far.
       18  Thank you.
       19      MR. POPE:  Okay.  Okay.
03:15  20      Q.  I'm going to skip to page 37 of Depo Exhibit
       21  11.  So we're still in this Response to Office Action
       22  that was submitted on November 9, 2012.
       23      I'll skip this preliminary section and point us
       24  to the Analysis section.  And there's a heading
03:15  25  "Applicant's Tough Cookie Mark Does Not Create A
```

166

```
03:16   1  Likelihood Of Confusion With The Cited Mark."
        2      Do you see that?
        3      A.  I see that.
        4      Q.  I want to walk through the substance of this.
03:16   5  I will just highlight and similarly give you -- I'll
        6  pause while you have a chance to digest it and you can
        7  let me know.
        8      A.  Okay.
        9      Q.  Do you have an opinion on the meaning of the
03:16  10  highlighted language?
       11      A.  I don't.
       12      Q.  Why not?
       13      A.  I'm not a trademark attorney.
       14      Q.  Okay.  I will give you a minute to read.  I am
03:16  15  at the top of page 38, still on Exhibit 11.
       16      A.  Okay.
       17      Q.  Any opinion on the highlighted language?
       18      A.  No.
       19      Q.  For the sake of trying to truncate this,
03:17  20  because I'm being presumptuous here, but it's been the
       21  case that you haven't had much, if any, opinion on the
       22  substance of these sections.  I'm going to streamline,
       23  if that's okay with you, and move through it a little
       24  quicker.
03:17  25      MR. POPE:  Mr. Singh, if you prefer I go the
```

167

```
03:17   1  pace I'm going, I am happy to do that, too.
        2      MR. SINGH:  We would even be prepared to
        3  stipulate that given -- actually, you know what?  I am
        4  going to not say anything because I don't want to do
03:17   5  anything that is going to in any way influence the
        6  witness.  I will just say that if you wanted to
        7  stipulate, we can stipulate.  It is up to you.  There
        8  are a number of methods you can use to handle this.
        9      MR. POPE:  Let me -- if we could stipulate and
03:17  10  on the record note that the stipulation apply to the
       11  witness, right, that would streamline things
       12  tremendously, I think.
       13      MR. SINGH:  Let's be careful on the wording.  I
       14  want to hear what the proposed wording of the
03:18  15  stipulation is.
       16      MR. POPE:  What I intend to do is walk through
       17  the entirety of this office action or the response to
       18  the office action, right, here in Deposition Exhibit 11.
       19      MR. SINGH:  Yep.
03:18  20      MR. POPE:  And establish that Mr. Resnikoff
       21  won't have any opinion on any of the substance of the
       22  analysis and establish the reason for that, assuming
       23  that he won't have an opinion.  And my assumption --
       24      MR. SINGH:  Yep.
03:18  25      MR. POPE:  My assumption -- my assumption would
```

168

```
03:18   1  be that he wouldn't have an opinion on any of the
        2  substance and that the reason would be because he's not
        3  a trademark attorney.
        4      That would be, sort of, the stipulation that I
03:18   5  would propose.
        6      MR. SINGH:  The only thing I would add to that
        7  is, as he previously testified, not only is he not a
        8  trademark attorney but he had no interaction with Bruno
        9  Tarabichi at all.
03:19  10      MR. POPE:  Understood.
       11      MR. SINGH:  Those two facts combined make it
       12  extremely difficult, and I understand why he is
       13  answering the way he is.
       14      Thus, we can stipulate to everything you said,
03:19  15  that he has no opinion -- just to be clear, no opinion
       16  on the analysis.
       17      MR. POPE:  Yes.
       18      MR. SINGH:  And, obviously, he may have
       19  opinions about facts ultimately that are not contained
03:19  20  in this analysis, but that he has -- I just don't want
       21  your stipulation to be used to say as the 30(b)(6)
       22  witness he was not prepared, didn't know the related
       23  facts, et cetera.
       24      MR. POPE:  No.  That -- that's not the intent
03:19  25  at all.
```

169

03:19  1          MR. SINGH:  Okay.
      2          MR. POPE:  I just --
      3          MR. SINGH:  Good.  Then I can agree -- I can
      4  agree that we can stipulate to the fact that Akiva
03:19  5  Resnikoff as the Rule 30(b)(6) witness and also in his
      6  capacity as a 30(b)(1) witness today cannot opine or
      7  provide an opinion on what this attorney wrote, given he
      8  has testified he did not interact with this attorney
      9  and, obviously, he did not prepare this document.
03:20 10          MR. POPE:  Okay.  That's -- that's fine.
     11          MR. SINGH:  Do you want to ask Mr. Resnikoff,
     12  obviously, just to be clean, do you want to ask him if
     13  he agrees to what we just said?
     14      Q.  BY MR. POPE:  Yes, Mr. Resnikoff, were you
03:20 15  listening in on my dialogue with Mr. Singh?
     16      A.  I was.
     17      Q.  And also, did you hear the proposed
     18  stipulation?
     19      A.  I did.
03:20 20      Q.  Do you agree to be bound by it?  Are you
     21  comfortable with it?
     22      A.  Yes.
     23          MR. SINGH:  Hold on a second.  To be bound by
     24  it, but we are agreeing that for the purpose of this
03:20 25  depo his answer will be the same.  The bound part

170

03:20  1  concerns me a little bit, but yeah.
      2          MR. POPE:  Okay.  I wasn't being difficult.
      3          MR. SINGH:  I know you weren't.  It got a
      4  little ominous there.  You got a little ominous.  Who
03:21  5  are you trying to bind?
      6          MR. POPE:  All good.
      7      Q.  Just for -- I want to flip through these to
      8  make sure we're on -- to ensure we're on the same page
      9  and that the video captures it.
03:21 10          Page 38 is a section, subsection (a) reads,
     11  "Applicant's mark is sufficiently dissimilar from the
     12  cited mark to obviate any likelihood of confusion."
     13          And there is some analysis that follows.
     14          Assuming that, Mr. Resnikoff, you would agree
03:21 15  that the stipulation applies to that section?
     16      A.  Yes.
     17      Q.  Okay.  And then there is another, sort of,
     18  subheading at the top of page 39 of Deposition Exhibit
     19  11, it says, "The marks are different in terms of
03:21 20  appearance."  And some analysis follows.  You're
     21  agreeing that the stipulation would cover this material,
     22  as well?
     23      A.  Yes, that's correct.
     24      Q.  Toward the bottom of page 39, there is another
03:22 25  heading, "The marks are different in terms of sound."

171

03:22  1  And then some analysis follows that spills over to the
      2  top of page 40.
      3          Are you comfortable with the stipulation
      4  covering that portion, as well?
03:22  5          MR. SINGH:  I want to note, because this is a
      6  somewhat unusual situation, my previous caveat on the
      7  stipulation was that he's not -- that the stipulation is
      8  not applying to whether or not he has opinions on the
      9  underlying facts.
03:22 10          The way you just summarized that section, you,
     11  kind of, read a selected portion that was an underlying
     12  fact.  I just want to be very clear this stipulation is
     13  to the descriptions and legal writings of both the
     14  examiner and the attorney, not to underlying facts.
03:22 15          MR. POPE:  I don't think I said anything about
     16  underlying -- I am merely reading the headings for
     17  trying to make the record clear, as clean as I can.
     18          MR. SINGH:  I am making sure.
     19          MR. POPE:  The headings, presumably the
03:23 20  attorney wrote them.  So it would cover it; right?
     21          MR. SINGH:  Right.  We are at peace, Keyonn.
     22  We are at peace.
     23      Q.  BY MR. POPE:  Let me ask the question on this
     24  particular section.  The section heading is, "The marks
03:23 25  are different in terms of sound."

172

03:23  1          Do you see that, Mr. Resnikoff, on the bottom
      2  of page 39 of the exhibit?
      3      A.  Yes.
      4      Q.  There are some analysis that follows that we
03:23  5  will skip past.  Are you comfortable that the
      6  stipulation applies to this section, as well?
      7      A.  I am.
      8      Q.  Continuing on to near the top of page 40 of the
      9  exhibit, the heading reads, "The marks are different in
03:23 10  terms of meaning."
     11          And then there's some -- there's some analysis.
     12          Are you comfortable that the stipulation covers
     13  this portion, as well?
     14      A.  I am.
03:24 15      Q.  Okay.  And then there's toward the middle or
     16  bottom of page 40 of Exhibit 11, there's a heading that
     17  reads, "The marks are different in terms of overall
     18  commercial impression."
     19          Do you see that?
03:24 20      A.  I do.
     21      Q.  And then there is a short paragraph.
     22          Do you see the short paragraph that I'm
     23  referring to?
     24      A.  The one you're circling, yes.
03:24 25      Q.  Yes, okay.

JAN BROWN & ASSOCIATES (415) 981-3498 (800) 522-7096

173

03:24 1        Are you comfortable with the stipulation
2  covering that portion?
3     A.  Yes.
4     Q.  And there's some subheadings.  I know it's kind
03:24 5  of weird, but the subheading -- subheading B, near the
6  bottom of page 40 of the exhibit, Exhibit 11, reads,
7  "Applicant's cookies are sufficiently different from
8  registrant's goods to obviate any likelihood of
9  confusion."
03:25 10     Do you see that?
11     A.  Yes.
12     Q.  There's a litany of analysis there.
13     Are you comfortable that Section B is covered
14  by the stipulation?
03:25 15     A.  I do.
16     Q.  Okay.  And then there's Section C that begins
17  toward the top of page 42 of Exhibit 11.  It reads,
18  "Applicant's and Registrants's trade channels are
19  sufficiently different to obviate any likelihood of
03:25 20  confusion."
21     Do you see that?
22     A.  I do.
23     Q.  Following still on page 42 there is, again,
24  some analysis that applies to Section C.
03:25 25     Are you comfortable that this section is

174

03:25 1  covered by the stipulation?
2     A.  Section C, yes, the one you're circling, yes.
3     Q.  And at the top of page 43 of Exhibit 11, the
4  heading D reads, "Registrant has failed to file a
03:26 5  Section 8 declaration of use."
6     Do you see that?
7     A.  I do.
8     Q.  And the following that the -- the analysis that
9  follows it, are you comfortable that the stipulation
03:26 10  covers it?
11     A.  Yes.
12     Q.  I will take all of this together - again,
13  trying to truncate -- but there are two sections, a
14  disclaimer section and a conclusion section near the
03:26 15  bottom of page 43 of Exhibit 11.
16     Do you see those two sections?
17     A.  I do.
18     Q.  And then there's analysis under both sections.
19     Do you see that?
03:26 20     A.  Yep.
21     Q.  Are you comfortable that the stipulation covers
22  both the disclaimer and the conclusion section?
23     A.  Yes.
24     Q.  All right.  That was painful, but I think a lot
03:27 25  faster than it would have been had we gone section by

175

03:27 1  section.
2     A.  Okay.  I have to say "stipulation" 10 times
fast.
3     Q.  I am going to stay in this document.  I am
03:27 5  going to go to page 30 of the document, which -- so page
6  30 of Exhibit 11, and this appears to be a memo of some
7  sort addressed to Mr. Tarabichi on behalf of The Cookie
8  Department.
9     The subject line is "U.S. Trademark Application
03:27 10  Number 85528080 for Tough Cookie," which we have been
11  referring to as the first Tough Cookie trademark
12  application.
13     Did I read all of that correct, Mr. Resnikoff?
14     A.  Yes.
03:28 15     Q.  And the date, I don't remember if I read the
16  date already.
17     December 1, 2012, do you see that?
18     A.  Yes.
19     MR. POPE:  Mr. Singh, are you comfortable with
03:28 20  a similar stipulation?  There will be a similar line of
21  questioning for this one.
22     MR. SINGH:  Yeah.  I'm sort of questioning --
23  Can we go off the record?
24     MR. POPE:  Yeah, sure.
03:28 25     THE VIDEOGRAPHER:  The time is 3:28 p.m. and we

176

03:28 1  are now off the record.
2     (Discussion held off the record at 3:28 p.m.
3  to 3:32 p.m.)
4     THE VIDEOGRAPHER:  The time is 3:32 p.m., and
03:32 5  we are now back on the record.
6     MR. POPE:  Mr. Singh, I know we had some
7  discussion off the record about further stipulations
8  similar to what we had agreed to thus far, and you
9  wanted to raise some concerns to that end.
03:33 10     MR. SINGH:  I just simply say if we are going
11  to have a similar stipulation to the one agreed to in
12  connection with this exhibit, which, just for the
13  record, is Exhibit 11, the prosecution history for 2012
14  registration application that was submitted by Bruno
03:33 15  Tarabichi, that I would just add -- I'm adding this out
16  of an abundance of caution, that we are in agreement
17  with continuing to use the stipulation to just
18  streamline this for the sake of time and efficiency,
19  provided that stipulation is just noted on the record.
03:33 20  And I don't believe Mr. Pope objects, has no bearing on
21  level of preparation of our witness who did, in fact,
22  review these documents, as he previously testified, and
23  also that it -- it has no effect in terms of an
24  admission or any evidentiary significance other than
03:33 25  just allowing for streamlining of this deposition.



177

03:34 1    MR. POPE:  No objection.  Not intending to use
2    this to attack any preparation or lack thereof.
3    Q.  Okay.  So with that in mind, I'm going to try
4    to go even faster.  I think we have already, sort of,
03:34 5    reviewed.
6    We are still on Exhibit 11, top of page 30,
7    which I will represent is the final office action that
8    the examiner issued in connection with the first Tough
9    Cookie trademark application.  The contents I'll just
03:34 10   scroll through quickly.
11   THE REPORTER:  It's not on screen share.
12   MR. POPE:  I'm sorry.  Forgive me.  Let me do
13   that.
14   Thank you, Madam Court Reporter.
03:35 15   Q.  Can you all see it now?
16   A.  Yes.
17   Q.  Okay.  I'm just going to scroll through this
18   quickly.  This is details about the application in the
19   prosecution history.  Mr. Tarabichi's name is the
03:35 20   correspondent.  The mark itself.
21   I think I'm going -- I think I'm going the
22   wrong direction.
23   Let me stop sharing so I can get to the right
24   page.
03:35 25   So page 4 of -- of Exhibit 11, similar

178

03:36 1    information at the top, to Mr. Tarabichi.  The subject
2    is the first Tough Cookie application, and then this was
3    sent on December 1, 2012.
4    Do you see that, Mr. Resnikoff?
03:36 5    A.  I do.
6    Q.  As opposed to going through this section by
7    section --
8    One other thing I want to note is that this
9    was -- again, it references being a final office action
03:36 10   here near the top of page 5 of Exhibit 11.
11   Do you see that, Mr. Resnikoff?
12   A.  I see that.
13   Q.  Okay.  As opposed to going through this in
14   truncated fashion, I'll skip down.  It doesn't have, you
03:36 15   know, sort of, the broken-out headings and subheadings
16   as the prior ones do.
17   Do you see this heading "Likelihood of
18   Conclusion - Final," here near the top of page 5 of
19   Exhibit 11, Mr. Resnikoff?
03:37 20   A.  I see that text, yes.
21   Q.  And then underneath it has what -- the analysis
22   related to that.  It continues on through page 6.
23   Do you see that?
24   A.  I see that.
03:37 25   Q.  Are you comfortable that the previously noted

179

03:37 1    stipulation would cover that analysis?
2    A.  Yes, I am.
3    Q.  All right.  We saved a lot of time.
4    Let's see.
03:37 5    One other thing, same exhibit.
6    Page 3, same exhibit, Deposition Exhibit 11,
7    the top reads "Notice of Abandonment."
8    Do you see that, Mr. Resnikoff?
9    A.  I do.
03:38 10   Q.  And the date is July 1, 2013.
11   Do you see that?
12   A.  I do.
13   Q.  Serial Number 85528080.
14   Do you see that?
03:38 15   A.  I do.
16   Q.  And the mark is Tough Cookie; right?
17   A.  Yes.
18   Q.  And then the owner is The Cookie Department,
19   Inc.; right?
03:38 20   A.  Correct.
21   Q.  In notes here, at the top "Trademark
22   Application identified above was abandoned in full
23   because a response to the office action mailed on
24   December 1, 2012, was not received within the six-month
03:38 25   response period."

180

03:38 1    Did I read that correctly, Mr. Resnikoff?
2    A.  You read that properly.
3    Q.  I will go back here to the prosecution history
4    and just note it goes, sort of, in reverse chronological
03:38 5    order.  So the last date is the July 1, 2013, date.
6    Do you see that?
7    A.  I do see that.
8    Q.  It notes "Abandonment notice mailed.  Failure
9    to respond."
03:39 10   I am on the middle of page 2 of Exhibit 11.
11   Do you see that?
12   A.  I see that.
13   Q.  Just for the record, there are no dates in this
14   chart, in the prosecution history, after -- after that
03:39 15   July 1 abandonment notice was mailed; right?
16   MR. SINGH:  Object to form.
17   THE WITNESS:  In this prosecution history on
18   this page you're showing me, it does not seem that there
19   are dates after July 1, 2013, printed.
03:39 20   Q.  BY MR. POPE:  Okay.  Do you know whether
21   additional action was taken with respect to the first
22   Tough Cookie trademark application beyond July 1?
23   A.  I am unaware.
24   Q.  Have you -- you've reviewed this document, I
03:39 25   think you mentioned earlier?

45 (Pages 177 to 180)

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

181

03:40  1      A.  I reviewed it, yes.
2      Q.  In preparation for today's deposition?
3      A.  Correct.
4      Q.  In your review, have you seen any additional
03:40  5  action beyond this July 1, 2013, date?
6          MR. SINGH:  Object to form.  You mean in
7  connection with this application, Keyonn?
8          MR. POPE:  Yes.
9          MR. SINGH:  You know, he's not a lawyer, so
03:40 10  you've termed "action."
11         MR. POPE:  Sorry.  Let me rephrase that and
12  dial back some of the jargon.
13     Q.  In reviewing this document, Mr. Resnikoff, have
14  you -- have you seen -- did you see any activity after
03:40 15  July 1 in connection with the first Tough Cookie
16  trademark application?
17     A.  I don't recall.
18     Q.  You don't recall seeing any, you are saying?
19     A.  That is correct.
03:41 20     Q.  Okay.  Mr. Resnikoff, did you -- at the time
21  you started The Cookie Department, was it -- did you
22  ever consider producing protein bars?
23     A.  No.
24     Q.  Ever give it any thought?
03:42 25         MR. SINGH:  Object to form.

182

03:42  1          THE WITNESS:  Can you repeat the question?
2          MR. POPE:  Madam Court Reporter, can you read
3  it back for us?
4          (Record read as follows:
03:42  5          "Q  Mr. Resnikoff, did you --
6          at the time you started The
7          Cookie Department, was it --
8          did you ever consider producing
9          protein bars?
03:42 10         "A  No.
11         "Q  Ever give it any thought?")
12         THE WITNESS:  I can't recall if I thought about
13  it.
14     Q.  BY MR. POPE:  So you might have thought about
03:43 15  it?
16     A.  I don't recall.
17     Q.  Mr. Resnikoff, aside from One Tough Cookie, are
18  you aware of any other entities that use the term "Tough
19  Cookie"?
03:43 20     A.  I am.
21     Q.  What entities are you aware of?
22     A.  I can't specify specific ones by company -- by
23  entity names, but I did see some in -- in prep.
24     Q.  Are they listed in your notes?
03:44 25     A.  They are not.

183

03:44  1      Q.  Any that you can recall?
2      A.  I did -- do I recall -- I don't remember the
3  name of the entity specifically, but I remember that
4  they had dessert-like cookies.
03:44  5          If I remember correctly, they weren't
6  functional in the sense that I use functional.  But they
7  had a sentence and "tough cookie" was on those -- was in
8  the sentence, within the sentence on the front of the
9  cookie.
03:45 10     Q.  Any others that you can think of?
11     A.  No.  I mean, with the exception of ONE Bar
12  using "Tough Cookies Only."
13     Q.  Okay.
14     A.  I had to throw that in here.
03:45 15     Q.  Let's see here.  I will share this again, the
16  same exhibit, and just reference this July -- still on
17  July -- still on Exhibit 11, page 2, the prosecution
18  history.
19         The last date here was July 1, 2013.  Is that
03:46 20  right, Mr. Resnikoff?
21     A.  On this sheet of paper, in this prosecution
22  history, yes, it says July 1, 2013.
23     Q.  Okay.  And there -- there was, at some point, a
24  second trademark application filed by The Cookie
03:46 25  Department for Tough Cookie; correct?

184

03:46  1      A.  After this, yes.
2      Q.  Do you recall when that was?
3      A.  That was late 2018.
4          MR. POPE:  Let me stop sharing.  I have
03:47  5  uploaded internal Exhibit 16, which I think should be
6  Deposition Exhibit 12.
7          (Whereupon, Exhibit 12 was marked
8          for identification by the Court Reporter
9          and attached hereto.)
03:47 10     Q.  BY MR. POPE:  Can you see the share screen,
11  Mr. Resnikoff?
12     A.  Yes.
13     Q.  Does this document look familiar?
14     A.  Yes.
03:47 15     Q.  Did you review it in preparation for today's
16  deposition?
17     A.  Yes.
18     Q.  At the top here it shows the mark is Tough
19  Cookie.
03:48 20         Do you see where my cursor is?
21     A.  Yes.
22     Q.  And then it is U.S. Serial Number 88164585.
23         Do you see that?
24     A.  I do.
25     Q.  And then the application filing date is

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

---

185

03:48  1    October 22, 2018.  Correct?
       2        A.  Yes.
       3        Q.  Is that -- is this -- does this appear to be a
       4    copy of the prosecution history for the second Tough --
03:48  5    the second Tough Cookie trademark application that we
       6    were discussing previously?
       7        A.  Yes.
       8        Q.  Are you okay with us referring to it as the
       9    second Tough Cookie trademark application?
03:48 10        A.  I am.
      11        Q.  My question is, between July 1, 2013, which was
      12    the last date that we saw for the prosecution history of
      13    the first Tough Cookie trademark application, so from
      14    July 1 through October -- July 1, 2013, between October
03:49 15    22, 2018, what did Tough -- what did The Cookie
      16    Department do to protect its Tough Cookie mark?
      17        THE WITNESS:  We used --
      18        MR. SINGH:  Madam Court Reporter, can you read
      19    back Mr. Pope's question, please?
03:50 20        (Record read as follows.
      21        "Q  My question is, between
      22        July 1, 2013, which was the
      23        last date that we saw for the
      24        prosecution history of the
03:50 25        first Tough Cookie trademark

---

186

03:50  1    application, so from
       2    July 1 through October --
       3    July 1, 2013, what did Tough --
       4    22, 2018, what did Tough --
03:50  5    what did The Cookie Department
       6    do to protect its Tough Cookie
       7    mark?")
       8        MR. SINGH:  Object to form.
       9        MR. POPE:  Let me re-ask it to make it a little
03:50 10    cleaner.
      11        Q.  Between -- for the period July 1, 2013, to
      12    October 21, 2018, what did The Cookie Department do to
      13    protect its Tough Cookie mark?
      14        A.  We used a common law mark.
03:50 15        Q.  What does that mean?
      16        A.  A TM.
      17        Q.  A TM.  Tell me more.
      18        A.  Well, we used the symbol "TM" on the package.
      19        Q.  On which package?
03:50 20        A.  Tough Cookie.
      21        Q.  So for uses of Tough Cookie on the packaging,
      22    you included a "TM."  Is what you're saying?
      23        A.  That is accurate.
      24        Q.  What does -- what does that "TM" mean?
03:51 25        MR. SINGH:  Object to form.

---

187

03:51  1        THE WITNESS:  I'm not a trademark attorney, so
       2    I can't answer that.
       3        Q.  BY MR. POPE:  You -- you cited to common law
       4    use which sounds a little legal in nature.
03:51  5        MR. SINGH:  Go ahead.  Sorry.  I thought --
       6        Go ahead.  I have another objection I have to
       7    make retroactively, but I can do it all at once.
       8        Q.  BY MR. POPE:  Sure.
       9        You refer to common law rights, which is a
03:51 10    pretty legal term; hence, my follow-up about what the
      11    significance of the TM is.
      12        MR. SINGH:  Is there a pending question?  I
      13    lost track whether that was the final --
      14        MR. POPE:  Get your objection in.
03:52 15        MR. SINGH:  My objection is just object on
      16    privilege.
      17        You can answer questions to the extent you do
      18    not disclose privileged communications between you and
      19    your current or past counsel.
03:52 20        THE WITNESS:  If I do say anything at this
      21    point to answer your question, I would be disclosing
      22    privilege.
      23        MR. POPE:  That's fair.
      24        Q.  Did you -- did The Cookie Department have a
03:52 25    process of checking the marketplace for other users of

---

188

03:52  1    Tough Cookie marks?
       2        A.  We didn't have an official process, but we did
       3    do and continue to do searches through the Internet.
       4        Q.  When you say "we," who is we?
03:53  5        A.  I mean "we" as The Cookie Department.
       6        Q.  Who specifically within The Cookie Department
       7    does these searches?
       8        MR. SINGH:  I am going to caution the witness
       9    if you can answer the question without disclosing
03:53 10    privileged information or to just focus on nonprivileged
      11    communication, you can do so.
      12        THE WITNESS:  I personally --
      13        MR. SINGH:  Please do not disclose privileged
      14    information.
03:53 15        THE WITNESS:  I personally will do publicly
      16    available Google searches.
      17        Q.  BY MR. POPE:  When did you start doing those?
      18        A.  I don't recall exactly when.
      19        Q.  Was it within the last five years?
03:54 20        A.  Probably within the last six or seven years.
      21        Q.  And you said you continue to do the searches,
      22    as well?
      23        A.  Yes.
      24        Q.  When you -- when you conduct those searches, do
03:54 25    you ever save any of those searches?

---

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

---

189

03:54 1      A.  No.
      2      Q.  When did The Cookie Department become aware of
      3  ONE Brand's use of the Tough Cookies Only personality
      4  tag?
03:54 5      A.  October 2018.
      6      Q.  Do you know the specific date in October?  I
      7  think it's probably in your notes.
      8      A.  Yeah.
      9      MR. SINGH:  You are very helpful, Keyonn.
03:54 10     Where is the question?
      11     THE WITNESS:  I believe it was October 15.
      12  Yes, October 15, 2018.
      13     Q.  BY MR. POPE:  Okay.  How did you become aware?
      14  How did The Cookie Department become aware?
03:55 15     A.  Shopping at a Trader Joe's.
      16     Q.  Who specifically discovered it?
      17     A.  I did.
      18     Q.  And what did you do when you discovered it?
      19     A.  Shopped.
03:55 20         What did I do?  I can't disclose that due to
      21  privilege.
      22     Q.  Did you -- did you have any communications
      23  about the discovery with anyone other than counsel?
      24     A.  I don't recall.
03:55 25     Q.  Did you discuss with Miss Kirschner?

---

190

03:56 1      A.  I may have, but I don't recall.
      2      Q.  Is there anything that would refresh your
      3  recollection?
      4      A.  I don't know.
03:56 5      Q.  Did you discuss with your brother, Isaac?
      6      A.  I definitely -- I think I discussed it, but I
      7  don't know when.
      8      Q.  Did you -- did you email with him about it?
      9      A.  I may have.  I don't recall how it was done, if
03:56 10  it was done.
      11     Q.  How about your wife?  Did you talk to your wife
      12  about it?
      13     MR. SINGH:  I'm going to object on the basis of
      14  spousal privilege.  She's not a party in this matter.
03:57 15  She does not work in connection -- she doesn't work as
      16  an employee for The Cookie Department.  I am happy to
      17  meet and confer with you, but where are you heading with
      18  this?
      19     MR. POPE:  You're invoking spousal privilege?
03:57 20  That doesn't apply in the civil context.
      21     MR. SINGH:  In the -- I am trying to
      22  understand --
      23     MR. POPE:  If you have got an objection, and
      24  you are instructing him not to answer.
03:57 25     I don't have to preview my question.  You

---

191

03:57 1  object or not.
      2      MR. SINGH:  Let me just make the objection and
      3  caution the witness.
      4      THE WITNESS:  Can I actually --
03:57 5      MR. SINGH:  Hold on a second.  Let me, because
      6  I want to do this cleanly without influencing you.
      7      I will withdraw the objection.
      8      MR. POPE:  Madam Court Reporter, can you read
      9  back the question, please?
03:58 10     (Record read as follows:
      11     "Q  How about your wife?  Did
      12     you talk to your wife about
      13     it?")
      14     THE WITNESS:  Yes, but I am not sure exactly
03:58 15  when I did.
      16     Q.  BY MR. POPE:  Would you have had email
      17  discussion with your wife about it?
      18     A.  Possibly.  I don't recall.
      19     Q.  How about text messages?
03:58 20     A.  Possibly, but I don't recall.
      21     Q.  Is there anyone else you might have discussed
      22  it with, aside from counsel?
      23     A.  I don't specifically recall who I had
      24  conversations with outside of counsel and the people
03:59 25  that I stated.

---

192

03:59 1      Can I use the restroom, or are you done?
      2      Q.  Sure.  We're taking a lot of bathroom and back
      3  breaks.
      4      A.  I have been drinking a lot of water.
03:59 5      Q.  They come at odd times.  We will take a break.
      6  Take a break.
      7      MR. SINGH:  I am going to stay right here.
      8      MR. POPE:  No, no, no.  Take a break.
      9      MR. SINGH:  No, no.  There's no -- there's
03:59 10  nothing -- he's been drinking a lot of water.  I am
      11  going to stay right here.
      12     MR. POPE:  It's all good.  Me, too.
      13     I am going to the restroom, as well.  You guys
      14  have at it.
03:59 15     Mr. O'Bryant, please, go off the record.
      16     THE WITNESS:  This is my proof of water.
      17     THE VIDEOGRAPHER:  The time is 3:59 p.m. and we
      18  are off the record.
      19     (Recess taken at 3:59 p.m. - 4:07 p.m.)
03:59 20     THE VIDEOGRAPHER:  The time is 4:07 p.m., and
      21  we are now back on the record.
      22     Q.  BY MR. POPE:  Mr. Resnikoff, I think we had
      23  established you personally became aware of ONE Brand's
      24  use of Tough Cookies Only on October 15, 2018; right?
04:07 25     A.  Yes.

---

48 (Pages 189 to 192)

193

04:07 1    Q.   And then a week later, on October 22, 2018, the
2    second Tough Cookie trademark application was filed;
3    right?
4    A.   Yes.
04:07 5    Q.   I want to share my screen again.  This has been
6    marked as Depo Exhibit 12.  It is internal Exhibit 16,
7    which is the prosecution history for the second Tough
8    Cookie trademark application.
9         Mr. Resnikoff, you said that you did review
04:08 10   this in preparation for today; right?
11   A.   Yes.
12        MR. SINGH:  Can you speak up, please, Mr.
13   Resnikoff.  I didn't hear the answer.
14        THE WITNESS:  Yes, I did.
04:08 15   Q.   BY MR. POPE:  Okay.  Thank you.  I am going to
16   go to page 18 of Exhibit 12.  Let me go back up.  Sorry.
17        Just to sort of walk through the basics.
18        So on page 1 of Exhibit 12, there is a section
19   that talks about "Goods and Services."  And it says,
04:08 20   "For:  Cookies, cookies and crackers, cookies with nuts,
21   almond cookies, chocolate covered cookies, vegan
22   cookies."
23        Do you see that?
24   A.   Yes.
04:09 25   Q.   And the primary class or international class,

194

04:09 1    it says "30 - Primary Class."
2         Did I read that right?
3    A.   Yes.
4    Q.   And then it says, "First Use:  January 1,
04:09 5    2012."
6         Do you see that?
7    A.   I do.
8    Q.   I am going to stop sharing so you guys don't
9    have your heads swimming while I scroll pages.  Bear
04:10 10   with me a second.  I must have marked the wrong page
11   inadvertently.
12        The same exhibit, Exhibit 12, and I'm on page
13   43 of the exhibit, and similar format as we've seen
14   before.  I will represent to you that this is an office
04:11 15   action that was issued in connection with the second
16   Tough Cookie trademark application.
17        And in form it looks similar to the ones that
18   we walked through, the office actions that we went
19   through for the first trademark application, the first
04:11 20   Tough Cookie trademark application.
21        Would you agree?
22        MR. SINGH:  Madam Court Reporter, can you read
23   back Mr. Pope's question so I note whether or not I'm
24   going to make an objection?
04:12 25        (Record was read as follows.

195

04:12 1    "Q   The same exhibit, Exhibit
2    12, and I'm on page 43 of the
3    exhibit, and similar format as
4    we've seen before.  I will
04:12 5    represent to you that this is
6    an office action that was
7    issued in connection with the
8    second Tough Cookie trademark
9    application.
04:12 10   "And in form it looks similar
11   to the ones that we walked
12   through, the office actions
13   that we went through for the
14   first trademark application,
04:12 15   the first Tough Cookie
16   trademark application.
17   Would you agree?")
18        MR. SINGH:  I am going to object to form.
19        MR. POPE:  Let me reword that.  It was a
04:12 20   mouthful.
21        Q.   I am showing you Exhibit 12 on the screen.  We
22   are at page 43.
23        Do you see that, Mr. Resnikoff?
24   A.   I do.
04:12 25        Q.   This layout, does this layout look familiar to

196

04:12 1    you?
2    A.   Yes.
3    Q.   In particular, does it look similar to previous
4    office actions that we went through for the first Tough
04:12 5    Cookie trademark application?
6         MR. SINGH:  Object to form.
7         THE WITNESS:  I'm not sure.  I'm not a
8    trademark attorney, so it hard for me to exactly spot on
9    say.
04:13 10        Q.   BY MR. POPE:  No worries.  Let's walk through
11   the substance.
12        On to the top here where my cursor is, it says
13   "To:  The Cookie Department," but this time on behalf of
14   your then current counsel and still current counsel,
04:13 15   right, Mr. Indrajana; correct?
16   A.   That is correct.
17   Q.   The subject is U.S. Trademark Application
18   Number 8816455 for Tough Cookie.  Is that right?
19   A.   That is accurate.
04:13 20   Q.   And we have colloquially been referring to that
21   as the second Tough Cookie trademark application; right?
22   A.   That is accurate.
23   Q.   This was sent on January 30th, 2019; right?
24   A.   Correct.
25   Q.   I will scroll down, and you see it's captioned

197

04:13  1    "Office Action" here at the bottom of page 43 of Exhibit
       2    12; is that right?
       3       A.  Yes, that's what it says.
       4       Q.  And then beginning at the top of page 44 we see
04:14  5    "Summary of Issues," and there's one bullet that says,
       6    "Section 2(d), refusal - likelihood of confusion."
       7       Do you see that?
       8       A.  Yes.
       9       Q.  And immediately below that it cites under the
04:14 10    "Summary of Marks and Goods," it says, "Applicant's
      11    Tough Cookie mark and standard characters is for:"
      12       It has a bullet, "Class 30, cookies, cookies
      13    and crackers, cookies with nuts, almond cookies,
      14    chocolate covered cookies, vegan cookies."
04:14 15       Did I read that correctly?
      16       A.  You did.
      17       Q.  It goes on, "Registrants's One Tough Cookie in
      18    standard characters is for:"
      19       And there's a bullet beneath that says, "Class
04:15 20    30:  Cakes."
      21       Is that right?
      22       A.  That's what it says.
      23       Q.  And just -- I'm going in the right direction.
      24       If we scroll down to page 47 of Exhibit 12, it
04:15 25    shows additional details of the registrant's mark.

198

04:15  1       Do you see that?
       2       A.  I do.
       3       Q.  You see serial number is 85960896; correct?
       4       A.  That's correct.
04:15  5       Q.  The word mark is One Tough Cookie; correct?
       6       A.  That's correct.
       7       Q.  The owner is One Tough Cookie, Inc., and based
       8    in New York; is that right?
       9       A.  That is accurate.  That is what the address
04:16 10    says on paper.
      11       Q.  Do you have a recollection of -- is it --
      12       Do you understand this One Tough Cookie, Inc.,
      13    to be the same One Tough Cookie, Inc., that we discussed
      14    in connection with the first Tough Cookie trademark
04:16 15    application?
      16       A.  Yes.
      17       Q.  Okay.  I will go back up to page 44 of Exhibit
      18    12.
      19       So just beneath the "Summary of Marks and
04:16 20    Goods," which we already went through and I read, and we
      21    confirmed, there is another heading, "Basis for
      22    Likelihood of Confusion."
      23       Do you see that?
      24       A.  I see that writing, yes.
04:16 25       Q.  I am going to do this -- actually, let me --

199

04:16  1    let me ask.
       2       There is a bunch of headings here, right,
       3    "Basis for Likelihood of Confusion."
       4       Do you see it?
04:17  5       A.  Yes.
       6       Q.  And "Similarity of Marks," do you see it?
       7       I am sorry.  I am scrolling too quickly.
       8       Bottom of page 44, "Similarity of Marks"?
       9       A.  Yes.
04:17 10       Q.  And then middle of page 45, Exhibit
      11    12, "Relatedness of Goods."
      12       Do you see that section?
      13       A.  I do.
      14       Q.  And then there is a conclusion section at the
04:17 15    bottom of page 45.
      16       Do you see that?
      17       A.  I do.
      18       Q.  Is it safe to assume that the analysis under
      19    those headings you won't have any opinion of its
04:17 20    interpretation?
      21       A.  That is accurate.
      22       MR. SINGH:  Hold on.  I am just going to get an
      23    objection after the fact.  Object to form.
      24       Q.  BY MR. POPE:  Is it safe to assume that you
04:18 25    don't have an opinion because you aren't a trademark

200

04:18  1    attorney?
       2       A.  That is accurate.
       3       Q.  Were you involved with preparing the second
       4    Tough Cookie application?
04:18  5       MR. SINGH:  So I'm going to -- as the question
       6    is worded, I am going to object on the basis of
       7    privilege.  I will instruct the witness to not disclose
       8    any privileged communications, but you can try to answer
       9    around that.
04:18 10       THE WITNESS:  Can you repeat the question?
      11       MR. POPE:  Can you read that back, Madam Court
      12    Reporter?
      13       (Record read as follows:
      14       "Q  Were you involved with
04:18 15       preparing the second Tough
      16       Cookie application?")
      17       THE WITNESS:  How do you mean "involved"?
      18       Q.  BY MR. POPE:  Did you play any role in
      19    preparing it?
04:18 20       A.  The physical application?
      21       Q.  Yes.
      22       A.  No.
      23       Q.  What role did you play in preparing it?
      24       MR. SINGH:  Same caution on privilege, but you
04:19 25    can go ahead and try to answer that, but being mindful

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

201

04:19  1    of privilege, please.
       2             If you need to confer with counsel on
       3    privilege, you can.  That's your right to do so.  But if
       4    you feel you can answer without violating privilege, you
04:19  5    can go ahead and do so.
       6             THE WITNESS:  May I confer?
       7             MR. POPE:  Yes.
       8             THE WITNESS:  Thank you.
       9             MR. SINGH:  We will be very brief.
04:19 10             MR. POPE:  Let's off the record, O'Bryant,
      11    please.
      12             THE VIDEOGRAPHER:  The time is 4:19 p.m. and we
      13    are now off the record.
      14             (Recess taken at 4:19 p.m. - 4:21 p.m.)
04:21 15             THE VIDEOGRAPHER:  The time is 4:21 p.m. and we
      16    are now back on the record.
      17             MR. POPE:  Madam Court Reporter, can you please
      18    read back the last question?
      19             (Record was read as follows:
04:22 20             "Q  Were you involved with
      21             preparing the second Tough
      22             Cookie application?")
      23             THE WITNESS:  I interacted.
      24             Am I good?
04:22 25             THE REPORTER:  Yes.

202

04:22  1             THE WITNESS:  Yes.  I took a role in preparing
       2    it.  I had conversations with Michael Indrajana.  I
       3    probably provided him with needed documents.
       4        Q.  BY MR. POPE:  But for the second Tough Cookie
04:23  5    application, is it safe to assume that it wasn't --
       6             Let me strike that and start afresh.
       7             It sounds like the engagement you had with
       8    Mr. Indrajana in connection with the second application
       9    was different than the engagement you had with Mr.
04:23 10    Tarabichi -- I am probably butchering his name.  Forgive
      11    me -- in connection with the first application?
      12             MR. SINGH:  No one can get it right.
      13             MR. INDRAJANA:  Don't speak about Bruno.
      14             MR. SINGH:  Poor guy.
04:23 15             THE WITNESS:  Yes, I was more involved.
      16        Q.  BY MR. POPE:  Did you personally hire
      17    Mr. Indrajana?
      18        A.  The Cookie Department hired Mr. Indrajana.
      19        Q.  Who specifically at The Cookie Department?
04:24 20        A.  I did.
      21        Q.  Was it a paid engagement?
      22        A.  It was.
      23        Q.  Back to Exhibit 12, while I know you -- we're
      24    clear on you having no opinion on the substance here, do
04:24 25    you understand this office action to be the Trademark

203

04:24  1    Office's way of rejecting the application?
       2             MR. SINGH:  I am going to object to form.
       3             But you can go ahead and try to answer.
       4             THE WITNESS:  No, I can't -- I can't comment on
04:24  5    that specifically.
       6        Q.  BY MR. POPE:  Why is that?
       7        A.  Because I'm not a trademark attorney.
       8        Q.  Okay.  Fair enough.  I think we've established
       9    that -- that there was an office action, at least one
04:25 10    office action in the -- during the prosecution of the
      11    first trademark application that cited the One Tough
      12    Cookie registration; right?
      13        A.  Repeat the question.
      14        Q.  I think we've established that there was at
04:25 15    least one office action in connection with the first
      16    Tough Cookie trademark application.  And that office
      17    action cited the One Tough Cookie registration; right?
      18        A.  Again, I'm not an attorney.  It is hard for me
      19    to digest that.
04:26 20        Q.  All right.  Let's go back.  I don't think it
      21    matters, though.  I will just keep charging forward.
      22             At any point, did you have any communication
      23    with One Tough Cookie?
      24        A.  With the -- with the entity?
04:26 25        Q.  Or anyone affiliated with the entity.

204

04:26  1        A.  I did.
       2        Q.  Okay.  Who specifically did you communicate
       3    with?
       4        A.  I don't recall her last name, but I know that
04:26  5    her first name is Gail.
       6        Q.  Do you know Gail's role with respect to One
       7    Tough Cookie?
       8        A.  I don't --
       9             MR. SINGH:  Object to form.
04:27 10             THE WITNESS:  I don't know her official title,
      11    specifically, but it's my understanding that she had a
      12    high-level role.
      13        Q.  BY MR. POPE:  Okay.  Do you remember when
      14    you -- when you communicated with her?  Is that in your
04:27 15    notes?
      16        A.  It was in -- I believe in 2019.
      17        Q.  Okay.  And what was the nature of the
      18    communication?
      19        A.  I was asking her to grant me rights to using
04:28 20    the registered mark.
      21        Q.  Was Mr. Indrajana aware that you reached out to
      22    Miss Dorsik?
      23             MR. SINGH:  I am going to object on the basis
      24    of privilege and --
04:28 25             Actually, on that one, there is no way he can

205

04:28  1    answer that without disclosing privilege. I am going to
       2    object on the basis of privilege and instruct the client
       3    witness not to answer.
       4          THE WITNESS: If I answer, I would be
04:28  5    disclosing privileged information; therefore, I can't
       6    answer.
       7          Q. BY MR. POPE: That is fair.
       8          Do you remember when you reached out was the
       9    second Tough Cookie application still pending?
04:29 10          MR. SINGH: Object to form.
      11          THE WITNESS: I believe so.
      12          Q. BY MR. POPE: What -- what was Miss -- what was
      13    Miss -- I'll call her Gail just for simplicity. What
      14    was Gail's response to you?
04:29 15          A. She said no.
      16          Q. Why did she say no?
      17          A. Because she claimed that she was still using
      18    it.
      19          MR. POPE: I just put the next exhibit in the
04:30 20    chat. It is internal Exhibit 14 but Depo Exhibit 13.
      21          (Whereupon, Exhibit 13 was marked
      22           for identification by the Court Reporter
      23           and attached hereto.)
      24          MR. SINGH: Which is which?
04:30 25          MR. POPE: It's internal Exhibit 14 but Depo

206

04:30  1    Exhibit 13.
       2          Q. Can you see my share screen, Mr. Resnikoff?
       3          A. Yes.
       4          MR. POPE: Do you have --
04:30  5          MR. SINGH: I have this. It was just
       6    downloading it. It is something with the downloading.
       7    Just go ahead, ask your questions. It's fine.
       8          You said it is Exhibit 13; correct?
       9          MR. POPE: Yes, Depo Exhibit 13, internal
04:30 10    Exhibit 14.
      11          MR. SINGH: Got it. Go ahead.
      12          MR. POPE: My mic conked out again for a
      13    second. I don't know what the last question that you
      14    guys heard. I was asking --
04:31 15          MR. SINGH: You didn't -- all you did was you
      16    answered my question and then you went silent.
      17          MR. POPE: Sorry about that.
      18          Q. I was asking Mr. Resnikoff. Do you recognize
      19    this document?
04:31 20          A. I do.
      21          Q. What do you recognize it to be?
      22          A. This is a Facebook interaction with Gail from
      23    One Tough Cookie.
      24          Q. Between you and Gail, specifically; right?
04:31 25          A. That is right.

207

04:31  1          Q. I will scroll through and, just for the record,
       2    this Exhibit 13 is Bates-stamped TCD 018425 through TCD
       3    018247.
       4          Mr. Resnikoff, I will go back up. I know I
04:32  5    scrolled pretty quickly.
       6          Did you get a chance to review that?
       7          A. Yes.
       8          Q. Did you previously review this document in
       9    preparation for today's deposition?
04:32 10          A. Yes.
      11          Q. Just to be clear, the blue bubbles are -- were
      12    drafted by you; correct?
      13          A. That is accurate.
      14          Q. And then the gray bubbles were drafted by Gail?
04:32 15          A. That is correct.
      16          Q. How did you find Gail?
      17          A. I believe on Facebook.
      18          Q. You just searched -- were you able to track
      19    down her name and search for it on Facebook?
04:33 20          A. I believe so, on One Tough Cookie.
      21          Q. Just for the record, the date of this is
      22    November 17, 2018. And specifically at 10:20 p.m.
      23          I guess I'm unclear on what time zone.
      24          Did I read that correctly, Mr. Resnikoff?
04:33 25          A. That is accurate.

208

04:33  1          Q. That's the time of your initial message; right?
       2          A. It looks to be that way, yes.
       3          Q. And then it looks like Gail replied the
       4    following day, so November 18, 2018 at 8:04 a.m.; right?
04:33  5          A. That's what it looks like, yes.
       6          Q. Is this the entirety of your exchange with
       7    Miss -- with Gail?
       8          A. That's my recollection, yes.
       9          Q. I will just read this for the record.
04:34 10          "Hi there Gail, my name is Akiva and my
      11    wife" --
      12          Is it Elannah?
      13          A. Yes.
      14          Q. -- "Elannah and I own a cookie company. I'm
04:34 15    reaching out as I noticed your website for your cookie
      16    business is no longer active, and I'm hoping that you
      17    might be comfortable releasing the trademark for One
      18    Tough Cookie. You see, we make a peanut butter cookie
      19    called Tough Cookie, and we would love to be able to
04:34 20    trademark it."
      21          It continues on page 2, "Please feel free to
      22    reach out to me here on Facebook or at my personal
      23    email" -- and it gives your gmail account -- "you can
      24    also reach me on my cell phone at" -- and it gives your
04:35 25    cell phone number. I'll read it --"(510) 978-7011.

209

04:35 1    Thanks for any consideration, Gail, and happy holidays.
2    Best, Akiva."
3        Did I read that accurately, Mr. Resnikoff?
4        A. You did.
04:35 5        Q. Do you remember -- do you remember writing
6    this?
7        A. I do.
8        Q. And then continuing on page 3 of Exhibit 13, it
9    looks like Gail responds, "Dear Akiva, I own the
04:35 10    trademark for the next couple of years and plan to renew
11    it. Although I'm not currently in business, I may
12    reopen in my new location. Thank you so much for
13    reaching out and asking."
14        Did I read that correctly?
04:35 15        A. Yes, you did.
16        Q. What did you understand Gail's response to
17    mean?
18        A. It meant that she was reopening her business
19    and didn't want to grant me my wishes or my request.
04:36 20        Q. At the time you had this interaction with Gail,
21    did you share it with your counsel?
22        MR. SINGH: Object on the basis of privilege
23    and instruct the client not to answer.
24        THE WITNESS: I can't, due to privilege, answer
04:36 25    that question.

210

04:36 1        Q. BY MR. POPE: So this -- this is -- did you
2    have any further discussion with Gail after this
3    November 18, 2018, response from her at 8:04 a.m.?
4        MR. SINGH: Object to form.
04:36 5        THE WITNESS: I don't recall.
6        Q. BY MR. POPE: You said this is the entirety of
7    your discussion with her; right?
8        MR. SINGH: Object to form.
9        THE WITNESS: I -- yeah, I assume so, yes. I
04:36 10    don't recall.
11        Q. BY MR. POPE: You pulled -- did you pull
12    this --
13        A. From Facebook.
14        Q. You pulled -- you personally pulled it?
04:37 15        A. Yes.
16        Q. Did you make any edits to -- to the discussion?
17        A. No.
18        MR. POPE: Are you offended by my question,
19    Mr. Singh?
04:37 20        MR. SINGH: No. I was just -- it is pretty
21    bold, but that's okay.
22        Go ahead.
23        THE WITNESS: Mr. Pope, do you mind, I am going
24    to grab some water from the machine? It is just on my
04:37 25    right side. Do you mind if I do that?

211

04:37 1        MR. POPE: That's good. No worries.
2        THE WITNESS: Thank you.
3        MR. POPE: Sure. So I've just dropped in the
4    chat my next exhibit, which is internal Exhibit 15 but
04:38 5    it's Depo Exhibit 14.
6        (Whereupon, Exhibit 14 was marked
7        for identification by the Court Reporter
8        and attached hereto.)
9        MR. POPE: I will share my screen.
04:38 10        MR. SINGH: Can you enlarge it? It's hard to
11    read.
12        MR. POPE: Yeah, it gets a little fuzzy, but I
13    will try.
14        MR. SINGH: A little better, just so Akiva can
04:38 15    read it.
16        Also, can you clarify, is the top -- it is very
17    hard to read, at least for me. I don't know if anyone
18    else is having a problem with it.
19        Q. BY MR. POPE: Can you see this, Mr. Resnikoff?
04:39 20        MR. SINGH: It is probably my -- sorry. Go
21    ahead.
22        MR. POPE: All good.
23        Q. So I will give you a minute to read the -- the
24    top bubble there in gray.
04:39 25        In fact, I'll read it.

212

04:39 1        "Hi there Gail, my name is Akiva and my wife
2    Elannah and I own a cookie company. I am reaching out
3    as I notice your website for your cookie business is no
4    longer active and I'm hoping that you might be
04:39 5    comfortable releasing the trademark for One Tough
6    Cookie. You see we make a peanut butter cookie called
7    Tough Cookie, and we would love to be able to trademark
8    it. Please feel free to reach out to me on Facebook or
9    my personal email."
04:39 10        And again it lists your gmail account.
11        "And you can also reach me on my cell phone at
12    (510) 978-7011. Thanks for any consideration, Gail, and
13    happy holidays. Thanks, Akiva."
14        Do you see that, Mr. Resnikoff?
04:40 15        A. Yes.
16        Q. Did I read it accurately?
17        A. You did.
18        Q. Does it appear to be the same text as Exhibit
19    12 that we have just looked at?
04:40 20        A. It is.
21        Q. And then the next bubble, I will let you read
22    it. And my question is going to be if it mirrors the
23    second bubble from the exchange in Exhibit 12 that we
24    previously looked at.
04:40 25        A. It looks like it does.

53 (Pages 209 to 212)

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

---

213

04:40 1     Q.  Okay.  And just to go back to Exhibit 12, it
2     ended after that second bucket, is that right, that
3     second -- that second message?
4         MR. SINGH:  Object to form.
04:41 5     Q.  BY MR. POPE:  Let's go back.
6     I am on Exhibit 12.  There are only two
7     messages in this exhibit; correct?  There's the one at
8     November 17, 2018; correct?
9         A.  Yes.
04:41 10    Q.  And then there's a second on November 18, 2018;
11    correct?
12        A.  Yes.
13    Q.  And there's nothing else; right?
14        MR. SINGH:  Object to form.
04:41 15        THE WITNESS:  There is nothing else on this
16    page.
17    Q.  BY MR. POPE:  But on this, there -- there is
18    additional dialogue beyond those two, correct, those
19    two -- the first two messages; right?
04:41 20        A.  Yeah, but the dates are different.
21    Q.  Okay.  But there's more than one -- there's
22    more than two, rather, messages in Exhibit 13; correct?
23        A.  Is this Exhibit 13?
24    Q.  This is.
04:42 25        A.  There's more than two messages.

---

214

04:42 1         (Clarification by the reporter.)
2         MR. POPE:  My understanding, Madam Court
3     Reporter, and I may have butchered it.  You're right.  I
4     stand corrected.  Excuse me.  Let me step back for
04:42 5     purposes of the record.  Thank you, Madam Court
6     Reporter.  I don't know why I tried to argue with you.
7         Let me step back and do this because I think I
8     was referencing the wrong thing.  This is Exhibit 13.
9     This is Exhibit 13.
04:43 10    Q.  Mr. Resnikoff, there's a message on
11    November 17, 2018; correct?
12        A.  That is correct.
13    Q.  And there is another message on November 18,
14    2018; correct?
04:43 15        A.  From Gail, correct.
16    Q.  Correct.
17    Now if we compare that with Exhibit 14, which
18    I've just put on the screen, we've already established
19    that the top two messages in Exhibit 14 are identical to
04:43 20    the two messages contained in Exhibit 13; correct?
21        A.  That is correct.
22    Q.  Okay.  So my question is, did you delete from
23    Exhibit 13 these foregoing messages after the second
24    one?
04:44 25        A.  I don't think so.  I don't remember.

---

215

04:44 1     Q.  Why weren't they included in Exhibit 13?
2         A.  I don't recall.
3     Q.  You didn't remove them?
4         A.  I don't recall.
04:44 5     Q.  Do you recall when you provided Exhibit 13 --
6     I'll put it back on the screen.
7         Do you recall when you provided this to your
8     counsel?
9         A.  I don't recall specifically when.
04:44 10    Q.  Was it within the last month?
11        A.  Sanjiv, will you --
12        MR. SINGH:  Hold on a second.  I'm going to --
13        Well, I am just going to caution you on
14    privilege here.  You can -- because there -- I don't
04:45 15    want to make a big deal of this because there is an
16    implicit disclosure on how you answer this question.
17        I am just going to say answer his question as
18    to just when you provided documents.  Please don't
19    answer about communications.  Please don't disclose
04:45 20    privileged communications.
21        THE WITNESS:  It could have been in the last
22    month, but I don't recall the exact date.
23    Q.  BY MR. POPE:  Okay.  So after the last
24    communication shown here on Exhibit 14, did you have any
04:45 25    further communication with Gail?

---

216

04:45 1     A.  I don't recall, no.
2     Q.  No, you didn't?
3         A.  I don't recall.
4     Q.  May I ask one more question?
04:46 5     Still on Exhibit -- Depo Exhibit 14.  Now that
6     you've seen the messages beyond the first two, do you
7     have a recollection of that correspondence with Gail?
8         A.  I do.
9         MR. SINGH:  Akiva -- Keyonn.
04:47 10        MR. POPE:  Yes.
11        MR. SINGH:  I would like to make a suggestion.
12    So where Mr. Resnikoff is, and I'm just looking at his
13    face right now, and I know when I sit in that room I
14    tend to get drowsy because the circ-- -- we are all in
04:47 15    sealed rooms.
16        So my recommendation is, I want to make sure --
17    and we can do this with you watching us, so you see this
18    is not an excuse for a break -- is to turn up the
19    ventilation in there.  There is a machine.  And, second,
04:47 20    if he wants to get himself a cup of coffee, because I am
21    just looking at the way he's looking and time of day and
22    I want him to be at his -- be able to answer his
23    questions in an alert fashion.
24        Is that acceptable to you?  We will do
04:48 25    everything with the mics on.

---

217

04:48  1       MR. POPE: It's fine. It's all good. Let's
2    just take 5.
3       MR. SINGH: Are you okay with that?
4       MR. POPE: I'm good.
04:48  5       THE VIDEOGRAPHER: The time is 4:48 p.m. and we
6    are now off the record.
7       (Recess taken at 4:48 p.m. - 4:56 p.m.)
8       THE VIDEOGRAPHER: The time is 4:56 p.m. We
9    are back on the record.
04:56 10       THE WITNESS: Keyonn, I just wanted to clarify
11   something.
12       MR. SINGH: Are we back on the record? I
13   didn't hear if the videographer brought us back.
14       THE VIDEOGRAPHER: Did nobody hear me?
04:56 15       MR. SINGH: Maybe I had transient --
16   Michael, did you hear him? I can't hear you.
17       MR. INDRAJANA: I didn't catch that.
18       MR. SINGH: It's weird. It is something on our
19   end, but that's okay.
04:56 20   Go ahead.
21       THE WITNESS: So, Keyonn, I just went back to
22   the text messages on Facebook, and I actually didn't
23   delete anything. The message is down below. It was
24   just --
04:56 25       MR. SINGH: Hold on, Keyonn.

218

04:56  1   Michael, can you go adjust the filter -- and
2    put your mask on and adjust the filter on Akiva's thing
3    so that Keyonn can see what he's showing so it is
4    captured on video, please.
04:57  5       THE WITNESS: The first message, can you see
6    that, Keyonn?
7       Q. BY MR. POPE: I can't, but I don't know that
8    I'm going to be able to. I can't make it out, but I can
9    see the bubble.
04:57 10       **A. Yeah, yeah, yeah. That's the first bubble, and**
11   **then her response there. Do you see that?**
12       **And then this is the secondary one you were**
13   **referring to. And then that's her last response.**
14       **The reason I -- it was just -- the documents**
04:57 15   **that were put into discovery were screenshots and -- on**
16   **my phone, and I didn't bother scrolling down all the**
17   **way.**
18       Q. Okay. Thank you. That's helpful.
19   I want to keep talking about the second Tough
04:58 20   Cookie application, second Tough Cookie trademark
21   application.
22   At some point are you aware, Mr. Resnikoff,
23   that there was a petition to cancel the One Tough Cookie
24   registration filed?
04:58 25       **A. I was aware.**

219

04:58  1   Q. Do you know -- Do you recall when that was?
2       **A. That was, roughly, 2019.**
3   Q. Does July 15, 2019, sound about right?
4       MR. SINGH: Object to form.
04:59  5       THE WITNESS: I don't speculate on the exact
6    date, but mid-2019 sounds about right.
7   Q. BY MR. POPE: Okay. That's fair.
8       My next thing was going to be to pull up the
9    petition, but I'm -- and walk through it with you. But
04:59 10   I suspect this will end where we ended up on our other
11   reviews of documents submitted to or from the Trademark
12   Office. In other words, I'm suspecting you won't be
13   able to render an opinion on the substance of the
14   petition to cancel.
04:59 15   Is that a fair assumption?
16       MR. SINGH: Object to form.
17   You can go ahead and answer.
18       THE WITNESS: Yeah, I'm not a trademark
19   attorney, so I wouldn't have any way of analyzing it.
04:59 20   Q. BY MR. POPE: Okay. That's fair.
21   During -- at the time -- after --
22   Did you have any communications with Gail
23   during the time that the petition to cancel was pending?
24       **A. I don't recall, no.**
05:00 25   Q. No, you didn't, or you don't recall whether you

220

05:00  1   did?
2       **A. I don't recall.**
3   Q. Is there anything that would refresh -- refresh
4    your recollection on it?
05:00  5       **A. I don't know.**
6   Q. Aside from your counsel, did you share your --
7    the correspondence with Gail with anyone else?
8       **A. I don't recall.**
9   Q. Anything that would refresh your recollection?
05:01 10       **A. I don't -- I don't know.**
11   Q. Just sort of skipping ahead, is it your
12   recollection that the petition to cancel was ultimately
13   successful?
14       **A. Yes.**
05:01 15   Q. And I will share it again.
16   So this is Depo Exhibit 12. This isn't a new
17   exhibit. This is one we've looked at already, which is
18   the second Tough Cookie application.
19       This application, registered on June 16, 2020;
05:02 20   right?
21       **A. That's what the document does say.**
22   Q. Okay. And I think the actual certificate is
23   somewhere in here. There it is. So you got this nice
24   certificate with the registration date; right?
05:02 25       **A. It looks to be, yes.**

221

05:02  1    Q.  Say that again?  I'm sorry.
       2    A.  It looks to be, yes.  That's what it says.
       3    Q.  Do you have this certificate in your
       4  possession, Mr. Resnikoff?
05:02  5    A.  Yes, I believe so.  Not today, no.
       6    Q.  No, no.  I just meant generally.
       7        And then sort of skipping ahead on the
       8  timeline, eventually The Cookie Department filed its
       9  Complaint against ONE Brands; correct?
05:03 10    A.  That is correct.
      11    Q.  Do you remember the date of the Complaint, the
      12  Complaint was filed?
      13    A.  I believe in late 2020.
      14    Q.  Does December 23, 2020, sound correct?
05:03 15        MR. SINGH:  Object to form.
      16        THE WITNESS:  I don't recall the exact date.
      17    Q.  BY MR. POPE:  Okay.  So between June 16, 2020,
      18  and TCD, The Cookie Department I'm sorry -- filing
      19  its Complaint, were there any attempts made to contact
05:04 20  ONE Brands?
      21        MR. SINGH:  I am going to caution the witness
      22  not to disclose privileged information.  You can attempt
      23  to answer that, as long as you do not disclose
      24  privileged information.
05:04 25        THE WITNESS:  I can't answer that without

222

05:04  1  disclosing privileged information.
       2        MR. POPE:  I'm baffled how that's privileged.
       3        MR. SINGH:  Yeah, and you know, my instruction
       4  was not -- I didn't give a whole instruction not to
05:04  5  answer.  Let me just try it again and if we have to
       6  confer with him again, we can.
       7        Be careful not to disclose privileged
       8  information.  You can otherwise try to answer the
       9  question.
05:04 10        THE WITNESS:  I personally did not contact ONE
      11  Brand.
      12    Q.  BY MR. POPE:  Did you attempt to contact ONE
      13  Brands?
      14    A.  I personally --
05:05 15        MR. SINGH:  Same -- sorry.  Same objection and
      16  caution.
      17        Go ahead and answer.
      18        THE WITNESS:  I personally did not attempt
      19  communication with ONE Brand.
05:05 20    Q.  BY MR. POPE:  Did anyone at The Cookie
      21  Department -- and look I'm not asking about what your
      22  counsel may or may not have done.  Did anyone else,
      23  other than your counsel, at The Cookie Department
      24  attempt to contact ONE Brands?
05:05 25        MR. SINGH:  Same objection.  Same caution.

223

05:05  1        But go ahead and answer.
       2        THE WITNESS:  No.
       3        MR. SINGH:  See, we can all work together.
       4    Q.  BY MR. POPE:  Mr. Resnikoff, have you ever
05:05  5  given any thought to selling The Cookie Department?
       6    A.  I mean, as a random thought, you know, my
       7  eventual goal in the future is to be acquired but not
       8  right now.  We're too early.
       9    Q.  Do you have a -- are there specific types of
05:06 10  companies that you might consider as sort of the ideal
      11  acquirer?
      12    A.  Yeah, there are -- there are bigger companies
      13  that --
      14        Are you referring to specific companies?
05:06 15    Q.  No.  Just general categories of companies.
      16    A.  Yeah.  You know, other functional food
      17  companies.
      18    Q.  Okay.  Any examples that come to mind?
      19    A.  I'll say, like, for example, the company I
05:07 20  mentioned earlier, NuGo as an example, something like
      21  that.
      22    Q.  Any others come to mind?
      23    A.  Not specifically, no.  But that's all
      24  hypothetical.
05:07 25    Q.  Sure.

224

05:08  1    A.  May I respond to that last question really
       2  quick?  I just wanted to make another mention.  Do you
       3  mind?
       4    Q.  Of course.
05:08  5    A.  From time to time we have been contacted.
       6  Brokers have contacted us in the past asking if we're
       7  interested in acquisition.  Nothing.  Nothing came of
       8  it.
       9    Q.  Are there specific companies that -- that the
05:08 10  brokers raised as potential acquirers?
      11    A.  Not to my recollection, no.
      12    Q.  Were these -- were these outreaches from --
      13  what mode of communication were the outreaches from
      14  brokers?
05:09 15    A.  Online.
      16    Q.  Which brokers?
      17    A.  I don't remember the names, specifically.
      18    Q.  Would it have been one of the brokers that we
      19  discussed earlier?
05:09 20    A.  No.  Definitely, no.
      21    Q.  Just random brokers that --
      22    A.  That are probably spamming.
      23    Q.  Oh, okay.
      24        MR. POPE:  I will share my screen.  I dropped
05:09 25  the next exhibit in the chat.  I will share my screen.

---

225

05:09   1          (Whereupon, Exhibit 15 was marked
        2          for identification by the Court Reporter 3
        3          and attached hereto.)
        4          Q.  BY MR. POPE:  Have you seen this article
05:09   5   before, Mr. Resnikoff?
        6          A.  I don't remember that specific article, no.
        7          MR. SINGH:  Did we name this new exhibit?  Did
        8   we share it?
        9          MR. POPE:  I shared it.  It is internal Exhibit
05:10  10   21 and I didn't -- thank you for the reminder,
       11   Mr. Singh.
       12          It should be Depo Exhibit Number 15.  Please
       13   keep me honest, Madam Court Reporter.
       14          THE WITNESS:  Do you mind if I have a snack
05:10  15   while we're talking?  Am I allowed to?
       16          MR. SINGH:  No.  Technically, because it -- if
       17   it is going to be played to a trier of fact --
       18          THE WITNESS:  It is not just going to sound
       19   right.
05:10  20          MR. POPE:  Only if it is a ONE bar, then you
       21   can.
       22          MR. SINGH:  Don't do it.
       23          MR. POPE:  I'm kidding.
       24          THE WITNESS:  That was clever.
05:10  25          MR. SINGH:  Get that Champion Chip and start

---

226

05:10   1   eating it live and then we'll be good.
        2          MR. POPE:  No Tough Cookies on hand?
        3          MR. SINGH:  There actually are, but they've
        4   been consumed.
05:11   5          Q.  BY MR. POPE:  Fair enough.
        6          Back to Exhibit 15 that I'm sharing,
        7   Mr. Resnikoff.  You said you have not seen this exhibit?
        8          A.  I don't remember seeing it, but I have seen a
        9   lot of documents, so this one is not in my memory.
05:11  10          Q.  We pulled this from the net.  You can see the
       11   URL across the top there.  And presumably if it hasn't
       12   been removed, it is still there.
       13          You see it is dated October 11, 2018; correct?
       14          A.  Yes.
05:11  15          Q.  Just to orient, I think you mentioned your
       16   discovery of ONE Brands use of Tough Cookies Only was
       17   four days after this on October 15, 2018; right?
       18          A.  I mean, that's what the dates -- yes.
       19          Q.  I'm asking you.
05:12  20          Let me ask it this way.  When did you -- remind
       21   me again when you discovered ONE Brands use of Tough
       22   Cookies Only.
       23          A.  October 15.
       24          Q.  Of what year?
05:12  25          A.  2018.

---

227

05:12   1          Q.  So it was four days after the date of this, of
        2   Exhibit -- of the article shown in Exhibit 15; right?
        3          A.  That is accurate.
        4          Q.  Let me know if you want me to scroll through
05:12   5   this or you want to read it.  I will be a spoiler and
        6   tell you that I am going to point to specific areas, but
        7   it's your right to review this in thorough detail, if
        8   you prefer.
        9          MR. SINGH:  Why don't you -- Keyonn, why don't
05:12  10   you try to focus on the areas.  And if Mr. Resnikoff
       11   feels like he needs to read the whole article -- I want
       12   him to take a few moments to look at it at a high level
       13   right now.
       14          MR. POPE:  Why don't I scroll through it slowly
05:13  15   to begin, and then I will come back to the specific asks
       16   that I have.
       17          Q.  Let me know.  Am I scrolling at a decent pace
       18   for show?
       19          A.  Sure.
05:13  20          Q.  The rest of this I think is just ads.  It cuts
       21   off at the middle of page 3.  And that's really where I
       22   want to focus.
       23          It appears that the author asked the question,
       24   "What is the ultimate goal of the TCD team?"
05:14  25          That's at the top of page 3 of Exhibit 15.

---

228

05:14   1          And it is quoting, "To be acquired."
        2          It goes on, "Potential acquirers are mainstream
        3   global brands like General Mills and Hershey's who are
        4   buying more natural boutique brands to compete in the
05:14   5   natural market.  Another option is to sell to a company
        6   that is already in the functional snack space, as we
        7   could become another product line offering to their
        8   existing customer base."
        9          Did I read that correctly?
05:14  10          A.  That's what that says, yes.
       11          Q.  Do you remember providing this quote?
       12          A.  I don't specifically.  No, I do not, not
       13   specifically that quote.
       14          Q.  Any reason to believe you didn't provide it?
05:14  15          MR. SINGH:  Object to form.
       16          THE WITNESS:  I can't stipulate on that.
       17          Q.  BY MR. POPE:  Is there anything that causes you
       18   to believe that you didn't provide the statement that
       19   I've just read?
05:15  20          A.  No.
       21          MR. POPE:  Okay.  O'Bryant, can we do a time
       22   check where we are?
       23          THE VIDEOGRAPHER:  One second.
       24          I currently have us at 5 hours and 57 minutes.
05:15  25          MR. POPE:  Perfect.  Thank you.  I will load

---

229

05:16   1    internal Exhibit 22, which will be depo Exhibit 16.  I
        2    will share my screen.
        3          (Whereupon, Exhibit 16 was marked
        4          for identification by the Court Reporter
05:16   5          and attached hereto.)
        6          MR. SINGH:  Depo Exhibit 16 you said?
        7          MR. POPE:  Yes.
        8    Q.  Can you see my screen, Mr. Resnikoff?
        9    A.  Yes.
05:16  10    Q.  Does this document look familiar?  I'll scroll
       11    through it.
       12    A.  Yes.
       13    Q.  What is it?  What is this document?
       14    A.  Stop.  This was a review done for one of the
05:17  15    rounds.
       16    Q.  You recall this review and have seen this
       17    document?
       18    A.  Yes.
       19    Q.  The review was done by an accounting firm?
05:17  20          Let me go back up to page 3 of the document
       21    16 -- Exhibit 16, rather.  So this review was done by an
       22    accounting firm; correct?
       23    A.  That is accurate.
       24    Q.  Is it safe to assume that the contents of the
05:18  25    document are accurate?

230

05:18   1    A.  It is safe to assume that.
        2    Q.  I don't want to go through all of these.  I
        3    just want to sort of hit quickly a few of these.
        4          MR. SINGH:  Keyonn, can I assume you are asking
05:18   5    him in his capacity -- in his 30(b)(1) capacity?
        6          MR. POPE:  Yes.
        7    Q.  There's a line item that says -- I'm on page 4
        8    of Exhibit 16.  It says, "loan to shareholder - AR."
        9          What does -- what is AR?
05:18  10    A.  That's my name.
       11    Q.  Can you tell me about these two loans?  There's
       12    one -- I will start with the one in 2016, $19,978.
       13    A.  I took -- in 2016 and 2017 I took a draw, and
       14    my -- my, you know, assumed responsibility was to pay it
05:19  15    back at the time, which, you know, being capable of.
       16    Q.  Did you ultimately pay it back?
       17    A.  I have paid it back -- I paid it back as loans
       18    from me to the company.  I've -- yes, I paid it back.
       19    Q.  In full?
05:20  20          MR. SINGH:  I would caution the witness not to
       21    speculate.
       22          THE WITNESS:  I can't speculate.  I'd have to
       23    review it.
       24    Q.  BY MR. POPE:  Okay.  Was this loan, and I'm
05:20  25    focused on the 2016 amount for now, was that taken as a

231

05:20   1    form of compensation for you?
        2          MR. SINGH:  Object to form.
        3          THE WITNESS:  It was a loan.
        4    Q.  BY MR. POPE:  What were -- what were the terms
05:20   5    of the loan?
        6    A.  The terms of the loan were to pay it back at
        7    the time that we deemed necessary.
        8    Q.  There was no fixed time period?
        9    A.  No.
05:20  10    Q.  Was there any interest on the loan?
       11    A.  No.
       12    Q.  When did you pay it back?
       13          MR. SINGH:  Object to form.
       14          THE WITNESS:  I can't speculate.  I would have
05:21  15    to get back to you on that.
       16    Q.  BY MR. POPE:  How could you refresh your
       17    recollection on that?
       18    A.  I'd have to talk to my bookkeeper.
       19    Q.  How about the 2017 loan?  Have you paid it
05:21  20    back?
       21    A.  I'd have to discuss with my bookkeeper.
       22    Q.  And I'm oh page 5 of Exhibit 15.  So if I'm
       23    reading this correctly, in 2016, you had a net loss of
       24    $16,507.36; correct?
05:21  25    A.  Yes.

232

05:22   1    Q.  For 2017 a net loss of $7370.29; right?
        2    A.  That's what that sheet says, yes.
        3    Q.  I am going to jump down to this page where it
        4    talks about bad debt expense.  What is your
05:22   5    understanding of -- and I'll highlight the page -- the
        6    section that I'm referring to on page 8 of Exhibit 16.
        7    A.  I believe that was a -- an item that we used to
        8    reference uncollectible receivables.
        9    Q.  Okay.  And you see this section that I'm
05:23  10    highlighting near the top of page 10 of Exhibit 16,
       11    under the credit cards heading?
       12    A.  Yes.
       13    Q.  So for 2016 the company had $30,220.84 in
       14    credit card debt?
05:23  15    A.  That's what that says, yes.
       16    Q.  But that amount increased in 2017; right?
       17    A.  That's correct.
       18    Q.  And it was $33,416.59; correct?
       19    A.  That's what that says, yes.
05:23  20    Q.  And there are five different credit cards
       21    listed here; is that right?
       22    A.  Correct.
       23    Q.  Do you know the interest rates on these cards?
       24    A.  Not off the top of my head, no.
05:23  25    Q.  Do you have a rough range?

233

05:24 1    A.  I'd say between maybe 14 and 22.
2    Q.  Okay.  And then there's some long-term
3  liabilities listed here, in particular convertible
4  notes.  Who is AK?
05:24 5    MR. SINGH:  I am going to --
6    THE WITNESS:  I can't disclose --
7    MR. SINGH:  I am going to object and caution
8  the witness based on the previous dialogue on this issue
9  regarding identity of investors, where I believe the
05:24 10  witness has stated the company's position.
11    You can go ahead and answer.  I am not
12  instructing you not to answer, but I am reminding you of
13  your previous --
14    THE WITNESS:  I cannot answer that.
05:24 15    Q.  BY MR. POPE:  Is that for confidentiality
16  reasons?
17    A.  Correct.
18    Q.  I will note, just for the record, I am on page
19  10 of Exhibit 16, under the section titled "convertible
05:25 20  notes."
21    And it lists eight or nine convertible notes.
22  It includes initials, presumably, corresponding to the
23  persons responsible for the notes.  And it actually
24  includes financials, which I think Mr. Resnikoff
05:25 25  previously objected to providing on confidentiality

234

05:25 1  grounds.
2    He provided aggregate numbers per round, but
3  said that he had confidentiality concerns around
4  providing individual amounts.
05:25 5    MR. SINGH:  Would you like me to respond or
6  we'll address it later?  I have a response.
7    MR. POPE:  Please, please.  Go ahead.
8    MR. SINGH:  I think what he was intending to
9  state --
05:25 10    MR. POPE:  No, no.  I don't want you to
11  testify.
12    MR. SINGH:  That's what I'm saying.  I think it
13  is better off for you, honestly, that I just remain
14  silent right now.  We can meet and confer about this.
05:26 15    MR. POPE:  I just want it to be noted on the
16  record.  I am going to show you in some subsequent
17  documents there have been public disclosures.  I got
18  this document from publicly available stuff.
19    There are names and there are amounts.  A lot
05:26 20  of this stuff has already been disclosed that he's
21  inappropriately claimed confidentiality.
22    MR. SINGH:  When you say public disclosure, are
23  you saying investment networks?  Because it is clear to
24  me --
05:26 25    MR. POPE:  The SEC.  The SEC.

235

05:26 1    MR. SINGH:  Okay.
2    MR. POPE:  Publicly available.
3    MR. SINGH:  Okay.  Fair enough.  Then we'll
4  deal with that.  We'll deal with that.
05:26 5    That's a -- here, if that is true, then that is
6  an open area of meeting and conferring that could be
7  productive, in which case we can talk about.
8    MR. POPE:  Fine.  That's fine.
9    MR. SINGH:  Fair enough.
05:26 10    MR. POPE:  That's fine.
11    I'll also go here because I think this was
12  similar.
13    Q.  Do you see here it references Marcus loan?  And
14  I'm on page 11.  It says, "Marcus loan for an initial
05:27 15  $53,500."
16    And it goes on, "The net of the loan from a
17  prior business partner and the settlement agreement and
18  mutual release for the departure of that business
19  partner.  There is no interest on this loan, and the
05:27 20  payments are being made at a rate of $1000 per month."
21    Did I read that correctly, Mr. Resnikoff?
22    A.  That is accurate.
23    MR. POPE:  I will just note for the record, we
24  don't have to debate it, but this is a publicly
05:27 25  available document.  The disclosure has already been

236

05:27 1  made, so either -- either Mr. Resnikoff violated the
2  confidentiality agreement or it's waived.  I don't know.
3  But it's already out there.
4    MR. SINGH:  First of all, let's not
05:27 5  characterize conduct in any way, and nothing was --
6  there is no bad faith here, honestly.
7    MR. POPE:  No, no, I didn't say bad faith.
8    MR. SINGH:  What I think -- that is the case
9  with startup companies.  There's a whole lot of
05:27 10  confusing restrictions and whatnot on investments at the
11  time you're making this.
12    You point out that some of it is now out there
13  in the public, in which case that simplifies our
14  position in terms of being able to answer questions,
05:28 15  potentially.
16    The only thing, though, Mr. Pope, which is
17  unclear from what you've shown us, is if you are
18  representing that all of it is out there, then
19  presumably my position would have to be -- I am not
05:28 20  going to take an irrational position that it is
21  inconsistent with the law.
22    If all of it is out there, that is news to me,
23  and then he can answer the questions.  If only portions
24  of it are --
05:28 25    I will tell you this on the record.

237

05:28  1          I am happy to work with you on this issue, even
       2   if it means bringing Mr. Resnikoff back at a later date
       3   to answer questions about them.  We can do that.  And I
       4   am more than happy to work on that.
05:28  5          I am still intrigued about the relevance of it
       6   to the matter, but that is a separate issue.
       7          MR. POPE:  I won't debate that, but it's very
       8   relevant.  I will just share -- I think I can truncate
       9   this, but I will share one additional example.
05:29 10          (Whereupon, Exhibit 17 was marked
      11            for identification by the Court Reporter
      12            and attached hereto.)
      13          Q.  BY MR. POPE:  I am dropping in the chat
      14   Internal Exhibit 24.  I'll share my screen.
05:29 15          MR. SINGH:  What is it going to be?  Is it 17?
      16          Q.  BY MR. POPE:  This 2019 balance sheet.
      17          Does this document look familiar,
      18   Mr. Resnikoff?
      19          A.  Yes.
05:29 20          Q.  Just to hammer home, I am on page 2 of this
      21   document where it lists -- just under the heading that
      22   says, "total interest free loans."
      23          And I will skip to the relevant portions, but
      24   it says "loan payable Bob Grossman."  There's another
05:30 25   one, Craig Maunter.  There is another one, Pam Marcus.

238

05:30  1          Do you see that, Mr. Resnikoff?
       2          A.  I do.
       3          Q.  I will represent on the record that these are
       4   from publicly facing sources, so another example of
05:30  5   public disclosure.
       6          I will scroll down.  I'm on page 3, top of page
       7   3, "long-term liabilities."  It lists a bunch of
       8   convertible notes, nine to be exact.
       9          And I will read the names.  There is a
05:30 10   convertible note for Andrea Kirschner.  One for Barry
      11   Labov.  One for Charles Lawrence.  One for Daniel Woods.
      12   One for David Ramone.  One for Noah Alper.  One for
      13   Renae Scott.  And one for Wilson Tsai, and one listed
      14   for Wefunder.
05:31 15          Do you see that, Mr. Resnikoff?
      16          A.  I do.
      17          MR. POPE:  We can debate it offline, Mr. Singh,
      18   but just I wanted to give you examples.
      19          MR. SINGH:  That's fine.  It's not -- I think
05:31 20   there is a possible path forward to resolve -- to
      21   essentially address whatever your desires are for
      22   obtaining information and for figuring out.  I,
      23   obviously, have a number of questions, when something is
      24   in an SEC document, sometimes it makes its way there
05:31 25   improperly and other times it makes its way properly.

239

05:31  1          If these are properly in there, then they are there.
       2          It could be as simple as the crowd -- whatever
       3   crowd funding platform was used, that Mr. Resnikoff
       4   didn't realize that he was consenting to the disclosure
05:31  5   of that.  Whatever.
       6          We will deal with it, and we are happy to meet
       7   and confer with you and resolve it as quickly as
       8   possible.  We want to be as cooperative as possible in
       9   proceeding --
05:31 10          This was not -- I will tell you this.  This was
      11   not an attempt either by us as counsel or by my client
      12   to withhold information improperly.
      13          MR. POPE:  No.  I haven't made that accusation.
      14          I just dropped in the chat another illustrative
05:32 15   document.
      16          (Whereupon, Exhibit 18 was marked
      17            for identification by the Court Reporter
      18            and attached hereto.)
      19          MR. SINGH:  You want to keep beating this home.
05:32 20          MR. POPE:  It's internal Exhibit 27.
      21          MR. SINGH:  Would you care to disclose, though,
      22   because you made the statement several times, and I
      23   don't believe you put this into discovery.  You keep
      24   referencing the SEC disclosures.  And you're asking --
05:32 25          MR. POPE:  They're coming.

240

05:32  1          MR. SINGH:  Are you going to show them to us?
       2          MR. POPE:  What do you mean?
       3          MR. SINGH:  You said you got these from SEC
       4   documents.  Will you tell us where you got these from?
05:32  5          MR. POPE:  They're on the SEC website.  If you
       6   go there and do a search for The Cookie Department, they
       7   will pop right up.  It is not magic.  We haven't done
       8   anything, you know, behind the scenes.
       9          MR. SINGH:  Okay.  Got you.  Thank you.
05:33 10          Q.  BY MR. POPE:  This document, do you recognize
      11   it, Mr. Resnikoff?
      12          A.  I do.
      13          Q.  I will go right to it, page 2 of Exhibit 18,
      14   internal Exhibit 27.  Our internal Exhibit 24 was
05:33 15   Deposition Exhibit 17, which was The Cookie Department
      16   balance sheet from 2019.  Now we're looking at The
      17   Cookie Department balance sheet from 2020, which is
      18   internal Exhibit 27 and Deposition Exhibit 18.
      19          Going to page 2 under "Other Liabilities," in
05:34 20   particular it lists a loan payable to Kassman, as well
      21   as another loan payable to Jesse Powell.  Further down
      22   under "Total Interest Free Loans," again, it lists loans
      23   payable to Bob Grossman, Craig Maunter, Pam Marcus.  And
      24   the top of page 3 lists a series of convertible notes
05:35 25   with specific sources ascribed to them.

241

05:35 1         Did I mischaracterize anything there,
2  Mr. Resnikoff?
3        MR. SINGH:  Object to form.
4        THE WITNESS:  No.
05:35 5        MR. POPE:  I will share my screen again.  This
6  is Deposition Exhibit 8 that I'm showing, which is
7  internal Exhibit 29.
8      Q.  And this is the notes that you provided,
9  Mr. Resnikoff.  I go here just hoping that it will sort
05:36 10  of truncate a line of questioning.  In particular, I am
11  going to point us to page 14.
12      I was going to ask questions about the modes in
13  which The Cookie Department advertises.
14      I see on the screen there is a section with the
05:36 15  heading "TCD's advertising, marketing and promotion of
16  Tough Cookie product."
17      Do you see that, Mr. Resnikoff?
18     **A.  Yes.**
19      Q.  TCD is The Cookie Department; correct?
05:36 20    **A.  Yes.**
21      Q.  Who -- by the way, who prepared this document
22  that we're referring to as Exhibit 8?
23    **A.  I did.**
24      Q.  You drafted all of it in its entirety?
05:36 25    **A.  Yes.**

242

05:37 1      Q.  Okay.  Is it safe to say its contents are
2  accurate?
3        MR. SINGH:  Object to form.
4        THE WITNESS:  One thing I will make notice of
05:37 5  is that Facebook, that was actually when I started the
6  Facebook, roughly around the time I started promoting
7  The Cookie Department on Facebook, not specifically
8  Tough Cookie.
9      Q.  BY MR. POPE:  Okay.  So what should that date
05:37 10  be?
11    **A.  It should be around late 2011, 2012.  Early**
12  **2012, roughly.**
13      Q.  Okay.
14    **A.  Sorry for that error.**
05:37 15      Q.  When you initially started selling Tough
16  Cookie, where were you selling it, geographically?
17    **A.  When I first started, geographically, it was**
18  **mainly in California.**
19      Q.  Do you have a recollection of when you began to
05:38 20  sell it outside of California?  It being the Tough
21  Cookie product.
22    **A.  It was around -- we expanded out in mid-2012.**
23      Q.  Okay.  So going back to the top of page 14 of
24  Exhibit 8, the section I'm highlighting, is that -- does
05:38 25  that capture all the places that The Cookie Department

243

05:38 1  advertises?
2    **A.  Yes.**
3      Q.  Do you have a rough breakdown of --
4      Let me ask this way.
05:39 5      How much does The Cookie Department typically
6  spend year over year on advertising?
7    **A.  I can't speculate on that.  That would be a**
8  **question for Andrea.**
9      Q.  No -- no rough idea?
05:39 10   **A.  No.**
11      Q.  Has The Cookie Department ever conducted any
12  market studies?
13        MR. SINGH:  Object to form.
14        THE WITNESS:  I believe -- aside from within
05:40 15  this current case, no, I don't believe so.  I don't
16  recall is what I mean.
17      Q.  BY MR. POPE:  What?  I'm not angling at
18  privileged information, but what do you mean by aside
19  from in connection with this case?
05:40 20       MR. SINGH:  I am going to let him answer but
21  caution him.  I think I know where he is going with
22  this.  If I have to pull a yank, I will.
23      You can answer that question based on your
24  knowledge as long as it is not dependent upon
05:40 25  communications from myself or Mr. Indrajana.  I think

244

05:40 1  you can answer this question without violating
2  privilege.
3        THE WITNESS:  We did bring on an expert
4  witness.
05:40 5        MR. POPE:  Okay.  I won't probe further because
6  I suspect that would be privileged.
7      I didn't know what the reference was.
8        MR. SINGH:  You could ask him the identity of
9  the expert, and it isn't news to you.
05:41 10      Q.  BY MR. POPE:  Who is the expert, do you recall?
11    **A.  CONSOR.**
12      Q.  Okay.  It is my understanding that CONSOR was
13  for more the financial analysis.  Is that consistent
14  with your understanding?
05:41 15    **A.  Yes.**
16      Q.  I was asking about market studies more in line
17  with marketing trends, advertising trends.  Has The
18  Cookie Department ever conducted any advertising or
19  marketing studies?
05:41 20    **A.  I have not.**
21        MR. SINGH:  What is this exhibit that is
22  currently numbered here?
23        MR. POPE:  These are Mr. Resnikoff's notes.  It
24  is Exhibit 8, internal Exhibit 29.
05:42 25        MR. SINGH:  Exhibit 8?

245

05:42  1          MR. POPE:  Yes.
      2          MR. SINGH:  Mr. Videographer, how much time do
      3   we have on the record, approximately, in the seven
      4   hours?  We will need an accurate number.
05:42  5          THE VIDEOGRAPHER:  Give me one second.  I
      6   apologize for this.  You are asking how much time is
      7   left?
      8          MR. SINGH:  Yes, so how much time has been on
      9   the record?  Either.
05:42 10          THE VIDEOGRAPHER:  We have been on the record
     11   for six hours and 34 minutes.
     12          MR. SINGH:  Okay.  Thank you.
     13      Q.  BY MR. POPE:  Mr. Resnikoff, has -- has -- has
     14   The Cookie Department -- do you know what search engine
05:43 15   optimization is?
     16      A.  I do.
     17      Q.  Are you okay if I refer to it as SEO?
     18      A.  Sure.
     19      Q.  Has The Cookie Department ever employed any SEO
05:43 20   strategies?
     21      A.  From time -- we did do some testing with it,
     22   yes.
     23      Q.  When was that?
     24      A.  It was within the last, I believe, two and a
05:43 25   half, three years.

246

05:43  1      Q.  And did you -- was there a third party
      2   assisting with the testing?
      3      A.  Yes.
      4      Q.  Who -- who was that?
05:44  5      A.  You know, I don't know off the top of my head,
      6   but I can provide you with that information.
      7      Q.  Okay.  That would be great.
      8          And what was the nature of the SEO strategy?
      9      A.  It was to market our keto line.
05:44 10      Q.  Was there any marketing of the Tough Cookie
     11   product in connection with the SEO strategy?
     12      A.  I don't recall, no.
     13      Q.  You don't recall or you don't know?
     14      A.  Not specifically.
05:44 15      Q.  Was there a written strategy?
     16      A.  Aside from communications between myself and
     17   the third party, no.
     18      Q.  Is there anything that would help refresh your
     19   recollection on whether Tough Cookie was -- advertising
05:45 20   of the Tough Cookie product was included in the SEO
     21   strategy?
     22      A.  I don't know.
     23      Q.  Would the communications with the unnamed third
     24   party assist?
05:45 25      A.  Potentially.

247

05:45  1      Q.  Okay.  Has The Cookie Department done any key
      2   word advertising?
      3      A.  Yes.  We have in the past.
      4      Q.  When?  Do you know the time period?
05:45  5      A.  It was, again, within the last two and a half,
      6   three years.
      7      Q.  Okay.  And was there a third party involved?
      8      A.  Yes.
      9      Q.  Which third party?
05:45 10      A.  I believe the company -- the company was called
     11   AdToro.
     12      Q.  AdToro.  Is it two separate words?
     13      A.  One word.
     14      Q.  A-D-T-O-R-O?
05:46 15      A.  Yes.
     16      Q.  Was AdToro the same company that assisted with
     17   the SEO strategy?
     18      A.  No.
     19      Q.  What keywords did The Cookie Department
05:46 20   purchase?
     21      A.  I don't specifically remember exactly which
     22   ones.
     23      Q.  Was Tough Cookie one of the keywords that The
     24   Cookie Department purchased?
05:46 25      A.  I don't believe so.

248

05:46  1      Q.  Mr. Resnikoff, are you familiar with Google
      2   Analytics?
      3      A.  Yes.
      4      Q.  Does The Cookie Department use Google
05:46  5   Analytics?
      6      A.  Yes, I believe we do have a Google Analytics
      7   account.
      8      Q.  Who manages it?
      9      A.  I believe that when we hired these companies
05:47 10   they were managing them.  They were reviewing them.  I
     11   am not -- I usually would do something -- would be in
     12   charge of stuff like that, but I don't do it on a
     13   regular basis.
     14      Q.  Are you still currently using Google Analytics?
05:47 15      A.  We do have an account, yes.
     16      Q.  So who is currently managing it, the account?
     17      A.  I have access to that account.
     18      Q.  Does that mean you are managing it day-to-day?
     19          MR. SINGH:  Object to form.
05:47 20          THE WITNESS:  I manage it.
     21      Q.  BY MR. POPE:  But you said previously there
     22   have been times where some of the previously discussed
     23   third parties managed it?
     24      A.  Yes.
05:47 25      Q.  How long would you say you've had a Google

249

05:48  1    Analytics account?
       2        A. I know that we had an account for a while, and
       3    it wasn't being utilized, meaning it wasn't tracking.
       4    And so in the most recent trackable version, it's been,
05:48  5    I would say, less than a year.
       6        Q. Okay.
       7        A. But I don't know exactly the exact dates.
       8        Q. Okay. I want to upload one more exhibit.
       9        I am uploading this. I had -- actually, let me
05:48 10    put this back up first.
      11        We didn't spend much time talking about it. I
      12    am back on Exhibit 8 now, and this is your notes,
      13    Mr. Resnikoff. Internal Exhibit 29, page 15,
      14    specifically.
05:49 15        You pulled together this list of ingredients
      16    that we see on the screen?
      17        A. Yes.
      18        Q. I see -- just scanning, I see eggs and other
      19    dairy products. Is it safe to say that the Tough Cookie
05:49 20    products are not vegan friendly?
      21        A. That is correct.
      22        MR. POPE: Okay. Uploaded Exhibit -- internal
      23    Exhibit 30 which we'll mark as Depo Exhibit 19.
      24        (Whereupon, Exhibit 19 was marked
05:50 25        for identification by the Court Reporter

250

05:50  1        and attached hereto.)
       2        Q. BY MR. POPE: Do you recognize this document,
       3    Mr. Resnikoff?
       4        A. Yes.
05:50  5        Q. Who prepared this document?
       6        A. This document was produced by my bookkeeper.
       7        Q. Fair to say all the numbers in the document are
       8    accurate?
       9        A. Yes.
05:50 10        MR. POPE: Can we take a break? I just want to
      11    pore over my notes. I think I'm about done.
      12        MR. SINGH: Sure, let's go off the record.
      13        THE VIDEOGRAPHER: The time is 5:50 p.m. and we
      14    are now off the record.
05:55 15        (Recess taken at 5:50 p.m. - 6:05 p.m.)
      16        THE VIDEOGRAPHER: The time is 6:05 p.m. and we
      17    are now back on the record.
      18        MR. POPE: I am going to share my screen again.
      19    And this is Exhibit 19, again, internal Exhibit 30,
06:05 20    which is --
      21        Q. Can you describe what this document is,
      22    Mr. Resnikoff?
      23        A. Sure. It's the amounts of individual Tough
      24    Cookies and the dollar amounts between 2012 and 2019.
06:06 25        Can you hear me?

251

06:06  1        Q. Yeah, we can hear you.
       2        MR. SINGH: What -- what exhibit is this for
       3    the deposition?
       4        MR. POPE: This is Exhibit 19. It's our
06:06  5    internal Exhibit 30.
       6        MR. SINGH: And you put it up on chat already?
       7        MR. POPE: Yeah, I previously loaded this
       8    before we took the last break.
       9        MR. SINGH: Maybe I didn't see that. Got you.
06:06 10    Thank you.
      11        Q. BY MR. POPE: Mr. Resnikoff, these were part of
      12    what you brought with you to -- this file is what you
      13    brought with you to your deposition today; correct?
      14        A. It was -- yeah, yes, it's on my screen.
06:06 15        Q. Okay. You mentioned that -- I believe you
      16    mentioned that your bookkeeper is the person responsible
      17    for preparing this exhibit?
      18        A. Yes.
      19        Q. Was Miss Kirschner involved with preparing the
06:06 20    exhibit?
      21        A. She reviewed it, yes.
      22        Q. Okay. So I just want to quickly click through
      23    the tabs across the bottom. The tab that we're looking
      24    at now, can you describe just high level what this is?
06:07 25    The TCD by year total tab.

252

06:07  1        A. Yes. On total 2012 --
       2        Do you want to read through it?
       3        Q. No, no, no. I just want to know, sort of, what
       4    it is. My understanding is that it's the volume and
06:07  5    amounts of sales of the Tough Cookie product for the
       6    year 2012 to 2019.
       7        A. Yes, individual cookies and amounts.
       8        Q. Okay. And then the revenue by year. Is this
       9    for all product or just for Tough Cookie?
06:07 10        A. This is for all products.
      11        Q. And then the next tab, the Tough Cookie summary
      12    by year is financials year over year from 2012 to 2019?
      13        A. Correct.
      14        Q. And this is specifically for the Tough Cookie
06:08 15    product; correct?
      16        A. Correct.
      17        Q. One question: This individual cookies column,
      18    if we go down to 2019, it shows 564 cookies for 2019. I
      19    can blow it up. Can you see that? I'm on the Tough
06:08 20    Cookie summary by year tab of Exhibit 19. The box C66
      21    has a 564 number.
      22        Do you see that, Mr. Resnikoff?
      23        A. Yes.
      24        Q. If we scroll up, that's for the number of
06:09 25    individual cookies sold in -- individual Tough Cookies

253

```
06:09  1    sold during 2019; right?
       2       A.  Yes, on that document, yes.
       3       Q.  If we go to the first tab, TC by years totals,
       4    why is this number different, this column or cell C67?
06:09  5       A.  Because there was some missing information that
       6    the bookkeeper didn't catch.  I can -- I can provide you
       7    with that information.
       8       Q.  Okay.  That would be great.  So which number is
       9    correct?
06:09 10       A.  The total in 2019 is correct.
      11       Q.  What we're looking at right now?
      12       A.  The sheet that you're looking at right now is
      13    correct.
      14       Q.  So 15,924 individual cookies sold in 2019?
06:09 15       A.  That is accurate.
      16       Q.  That's specifically for Tough Cookie?
      17       A.  Yes.
      18       Q.  And then there are tabs for 2012 through 2021.
      19    Are these numbers on a -- for all products or just Tough
06:10 20    Cookie?
      21       A.  These are all products.
      22       Q.  Okay.  And there's some that are noted as
      23    deleted.  What does that signify?
      24       A.  That was deleted because the title was deleted
06:10 25    out of our -- the title on Quickbooks, the way they were
```

254

```
06:10  1    itemizing it was deleted.
       2       Q.  Does that mean --
       3       Go ahead.  I'm sorry.
       4       A.  It just means the title was deleted.
06:10  5       Q.  Got it.  Would those deleted items likely been
       6    renamed something else?
       7       A.  You will have to refer to Andrea on that.
       8       MR. POPE:  Stop sharing.
       9       MR. SINGH:  O'Bryant, please check the message
06:11 10    box and just respond in the message box when you can.
      11    Thank you.
      12       Q.  BY MR. POPE:  So I'm back on Exhibit 8 of the
      13    deposition, internal Exhibit Number 9.  I am on page 17.
      14    And there's a heading "TCD Tough Cookie Sales Channels."
06:11 15       Do you see that, Mr. Resnikoff?
      16       A.  Yes.
      17       Q.  You prepared these -- there are 10 items
      18    listed.  Safe to assume you prepared this list?
      19       A.  Yes.
06:11 20       Q.  Is this a complete and accurate list of all the
      21    sales channels for the Tough Cookie product?
      22       A.  Yes.
      23       Q.  Which -- can you rate them, give me the top
      24    three?
06:12 25       A.  The top three would be climbing gyms.  So
```

255

```
06:12  1    specifically Number 4, Number 8 and -- it is kind of a
       2    hard one.  I would say 9.
       3       Q.  Okay.  What's included in Number 8,
       4    vending/food service?
06:12  5       A.  Vending is vending machine companies, and food
       6    service would fall under -- vending and food service is
       7    basically the same.
       8       Q.  Got it.  Okay.
       9       I want to jump -- staying on this same exhibit,
06:13 10    Exhibit 8, jump to page 13.  Do you see the greatly
      11    debated cross-out here in the center of the page?
      12       A.  Yes.
      13       Q.  Who -- who made that cross-out?
      14       MR. SINGH:  I'm going to caution the -- I am
06:13 15    going to caution the witness that be careful of
      16    privileged communications.  If you cannot answer that
      17    without disclosing privileged communications, the
      18    question as to who made the cross-out, then you should
      19    not answer the question.
06:13 20       THE WITNESS:  Can I confer with you?  Can I
      21    discuss?  I'm not sure if by saying it I'm going to be
      22    divulging privilege.
      23       MR. SINGH:  Sure, yeah.  We will be very quick.
      24    Very quick.
06:14 25       MR. POPE:  Off the record, please.  I know
```

256

```
06:14  1    we're short on time.
       2       THE VIDEOGRAPHER:  The time is 6:14 p.m. and we
       3    are now off the record.
       4       (Brief recess at 6:14 p.m. - 6:16 p.m.)
06:16  5       THE VIDEOGRAPHER:  The time is 6:16 p.m. and we
       6    are now back on the record.
       7       MR. POPE:  There was a break for privilege.
       8    Madam Court Reporter, would you mind reading back my
       9    prior question just before the break?
06:17 10       (Record read as follows:
      11       "Q  Who made that cross-out?")
      12       MR. SINGH:  My same caution applies.  I will
      13    caution you not to disclose privileged communication.
      14    If you think you can answer it without disclosing
06:17 15    communication, go ahead.  Otherwise, please do not
      16    disclose privileged information.
      17       THE WITNESS:  If I answer that question, I will
      18    be disclosing privileged information.
      19       Q.  BY MR. POPE:  I am still on Exhibit 8 of the
06:17 20    deposition, page 13.  And we are still talking about the
      21    crossed-out information.  Did you, Mr. Resnikoff,
      22    make -- did you cross the information out?
      23       MR. SINGH:  Again, same objection; same
      24    caution.  I believe you can answer that -- that you can
06:18 25    answer that question without disclosing privilege.
```

257

06:18  1      THE WITNESS: No.
    2    Q.  BY MR. POPE:  When was the cross-out made?
    3      MR. SINGH:  I am going to caution you again.
    4  If you can answer that without privilege, then --
06:18  5  without disclosing privilege information, you can do so.
    6  Otherwise --
    7      THE WITNESS:  I believe that's privileged.  I
    8  can't answer that.
    9      MR. POPE:  I'm having trouble understanding how
06:18 10  that's privileged.  When something occurred is
   11  privileged?
   12      MR. SINGH:  His knowledge of it.  You are
   13  asking him his knowledge of it.  I can confer with him
   14  again, but I think I know where he's coming from based
06:18 15  on what I know.
   16      MR. POPE:  I am not asking -- I am not asking
   17  who did it.  I am asking when it happened.
   18      MR. SINGH:  Right.  You do what you want to do.
   19  I have noted my objection.
06:19 20      I will note it again and I'll give him a chance
   21  to reconsider his answer.  My objection is, caution you
   22  not to disclose privileged information.  If you think
   23  you cannot answer that question without disclosing
   24  privilege, then don't disclose privileged information.
06:19 25  If you think you can answer it without disclosing

258

06:19  1  privileged information, then go ahead.  If you need to
    2  confer with counsel, we'll do it again.
    3      THE WITNESS:  I need to confer.
    4      MR. POPE:  Let's go off the record, please.
06:19  5      THE VIDEOGRAPHER:  The time is 6:19 p.m.  We
    6  are now off the record.
    7      (Brief discussion held off the record
    8        at 6:19 p.m. - 6:23 p.m.)
    9      THE VIDEOGRAPHER:  The time is 6:23 p.m. and we
06:23 10  are now back on the record.
   11      MR. POPE:  So we just had a pause for
   12  privilege.  We are still on Deposition Exhibit 8 at page
   13  13, focused on the crossed-out information in the middle
   14  of the page.
06:24 15    Q.  My question is, when was the information
   16  crossed out?
   17    A.  I'm unaware.
   18      MR. SINGH:  Hold on just a second.  Let me note
   19  something for the record.  Obviously, this is also the
06:24 20  information that initially was redacted out of caution,
   21  that, in retrospect, looking at it, as you know, we
   22  retracted the so-called clawback of it.  But go -- go
   23  ahead and ask your question.  My objection stands on
   24  privilege, and then he can try to answer.  I'm not sure
06:24 25  it is going to help.

259

06:24  1      MR. POPE:  I think he already did answer.
    2    Q.  Did you want to repeat your answer?
    3      MR. SINGH:  I didn't -- sorry.  I didn't hear
    4  his answer.
06:24  5      THE WITNESS:  I'm unaware of the specific
    6  moment that it was redacted.
    7    Q.  BY MR. POPE:  Was it today?
    8    A.  I'm unaware, specifically.
    9    Q.  When did you become aware that it was redacted?
06:25 10    A.  In this conversation.  You know, when he clawed
   11  back.
   12    Q.  Okay.  Staying on --
   13      MR. SINGH:  Just to be clear for the record --
   14      MR. POPE:  I'm -- I'm running low on time.
06:25 15      MR. SINGH:  Go ahead.
   16      MR. POPE:  All right.
   17    Q.  Still Exhibit 8, page 8, what is this,
   18  Mr. Resnikoff?
   19    A.  This is an analytical certificate of analysis
06:25 20  done by a Micro Quality Labs, Inc.
   21    Q.  What does it show?
   22    A.  It shows protein, a protein test.
   23    Q.  Okay.  Is this specifically for the Tough
   24  Cookie product?
06:25 25    A.  Yes.

260

06:25  1    Q.  Are you aware of any instances of actual
    2  confusion involving Tough Cookie and One Tough Cookie?
    3    A.  No.
    4    Q.  Are you aware of any instances of actual
06:26  5  confusion involving The Cookie Department and ONE
    6  Brands?
    7    A.  Yes.
    8    Q.  What -- which -- when did those occur?  How
    9  many instances?  Let me ask you that.
06:26 10    A.  Well, when searching --
   11      How many instances?
   12    Q.  Yeah.
   13      MR. SINGH:  Two questions.
   14      THE WITNESS:  There are two questions.
06:26 15      MR. SINGH:  Miss Court Reporter, can you read
   16  back Mr. Pope's question?
   17      MR. POPE:  Strike it.  I don't want to waste
   18  time.  Strike that.
   19    Q.  How many instances of actual confusion are you
06:26 20  aware of between The Cookie Department and ONE Brands?
   21      MR. SINGH:  Object to form.
   22      THE WITNESS:  Well, I can't answer on that
   23  specifically, but what I can say is that the source
   24  code, the back end of your website clearly drives
06:27 25  traffic to ONE Brand Chocolate Chip Cookie Dough over

261

06:27 1  our product.

2  Q.  BY MR. POPE:  You are reading from your script;

3  right?

4  MR. SINGH:  Object to form.

06:27 5  THE WITNESS:  No.

6  MR. POPE:  What page of your notes are you

7  on, Mr. Resnikoff?

8  **A.  I'm not on the notes.  I am not actually**

9  **looking at the notes.**

06:27 10  Q.  On Exhibit 8 of the deposition at page 13, I'll

11  just note in the middle of the page it reads, "In the

12  back end of ONE Brand's websites the users of Tough

13  Cookies Only confuses search engines, thus creating a

14  distorted search result when consumers are searching for

06:27 15  TCD cookies."

16  MR. POPE:  I'll just read that for the record.

17  We can move on.

18  That does it for me.  I don't have any further

19  questions.

06:28 20  MR. SINGH:  Great.  Let me just follow into my

21  questions, which I am going to keep short and sweet,

22  given the time of day and given the manner in which

23  Mr. Resnikoff answered questions.

24  /

06:28 25  //

262

06:28 1  EXAMINATION

2  BY MR. SINGH:

3  Q.  Okay.  So Mr. Resnikoff, I have some questions

4  for you.

06:28 5  First of all, in preparation when you were --

6  you testified earlier today in response to some

7  questions by Mr. Pope that you had spent approximately

8  120 hours in total between your time facilitating

9  production of discovery documents and also in connection

06:28 10  with this deposition.

11  Do you remember giving that testimony?

12  MR. POPE:  I will object to form.

13  THE WITNESS:  Yes.

14  Q.  BY MR. SINGH:  Do you remember giving testimony

06:28 15  about the amount of time you spent preparing for the

16  deposition?

17  **A.  I do.**

18  Q.  Do you remember giving testimony about the

19  amount of time in total preparing for the deposition and

06:28 20  also providing request for production of document, the

21  actual documents for those requests?

22  MR. POPE:  I will object to form again.

23  Q.  BY MR. SINGH:  Go ahead.

24  **A.  I do.**

06:29 25  Q.  And when you were working on providing -- is it

263

06:29 1  correct that you spent time locating documents

2  responsive to defendant's request for production of

3  documents?

4  **A.  Yes.**

06:29 5  Q.  When you did that, did you review those

6  documents while you were producing them to your counsel?

7  **A.  Yes.**

8  Q.  Thank you.

9  Do you recall there was an exhibit that was

06:29 10  just recently put in front of you, actually.  It was

11  Exhibit 19, which was a so-called -- I'm just going to

12  put it in front of you right now.

13  MR. POPE:  Let me stop sharing.  I'm sorry.

14  MR. SINGH:  That's okay.  No worries.

06:29 15  For some reason -- for some reason I'm having

16  trouble opening some of your exhibits.  That's okay.

17  MR. POPE:  Would you like me --

18  MR. SINGH:  That's fine.  We don't need it.

19  Q.  Do you remember you were looking at an exhibit

06:30 20  just recently in this deposition, which was the

21  bookkeeper had prepared a so-called and I think she used

22  the term you used the term "cheat sheet" to summarize

23  financial data about the individual cookies.  I believe

24  it is Exhibit 19.

06:30 25  **A.  Yes.**

264

06:30 1  MR. SINGH:  Mr. Pope, can you check me on that,

2  it is Exhibit 19?

3  MR. POPE:  Yes, I think that's right.

4  Q.  BY MR. SINGH:  That document, was that an

06:30 5  official report or something that was prepared as part

6  of your preparation for the deposition today?

7  **A.  It is the latter.**

8  Q.  In other words, something that was prepared for

9  the deposition today?

06:30 10  **A.  Correct.**

11  Q.  Thank you.  Can you think of -- do you recall

12  the line of questioning by Mr. Pope about bars earlier

13  today, do you recall that?  Protein bars?

14  **A.  Yes.**

06:31 15  Q.  Do you -- as you sit here today, can you think

16  of any other competitive protein bars in your space,

17  TCD's space, that would be competing with The Cookie

18  Department Tough Cookie?

19  **A.  Aside from ONE Brand?**

06:31 20  Q.  Yes.

21  **A.  Cliff bars.  Macro bars.  Think Thin bars.**

22  **Keto Fat.  I think that's what it's called.  There's a**

23  **whole long list of them.**

24  Q.  That's fine.  I just wanted a few examples.

06:31 25  Thank you.

66 (Pages 261 to 264)

265

06:31  1          In connection with this issue of investment and
2      the disclosure of identities, were you trying to
3      withhold evidence in any way when you -- when you were
4      earlier saying that you believed there was a privacy
06:32  5      obligation with regards to those investors?
6          A.  No.
7          Q.  When you found out through Mr. Pope that there
8      was an SEC filing, do you have any -- and, obviously, we
9      will look into it.  But do you have any thought right
06:32 10      now as to how that information made it into an SEC
11      filing?
12          A.  I had to report to Wefunder on an annual basis.
13          Q.  Do you have any thought right now as to how the
14      information made it into an SEC filing?
06:32 15          A.  No.
16          Q.  Would you knowingly let that information into
17      the SEC filing?
18          A.  No.
19          Q.  Of all of those investors, some of which Mr.
06:32 20      Pope has now named in this deposition and which appeared
21      in the SEC documents, are you aware of any individual or
22      entity that is a competitor in any manner with the
23      Hershey Company or ONE Brands?
24          A.  No.
06:33 25          Q.  Do you recall the line of questioning from

266

06:33  1      Mr. Pope about the activities with Tough Cookie between
2      2019 to 2022 and the possible reformulation of the keto
3      line?
4          My question to you is, can you please describe
06:33  5      the -- what steps The Cookie Department took in
6      connection with Tough Cookie to launch a keto line and
7      the ultimate decision to launch -- to bring back the
8      fully functional line?
9          MR. POPE:  I'll object -- I'll object to form.
06:34 10          MR. SINGH:  Let me try that again.
11          Q.  BY MR. POPE:  Can you please explain the
12      decision, which you testified to and Mr. Pope heard it,
13      to bring back Tough Cookie as a -- in its fully
14      functional form?
06:34 15          A.  We received multiple emails from former buyers
16      and current buyers letting us know that they really
17      wanted to see our Tough Cookie and the rest of our
18      functional line back on the market.  We also have a very
19      large chain who's interested in bringing them out
06:34 20      full -- full chainwide.  So we felt it was necessary to
21      relaunch -- well, re-release rather.
22          Q.  Did you receive any communications at any time
23      from customers or distributors that they wanted the
24      full -- fully functional line back in favor of keto?
06:35 25          A.  Yes.

267

06:35  1          Q.  Sorry.  Let me reword that.
2          Did you receive communications from any
3      customers or distributors that they wanted the fully
4      functional line back instead of keto?
06:35  5          A.  Yes.
6          Q.  Can you give an example of any such
7      communications?
8          A.  We received an email from part of this chain, a
9      franchise owner.  I'm not sure if she's an owner, but a
06:35 10      manager of some sort, letting us know that keto -- you
11      know - she's a smoothie bar - keto wasn't doing well for
12      her retail store but that she really wanted to see Tough
13      Cookie and the other fully functional line of cookies.  She
14      wanted to order them specifically.
06:36 15          Q.  During the course of the deposition several
16      times Mr. Pope put prosecution history documents in
17      front of you in connection with the 2012 registration
18      application and the 2018 application.
19          Do you remember that?
06:36 20          A.  I do.
21          MR. SINGH:  And I believe the exhibit numbers
22      were Exhibit 11 and Exhibit 12.
23          Mr. Pope, is that consistent with your marking?
24      Just because we've had a little bit of confusion, I
06:36 25      wanted to double-check that.

268

06:36  1          MR. POPE:  I am checking now.  Bear with me.
2          MR. SINGH:  Just so we have a clean record.
3          MR. POPE:  So 11 was the 2012.  I am not seeing
4      12, though.  Yes, yes, that's right, 11 and 12.
06:37  5          Q.  BY MR. SINGH:  What were marked as Exhibit 11
6      and Exhibit 12, do you remember running through
7      questions with Mr. Pope on that?
8          A.  I do.
9          Q.  Do you remember at various times he asked you
06:37 10      something to the effect of did I read it correctly, and
11      you would respond.  How did you interpret his question
12      when he asked you, "Did I read that correctly?"
13          A.  I thought he was referring to the actual copy
14      stated on the document.
06:37 15          Q.  Okay.  I just wanted to make that clear.
16          Do you recall the line of questions about SEO
17      strategy from Mr. Pope?
18          A.  Yes.
19          Q.  At the time when you -- I am getting feedback
06:38 20      because my door is partially open.  Hold on.
21          At the time when you -- at the time when you
22      were considering SEO strategy, did you have a
23      significant budget for an SEO strategy?
24          A.  No.
06:38 25          Q.  In the last year and a half have you had issues

AKIVA RESNIKOFF - HIGHLY CONFIDENTIAL - A.E.O. - April 28, 2022

269

06:38 1    with cash flow?
2        A.  Yes.
3        Q.  And what has been one of the reasons why you've
4    had issues with cash flow?
06:38 5      A.  Defending what I believe to be a frivolous and
6    retaliatory lawsuit filed by Hershey Confectionary, LLC,
7    accusing me of infringement on their Hershey Kiss mark.
8        Q.  Have you also incurred significant expenses in
9    connection with this litigation?
06:39 10     A.  Yes.
11       Q.  Do you remember Mr. Pope put in front of you
12   and has been referring to it from time to time in this
13   deposition, I'm going to do a share screen to
14   Exhibit 8.  Can you all see it?
06:39 15     MR. POPE:  It flashed but went away.
16       MR. SINGH:  Interesting.  Stop share.  I am
17   going to minimize you all.  There was a Zoom update this
18   morning, and it's been behaving a little bit funny since
19   then.  I wonder if I am going to have to restart my
06:39 20  machine.  If worst comes to worst, Mr. Pope, I might ask
21   you, I don't like to do that to opposing counsel.  It's
22   not your job, but just for the sake of time.
23       Let's see if we get it right this time.  I have
24   put it on the same screen.  Can you now see it?
06:40 25     MR. POPE:  The same, it flashed, but I am

270

06:40 1    looking at the Brady Bunch screen.  Let me try --
2        MR. SINGH:  Michael, do you see it?
3        MR. POPE:  For whatever reason, our Zoom screen
4    was showing on top of it.  I'm good.
06:40 5      MR. SINGH:  You're good.
6        Q.  So, Mr. Resnikoff, this was marked as Exhibit 8
7    in this deposition, I believe.  It's the notes that were
8    collected from your desk and scanned and sent to
9    Mr. Pope.
06:40 10     Do you recognize this document as being an
11   exhibit that you were questioned on earlier today?
12       A.  I do.
13       Q.  I want to spend a little bit of time on the
14   notes because there were some questions that had a
06:40 15  little bit of, as much as I like and respect Mr. Pope,
16   had a fair bit of implication and innuendo.
17       Do you see these TCD deposition prep notes
18   here?
19       A.  I do.
06:41 20     Q.  I want you to, in as much detail as you can,
21   tell me when and how you actually prepared these notes.
22       A.  I prepared this -- these notes in full the
23   week -- well, during deposition prep.  I guess that
24   would be a portion of the weekend, last weekend and this
06:41 25  week.

271

06:41 1    Q.  Did myself or Mr. Indrajana write any of these
2    notes?
3        A.  No.
4        Q.  Did we create this document?
06:41 5      A.  No.
6        Q.  Do you have the native form of this document
7    still on your laptop?
8        A.  Yes.
9        Q.  Okay.  Please retain that, and we will produce
06:41 10  it for Mr. Pope tomorrow.
11       A.  Okay.
12       Q.  Do you -- I am going to go point by point here
13   on the corporate structure and organization.  Did either
14   myself or Mr. Indrajana write any of this content here?
06:42 15     A.  No.
16       Q.  "Why Tough Cookie name?"  Did either myself or
17   Mr. Indrajana write any of this information here?
18       A.  No.
19       Q.  And for the sake of time, just so I'm not
06:42 20  burning time, because I'm obviously aware that all of us
21   are eager to get going, for the remainder of this note
22   document, and I would like you to take a look at every
23   single section, did either myself or Mr. Indrajana write
24   any of this that you put here?
06:42 25     A.  No.

272

06:42 1    Q.  When did you do most of these notes?
2        A.  Most of these notes were done on, I believe,
3    Monday.
4        Q.  And were they done with either Mr. Indrajana or
06:42 5    I standing over you or even in your presence?
6        A.  No.
7        Q.  When did you do it?
8        A.  I did it -- well, I did it on Monday.
9        Q.  Where were you physically?
06:42 10     A.  I was at my mother's house in Berkeley.
11       Q.  Okay.  And at that time were you preparing for
12   the deposition?
13       A.  Yes.
14       Q.  Were you looking at documents?
06:43 15     A.  Yes.
16       Q.  Okay.  Now, there was a question about where do
17   you advertise.  Do you recall that?  It was actually
18   just in the last hour.  And I think Mr. Pope was
19   focusing on this section here.  Do you see that?  This
06:43 20  is page 14 of the 17 of the .pdf in Exhibit 8.
21       Do you see it?
22       A.  Yes.
23       Q.  My question to you is, first of all, these
24   notes, just the whole notes that are captured here, were
06:43 25  they intended to be complete?  In other words, were you

68 (Pages 269 to 272)



273

06:43  1    trying to put together a document that would have
       2    everything that you would need to testify about?
       3         A.  No.
       4         Q.  What was the intent when you put together these
06:43  5    notes?
       6         A.  It was just a point of reference to think about
       7    it.
       8         Q.  So, for example, here under "advertising," does
       9    it list every single significant channel of advertising?
06:43 10         A.  No.
      11         Q.  What, for example, is missing from here?
      12         A.  Amazon, my website.
      13         Q.  Does it include, for example, advertising on --
      14    on online or Amazon or Google?
06:44 15         A.  No.
      16         Q.  You recall there was a line of questioning and
      17    an article that was put in front of you that showed that
      18    you had given a quote at some point in 2018, four days
      19    before, according to Mr. Pope, four days before
06:44 20    October 15, 2018.  You were quoted in an article where
      21    you were talking about the potential acquisition of The
      22    Cookie Department.
      23         Do you recall that line of questioning?
      24         A.  I do.
06:44 25         Q.  Do you remember in that quote there was some

274

06:44  1    reference to General Mills and Hershey as being the
       2    kinds of companies that might acquire a company like
       3    you?
       4         Do you remember that?
06:44  5         A.  Yes.
       6         Q.  Do you remember Mr. Pope asking you if you gave
       7    that quote?
       8         A.  I do remember that.
       9         Q.  And then do you remember the line of
06:45 10    questioning about your acquiring knowledge of ONE
      11    Brands' use of Tough Cookies Only four days later on
      12    October 14, 2018?
      13         A.  Yes.
      14         Q.  At the time when you saw that ONE Brand bar on
06:45 15    October 15, 2018, did you have any knowledge that ONE
      16    Brands had any affiliation or would have any affiliation
      17    with the Hershey Company?
      18         A.  No.
      19         Q.  When did you learn, you personally learn, that
06:45 20    the Hershey Company had acquired ONE Brands?
      21         A.  March of 2020.
      22         Q.  Okay.  When you made the decision to work with
      23    Mr. Indrajana to file an application for trademark for
      24    Tough Cookie in 2018 and pursue that strategy, did you
06:46 25    have any idea that ONE Brands would be acquired by the

275

06:46  1    Hershey Company?
       2         A.  No.
       3         Q.  I think we covered this already.  When you
       4    initially answered a question from Mr. Pope about your
06:46  5    communication with Gail Dosik, and he asked you when did
       6    you communicate with Gail Dosik, do you remember saying
       7    initially you thought it was 2019?
       8         A.  Yes.
       9         Q.  What is, in fact, the correct date you
06:46 10    communicated with Gail Dosik?
      11         A.  2018.
      12         Q.  I believe you already, yourself, brought into
      13    the record your screenshots -- sorry.  Your phone to
      14    show, in fact, you had both messages that Mr. Pope
06:47 15    showed you; correct?
      16         A.  That is correct.
      17         Q.  Were you trying to conceal evidence or withhold
      18    evidence in any way?
      19         A.  No.
06:47 20         Q.  Again, just to be clear, and I think you
      21    already said this, but I want this clear for the record.
      22         What do you think happened?  In other words,
      23    why do you think there was a discrepancy between what
      24    you provided to us to provide to defendants versus what
06:47 25    Mr. Pope appears to have obtained, I'm assuming, from

276

06:47  1    Gail Dosik herself?
       2         A.  Because it was a screenshot on my phone, and I
       3    didn't -- I didn't think to go down further.
       4         Q.  When you looked at the nature of the second
06:47  5    communication, do you think there was anything
       6    significant in that second communication, as you sit
       7    here today?
       8         A.  No.  It was basically peer-to-peer banter.
       9         MR. SINGH:  Okay.  I have no further questions
06:48 10    right now at this time, subject, of course, to ping-pong
      11    with Mr. Pope.  If we have a few rounds, let's do it.
      12         MR. POPE:  Nothing more.
      13         MR. SINGH:  Thank you, kind sir.  That is
      14    greatly appreciated.
06:48 15         THE VIDEOGRAPHER:  Do you want to get a
      16    transcript order from Mr. Pope?
      17         MR. POPE:  Yes, what's normal turnaround?
      18         THE REPORTER:  I think it's 10 business days.
      19         (Clarification by the reporter.)
06:48 20         MR. POPE:  The rough this weekend would be
      21    great.  And I'm not trying to squeeze you at all, but we
      22    are facing a deadline to the extent we wanted to move to
      23    compel anything at the end of next week, which Mr. Singh
      24    can attest to.  What is feasible in terms of rushing the
06:49 25    final?

69 (Pages 273 to 276)

277

06:49 1        THE REPORTER:  Do you want it Tuesday?

2        MR. POPE:  Is there any way for us to get it by

3    Monday, end of day Monday?

4        THE REPORTER:  Sure.

06:49 5        MR. POPE:  It can be California time.  I know

6    I'm ahead of you guys.  Rough this weekend and the final

7    by end of day Monday would be fantastic.

8        THE REPORTER:  Mr. Singh, do you want a rough

9    of this?

06:49 10        MR. SINGH:  Nope, don't need it.

11        THE VIDEOGRAPHER:  Okay.  This marks the end of

12    today's deposition of Akiva Resnikoff.  We are

13    officially off the record at 6:50 p.m.

14        (Whereupon, at 6:50 p.m. the

06:50 15        deposition of AKIVA RESNIKOFF

16        was concluded.)

17

18

19

06:50 20

21

22

23    _____

24        AKIVA RESNIKOFF

25

278

06:50 1    STATE OF CALIFORNIA )   SS.

2        I do hereby certify that the witness in the

3    foregoing deposition was by me duly sworn to testify to

4    the truth in the within entitled cause; that said

06:50 5    deposition was taken at the time and place therein

6    stated; that the testimony of said witness was correctly

7    reported by me, a certified shorthand reporter and a

8    disinterested person, and was under my supervision

9    thereafter transcribed and when so transcribed was

06:50 10    carefully read to or by the said witness, and being in

11    every desire, was thereafter by the said witness duly

12    subscribed; that if unsigned by the witness, signature

13    has been waived in accordance with stipulation between

14    counsel for the respective parties.

06:50 15        And I further certify that I am not of counsel

16    or attorney for either or any of the parties to said

17    deposition nor in any way interested in the outcome of

18    the cause named in said caption.

19        IN WITNESS WHEREOF, I have hereunto set my

06:50 20    hand and affixed my seal of office this 2nd day of

21    May, 2022.

22

23

24    _____

06:50 25        TARA SANDFORD, RPR, CSR #3374

# Exhibit C

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3                 OAKLAND DIVISION
 4                     - - -
 5   THE COOKIE DEPARTMENT, INC., a )
     a California corporation,     )
 6                                 )
             Plaintiff,            )
 7                                 )
     vs.                           ) Case No.
 8                                 ) 4:20-cv-09324-KAW
     THE HERSHEY COMPANY, a Delaware)
 9   Corporation, ONE BRANDS, LLC, a) Volume I
     Foreign Limited Liability     )
10   Company; AND DOES 1 TO 50,    ) Pages 1 - 163
     INCLUSIVE,                    )
11                                 )
             Defendants.           )
12   _____)
13        VIDEOTAPED DEPOSITION OF
14          THE COOKIE DEPARTMENT,
15   by and through 30(b)(6) Witness, ANDREA KIRSCHNER
16          701 Battery Street, 3rd Floor
17            San Francisco, California
18             Friday, April 29, 2022
19
20   STENOGRAPHICALLY REPORTED BY:
     CARRIE HEWERDINE, RDR, CSR #4579
21   - - - - - - - - - - - - - - - - - - - - - - - - -
22   JAN BROWN & ASSOCIATES
23   WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES
24   701 Battery St, 3rd Floor, San Francisco, CA 94111
25        (415) 981-3498 or (800) 522-7096
```

**Page 2**

```
 1                   I N D E X
 2                                        Page
 3   Examination by Ms. Howery            9
 4   Examination by Mr. Singh             157
 5
 6   Reporter's Certificate               163
 7
```

**Page 3**

```
 1            I N D E X   O F
 2          E X H I B I T S  (Continued)
 3   Plaintiff's No.                          Page
 4   EXHIBIT 1  Defendants The Hershey Company    26
               and ONE Brands, LLC's Notice of
 5             Rule 30(b)(6) Deposition of
               Plaintiff The Cookie Department
 6
 7   EXHIBIT 2  Defendants The Hershey Company    27
               and ONE Brands, LLC's Amended
 8             Notice of Rule 30(b)(1) and
               30(b)(6) Deposition of Andrea
 9             Kirschner.
10   EXHIBIT 3  Kirschner LinkedIn Profile       31
11   EXHIBIT 4  TCD-018421 Financial Production   71
12   EXHIBIT 5  TCD-018422 cheat sheet final      87
13   EXHIBIT 6  AK Depo Notes                     87
14   EXHIBIT 7  SEC Form C                        108
15   EXHIBIT 8  SEC Balance Sheet 2019            120
16   EXHIBIT 9  SEC Balance Sheet 2020            129
17   EXHIBIT 10  SEC FORM C-AR TCD (Annual Report)  133
18   EXHIBIT 11  SEC Profit and Loss 2020         143
19
20
21   *AEO     Attorneys' Eyes Only Confidential
               Exhibits Bound Separately
22
23
24
25
```

**Page 4**

```
 1       BE IT REMEMBERED that, pursuant to Notice of
 2   Taking Deposition, on Friday, April 29, 2022,
 3   commencing at the hour of 9:02 a.m. PST, via
 4   Zoom teleconferencing through the offices of
 5   Jan Brown & Associates, 701 Battery Street,
 6   3rd Floor, San Francisco, California, before
 7   me, Carrie Hewerdine, RDR, a Certified
 8   Shorthand Reporter in the state of California,
 9   there personally appeared
10
11          THE COOKIE DEPARTMENT,
12   by and through 30(b)(6) Witness, ANDREA KIRSCHNER,
13   called as a witness by the Plaintiff, and who, being
14   by me first duly sworn, was thereupon examined and
15       interrogated as herein set forth.
16
17               --o0o--
```

A P P E A R A N C E S

SANJIV N. SINGH, Attorney at Law, of
SANJIV N. SINGH, A PROFESSIONAL LAW CORPORATION,
1650 S. Amphlett Boulevard, Suite 220, San Mateo,
California 94402, appeared via Zoom teleconference
as counsel on behalf of the Plaintiff.
Telephone: 650.389.2255
E-mail: ssingh@sanjivnsingh.com

MICHAEL B. INDRAJANA, Attorney at Law, of
the INDRAJANA LAW GROUP, 1650 S. Amphlett Boulevard,
Suite 220, San Mateo, California 94402, appeared via
Zoom teleconference as counsel on behalf of the
Plaintiff.
Telephone: 650.597.0928
E-mail: michael@indrajana.com

MONIQUE HOWERY and KEYONN L. POPE,
Attorneys at Law, of RILEY, SAFER, HOMS & CANCILA,
LLP, 70 West Madison Street, Suite 2900, Chicago,
Illinois 60602, appeared via Zoom teleconference as
counsel on behalf of the Defendants.
Telephone: 312.471.8700
E-mail: kpope@rhsc-law and mhowery@rhsc-law.com

5

A P P E A R A N C E S  (Continued)

ALSO PRESENT:
O'BRYANT MURALLES, Videographer
AKIVA RESNIKOFF, TCD Corporate Representative

6

APRIL 29, 2022                    9:02 A.M. PST
P R O C E E D I N G S
-- o0o --

THE VIDEOGRAPHER:  We are going on the
record.
This marks the beginning of today's
video-recorded deposition of Andrea Kirschner taken
in the matter of The Cookie Department versus The
Hershey Company in the United States Northern
District Court of California, for the Oakland
Division.  This is Case Number 4:20-CV-09324-KAW.
Today's date is April the 29th, 2022, and
the time is 9:02 a.m.
This deposition is being held remotely via
Zoom.  The videographer is O'Bryant Muralles of
Jan Brown & Associates.  The court reporter is
Carrie Hewerdine also of Jan Brown & Associates.
Would counsel please identify themselves
and state whom they represent.
MR. SINGH:  Sinjiv -- oh, go ahead.
MS. HOWERY:  Monique Howery.  I represent
the Defendants, The Hershey Company and ONE Brands,
LLC.
MR. POPE:  Keyonn Pope also on behalf of

7

the Defendants, The Hershey Company and ONE Brands,
LLC.
MR. SINGH:  Sanjiv Singh representing
Plaintiff The Cookie Department and also
representing the witness today, Andrea Kirschner.
MR. INDRAJANA:  Michael Indrajana
representing Plaintiff The Cookie Department and
also representing the witness today.
THE VIDEOGRAPHER:  Thank you.
If there are no stipulations, the court
reporter may swear in the witness.
THE REPORTER:  Ma'am, would you raise your
right hand, please.

THE COOKIE DEPARTMENT,
by and through 30(b)(6) Witness, ANDREA KIRSCHNER
having first been duly sworn,
was examined and testified as follows:
THE WITNESS:  I do.
THE REPORTER:  Thank you.
Go ahead.
MR. SINGH:  Ms. Howery, can I just -- two
notes.  One is, obviously, we are designating the
transcript, provisionally, highly confidentiality,
Attorneys' Eyes Only, consistent with the manner in

8

**Page 9**

1  which you have.  And then we will de-designate
2  accordingly.
3      Second, it's just a logistical note.  I'm
4  obviously defending the deposition, but there is a
5  possibility, depending on how long the depo goes,
6  that I will hand it off to Mr. Indrajana to continue
7  defending it if the need arises.  We'll see how long
8  it goes.
9      Do you have an estimate, just for our
10  witness, so she can adjust accordingly as to how
11  long the depo will go today?  If you do.
12      MS. HOWERY:  I'd estimate four hours.
13      MR. SINGH:  Okay.  Thank you.  We
14  appreciate it.
15      Obviously, we know you're not tied to
16  that, if things arise; but, thank you.  We
17  appreciate it.
18      MS. HOWERY:  Great.
19
20          EXAMINATION
21  BY MS. HOWERY:
22      Q   Thank you so much Ms. -- is it Kirschner
23  or Kirschner (phonetic)?
24      A   **Kirschner.**
25      Q   Kirschner.

**Page 10**

1      Thank you so much for taking time to meet
2  with us today.  As I mentioned earlier, my name is
3  Monique, and I represent the Defendants in this
4  action.
5      Have you ever been deposed before?
6      A   **I have.**
7      Q   Okay.  And when was that?
8      A   **Over a decade ago.**
9      Q   Okay.  And what type of matter were you
10  deposed in?
11      A   **It was for a previous employer.**
12      Q   Okay.  Was -- was it in connection with a
13  lawsuit?
14      A   **It wasn't a lawsuit.  It was just a**
15  **discovery.**
16      Q   Okay.
17      MR. SINGH:  I'll just caution the
18  witness -- and to the extent you're bound by any
19  confidentiality obligations in connection with a
20  settlement or if it was a private proceeding,
21  et cetera, to just be weary of that.
22      I obviously was not involved in it, so I
23  don't know, but --
24      THE WITNESS:  I wasn't privy to that
25  information, either.

**Page 11**

1      MR. SINGH:  You should be able to freely
2  answer these questions, though.
3  BY MS. HOWERY:
4      Q   Okay.  What was the nature of the dispute?
5      A   **I'm not -- again, I'm not privy to**
6  **providing more data on that.**
7      Q   Well, what topics were you deposed on?
8      A   **On work I have done for the company.**
9      Q   Okay.  And what company was that?
10      A   **The Home Shopping Network.**
11      Q   Okay.  So you say that was about ten years
12  ago.  So it looks like you may have a little
13  familiarity with the deposition process, but I'd
14  like to lay some ground rules before we get started.
15      This is a formal legal proceeding.  So
16  it's just like testifying in court, and you are
17  under the same obligations to tell the truth as if
18  you were in court.
19      Do you understand that?
20      A   **Yes.**
21      Q   And I'm going to ask you questions, and
22  please answer truthfully unless your attorney
23  clearly and directly instructs you not to answer.
24      Do not speculate.  I'm looking for your,
25  you know, answer to the best of your knowledge or

**Page 12**

1  for what you are speaking on behalf of the company
2  for.
3      The court reporter is taking down our
4  conversation today and your testimony.  So I need
5  you to speak clearly; wait for me to complete my
6  question; and respond with an audible response, not
7  a shaking of the head or uh-huh or huh-uh.  That
8  type of thing.
9      Do you understand that?
10      A   **Yes.**
11      Q   If you don't understand my question,
12  please feel free to ask me to rephrase.
13      And if you need to take a break, just let
14  me know, and we can break so long as there's no
15  pending question -- unless that question relates to
16  a privilege issue.
17      MS. HOWERY:  Should we, Counsel, discuss
18  the cadence of breaks today?  Typically we've been
19  going to an hour to hour-and-a-half before we take
20  breaks.
21      Would you be comfortable with that,
22  Ms. Kirschner?
23      THE WITNESS:  Yes.
24      MR. SINGH:  And I would imagine, Monique,
25  that if you want to charge forward, just ask her.

**Page 13**

1   I'll defer to her --
2          MS. HOWERY:  Okay.
3          MR. SINGH:  -- because I know she really
4   does want to, you know, be efficient here.
5          MS. HOWERY:  Okay.
6          MR. SINGH:  We are also willing to go
7   longer if she's willing to go longer.
8          MS. HOWERY:  Fantastic.
9          So just let me know if you need a break,
10  and we will move forward and be as efficient as we
11  can.
12  BY MS. HOWERY:
13     Q   Is there anything that will prevent you
14  from testifying truthfully today?
15     **A   No.**
16     Q   Okay.  Are you under the influence of any
17  substances that might impact your ability to
18  truthfully testify?
19     **A   No.**
20     Q   Do you have any physical or mental
21  impairment that might impact your ability to
22  truthfully testify today?
23     **A   No.**
24     Q   Okay.  Great.  We can get started then.
25     I am going to populate to the Chat --

**Page 14**

1   well, hold on.
2          When did you first learn that you were
3   going to be deposed in this case?
4      **A   A few weeks ago.**
5      Q   And would that be in April or March?
6      **A   I believe, March.**
7      Q   And who informed you that you'd be
8   deposed?
9      **A   It was Mr. Resnikoff, Akiva.**
10     Q   And what did he say?
11     **A   He asked if I would be willing to speak to**
12  **the numbers.**
13     Q   Okay.  And did you talk about anything
14  else?
15     **A   No.**
16     Q   Did you talk about the allegations in this
17  case?
18     **A   I knew about it.  I knew what this case**
19  **was about, but I'm just focused on the numbers.  So**
20  **we didn't discuss anything else.**
21     Q   And what's your understanding of what this
22  case is about?
23     **A   Based on my conversation with counsel, it**
24  **is a trademark infringement.**
25         MR. SINGH:  I'll just caution the witness,

**Page 15**

1   that answer was fine, but just be careful not to
2   actually disclose actual communications with
3   counsel.
4          THE WITNESS:  Yes.
5   BY MS. HOWERY:
6      Q   Okay.  What did you do to prepare for
7   today's deposition?
8      **A   I reviewed the deposition paperwork with**
9   **my attorney, a couple of days ago.**
10     Q   Did you review anything else?
11     **A   Just the documents that were provided, the**
12  **deposition notice and the financial information that**
13  **was submitted for discovery.**
14     Q   And what financial information did you
15  review?
16     **A   Reviewed Touch Cookie performance, sales**
17  **performance.  That was included in the documents as**
18  **well as the financial P&L for The Cookie Department**
19  **for the time spent 2012 through mid-year 2021.**
20     Q   How many hours did you spend preparing for
21  this deposition?
22     **A   We had a one-and-a-half-hour review with**
23  **the attorney.**
24     Q   And was anyone -- who was -- strike that.
25         Who participated in the review?

**Page 16**

1      **A   It was Mr. Indrajana and -- sorry -- and**
2   **Akiva participated for a part of the conversation.**
3   **But he dropped off then.**
4      Q   Was anyone else present?
5      **A   No.**
6      Q   Was this preparation in person?
7      **A   No.  It was via Zoom.**
8      Q   And when did that prep happen?
9      **A   I believe it was Tuesday or Wednesday.**
10     Q   Did you speak with anyone else about your
11  preparation?
12     **A   I have not.**
13     Q   Did you review any other documents beside
14  the deposition notice and the financial documents
15  you referenced?
16     **A   I looked at the financials that were**
17  **provided.**
18     Q   Did you look at any financials that were
19  not provided to you by counsel?
20     **A   No.**
21     Q   Did you look at the Complaint in this
22  action?
23     **A   It was -- if it was part of the documents**
24  **provided by my counsel, we briefly went through it.**
25     Q   So is that a "Yes"?

ANDREA KIRSCHNER - April 29, 2022

1      A   Yes.
2      Q   Had you seen the Complaint before your
3  preparation for this deposition?
4      **A   No.**
5      Q   Did you talk with Akiva about the lawsuit
6  before this deposition?
7      **A   Not in great detail.  He told me that**
8  **there is a lawsuit.**
9      Q   Okay.  Did you talk to him -- (audio
10 distortion)
11     THE REPORTER:  I'm sorry?
12     MS. HOWERY:  Sorry.
13     THE WITNESS:  I'm sorry.
14     That we will be filing a lawsuit on the
15 company.  He will be filing a lawsuit.
16 BY MS. HOWERY:
17     Q   And did you discuss with him why he was
18 filing a lawsuit?
19     **A   Just very, very basic.  He told me about**
20 **the trademark infringement.**
21     Q   Okay.  And what's your understanding of
22 that infringement?
23     **A   That we -- or The Cookie Department has**
24 **the trademark for the name of a particular cookie,**
25 **and that was used by a different company.**

17

1      Q   Did you ever talk about communicating with
2  ONE Brands, before filing the lawsuit?
3      **A   No.**
4      Q   Did you ever talk about communicating with
5  The Hershey Company before filing the lawsuit?
6      **A   Not to the best of my knowledge, no.**
7      Q   Did you ever talk about any strategies to
8  communicate with the Defendants in this action
9  before filing a lawsuit?
10     **A   No.  That was his -- his area for me.  And**
11 **I'm, you know, focused on the financial plan, on --**
12 **on the analysis part of it, and results.**
13     **So the strategic direction and**
14 **operationally, that's Akiva's bit.**
15     Q   Did you review any e-mails in preparation
16 for this deposition?
17     **A   I looked through my e-mails, but I haven't**
18 **found anything.**
19     Q   And what did you look for?
20     **A   I looked for keywords.**
21     Q   What keywords did you look for?
22     **A   Tough Cookie.**
23     Q   And you didn't find anything in your
24 e-mail?
25     **A   No.**

18

1      Q   Did you look at any presentations, like
2  PowerPoints?
3      **A   No, not specifically.  I -- I've done a**
4  **search in my e-mail for Tough Cookie, and I haven't**
5  **found anything that popped up.**
6      Q   Did you look at the Tough Cookie website?
7      **A   Yes.**
8      Q   Okay.  And what were you looking for on
9  the website?
10     **A   I'm sorry.  The Tough Cookie website?  No.**
11     Q   I'm sorry.
12     **A   I looked at The Cookie Department site.**
13     Q   Thank you for clarifying.
14     **A   I looked at The Cookie Department's**
15 **website, yes.**
16     Q   Thank you.  Thank you.
17     And I -- I may sometimes say "TCD" or "The
18 Cookie Department" instead of Tough Cookie.  So I'll
19 be very careful there.
20     Did you take a look at The Cookie
21 Department's discovery responses in this litigation?
22     **A   I will defer to my attorney.**
23     **Were they're in the paperwork?  I don't**
24 **recall seeing it.**
25     MR. SINGH:  So, Monique, I -- I don't want

19

1  to be -- if you don't think it's appropriate for her
2  to ask me that question right now, I'm not going to
3  try to assist her with the answer.
4      MS. HOWERY:  I would prefer that you
5  didn't, Counsel.
6      MR. SINGH:  Yeah.  So I'm just going to --
7  unfortunately, Ms. Kirschner, you need to try and
8  answer the question on your own.  If -- the only way
9  you could confer with me right now is if you thought
10 there was a privilege issue.
11     THE WITNESS:  I see.
12     MR. SINGH:  So I -- I have to let you
13 answer this one on your own.
14     THE WITNESS:  So I don't recall
15 specifically the answer.
16     I just know that I recall seeing or going
17 through the notice.  I haven't spent a lot of time,
18 truly, going through each of the items.
19     But I remember reviewing the notice with
20 Michael, and, umm, I was more focused on the Excel
21 documents provided.
22 BY MS. HOWERY:
23     Q   Okay.  Have you seen a document that would
24 be called something like "The Cookie Department's
25 Responses to Defendant's Request for Production of

20

1  Documents"?
2  **A   I don't remember specifically that title.**
3  Q   Have you seen a document titled "The
4  Cookie Department's Responses to Defendant's
5  Interrogatories"?
6  **A   I don't remember seeing that now.**
7  Q   Did you take any notes during your
8  deposition prep sessions?
9  **A   I took a couple of notes, yes, on the**
10  **numbers.**
11  Q   Okay.  And did you bring any of those
12  notes with you today, to the deposition?
13  **A   I have.**
14  Q   Okay.
15  MS. HOWERY:  Counsel, would you be --
16  would you share those notes, please.
17  MR. SINGH:  I -- we didn't know that she
18  had.
19  So, Ms. Kirschner, when you say you
20  brought them, are they in front of you?
21  THE WITNESS:  These are, for instance, the
22  documents that were provided, and I have made some
23  manual notes to it.
24  MR. SINGH:  Okay.  So I just became aware
25  of this right now, this moment -- which is -- it's

21

1  fine for you to have notes.  But what Ms. Howery is
2  requesting is she wants a copy of them.
3  Do we have a quick way that you could
4  e-mail to us what you have in front of you?
5  Can you show it to the screen, just so
6  that Ms. Howery can see it?
7  How many documents do you have next to
8  you?
9  THE WITNESS:  I -- (audio distortion)
10  MR. SINGH:  Well, actually -- here, let me
11  ask you this:  Not around you.  But the documents
12  that you have in front of you that you were going to
13  use to assist you with the depo.
14  THE WITNESS:  I have this particular one
15  and the P&L.
16  MR. SINGH:  Okay.  So --
17  THE WITNESS:  I have that here.
18  Again, it's just a couple of notes.
19  MR. SINGH:  Okay.  So how many pages is
20  that in total?
21  THE WITNESS:  Two pages.
22  MR. SINGH:  Do you want to -- Monique, I
23  would propose for timing purposes, she could do one
24  of two things.
25  Do you have a way that you could e-mail or

22

1  scan those to us quickly?  We'd go off for five
2  minutes and do that?  That's choice one.
3  Choice two would be you can take a screen
4  shot with your phone, text it to Michael.  We can
5  produce that as a jpeg or pdf.
6  THE WITNESS:  I can do that screen shot
7  right now.
8  MR. SINGH:  Yeah.  Let's do that, Monique.
9  I think that will be fastest.
10  And then, obviously, if you want a more
11  pristine copy later -- but actually, the jpeg will
12  be good because you'll be able to see that it's an
13  authentic set of notes, et cetera.
14  Is that okay?
15  MR. INDRAJANA:  That's like using the
16  iPhone photo.
17  MR. SINGH:  Yeah.  Okay.
18  MS. HOWERY:  Okay.
19  THE WITNESS:  Do that --
20  (Concurrent conversations)
21  THE WITNESS:  -- now?
22  BY MS. HOWERY:
23  Q   Okay.  Are you looking at any notes on
24  your computer screen, Ms. Kirschner?
25  **A   No, I do not.**

23

1  MS. HOWERY:  Okay.  Let's take five, and
2  we'll --
3  MR. SINGH:  We'll handle it, and we'll get
4  it to you.  Okay?
5  THE VIDEOGRAPHER:  The time is 9:18 a.m.
6  We're now off the record.
7  (Proceedings recessed
8  from 9:18 a.m. until 9:28 a.m.)
9  THE VIDEOGRAPHER:  The time is 9:28 a.m.
10  We're now back on the record.
11  BY MS. HOWERY:
12  Q   Ms. Kirschner, thank you for scanning
13  those documents over.
14  Did you send us everything that you
15  have --
16  **A   Yes.**
17  Q   -- that you are using today?
18  **A   Yes.**
19  Q   Okay.  And the spreadsheets or Excel that
20  you referenced earlier, is -- is that the document
21  that you sent over today?
22  **A   I'm sorry.  What do you mean?**
23  Q   So you mentioned that you looked at some
24  Excel documents during your prep.
25  **A   I've -- that is part of one of them, yes.**

24

6 (Pages 21 to 24)

**The other documents are -- have been**
**provided to you. I don't have them in front of me**
**right now.**
Q   So these are the only two documents you
had?
**A   Yes.**
Q   Okay. And I notice that there are notes
on these documents that you sent today?
**A   Yes.**
Q   And how did you, umm, prepare those notes?
**A   By doing basic calculations and analysis**
**based on the numbers on the spreadsheet.**
Q   And what sort of calculations did you do?
**A   I -- for instance, I looked at the**
**growth -- year over year growth in sales, and I**
**calculated the average price point per cookie.**
Q   Did you speak with anyone else, outside
the presence of counsel, to prepare for your
deposition?
**A   No, but Akiva was part of the**
**conversation -- for a part of the conversation when**
**I spoke with counsel.**
Q   And did you speak with Akiva outside of
the presence of counsel to prepare --
**A   No.**

25

MS. HOWERY: I'm going to introduce an
exhibit.
          (Deposition Exhibit No. 1
          marked)
BY MS. HOWERY:
Q   Can you see that exhibit?
**A   I -- (audio distortion)**
Q   Is that a "Yes"?
**A   Yes, I can.**
Q   Okay. This is the original deposition
notice, uh, that we issued to your counsel.
     I will make it a little bigger.
     Have you seen this document before?
**A   I believe so, yes. That was part of the**
**documents provided to me by counsel.**
Q   Okay. And you will note that, umm, this
deposition was originally scheduled for April 4th,
2022.
     Do you see that?
**A   Yes.**
Q   And do you note that we issued this notice
back in February of 2022?
**A   I have not seen it prior to this week.**
Q   Okay. And is this the deposition notice
that you saw this week?

26

**A   I'm not exactly sure. I didn't review it**
**in detail, but it looks familiar to me. I'm not**
**sure how many versions are out there.**
Q   Okay. Let me adjust my controls. I'm
sorry. I don't see my -- okay. There they are.
     MS. HOWERY: I'm going to stop sharing
that document.
     Let's drop another one into the Chat.
          (Deposition Exhibit No. 2
          marked)
     MR. SINGH: Ms. Howery?
     MS. HOWERY: Yes.
     MR. SINGH: Just so you know -- and only
because I did it myself in one of my depos -- we
were looking at your overall folder on that share.
     I don't know if that was intentional or
not, but just --
     MS. HOWERY: It was not. I could not find
my controls to stop sharing.
     MR. SINGH: Yeah. No worries. I did it,
as you know, on one of our previous --
     MS. HOWERY: Yes. Thank you.
     MR. SINGH: We did not take screen shots,
I assure you.
     MS. HOWERY: Good. But that makes me try

27

to shut out of everything. So we don't have
anything sharing.
     All right. I've populated the next
exhibit to the Chat.
     THE REPORTER: And that is Exhibit 3?
     MS. HOWERY: We'll mark this as
Plaintiff's [sic] Exhibit 2.
BY MS. HOWERY:
Q   Ms. Kirschner, can you see this document?
**A   I can.**
Q   Okay. This is the Amended Notice
Rule 30(b)(1) through 30(b)(6) Deposition Notice,
noticing your deposition for today.
     Do see that?
**A   Yes.**
Q   And does this look familiar to you?
**A   Yes.**
Q   And do you understand that you are
appearing today as a corporate representative for
TCD?
**A   Yes.**
Q   And I should state when I reference "TCD,"
is it your understanding that I'm referring to The
Cookie Department?
**A   Yes.**

28

1    Q   And what's your understanding of your
2  responsibilities as a corporate witness?
3         MR. SINGH:  Object --
4         THE WITNESS:  My --
5         MR. SINGH:  Hold on.
6         I'm going to object to form.
7  BY MS. HOWERY:
8    Q   Do you understand that your testimony
9  today, as a corporate witness, is on behalf of The
10  Cookie Department?
11   **A   It's not necessar- -- well, yes.**
12   Q   Do you understand your designation as a
13  30(b)(6) witness is on behalf of The Cookie
14  Department?
15   **A   Yes.**
16   Q   And do you understand that your testimony
17  given in your 30(b)(6) capacity is considered
18  testimony of The Cookie Department?
19   **A   Yes.**
20   Q   Do you also understand that I will be
21  asking you questions and -- within your personal
22  knowledge?
23   **A   I understand, yes.**
24   Q   When you were preparing for your
25  deposition, did you read this document?

29

1    **A   I briefed through it, but I haven't read
2  each line.**
3    Q   You did not read each line.
4         Did you happen to take a look at the
5  various topics that were included?
6    **A   I focused on the topics that would apply
7  to me because of the financials, which is Number 4,
8  Number 5 -- the profits, revenue, and expenses.**
9    Q   So let's look at Topic 4.
10        It states:  All facts relating to TCD's
11  profits, revenues, expenses from 2012 to present
12  attributable to Tough Cookie product.
13        Are you prepared to testify about that
14  topic today?
15   **A   To the best of my knowledge, yes.**
16   Q   And let's look at Topic Number 5:  All
17  facts relating to TCD's overall profits, revenue,
18  and expenses from 2012 to present.
19        Are you prepared to provide testimony on
20  this topic today?
21   **A   Yes.**
22   Q   There are several other topics on this
23  deposition notice for which you are not designated,
24  but I will examine you about your personal
25  knowledge.

30

1         Do you understand that?
2    **A   Yes.**
3    Q   Okay.  Great.
4         I'd like to talk a little bit about your
5  professional and educational background.
6         THE REPORTER:  Which exhibit number is
7  this going to be?
8         MS. HOWERY:  Plaintiff's Exhibit
9  Number 3 -- I'm sorry.  Defendants Exhibit 3.  My
10  apologies.
11        And that should be the same for the prior
12  exhibits.
13             (Deposition Exhibit No. 3
14             marked)
15        THE REPORTER:  I was asking them because
16  they are labeled differently than we're actually
17  numbering them.
18        MS. HOWERY:  They are.  I skipped an
19  exhibit.  If it's easier to use ...
20        THE REPORTER:  I just need to know.
21        MS. HOWERY:  Okay.  We'll --
22        MR. SINGH:  May I suggest that we just
23  refer -- just so there's no confusion, you could
24  just do what Mr. Pope did yesterday, which is say,
25  you know:  Internal Exhibit blank, but it's going to

31

1  be renamed.
2         MS. HOWERY:  Okay.
3         MR. SINGH:  That will reduce confusion.
4         MS. HOWERY:  Okay.  Fantastic.
5         MR. SINGH:  Thank you.
6  BY MS. HOWERY:
7    Q   Ms. Kirschner, can you see my screen?
8    **A   Yes.**
9    Q   Is this your LinkedIn profile?
10   **A   It sure looks like it, yes.**
11   Q   Okay.  I'll scroll through it.  And you
12  can let me know if it's a fair representation.
13   **A   Yes.**
14   Q   Okay.  Did you prepare this LinkedIn
15  profile?
16   **A   I have.**
17   Q   Is it current?
18   **A   Yes.**
19   Q   And is it an accurate representation of
20  your educational and professional experience?
21   **A   Yes.**
22   Q   Let's take a look.
23        In your Summary, here, I see various
24  things highlighted:  "Strategic value creation;
25  advanced financial modeling."

32

**Page 33**

1  What is that, what is "advanced financial
2  modeling"?
3  **A   Advanced financial modeling refers to**
4  **creating a business financial model for a particular**
5  **business or for a revenue stream or for a particular**
6  **industry.**
7  Q   Okay.  And I see "budgets and forecasts"
8  highlighted.
9  What --
10  **A   That's correct.**
11  Q   -- budgets and forecasting, does this
12  describe?
13  **A   So this describes, again, budgets and**
14  **forecasts for a total business or for a particular**
15  **expense area of the business, a cost center of the**
16  **business, or all aspects of the business.**
17  Q   What about "profit and loss
18  accountability"?  What does that mean?
19  **A   That means that I'm responsible for the**
20  **profitability of a particular expense cost center or**
21  **a revenue stream or a P&L.  Depends on the position.**
22  Q   And would that also encapsulate reporting?
23  **A   Reporting for -- not -- reporting for the**
24  **day to day and as it fits into the budgets and the**
25  **forecast, forecasts of the year, yes.**

**Page 34**

1  Q   What about this "operational and financial
2  restructuring"?  What does that refer to?
3  **A   That refers to, umm, going to banks.  If**
4  **you need to -- if the business needs to, umm,**
5  **refinance its current debt structure.**
6  Q   Okay.  And would this Summary that you
7  highlight at the top of your resume -- is it a fair
8  statement to say this represents your areas of
9  expertise that you would like to focus on?
10  MR. SINGH:  Object to form.
11  THE WITNESS:  Is --
12  MR. SINGH:  You can go ahead and answer.
13  THE WITNESS:  Okay.  These are my areas of
14  expertise, but not necessarily some -- I like to
15  focus on more than others in my day-to-day work.
16  BY MS. HOWERY:
17  Q   Okay.  Let's take a look at your
18  educational experience?
19  **A   Sure.**
20  Q   So Maria Ward Gymnasium, Germany.
21  Are you from Germany?
22  **A   I am.**
23  Q   Okay.  And it looks like you attended
24  university here in the U.S., in Pennsylvania.
25  **A   That's correct.**

**Page 35**

1  Q   Can you tell me about your degree?
2  **A   I have a bachelor's degree in business and**
3  **finance from the Shippensburg University of**
4  **Pennsylvania.**
5  Q   Okay.  And it shows here that you
6  graduated in 1996; is that correct?
7  **A   That's correct.  With a bachelor's.**
8  Q   Okay.  And looks likes you have some
9  graduate education.
10  Can you tell me --
11  **A   Yes.**
12  Q   -- about that?
13  **A   Sure.  I attended George Mason University**
14  **right after my bachelor's degree, for an MBA in**
15  **international finance and business -- or**
16  **international business and finance.  I had a double**
17  **major.**
18  Q   Okay.  Did you graduate with honors?
19  **A   No.**
20  Q   Okay.  Looks like you went to work right
21  away after graduating with your MBA; is that
22  correct?
23  **A   That's correct.**
24  Q   Can you tell me about your work at Bush
25  Industries?

**Page 36**

1  **A   Sure.  I worked at Bush Industries as a**
2  **financial analyst.  They did have an international**
3  **division in Germany.  So I worked primarily with the**
4  **German division for basic reporting and financial**
5  **analysis.**
6  Q   And when you say "basic reporting," what
7  type of basic reporting did that include?
8  **A   That included the financial statements**
9  **reporting, key performance indicators reporting.**
10  Q   And what financial statements would that
11  include?
12  **A   The basic ones, which are the profit and**
13  **loss statements, the balance sheet, and the cash**
14  **flow.**
15  Q   Okay.  And why did you leave that job?
16  **A   I left that job because I got a better**
17  **offer.**
18  Q   Okay.  For who?  For what company?
19  **A   I worked for Corning.**
20  Q   Okay.  So let's move up.
21  Is that this World Kitchen?
22  **A   That is World Kitchen.  World Kitchen was**
23  **a division of Corning in Jamestown, New York, yes.**
24  **I'm sorry.  In Elmira, New York.  It's different.**
25  Q   I have a little familiarity with Elmira.

ANDREA KIRSCHNER - April 29, 2022

---

1    Okay.  So what did you do at World
2  Kitchen?
3    A   Pretty much the same thing.  They did have
4  some international divisions.  So I did their
5  monthly and annual budgets and forecasts.
6    And I also, umm, have helped them on their
7  top projects.  The SVP at that time for that
8  particular division needed to do some more analysis.
9  She came new to the company as well, so she had me
10  do various analysis of their international
11  businesses.
12    Q   And did you also do financial reporting on
13  this job?
14    A   I have, but I don't remember much of that
15  anymore.
16    Q   Okay.  It doesn't look like you stayed
17  there long.
18    Why did you leave that job?
19    A   I received a better offer with the Home
20  Shopping Network.  And, frankly, I did not like my
21  boss.
22    Q   Okay.
23    A   She was not the one who hired me.
24    Q   Okay.  So Home Shopping Network.  It looks
25  like you had quite a run there.  Let's talk about

37

---

1  when you joined and your various roles.
2    And I'm assuming, we'll start at the
3  bottom here.
4    What did you do as the senior manager of
5  international businesses?  Tell me about that job.
6    A   Pretty much, the Home Shopping Network had
7  also divisions in Europe.  So I pretty much traveled
8  over there, and I helped them translate their
9  financials into, you know, the way the HSN division
10  reported their financials.
11    So some expense line items, for instance,
12  in their international divisions were expense
13  bucket, whereas Home Shopping would report it in
14  gross profits.
15    So I helped translate and make them apples
16  to apples.
17    Q   And would that include preparation of
18  financial statements, or was it more limited in
19  scope?
20    A   It was more the analysis thereof.  And the
21  Home Shopping Network had an accounting department
22  and a treasury department who was responsible for
23  all of these tasks.
24    We were an FP&A division.  We're more
25  analyzing the information as well as preparing

38

---

1  budgets.
2    Q   Did you say "FP&A"?
3    A   FP&A, Financial Planning and Analysis
4  division.
5    Q   So you did that for about four years.
6    And what was your next job?
7    A   The next job, I was promoted.  It's pretty
8  much along the same lines, just with increased
9  responsibility.
10    But I was also, umm -- I was also
11  traveling all over the world with a team, to see
12  what additional markets would be of interest to the
13  Home Shopping Network.
14    And I would perform the financial, you
15  know, due diligence for it when necessary or create
16  a basic business plan for a startup business in a
17  different market.
18    Q   Okay.  And when you -- when -- I see here
19  that it says you managed cash flow and capital
20  expenditures, and you were accountable for financial
21  planning analysis of the operation --
22    A   Yes.
23    Q   -- and for finances and profit and loss
24  and BS.
25    What is BS?

39

---

1    A   Balance sheet.
2    Q   Balance sheet.  Okay.
3    Were you creating those financial
4  statements?
5    A   We had an accounting department in those
6  local divisions as well.  I was reviewing them and
7  making sure they translated well.
8    Q   And in your review, were you reviewing for
9  errors?
10    A   I was reviewing for -- to ensure that we
11  would report one on one with what's being reported
12  and consolidated in the U.S. numbers.
13    Q   And I would presume if -- if that review
14  was incorrect, that that would result in some sort
15  of inaccuracy on the U.S. numbers; is that correct?
16    A   That would, yes.
17    Q   Okay.  Moving on.
18    Looks like you got another job about a
19  year later as OVP of international business
20  development.
21    What does "OVP" stand for?
22    A   Operating vice president.
23    Q   And was that a promotion?
24    A   It was, yes.
25    Q   And what was your job as the OVP?

40

---

1    A   Pretty much the same as the previous job.
2  It was just increased responsibilities.  More money.
3         But it was traveling around the world as
4  part of the due diligence team and looking for
5  appropriate markets for further development.
6    Q   Okay.  And shortly thereafter, another job
7  as operating vice president of finance.
8         Tell me about your job there.
9    A   I moved over to the domestic division.
10 HSN, at that point in time, divested out of its
11 international markets.  So they transferred me over
12 to the domestic division.  And I was doing a couple
13 of things.
14        I was managing, umm, the -- umm, the
15 expense buckets for certain areas of the company.
16 It's -- it's a huge company.  So the marketing
17 department, I was helping and managing from an FP&A
18 standpoint.  I was creating budgets and reported
19 their actual results versus budget, and provide
20 reasons for the variances.
21   Q   Okay.  And was there any financial
22 reporting, such as preparation of P&Ls, balance
23 sheets, cash flows?
24   A   Not necessarily the preparation, but the
25 analysis.  Home Shopping Network had a domestic

41

1  accounting department that took care of everything.
2    Q   Okay.  Let's move on.
3         Why did you leave HSN?
4    A   When?
5    Q   Why?
6    A   Why?  They reduced my position.
7    Q   And what do you mean by reduced your
8  position?
9    A   They reduced the overall financial
10 planning and analysis department.  So they had to
11 reduce a couple of positions.  I was one of them.
12        But at that point in time, I was happy to
13 leave because I felt I'd reached my -- my options
14 there.  They were very -- very forthcoming.  They
15 allowed me to pretty much decide when I wanted to
16 leave.  They didn't really, you know, make me leave
17 the same day.
18   Q   Okay.  And where did you go after you left
19 HSN?
20   A   Afterwards, I worked for a local company
21 in insurance.  Cunningham Lindsey, that's an
22 insurance business.
23   Q   Okay.  Director, FP&A.
24        That's financial planning and analysis?
25   A   Planning and analysis.  That's it.

42

1    Q   Okay.  And tell me what you did there.
2    A   So pretty much, the FP&A world is not very
3  diverse.  So I reported on actual results.  I
4  created budgets.  And I was helping, umm -- I was
5  part of the pricing committee.  So when, uh -- uh,
6  when -- when insurance adjusters went out to bid for
7  a new business, they, umm -- you know, I would help
8  them price it properly, my team and I.
9    Q   Okay.
10   A   I also assisted other divisions with, umm,
11 you know, making sure that -- the IT division, for
12 instance, making sure that they encompass all
13 finance needs when they make any systems changes or
14 when they change any processes.
15   Q   And I don't see, in this description, any
16 reference to financial statements.
17        Was that not part of the job?
18   A   No.  That was, again, they had an
19 accounting -- there is a clear distinct between an
20 accounting and treasury department and FP&A.
21        FP&A focuses more on the modeling -- on
22 the analysis, budgeting and forecasting versus
23 accounting.
24        They actually take the actual results and
25 they report it.

43

1    Q   Okay.  So I'm going to skip past The
2  Cookie Department for a moment and move up to
3  Kirschner Consulting.
4    A   Mm-hmm.
5    Q   Looks like you started that in April 2016.
6         Is that still ongoing business for you?
7    A   It is.  Yes.
8    Q   And tell me what type of work you do at --
9  as a consultant?
10   A   I assist smaller startup businesses who
11 don't have, necessarily, the funds nor the
12 experience with modeling a business plan.  So I help
13 them set up a business model for a forecast and for
14 a budget, a three-year plan, as well as help them
15 set up the basic structure of a financial reporting
16 for profit and loss statements and balance sheet.
17   Q   Okay.  And I note that you're the interim
18 CFO of that business.
19   A   That is correct.
20   Q   Does anyone else work in this business
21 with you?
22   A   I have a consultant, abroad, that is
23 assisting me.
24   Q   Okay.  And let's take a look at your job
25 at Diversified Maintenance Systems.

44

Tell me what you do there.

A   So I work in the financial planning area.

I also overtook -- or took over the IT department as an interim head of IT for a couple of years.

I am still with the company at this point in time, but it's mostly focusing on budgeting, forecasting, and also working on ad hoc projects.

Q   Okay.  I see there's a reference to a financial reporting tool.

Are you involved in financial reporting? Are you preparing reports at all?

A   I do not.  I take the numbers, and I compare them to the budgets.

Q   Let's see.  There's one more thing I'd like to ask about.

I'm going to stop sharing my screen for a moment.

Umm, explain to me, umm, where -- where you got your restructuring experience.  Which job was that?

A   I worked at the Home Shopping Network, umm, in trying to restructure some of the original businesses over there, abroad.

Q   Okay.  And it looks like -- in your first

45

job at HSN, looks like you were handling SEC filings; is that right?

A   I was part of the team who was handling it, but I didn't submit it.  I was part of helping pulling together some information that was then sent over to the CFO for review.

Q   Okay.  And are you familiar -- do you -- strike that.

Do you do any current work with SEC filings?

A   I do not, no.  Not directly in my job.

Q   So tell me about, uh, your connection to The Cookie Department.  How did you come to be affiliated with The Cookie Department?

A   A common friend introduced me to Akiva, mentioning that he might need some help in modeling a business plan.

Q   And when was that?

A   2016.

Q   Were you familiar with The Cookie Department before you joined the company?

A   I was not, no.

Q   And when you joined the company, what were you hired to do?

A   I was hired to create a business plan for

46

The Cookie Department.

Q   And it also states on your resume, umm, that you're an investor.

Umm, when you were hired, were you also an investor?

A   No.

Q   When did you become an investor?

A   2017.

Q   And what was your title when you were hired?

A   I wasn't really hired.  I was a contractor, or I was a consultant.  I still am.  I'm not an employee.

Q   Are you compensated?

A   I'm not, no.

Q   Have you ever been compensated by The Cookie Department?

A   In cookies, yes.

Q   And how many hours -- strike that.

As a consultant, what are your deliverables?

A   My deliverables are to create a business plan at the beginning of each year; to review the financials on the monthly and quarterly basis; to ensure that the recordkeeping makes sense; to create

47

reforecasts midyears.

Q   Are there plans to hire a permanent CFO?

A   You have to ask Akiva.

Q   Are you under contract right now?

MR. SINGH:  Object to form.

BY MS. HOWERY:

Q   Are you under contract with The Cookie Department to serve as --

A   We have -- we have no written agreement.

Q   Do you plan to continue serving as an interim CEO -- CFO?

A   Yes.

Q   What type of investment did you make in TCD?

A   I made a cash investment.

Q   And what did you get in return for that investment?

A   I haven't received anything yet.  It's part of a convertible note.

Q   And what's the maturity date on that note?

A   I believe it has matured or it's maturing in April of this year.

Q   Do you have ownership in The Cookie Department?

MR. SINGH:  Object to form.

48

12  (Pages 45 to 48)

BY MS. HOWERY:

Q   Do you have an ownership interest in The Cookie Department, Incorporated?

MR. SINGH:  Object to form.

THE WITNESS:  (No audible response)

BY MS. HOWERY:

Q   Do you own shares of The Cookie Department, Incorporated?

A   As far as I know, no.

MR. SINGH:  May I just advise the witness? When I object, unless I instruct you not to answer, you can still try to answer.

THE WITNESS:  Oh.

MR. SINGH:  Yeah.

THE WITNESS:  Okay.

MR. SINGH:  Just so that's clear. I'll tell you, it's only on privilege or privacy issues I will instruct you not to answer.

THE WITNESS:  Okay.

BY MS. HOWERY:

Q   What's your day-to-day experience with The Cookie Department?

A   So, I don't necessarily work day to day. It comes in cycles.

So on average, I spend two hours a week on

49

The Cookie Department, but -- however, in, you know, the latter part of the year, I spend more time since I'm building a budget for the new year -- or midyear, when we are after six-month of actual performance, we're reforecasting the rest of the year.

Q   Do you prepare financial statements?

A   I review the -- the entries that the bookkeeper makes, and I prepare, you know, their -- their correctiveness from a reporting standpoint.

Q   Who is the bookkeeper?

A   She's a consultant.

Q   Okay.  Who is that?

A   It's a consulting company, I think.  They used to be -- it's a new company that we switched. So the bookkeeper's name is Catherine -- (sotto voce)

THE REPORTER:  I'm sorry.  Say it again.

THE WITNESS:  Catherine.  I believe, Lindquist (phonetic).

BY MS. HOWERY:

Q   When you say you review the statements, did I understand you correctly, for accuracy?  Is that what you said?

A   I -- I review them to ensure that expenses

50

are coded to the right buckets, where I think they should be; umm, that expenses are properly coded to the profit and loss statement versus the balance sheet.

Q   And once these statements are complete, do you approve those statements?

A   There is no formal approval process.  We make sure that the entries are corrected, and then I review and -- and then we don't necessarily submit them.  They're for our own internal purposes mostly.

Q   And so at the end of the year, you prepare a budget?

A   Yes.

Q   And if I understand you correctly, midyear, you take a re- -- a look at the budget to see if you're on base?

A   That's correct.  And if we need to reforecast the remainder of the year.

Q   How are accounts receivable tracked?

A   Accounts receivable are tracked by, umm, invoices, that are entered into the system, and their, uh, due date and whether or not they have been paid or not.

Q   What system is that?

A   We are using QuickBooks.

51

Q   And how, umm, is accounts payable tracked?

A   The same manner, invoices are -- or bills or entered into the system with the due date, and, umm, when they're paid, they're being marked as paid.

Q   And is that also in QuickBooks?

A   Yes.

Q   And are you responsible for cash flow management?

A   Yes and no.  It's mostly Akiva, because he does the operational decisions.

Q   So when you say "yes," what portion of cash flow management are you responsible for?

A   So, I'm responsible for letting him know if, umm, we need to relook at certain expense line items because it's up -- impacting our operating cash flow.

Q   Are you responsible for tax filings?

A   No.

Q   Do you review tax returns for TCD?

A   Prior to submission, I review the financials to ensure that the tax accountants made the proper -- or the -- our bookkeeper has a proper accountant -- accountability in the system of where items belong to.

52

13  (Pages 49 to 52)

1    Q   And the bookkeeper, when she's preparing
2  financial statements, where does she get the data?
3    A   The data is inputted into the system by
4  Akiva.  For instance, he gets the invoices, so he
5  inputs them into the system or uploads them with a
6  backup.  Same with the invoices.  The invoices are
7  created to, umm, larger vendors.  They're created
8  umm, in QuickBooks.  So it's -- it's all trackable.
9    Q   Okay.  Do you do any type of financial --
10  other financial reporting for The Cookie Department?
11    A   No.  It's mostly budgeting, lending, and
12  analysis --
13    Q   Do you --
14    A   -- and forecasting.
15    Q   Do you do any SEC reporting?
16    A   I do not directly, no.
17    Q   Can you describe The Cookie Department's
18  organizational structure?
19    A   It's a California-based corporation.
20    Q   Do you know when it was incorporated?
21    A   2012.
22    Q   Is it still current?
23        MR. SINGH:  Objection.  Form.
24        THE WITNESS:  Yes.
25        Yes.

                                        53

1  BY MS. HOWERY:
2    Q   How many employees were there at the time
3  of formation?
4    A   I'm not familiar with that set up.  That
5  was prior to my time.
6    Q   How many employees are there currently?
7    A   One.
8    Q   And who is that?
9    A   That's Akiva.
10    Q   To your knowledge, have there ever been
11  more than one employee?
12    A   Not exactly, no.  I know there is
13  contractors and that there is consultants; but not
14  necessarily employees, no.
15    Q   Who -- who are the contractors currently
16  employed?
17    A   It is myself, the bookkeeper, and somebody
18  in the creative department, I think.
19    Q   And is the bookkeeper compensated?
20    A   I believe so, yes.
21    Q   How much?
22    A   I'm not sure.  Akiva agreed with her on a
23  price.
24    Q   Is the creative person compensated?
25        MR. SINGH:  Object to form.

                                        54

1        THE WITNESS:  I believe so, yes; but I'm
2  not sure.
3  BY MS. HOWERY:
4    Q   Are there any partners in The Cookie
5  Department corporation?
6    A   What do you mean?  I'm not sure I
7  understand.
8    Q   Are there any, uh, directors?
9    A   We have -- on the board of directors,
10  there's three of us.
11    Q   Okay.  And who -- who is that?
12    A   It is Akiva, myself, and Isaac, Akiva's
13  brother.
14    Q   Is that Isaac Resnikoff?
15    A   Yes.
16    Q   And does Isaac have an ownership
17  interest --
18    A   I don't know.
19    Q   -- in The Cookie Department?
20    A   I don't know.
21    Q   Are there any other investors in The
22  Cookie Department?
23    A   For the same as me, for the convertible
24  note, there are.  Yes.
25    Q   How many?

                                        55

1    A   I don't know the exact number, but it's
2  listed on the balance sheet.
3    Q   Has balance sheet been produced in
4  discovery?
5    A   Are you asking me?
6    Q   Yes.
7    A   Based on the information that I have been
8  shared with by our team last night, it looks like it
9  has.
10    Q   So you reviewed the balance sheet in your
11  preparation for this --
12    A   This morning, when -- because I received
13  the information from my -- from the attorneys last
14  night, yes.  From the additional financials that
15  were procured last night or provided last night.
16    Q   Are you aware that before The Cookie
17  Department incorporated, there was another Cookie
18  Department entity formed as an LLC?
19    A   No.
20    Q   Have you ever seen the ONE Brands'
21  Chocolate Chip Cookie Dough protein bar product?
22    A   Not specifically.  I don't remember it
23  exactly.  I've seen it in Smoothie Kings, the ONE
24  Brand, but not necessarily the -- the one you
25  mentioned.

                                        56

**Page 57**

```
 1        Q   Did you see the images of the purportedly
 2   infringing product in the Complaint?
 3        A   No, I have not.
 4        Q   Do you understand what portion of the
 5   product that The Cookie Department takes issue with
 6   in this litigation?
 7        A   I do not, no.
 8        Q   Let's move on to the topics that you've
 9   been designated for.
10            If I understand you correctly, you don't
11   prepare the financial statements for The Cookie
12   Department; is that right?
13        A   I review the entries in the system, yes.
14        Q   So you review the entries in the system?
15        A   I print those out in a financial statement
16   format if I need to work with those from a budgeting
17   standpoint.
18        Q   So you do -- you do prepare statements?
19        A   Prepare -- I guess, can you specify why --
20   what exactly you mean if I prepare statements?  If I
21   just press a print report button, or if I actually
22   do -- what purpose?
23            I prepare statements to have that as my
24   starting point for my budgeting.
25        Q   Okay.
```

**Page 58**

```
 1        A   I know those -- those are the statements
 2   are set up in the system.
 3        Q   And when you say "the system," you're
 4   referring to QuickBooks?
 5        A   The QuickBooks.  QuickBooks has a
 6   reporting suite.  And it has balance sheets and cash
 7   flows and P&L's set up already, automatically.
 8        Q   And when you say they're set up
 9   automatically, how are those sheets -- how are those
10   reports -- and we'll step through them.
11            Let's say, the profit and loss report, how
12   is that report populated by --
13        A   That report is populated through the
14   accounting entries that you make from an income
15   standpoint, all the sales transactions, the invoices
16   issued.
17            And then from an expense standpoint, all
18   the invoices received or bills received, umm, that
19   they're coded to the right accounts, and that
20   they're coded to the right, umm -- in the right,
21   umm, time frame.  So they are rolling up in the
22   correct months and years.
23            So once that information is in the system,
24   you go into the reporting suite, and you just run it
25   for the time frame you need it for.
```

**Page 59**

```
 1            And then it spits out the P&L.
 2        Q   All right.  And who's responsible for
 3   making those accounting entries?
 4        A   The accountant and, umm, Akiva.
 5        Q   And is the accountant the same person as
 6   the bookkeeper?
 7        A   I'm sorry.  Yes.  It's the bookkeeper.
 8        Q   Okay.
 9        A   It's the same person.
10        Q   Okay.  And they both make entries into the
11   account -- accounting entries?
12        A   Oh, Akiva enters, for instance, invoices
13   he receives, bills he receives with the attachment
14   of the invoices.  So he enters those into the
15   system.  He issues invoices for products sold to
16   wholesalers and distributors.  Then we have entries
17   from the online, umm, sales.  So they're transferred
18   over into QuickBooks automatically because the
19   accounts are connected.
20            Umm, and, uh, based on that, uh, the
21   accountant then goes in, make sure that everything
22   is tagged and reconciled properly.  And I take a
23   look at the numbers and make sure that they're
24   tagged properly to the right accounts.
25        Q   And how is the balance sheet populated?
```

**Page 60**

```
 1        A   Same way.  It's -- it's a -- it's a result
 2   of the monthly activities.
 3            For instance, if Akiva issues an invoice
 4   for a vendor and the payment terms are 30 months
 5   [sic], which is beyond the current month, the
 6   balance sheet will show it in an accounts receivable
 7   for the current month because it has not been paid.
 8            And it's -- once it's getting paid in the
 9   next month, it's going to be removed from the
10   balance sheet.
11            When we have accounts receivables that are
12   noncollectable on our end, we write them off.  So
13   that's an -- a decision we're making after, you
14   know, several collection attempts.  And if it's a
15   decision, umm, that, you know, Akiva feels that it's
16   no longer something that we are able to collect, we
17   will write that off.  So that's an entry, the
18   account or the bookkeeper will make to make sure
19   that we move it from the balance sheet to the P&L.
20        Q   And is the cash flow statement prepared in
21   a similar way?
22        A   Yes, it's -- the cash flow statement, it's
23   pretty much a combination of your P&L and your
24   balance sheet.  It shows the movement of funds from
25   one month to another.
```

**Page 61**

Q   How do you ensure that the reports are accurate?

A   By validating a trend; by looking at, you know, the expenses, if they're reoccurring, that they are showing up every month; by making sure we're accruing for items that we know are going to happen, but we have not yet received an invoice for.

So it's pretty much just reviewing a trend and seeing if there is big gaps to previous month. And then, if there is, understanding the reason why.

Q   Are there any tools within QuickBooks that help identify potential inaccuracies?

A   There is a reconciliation tool that reconciles, helps you -- helps to reconcile your bank accounts, your credit cards at the end of each month. So that ensures that all transactions are being captured.

If some are not, then there's a reason for it, and they're being moved with a journal entry that's traceable.

Q   So are there any other systems used for the performance of your job as CF -- interim CFO?

A   For The Cookie Department?

Q   Mm-hmm.

A   I'm just using, umm, QuickBooks and Excel.

**Page 62**

Q   Does any -- does Akiva use any other systems?

A   You'll have to ask Akiva.

Q   Does The Cookie Department use any other systems?

A   You have to ask Akiva.

I know -- I'm involved with QuickBooks and Excel. I'm -- I'm sure we have Shopify. I do not have access to that account.

Shopify is the online platform.

Q   And what does Shopify do?

A   It is the online sales platform.

Q   Does that feed into QuickBooks?

A   I believe so. Maybe -- I believe so.

Again, I have not ever accessed Shopify for The Cookie Department. I've only seen the transactions come through in QuickBooks.

Q   How is inventory tracked at TCD?

A   I believe it was a manual process. I'm not -- I know that, uh, we are, previous to my coming, expenses for the production of cookies were expensed when received versus dropping it on the balance sheet.

So right now, the cost for the cost of goods sold should be reflected on the number of

**Page 63**

units sold. Not necessarily what were produced with each invoice.

So I believe it's a manual process.

Q   And it sounds like, if I understood your testimony, that sales is tracked by Shopify and through invoices?

A   Yes. So Shopify, if we're still in the same platform -- which honestly, I don't know -- is just the online platform of sales.

However, also, were generated by a various other revenue streams. So wholesalers and distributors. Those would be the invoices in QuickBooks.

Q   Okay. Does The Cookie Department use any other, umm, outside person to assist with financial statement preparations besides Ms. --

A   Catherine.

Q   -- Catherine?

A   As far as I know, it's just Catherine and myself who review the financials.

Q   How long has Catherine been a contractor with TCD?

A   I don't know the exact date, but it's been a few years.

Q   Was she a contractor when you joined in

**Page 64**

2016?

A   She was not, no.

Q   Who was handling financial statement preparation when you --

A   Catherine's previous employer, who was also a contractor.

So Catherine started with our previous bookkeeping company. And then she became independent, and we switched over to her.

Q   And what was the previous company?

A   Tax -- (audio distortion)

THE REPORTER:  Say it again.

THE WITNESS:  Tax Force, Inc.

BY MS. HOWERY:

Q   Did Tax Force, Inc., also prepare tax returns?

A   Yes, they have.

Q   And is that a function that Catherine now does?

A   I believe that tax filing is still being done by Tax Force, Inc.

Q   Okay.

A   The bookkeeping functions are being done by Catherine.

Q   So does Catherine -- it sounds like

1    Catherine has access to QuickBooks?
2        **A   She does.**
3        Q   Is that --
4        **A   Yes.**
5        Q   Is there any sort of manual, uh, relay of
6    information to Catherine outside of QuickBooks?
7        **A   Not that I'm aware of.  You'll have to ask**
8    **Akiva.  I do not receive invoices, and I do not**
9    **receive bills.  So I'm not exactly sure, umm, you**
10   **know, if there's a communication between Akiva and**
11   **her to that end.**
12       Q   Are the financials audited?
13       **A   No, they're not.**
14       Q   Has there ever been any audited
15   financials?
16       **A   Not an audit per se, but we had a review**
17   **by a CPA.**
18       Q   When was that?
19       **A   I believe it was in 2018.**
20       Q   And who was the CPA?
21       **A   I don't know her name offhand.  We can**
22   **provide that to you.  We only dealt with her once,**
23   **and that was a while ago.**
24       Q   You can provide that -- the review or --
25       **A   The CPA's name.**

65

1        Q   Okay.  Have you ever had a reason --
2    strike that.
3            Have you ever had to revise financial
4    statements produced by The Cookie Department?
5            MR. SINGH:  Object to form.
6            THE WITNESS:  For year end, after my final
7    review, umm, I know there were exchanges with the
8    bookkeepers of changes that they needed to make and
9    push through.
10           For instance, accrual of interest that was
11   not done at the point in time, or you know, moving
12   things to the balance sheet because, umm -- umm,
13   items were not yet incurred.
14           Umm, so I remember that discussion with
15   them for yearend conversations.
16   BY MS. HOWERY:
17       Q   Okay.  Is this for a particular yearend,
18   or is this just something that happens --
19       **A   This just happens every year.**
20       Q   How do you evaluate the financial
21   condition of a company?
22       **A   I am looking at a couple of things.**
23       **I'm looking at their balance sheet for**
24   **their debt ratio.**
25       **I'm looking at their accounts receivable**

66

1    aging, at their accounts payable aging.
2        **I'm also looking at the gross profit of**
3    **the business, on a monthly basis.**
4        **And, umm, one-time expenses.**
5        Q   Did you say one-time expenses?
6        **A   One-time expenses, if they're large, or if**
7    **they're recurring.**
8        Q   And what does it mean for a company to be
9    profitable?
10       **A   Everybody will have a different opinion of**
11   **what profitability means.**
12       **One are -- we could talk to a salesperson.**
13   **They're going to be looking at the top line, growth.**
14       **For me, a company's profitable if it has a**
15   **positive cash position or if it can fund its**
16   **activities.**
17       Q   And when you say if "they can fund its
18   activities," how do you make that determination?
19       **A   Through the analysis, the operating cash**
20   **flow.  The operating cash flow keeps track of**
21   **operating activities, financing activities, and**
22   **investing activities.  And it's measuring those**
23   **against your cash on hand.**
24       Q   So when you look at a profit and loss
25   statement, what is "gross profit"?

67

1        **A   Gross profit is your net sales, which are**
2    **your gross sales, less any discounts, returns.  You**
3    **add in the shipping and handling revenue as well as**
4    **any other revenue streams you may have.  So that's**
5    **your net sales.**
6        **And you subtract all cost of goods sold.**
7        Q   And --
8        **A   Off of the expenses.**
9        Q   And is that part of the profitability
10   analysis?
11       **A   It is.  It's your gross profit analysis.**
12   **Right.**
13       Q   Okay.  So if a company has positive growth
14   profit -- gross profit, that would tend to suggest
15   that it's profitable?
16       **A   Not necessarily.  The profit -- the gross**
17   **profit that it has, allows it to maintain its**
18   **operating expense structure.**
19       **So the gross profit is just the reflection**
20   **of its profitability after the direct costs**
21   **associated with the sale of the product.**
22       Q   What is "net operating income"?
23       **A   Net operating income is on the cash flow,**
24   **when you back out items such as interest,**
25   **depreciation, amortization, and you look at the**

68

17 (Pages 65 to 68)

1  changes in the operation of the company.
2         For instance, your accounts payable, your
3  inventory, your accounts receivable, umm, credit
4  cards, et cetera.  So you back those out -- I'm
5  sorry.
6         You back out the depreciation,
7  amortization.  There are certain line items you back
8  out of the net income.
9         And then you look at the movement.
10        That's tracking if your business is
11  generating operating -- a positive cash flow from
12  its operations.
13        Then you have two additional categories --
14  which is the investing as well as the financing
15  activities for the business -- to get your total net
16  cash flow.
17     Q   Okay.  So if a company has a positive
18  operating income, that means that it's operating at
19  a profit?
20        Am I understanding that correctly?
21        MR. SINGH:  Object to form.
22        THE WITNESS:  I just want to be careful
23  about the definitions.
24        When you mean "operating income," are you
25  meaning the operating income from a cash flow or

69

1  from an P&L?
2  BY MS. HOWERY:
3     Q   From a P&L statement, I'm asking about net
4  operating income.
5     A   Is that equivalent to your net income,
6  which is the bottom line?
7         Because, again, there's many definitions
8  out there.  We might talk about the same thing and
9  have different terminology.
10     Q   Okay.  We'll come back to that.
11     A   Sure.
12     Q   To that line of questioning.
13        What was the financial condition of The
14  Cookie Department when you joined in 2016?
15        MR. SINGH:  Object to form.
16        THE WITNESS:  Umm, it was ramping up its
17  revenue.  So I believe revenuewise, they were
18  roughly 300,000, $250-300,000 annual revenue range.
19  BY MS. HOWERY:
20     Q   Okay.  And what is the financial condition
21  of The Cookie Department today?
22     A   So today, as of, umm, April, we are at
23  roughly 225,000, to date, sales.
24        So if you annualize that, you're in a
25  better shape than, you know, if you're just taking

70

1  it, performance for now and you're adding -- (audio
2  distortion) -- in a better position than what we
3  were in the previous -- in previous years.
4        MS. HOWERY:  Okay.  I think I'd like to
5  take a break here, if you don't mind.
6        MR. SINGH:  How long?
7        MS. HOWERY:  Ten minutes.
8        MR. SINGH:  Okay.
9        THE VIDEOGRAPHER:  The time is 10:37 a.m.
10  We are now off the record.
11        (Proceedings recessed
12        from 10:37 a.m. until 10:49 a.m.)
13        THE VIDEOGRAPHER:  The time is 10:49 a.m.,
14  and we are now back on the record.
15        MS. HOWERY:  I'm just trying to coordinate
16  some lunch on our end.  Apologies.
17        Okay.  I am going to populate an exhibit.
18        And, Madam Court Reporter, this one does
19  not have a number attached.  So we will use the next
20  consecutive number.
21        THE REPORTER:  That would be 4.
22        (Deposition Exhibit No. 4
23        marked)
24  BY MS. HOWERY:
25     Q   Okay.  Can you see my screen?

71

1     A   I can, but could you make it a tad bigger,
2  please.
3     Q   I will.
4     A   Thank you.
5     Q   And I'm also going to -- well, freeze the
6  pain so we can just scroll through and keep the
7  headings.
8        Okay.  So, Ms. Kirschner, have you seen
9  this document before?
10     A   I have.
11     Q   When did you see this document?
12     A   I saw it in this particular format when I
13  prepared with the, umm -- with my legal counsel.
14     Q   And I'll just represent to you that this
15  is the financial production legal counsel shared
16  with us, umm, for The Cookie Department.  It is The
17  Cookie Department's Profit and Loss Statement, dated
18  September 7, 2012, through August 31st, 2021.
19        Do you see that?
20     A   Yes.
21     Q   And do you see -- this might be difficult
22  to see -- at the top-hand corner [sic], there's a
23  number that's TCD-018421.  That is the Bates number
24  of the produced document from The Cookie Department.
25        Do you see that?

72

18  (Pages 69 to 72)

1    A  I do, yes.
2    Q  (Coughing)  Excuse me.
3         Did you prepare this document?
4    A  I did not, no.
5    Q  Do you know who prepared it?
6    A  I'm -- I'm sure -- I think Catherine might
7  have prepared it, but I'm unsure.  She just ran the
8  report.
9    Q  And is this a report -- is this how a
10  profit and loss report is generated from QuickBooks?
11   A  It is, yes.
12   Q  Did you assist in the preparation of this
13  report?
14   A  Again, I haven't run this report.  So it's
15  the first time I saw it, a few days ago, in this
16  particular format.
17        However, this is the P&L report that we
18  have in QuickBooks, the format.  So depending on the
19  timeframes you run it, it's going to be populating
20  these particular accounts with the information where
21  there is available.  This is a canned report out of
22  the QuickBooks.
23   Q  When you say depending on the particular
24  timeframe, what do you mean?
25   A  I mean depending on the years and months

73

1  you run it.
2        On some accounts are, for instance, not
3  populated in particular years because we had no
4  activity.
5        So those accounts, if you just run it for
6  a particular year, will not show up.
7    Q  Okay.  So this particular report, am I
8  correct, that it covers the period from
9  September 7th --
10   A  Yes.
11   Q  -- 2012, all the way through August 31st,
12  2021?
13   A  That's correct.
14   Q  And does that mean that the figures that
15  are reflected in this report are what those
16  numbers -- strike that.
17        Does that mean that the figures we see in
18  this report were what's contained in these various
19  categories at the time the report was run?
20   A  That's correct.
21   Q  Okay.  And the source of this data is
22  QuickBooks data, right?
23   A  That's correct.
24   Q  When you say "this particular format," is
25  there a different format for profit and loss reports

74

1  that QuickBooks can generate?
2    A  There is not, no.
3    Q  And is this document an accurate statement
4  of The Cookie Department's financials for this time
5  period?
6    A  Yes.  As far as I'm aware, it is, yes.
7    Q  And when you reviewed this document -- and
8  I'll just scroll through to confirm -- when you
9  reviewed this document with your counsel yesterday,
10  umm -- strike that.
11        When you reviewed this document, did
12  anything stick out as being inaccurate to you?
13   A  Nothing at first glance, no.
14   Q  Okay.  So I'd like to step through this
15  document a bit, just so that I can understand --
16        (Phone ringing)
17        THE WITNESS:  Sorry.
18  BY MS. HOWERY:
19   Q  No worries.
20        So I can understand what these various
21  categories mean, and help frame the questions that I
22  was asking earlier about net operating income.
23   A  Okay.
24   Q  -- so we follow the line.
25        Okay.  So looking at line 6, I see

75

1  "Income."  And I see various categories under
2  Income, which suggest to me that these are, umm,
3  categories of income that are captured.
4        Is that right?
5        MR. SINGH:  Madam Court Reporter, can you
6  read Ms. Howery's question.
7     (Record read back by the Court Reporter)
8        THE WITNESS:  (No audible response)
9  BY MS. HOWERY:
10   Q  I can't hear you, Ms. Kirschner.  We lost
11  your audio.
12   A  Can you hear me now?
13   Q  Yes.
14   A  Yes, that is correct.  Sorry.
15   Q  Okay.  So looking at this report, I see
16  directly under Income, line 7, "Discounts Given."
17        What does that represent?
18   A  That represents any type of returns,
19  refunds, or allowances that would reduce or be
20  deducted from the gross sale of a product.
21   Q  Okay.  And what is a "rebate amounts"?
22   A  Rebates are given to, you know, vendors or
23  customers.  It's -- again, it's an allowance, a
24  credit, for instance.
25        So if you have -- you know, return the

76

1    product or if you are giving a rebate, a reduction
2    in price, umm, it would be captured over there.
3    Because that actually reduces the gross sale of a
4    product.
5         Q   Okay.  And the same thing would apply for
6    Sale Discounts?
7         A   That's correct.  Yeah.
8         Q   Okay.  So umm, if we move down the line,
9    umm, it looks like Total Discounts Given is a sub --
10   subtotal?
11        A   That's correct -- of all the rebates and
12   returns.
13        Q   Okay.  What is "Event Income"?
14        A   Event Income is -- what you see in the
15   next few rows are various, pretty much, revenue
16   streams or how we captured revenue.
17            So you'll see income, uh, from -- from
18   Groupon sales.  So we had Groupon as a platform for
19   sale.  We had -- Farmers Market obviously is
20   some -- you know, when we have attended -- or Akiva
21   attended a farmers market or a pop up, and he sold
22   cookies at an event.
23            Same thing with the Event.
24            I have not created that particular
25   account.  It's just a way for us to track where the

                                                    77

1    revenue's coming from.
2         Q   What is "Hubba Income"?
3         A   Hubba is another platform that, I believe,
4    we sold cookies to for a small period of time.
5         Q   And what are "QuickBooks Payment Sales"?
6         A   That's a small insignificant amount.  I'm
7    not exactly sure.  It's probably -- actually, I
8    don't know for sure.  It's $157 in ...
9         Q   In 2019?
10        A   Yeah.
11        Q   So this Sales number in line 18 --
12        A   Mm-hmm.
13        Q   -- does this represent cookie sales?
14        A   It does represent cookie sales.
15        Q   Does it represent anything else?
16        A   No.  It should just be clear cookie sales
17   to the various revenue streams.
18        Q   Okay.  And this "Pre 8/30 Sales, Deleted,"
19   what does that mean?
20        A   Deleted is an account that's no longer
21   used or no longer should be used.
22            So that was -- at the beginning, when the
23   company started, I'm assuming, those were
24   pre-orders, but that's my own assumption.  I don't
25   know for sure.

                                                    78

1            That was previous to my time.
2         Q   So it -- help me understand.
3            If it's an account that's no longer used,
4    why would it show up on the P&L?
5         A   Because it hasn't been cleaned up, and it
6    hasn't been moved into one of the other active
7    accounts.
8            So for the financial statements to be
9    accurate, also, deleted accounts will show up.
10   Hopefully there will have no longer activities after
11   they've been deleted.
12        Q   Okay.
13        A   But the actual activity that's currently
14   still being booked in there, it's still going to
15   show up in a report.
16        Q   Makes sense.
17            So this Total Sales number in line 20,
18   that will represent all of the sales less these
19   discounts?
20        A   It actually should be just the sales.
21        Q   Just the sales?
22        A   If you click -- can you -- can you click
23   on the formula, please.
24            Right there.
25        Q   Okay.

                                                    79

1         A   It's, umm -- it's looking at the overall
2    sales and the pre-sales.  Yes.  And the line 18 is
3    going to add all your, umm, sales from Row 12
4    through, umm, line 17 actually.
5         Q   Okay.  That makes sense.
6            What are "Sales of Product Income"?
7         A   It's the same thing.  They are incorrectly
8    coded.  They were not cleaned up.
9            So that should be -- that number should be
10   a part of the Row 18, actually.
11        Q   Okay.  And what about "Shipping and
12   Delivery Income"?
13        A   Oh, Shipping and Delivery Income is, uh,
14   nonproduct revenue stream.
15            When -- for instance, when you order
16   something and they charge you shipping and handling
17   for your order.  That would be a shipping and
18   handling revenue for us since we received it as cash
19   in.
20            And that's going to help us, partly offset
21   our shipping and fulfillment costs.
22        Q   And what's the "Third Party Income"?
23        A   I'm not sure.  That's -- it looks like
24   it's a credit in 2019, and it's negligible.  It's
25   $475.  It's probably miscoded; should be in the

                                                    80

Allowances piece on top.

Q   And "Website Sales"?

A   So those would be the dot-com sales or the sales we generated from our online store.

Q   Okay.  Any -- would this capture any sales from, perhaps, an Amazon or a third-party seller or anything like that?

A   It may.  Most of it, though, is from our online store.

Q   So what does Total Income represent?

A   The Total Income is what I alluded to earlier.  It's your net income, which is your gross product sales minus any type of rebates, returns, and refunds, plus the shipping and handling revenue.

Q   So you say this is the net income, but I believe there's a --

A   Yes.

Q   -- column that says --

A   Net sales.  I said net sales.

Q   Okay.

A   I'm sorry if I said net income.  I misspoke.  It is net sales or net revenue.  Because you net out the returns and the refunds.

MR. SINGH:  May I request, just for clarity of the record, if the word "it" is being

81

used, Monique -- I mean, I leave up to you, but just, it would be nice to have clarity of the record on this.

THE WITNESS:  Total Income, in this particular illustration, is net sales.

BY MS. HOWERY:

Q   Thank you.

A   Mm-hmm.

Q   Let's move down to line 26, Cost of Goods Sold.

What -- what are "Cost of Goods Sold"?

A   Cost of Goods Sold is the category that captures all the direct expenses associated with the production and the fulfillment of the shipping of the goods.

So -- or getting the goods to the customer.

Those are, again, the direct costs.  So those are the direction production costs, the material costs, film costs, you know, any type of warehousing expenses, shipping and handling fulfillment costs, et cetera.

Q   And I note in line 29, it seems to have something called "Cookie Production."

A   It is -- so, everything that's in line 29,

82

down to line 38, those are the expenses associated with the production of cookies from the copackers.

So that includes raw material.  And those are being invoiced to The Cookie Department by their vendors.

Q   Okay.  And who are the copackers?

A   I don't know their names.  That's something that Akiva deals with.

Q   So I see Costs of Goods Sold for assorted.

What are "assorted"?

A   Assorted, I would assume -- that was previous to my time -- would be mixed, like, a mixed pack of different flavor cookies; not just the same flavor.

Q   And I see various flavors, but we'll focus on the flavor that's at issue in this lawsuit, Cost of Goods Sold for Tough Cookie, in line 38.

Do you see that?

A   I do.  Yes.

Q   Can you explain why there are no costs of goods sold for the flavor in 2012?

A   I cannot explain that.  I'm assuming it's all captured in Row 29.  All the flavors are captured in Row 29.  Nobody broke it up in 2012.

Q   And I note that there are no Costs of

83

Goods Sold for Tough Cookie in 2020; is that correct?

A   The way it seems, yes.

Q   And there are no Cost of Goods Sold for the Tough Cookie flavor in 2021; is that correct?

A   That's correct.

Q   Does that mean that there were no cookies sold in 2020?

MR. SINGH:  Object to form.

BY MS. HOWERY:

Q   Does it mean that there was no Tough Cookie flavor sold in 2020?

A   Umm, I believe so, but it also means that, if you look -- go back to Row 29, all the flavors or all the cost of goods sold associated with all the flavors are included in one line item.

So they weren't necessarily broken out separately on -- on this -- on this P&L view.  So it's a lump sum entry.

And it looks like the accountant made that entry versus breaking it up by category.  We -- we haven't tracked it this way.

Q   And why -- why was that done?

A   I don't know, to be honest.

Q   So is this data still available?

84

ANDREA KIRSCHNER - April 29, 2022

1  Can you still determine from QuickBooks
2  what the cost of goods sold for the Tough Cookie
3  flavor was in 2020?
4  **A   If there were sales, we should be able to.**
5  **I just don't think that there were any sales in**
6  **2020.**
7  **In 2020, we started, I believe, our keto**
8  **line.**
9  Q   So you started the keto line.
10  Does that mean you discontinued production
11  on all these flavors?
12  MR. SINGH:  Object to form.
13  THE WITNESS:  We stopped production and
14  reformulated the goods -- the functional line.
15  BY MS. HOWERY:
16  Q   And what's the "functional line"?
17  **A   The functional line was the first line of**
18  **cookies that, uh, were a part of the assortment that**
19  **The Cookie Department sold.  They were, I believe,**
20  **five or six flavors which are listed over there.**
21  **So Awaken Bake, Cherry Bomb, Great Full,**
22  **Snap Back, and Tough Cookie.**
23  Q   So the keto line is replacing the
24  functional line?
25  MR. SINGH:  Object to form.

85

1  THE WITNESS:  No -- sorry.
2  No.  It's not.  We just stopped the
3  functional line so we could reformulate it.
4  I know that Akiva wanted to reformulate
5  the -- the functional line, and it's -- it's back in
6  our assortment as of this year, I believe.
7  BY MS. HOWERY:
8  Q   So have sales of the Tough Cookie
9  functional product resumed?
10  **A   Not as far as I know yet.  I -- it's --**
11  **the entire functional line should be available as of**
12  **spring.  It should resume probably in -- in May, if**
13  **I'm not mistaken.  But you'll have to ask Akiva as**
14  **to what the plan is for that, when the copackers**
15  **will be able to reoffer the newly formulated ...**
16  Q   When was the last time that Tough Cookie
17  was sold?
18  **A   I believe it was in 2019.**
19  Q   And is that also the last date that it was
20  offered for sale?
21  MR. SINGH:  Object to form.
22  THE WITNESS:  I honestly don't remember.
23  MS. HOWERY:  A moment.  Bear with me.
24  (Proceedings paused briefly)
25  MR. SINGH:  Is everything okay.

86

1  MS. HOWERY:  Yeah.  I'm just trying to
2  load an exhibit.
3  MR. SINGH:  Do you want me to help?  I'm
4  just kidding.  Sorry.
5  THE REPORTER:  There was one just loaded.
6  I captured that.  Is that going to be 5?
7  MS. HOWERY:  Yes, that is Number 5.
8  (Deposition Exhibit No. 5
9  marked)
10  MS. HOWERY:  I've got one more.  There it
11  is.  For some reason ...
12  (Deposition Exhibit No. 6
13  marked)
14  THE REPORTER:  I'm assuming that second
15  one is 6.
16  MS. HOWERY:  Yep.
17  THE REPORTER:  Thank you.
18  (Proceedings paused briefly)
19  MR. SINGH:  Wait.  What second one?  Oh, I
20  see.  Got you.
21  MS. HOWERY:  Got it?
22  MR. SINGH:  Yep.  Got you.
23  BY MS. HOWERY:
24  Q   Okay.  All right.  I'm going to share my
25  screen again -- wrong button.  I almost left the

87

1  meeting.  Hold on.
2  MR. SINGH:  I'll take over.
3  BY MS. HOWERY:
4  Q   All right.  So let's get back to the
5  profit and loss statement.
6  We talked about gross profit.  And I see a
7  range of expenses, but I want to drop down to Total
8  Operating Expenses.
9  Do you see that?
10  **A   I do, yes.**
11  Q   And are Total Operating Expenses, as
12  reflected on line 144, a summary of all the expenses
13  identified between lines -- wow.  There's a lot.
14  **A   Yes.**
15  Q   Lines 52 and --
16  **A   That's correct.**
17  Q   Okay.  So what are "Operating Expenses"?
18  **A   Operating Expenses are fixed and variable**
19  **costs associated with running the business.  It's**
20  **the overhead.**
21  Q   Okay.
22  THE VIDEOGRAPHER:  Ms. Howery, could you
23  Zoom in a little bit?  This document is a little bit
24  smaller than the previous one, for some reason.
25  Thank you.

88

22 (Pages 85 to 88)

1    MS. HOWERY:  Okay.
2  BY MS. HOWERY:
3    Q   So, Total Operating Expenses looks like,
4  in 2012, they were 85,000 and some change.
5        And they appear to increase, year over
6  year, from 2012 up until January 2018; is that
7  correct?
8    A   That's correct.  It's trending that way
9  with the exception of 2015.
10    Q   Yes.  I see that.
11        And can you explain why operating expenses
12  dropped in 2015?
13    A   If you scroll back up, I can call out the
14  certain line items; but, offhand, umm, not
15  necessarily.  It looks like rent expense was one of
16  the lower expense items, and payroll.
17        So we did not have any payroll payout.
18    Q   Okay.  And I see a similar drop in 2019 in
19  Total Operating Expenses.
20        Can you explain that?
21    A   Umm, let's see.  If you scroll back up,
22  again, it's payroll expenses.  When you compare it
23  to previous -- to the previous year, umm, and
24  then -- so overall payroll expenses are lower.  That
25  contributed to it.

89

1        And that's probably some marketing costs,
2  yeah.  I'm mistaken.  So if you scroll back up,
3  there is more items that affect that line item.
4        So Total Marketing was a big driver.
5    Q   Okay.  And if -- if I understood you
6  correctly, Akiva is the only employee; is that
7  right?
8    A   That's correct.  Yes.
9    Q   And would contractor compensation be paid
10  out of payroll costs or --
11    A   Not out of payroll, no.
12    Q   So in 2019, payroll expenses dropped about
13  $34,000 -- 33, we'll say.
14        Does that mean Akiva stopped taking a
15  salary or reduced his salary?
16    A   Pretty much, yes.
17    Q   And in 2020, there's no payroll expense?
18    A   That's correct.
19    Q   And none in 2021?
20    A   So far, yes.
21    Q   Why did Akiva stop taking a salary?
22    A   You have to ask him.
23    Q   Has he resumed taking a salary?
24    A   Not as far as I know, no.
25    Q   So it looks like we see declining expenses

90

1  in 2020 and 2021 -- all seem to be driven by the
2  reduction in payroll?
3    A   And by Marketing Expenses.
4        So several line items.  It's not just one.
5    Q   Okay.  Where would you see -- where would
6  we expect to find expenses for the development of
7  this keto line?
8    A   If you scroll further down -- let's see.
9  Can you scroll back up?  I'm sorry.
10        It's probably part of the cost of goods
11  number, and there should be an R&D account.
12        Just a second.  Right there.
13        Stop.  Stop, please.
14        Row 127.
15    Q   Okay.
16    A   So that's a research and development
17  account.  And this is where all the costs associated
18  with the development of new products should be coded
19  to.
20    Q   Okay.  And when did -- umm, so -- The
21  Cookie Department start development of the keto
22  line?
23    A   I believe it was in 2019.
24    Q   Can you explain what the research and
25  development expense was in 2018?

91

1    A   Not without seeing the backup, not
2  offhand.  But it -- Akiva was constantly working
3  also on new flavors.  So it's probably a combination
4  of, you know, keto and different other flavors as
5  well as packaging, changing in packaging.
6    Q   So moving right along, let's take a look
7  at Net Operating Income.
8        What is "Net Operating Income"?
9    A   Net Operating Income is your gross profit.
10  So you take your net -- net revenue or net sales,
11  minus all the direct costs associated with the
12  production and the fulfillment of the products you
13  sold, less all the variable and fixed costs.  That
14  includes the depreciation, amortization, and
15  interest expense as well.
16        And that's your net operating income and
17  that's what you referred to -- I usually look from a
18  profitability standpoint, I look at, umm, EBIT.
19    Q   EBIT?
20    A   Yeah.  Which is --
21    Q   Are --
22        (Concurrent conversations)
23        THE WITNESS:  -- operating income less the
24  taxes paid and interest.
25

92

23 (Pages 89 to 92)

BY MS. HOWERY:

Q   EBIT, what does that stand for?

A   **It's earnings before income tax -- interest and tax.**

Q   So if we look at Net Operating Income for The Cookie Department, also known as EBIT, also known as earnings before interest and taxes, in 2012, it looks like there's a negative number here; is that correct?

A   **It is a loss, which is to be expected for a startup business.**

Q   Okay.  So if -- if I were explaining this in layman's terms, would -- would I say that The Cookie Department was operating at a loss in 2012?

A   **Yes.**

Q   And would it be accurate to state that The Cookie Department was operating at a loss in 2013?

A   **Yes.**

Q   And it was operating at a loss in 2016?

A   **Yes.**

Q   And it was operating at a loss in 2018?

A   **That's correct.**

Q   And it was operating at a loss in 2019?

A   **Right.**

Q   And across all years, total, it's -- it's

93

operated at a loss?

A   **Yes.**

Q   And would you still consider The Cookie Department a startup?

MR. SINGH:  Object to form.

THE WITNESS:  Not after a few years.  However, The Cookie Department reformulated its flavors.  So it -- it's -- it's part of a startup; but, umm, no, after three, four years, I wouldn't -- I wouldn't, umm, see that as a startup business.

BY MS. HOWERY:

Q   All right.  I'd like to drop down a little bit further to Net Income.

What is "Net Income"?

A   **Net Income is your net operating income or EBIT, less taxes and interest.**

Q   And how's that different from Net Operating Income?

A   **In that it has additional expenses that hits the profitability of the business, such as taxes that you need to pay, as well as interest paid out.**

Q   Okay.  So looking at the Net Income for 2012, when it was a startup, it was a net loss; is

94

that correct?

A   **A greater net loss than the net operating income.  That's correct.**

Q   And then in 2013, it was also a net loss?

A   **That's correct.**

Q   And in 2015, there was also a net loss?

A   **That's correct.**

Q   And in 2016, there was a net loss?

A   **That's correct.**

Q   In 2017, there was a net loss?

A   **That's correct.**

Q   And then in 2018, there was a net loss?

A   **That's correct.**

Q   In 2019, there was a net loss?

A   **That's correct.**

Q   In 2020, there was a net loss?

A   **That's correct.**

Q   And it looks like total, overall, there was a net loss across all periods reflected on this profit and loss statement, correct?

A   **That's correct.  Yes.**

Q   And, in fact, umm, there's only one full year that shows a positive earnings; is that correct?

A   **That's correct.**

95

Q   And would you consider Cookie Department to be a profitable company?

A   **From a financial earnings standpoint, no.  However, from a growth and development, yes.**

Q   Do you recall the specific date in 2019 when the cookie -- Tough Cookie product was last sold?

A   **I do not, no.**

Q   Who -- who would know that?

A   **Probably Akiva.**

Q   Has The Cookie Department ever defaulted on its financial obligations to anyone?

A   **Not to my --**

MR. SINGH:  Object to form.

THE WITNESS:  Not to my knowledge.

BY MS. HOWERY:

Q   Has the company -- has The Cookie Department ever had challenges meeting its financial obligations as those obligations became due?

A   **Not to my knowledge.**

MS. HOWERY:  Madam Court Reporter, what's the number of this exhibit?

THE REPORTER:  Is this the one that says "Depo notes," or is this the one ending in --

96

24  (Pages 93 to 96)

97

1    MS. HOWERY:  It says "Cheat sheet final."
2    Is that not the one that I populated?
3    THE WITNESS:  It is.
4    MS. HOWERY:  It is.  Okay.
5    Umm, yes.  The second-to-last -- this last
6  spreadsheet I shared, what's the document number?
7  Is that 5?
8    THE REPORTER:  The TCD 018422 is Number 5.
9    MS. HOWERY:  Okay.  Thank you.
10  BY MS. HOWERY:
11    Q   Ms. Kirschner, do you recognize this
12  document?
13    A   I can't see anything yet.  It's not
14  popping up.
15    Q   Okay.  Let's give it a moment.
16    A   It's a blue screen.
17    MS. HOWERY:  I maybe shared the wrong
18  screen.
19    Hold on.  I did.
20    How about that?
21    MR. SINGH:  Better.
22    THE WITNESS:  That's -- (audio distortion)
23  Yes.
24  BY MS. HOWERY:
25    Q   Yes.  Okay.

98

1    Do you recognize this document?
2    A   I am, yes.
3    Q   And where did you see this document?
4    A   So I saw it in the -- in the information
5  that was sent to me by the attorneys.
6    And that's the document that I also
7  provided to you this morning with my notes on it.
8    Q   Okay.  And I'm going to stop sharing --
9  well, let's take a look at this before I stop
10  sharing.
11    So you will note the Bates number of this
12  document is TCD-018422.  And it's the document that
13  counsel shared with Defendants yesterday.  And I
14  note that it is titled "The Cookie Department, Inc.,
15  Tough Cookie Sales, 2012 through 2019."
16    A   That's correct.
17    Q   And it looks like, across the bottom of
18  this document, there are several tabs:  Tough Cookie
19  By Year Totals; Revenue By Year; Tough Cookie
20  Summary By Year; and then various tabs with years on
21  it.  2012 going all the way through 2021.
22    Do you see that.  2012, 2013 ...
23    A   Yes.  I can't see the bottom part of your
24  screen.
25    Q   Okay.  Let's see if I can --

99

1    A   Yes, I can now.
2    Q   Okay.  All right.  I'm going to stop
3  sharing just for one moment.
4    Did you share this entire spreadsheet with
5  us?  Doesn't look like it?
6    A   Just the -- the front page.  That's the
7  one that I have here printed out from my notes.
8  That's what you requested.
9    Q   Okay.  Did you print the entire
10  spreadsheet?
11    A   I did, yes -- well, not print.  No, I just
12  printed the worksheet.
13    Q   And what do you mean by work -- worksheet?
14    A   This particular slide, I printed.  There
15  is worksheets -- in this whole spreadsheet, there is
16  different tabs or worksheets.  I only printed this
17  particular tab or worksheet.
18    Q   Okay.  So let's take a look at this
19  document.
20    Did you prepare this document?
21    A   I did not, no.
22    Q   Did you assist in its preparation?
23    A   The bookkeeper -- oh, no.  No, I didn't.
24    Q   What's the source of the data in this
25  document?

100

1    A   It's the data underlying in QuickBooks.
2    Q   Okay.  Is the data reflected in this
3  spreadsheet an accurate representation of The Cookie
4  Department's financials?
5    MR. SINGH:  Object to form.
6    THE WITNESS:  It is part of the
7  financials.  Umm, if the cookie sales were
8  properly -- the Tough Cookie sales were properly
9  tagged, as such, they will be represented here.
10    If not, they will just go into an overall
11  revenue account.
12  BY MS. HOWERY:
13    Q   And how would you know if Tough Cookie
14  sales were properly tagged to the right flavor?
15    A   It is based on the invoice issued and the,
16  umm -- the sales SKU.
17    Q   And is there a trigger in QuickBooks that
18  lets you know if something's improperly coded to a
19  flavor?
20    A   No.  There is no automatically trigger --
21  no automatic trigger.  You have to manually tag them
22  to the right product category.
23    Q   And as you look at this page of the
24  worksheet, is there anything that sticks out as
25  being inaccurate?

25  (Pages 97 to 100)

1    MR. SINGH:  Object to form.
2    THE WITNESS:  Nothing that, you know,
3  without further, deep dive investigation.  It looks
4  accurate based on the trend of revenue.
5  BY MS. HOWERY:
6    Q    And is this page of the spreadsheet and
7  report from QuickBooks?
8    A    Can you repeat the question, please.
9    Q    Is this page of the spreadsheet a report
10 from QuickBooks?
11   A    No.  This is a result of the underlying
12 reports or tabs that you have in this spreadsheet.
13 This is just a summary cheat sheet at a, you know,
14 quick glance.
15      So you'll have the detail that feeds into
16 those particular numbers into each yearly tab --
17   Q    Okay.  So --
18   A    -- that we had.
19   Q    I see formulas under the amount tabs here.
20     What -- where's ...
21   A    The formula is -- you have to unhide the
22 row.  You see the Rows 10 and 14.
23   Q    Mm-hmm.
24   A    There's three rows hidden.  You can unhide
25 those, and then you should see the numbers that make

101

1  up that particular total.
2    Q    Okay.  So you'll have -- I am not an
3  Excel --
4    A    So highlight Row 10 and 14.
5    Q    Okay.
6    A    The whole row.
7    Q    Oh.  10?
8    A    No.  No.  No.  The entire row.  These are
9  columns.
10   Q    That?
11   A    Yep.  Like that.
12      And then right click on the mouse.
13      And then it says "Unhide," if you scroll
14 down.  Yeah.
15   Q    Okay.  Okay.  So if we do that for all of
16 these --
17   A    Mm-hmm.
18   Q    -- it should give the data.
19   A    Yeah.
20   Q    Okay.  That's helpful.
21   A    You have this particular data also in each
22 individual tab.
23   Q    Okay.
24   A    She missed a row in there, but if you go
25 into the 2019 tab ...

102

1    Q    I have to scroll that up a bit.
2    A    Okay.  So it is the Row 25.  And if you
3  scroll a little bit further -- let me see where it's
4  at.  Scroll further down, please.
5      There is another -- where is it?  Tough
6  Cookie -- where is it -- Tough Cookie, Row 43.
7    Q    43.  Okay.
8    A    So she didn't pick that one up in the
9  summary.
10   Q    Okay.
11   A    Or it overwrote the formula, I guess.
12   Q    Okay.  Good.  I'm glad we're talking about
13 this.
14      Just so we're clear for the record,
15 line 67, on the tab titled "Tough Cookie By Year
16 Totals," shows totals for 2019 for the Tough Cookie
17 flavor.
18      Aah, I did not freeze the frame.
19      Individual cookies, 15,924; is that
20 correct?
21   A    That's correct.
22   Q    Okay.  And so if we cross-reference that
23 with the 2019 tab, we should get that same number?
24   A    You should get the same number.
25      Can you go back to that 2019 tab?  So it's

103

1  at -- at 1280, and that's a caddy.  So you have to
2  take -- that's the number of caddies sold.
3      So you would have to take that and convert
4  it into individuals cookies.
5      So you take that times 12 plus the 47, the
6  box over there.
7    Q    Okay.
8    A    And what that converted to, which you have
9  already on the first page.
10      So just need to take the 1280 times 12 and
11 add it to the number on the -- on the first page
12 that you unhid, to get to that total of 15,924.
13   Q    But I already -- (audio distortion)
14   A    I'm sorry?
15   Q    Ms. Kirschner, I'm sorry.  You were
16 frozen.  I didn't hear --
17   A    Oh.
18   Q    -- anything after Tough Cookie.  I heard
19 you say Tough Cookie Box 47 and it's sounded like
20 there's another -- (audio distortion)
21   A    She's frozen.  It's not me.  Right?
22     MR. SINGH:  Right.  Monique -- Keyonn and
23 Monique, it's you guys that are frozen, not Andrea.
24     MS. HOWERY:  I wasn't there?
25     MR. SINGH:  Yeah.  Monique, I -- it's you

104

1  guys who were frozen, not us.  Not -- it's not
2  Andrea, and I don't think the -- the --
3       MS. HOWERY:  Maybe -- let me see if I can
4  close out of one of these.
5       MR. SINGH:  Okay.
6       MS. HOWERY:  I'm trying to keep documents
7  closed so I don't, you know, use up all my memory.
8       All right.  Let's see.
9  BY MS. HOWERY:
10   Q   So, let's try this again.
11      MR. SINGH:  Got it.
12  BY MS. HOWERY:
13   Q   Ms. Kirschner, is there a conversion for
14  the 47 quantity for -- in line 25, that needs to be
15  made?
16   **A   No.  That is already included on the first**
17  **page.**
18   Q   All right.
19   **A   The summary page.**
20   Q   Okay.  So while I do some rough
21  calculations, 1280 times 12 is 15,360 plus another
22  47, that should give us 15,407?
23   **A   No.  You have to take the 564 that's on**
24  **this page.  So that's -- the 47, it's converted.**
25  **That 47 is boxes.  And that's converted into this**

1  **many individual cookies.  So you take the number**
2  **that you just calculated, the 1240.**
3   Q   Okay.
4   **A   And --**
5   Q   I thought the first question I asked, if
6  the -- if the 47 required a conversion.
7   **A   I said no --**
8   Q   So --
9   **A   -- because if you refer to the first page,**
10  **it's already converted.**
11      **So the 47, if you refer back to the first**
12  **page, it's converted to 564.**
13      **So this is how -- this is the one to one.**
14  **It's 47 boxes equals to 564 cookies.**
15   Q   How many cookies are in a box?
16   **A   I believe twelve.**
17   Q   Okay.  Okay.
18   **A   That is already converted.  The 47 boxes,**
19  **converted into cookies, it's 564.**
20   Q   And then we get the number.  Fantastic.
21  Thank you for that explanation.
22   **A   Sure.**
23      **(Proceedings paused briefly)**
24  BY MS. HOWERY:
25   Q   So the revenue by year, on this same

1  spreadsheet, looks like the profit and loss
2  statement without, uh, the operating income, net
3  income, and expenses; is that correct?
4      Is this what --
5   **A   That's right.  Yes.**
6      **Just the gross sales piece.**
7   Q   Okay.  I'll move on from this document.
8  We're now -- are you familiar with
9  SEC Form C?
10      MR. SINGH:  Close your screen.
11      MS. HOWERY:  Oh.  Sorry.
12      MR. SINGH:  It's okay.  I looked away.
13      MS. HOWERY:  Yes.  Let me stop sharing.
14  BY MS. HOWERY:
15   Q   Are you familiar with SEC Form C?
16   **A   I have been provided, yesterday by**
17  **counsel, some of the documents that were shown**
18  **yesterday in Akiva's deposition.**
19      **So I reviewed that, yes.**
20   Q   And what is the purpose of a Form C?
21      MR. SINGH:  Object to form.
22      And also I'm going to note beyond the
23  scope of what this witness is here to testify about.
24      You can try to answer, though,
25  Ms. Kirschner.  Those are just objections for the

1  record.
2      THE WITNESS:  This is now just based on
3  what I think?  I'm not 100 percent sure.  It's
4  showing the company's, umm, financial and, umm --
5  uh, descriptive information.  It's providing
6  information about a company.
7  BY MS. HOWERY:
8   Q   Have you ever filed a Form C?
9   **A   Umm, if I recall correctly, we -- not for**
10  **the SEC.  SEC, no.  As far as I know, no.**
11   Q   Okay.
12      MS. HOWERY:  Court Reporter, I think we're
13  up to Exhibit 7?
14      THE REPORTER:  Yes.
15        (Deposition Exhibit No. 7
16        marked)
17      THE REPORTER:  Let me just grab it real
18  quick.
19  BY MS. HOWERY:
20   Q   Ms. Kirschner, can you see my screen?
21   **A   I can, yes.**
22   Q   Okay.  I will represent to you that this
23  is a Form C filed on behalf of The Cookie Department
24  with the SEC on August 31st, 2016.
25      Were you employed with The Cookie

1    Department on August 31st, 2016?
2        MR. SINGH:  Object to form.
3        THE WITNESS:  I believe I started with
4    them by then, yes.  But I was not employed; I was as
5    a consultant.
6    BY MS. HOWERY:
7        Q   Understood.
8        And do you recall TCD filing this Form C
9    with the Securities and Exchange Commission?
10       MR. SINGH:  Object to form.
11       THE WITNESS:  I don't particularly recall.
12   I don't have a recollection.
13   BY MS. HOWERY:
14       Q   Okay.  Let's just scroll through this
15   document.
16       So Form C says:  "Issuer information."
17   And the name of the issuer is The Cookie Department.
18       Do you see that?
19       **A   Yeah.  I do.**
20       Q   Okay.  And it's formed as a corporation.
21   We talked about that.
22       And here's The Cookie Department website.
23       **A   Yes.**
24       Q   And then there's a notation here that:
25   "Intermediary through which the offering will be

109

1    conducted."
2        Does this jog your memory as to what the
3    purpose of a Form C is?
4        MR. SINGH:  Object to form.
5        THE WITNESS:  I see that it's Wefunder.
6    So we did a Wefunder fundraiser.  So ...
7    BY MS. HOWERY:
8        Q   So you recall this fundraiser?
9        **A   I do.**
10       Q   And what were you raising funds for?
11       **A   Am I getting them confused?**
12       **We did a Wefunder in 2018, I believe.  So**
13   **this might be a different round.  I'm not sure.  I'm**
14   **not going to be able to operate -- to answer it**
15   **correctly.**
16       MR. SINGH:  Ms. Howery, I just want to
17   clarify you're asking this question -- you're asking
18   these questions about this document in her 30(b)(1)
19   capacity.  Because I just checked on 4 and on 5.
20   This is not listed as the designated topic for her.
21       So I just want to confirm with you:
22   You're asking her in her 30(b)(1) capacity?
23       MS. HOWERY:  Okay.  That's fine.  Yes.
24       MR. SINGH:  Okay.  Go ahead.
25

110

1    BY MS. HOWERY:
2        Q   So it looks like there's, uh, offering
3    information here.
4        **A   Mm-hmm.**
5        Q   And it states that 5 percent of the
6    offering amount upon a successful fundraise.
7        So this seems to be consistent with your
8    recollection that --
9        **A   Yes.**
10       Q   -- there was some sort of fundraiser with
11   Wefunder?
12       **A   That's correct, yes.**
13       Q   Okay.  Up --
14       **A   So -- yeah.  That is the note -- I just --**
15   **I wasn't aware that it was in 2016.  That threw me**
16   **off.  I thought this -- the 600,000 convertible note**
17   **was filed in 2018.  So that threw me off also.**
18       Q   Let me just confirm, to make sure that I
19   haven't misrepresented anything on my end.
20       Give me one quick second.
21       I'll stop sharing for a second.
22       (Proceedings paused briefly)
23   BY MS. HOWERY:
24       Q   Back to sharing.
25       So you are correct, Ms. Kirschner.  There

111

1    is a date on the bottom of this document of 2018.
2    So --
3        **A   Yes.**
4        Q   -- you were correct.  Not 2016.
5        So this form, umm, was filed on
6    August 31st, 2016, according to the SEC.
7        It was accessed this morning at 10:35.
8        So let's move down.
9        So now you recall the notes.  Umm --
10       **A   Yes.  The note.**
11       Q   And what was the purpose of this round of
12   fundraising?
13       **A   The purpose was to get more, umm,**
14   **operating cash so we could grow the business and**
15   **expand further, as well as invest in various --**
16   **enhance marketing abilities to grow the top line.**
17   **So working capital.  Raising working capital.**
18       Q   And is this a form of debt, right?
19       **A   Yes.  It's a convertible note.**
20       Q   And does that mean that The Cookie
21   Department has to make payments on this debt?
22       **A   No.  It's accruing interest until it**
23   **converts.**
24       Q   Okay.  And what is it converting to?
25       **A   It's converting to shares within the**

112

28 (Pages 109 to 112)

1    company.
2         Q    And has the -- have the notes matured?
3         A    I don't believe so.  Not yet.
4         Q    And is it your understanding that as part
5    of a Form C filing, there are various financial
6    reports that are filed in conjunction with Form C?
7             MR. SINGH:  Object to form.
8             THE WITNESS:  Various numbers, figures
9    within -- from the balance sheet and cash flow, yes.
10   BY MS. HOWERY:
11        Q    Okay.  Did you file this Form C report?
12        A    I filed it -- I signed -- no.  I -- I
13   completed some documents which we -- they would have
14   filed it on our behalf.  I have not filed this.
15            I have never completed this form.
16        Q    Okay.  So I'm going to scroll to the
17   bottom.
18            It shows your signature on the form --
19        A    Mm-hmm.
20        Q    -- here.
21            Did you authorize your signature to be
22   placed on this form?
23        A    I did, yes; but it was via the Wefunder
24   program.
25        Q    Okay.

                                                   113

1         A    I have not gone on the SEC portal to file
2    this.
3         Q    Okay.  So let's take a look at, uh, some
4    of the financial information that was populated
5    here.
6             I cannot tell from these numbers what
7    fiscal year end this refers to.
8             Is this fiscal year end 2017?  Is that
9    what you would expect these numbers to be?
10        A    So if -- if this was filed in 2018, and it
11   says prior -- most recent fiscal year end would be
12   2017.  And prior fiscal year end would be 2016,
13   because this was filed mid-August.
14        Q    Okay.
15        A    So it says that most recent fiscal year
16   end, that would be the year prior.  So that would be
17   2017.
18        Q    Okay.  So we would -- we're looking at
19   2016 and 2017, for the purposes of this Form C?
20        A    That's correct.
21        Q    So let's look at revenue and sales figure
22   here for the most recent fiscal year.
23            So that would be the 2017 year, correct?
24        A    I believe so, yes.
25        Q    And are these numbers that -- are

                                                   114

1    populated numbers that The Cookie Department
2    provided?
3         A    In my opinion, yes.
4         Q    So the revenue sales for 2017 are
5    $367,210.04, correct?
6         A    That's correct.  It says so.
7         Q    And that -- that will coincide with what
8    shows on the profit and loss statement that was --
9         A    It should, yes.
10        Q    Okay.  And as I look at the profit and
11   loss statement, I see that that number is the same
12   for 2017, and it's reflected in the Total Income
13   line.
14            MR. SINGH:  Are you going to show us the
15   exhibit?
16            MS. HOWERY:  Yes.  I'm going to open it to
17   show you.
18            MR. SINGH:  Okay.  Just for clarity,
19   please.  Thank you.
20            MS. HOWERY:  I'm going to show you.
21   BY MS. HOWERY:
22        Q    Let's see if I can ...
23        A    Yes.  That is net revenue.  That's
24   correct.
25        Q    All right.  I don't know if I can -- if

                                                   115

1    the split screen will show properly?
2         A    It doesn't.
3         Q    It doesn't.  I didn't think so.  Okay.
4             So I'm going to go back here and pull this
5    back on this.
6             Stop share.
7             So as we discussed -- see that same
8    number, 367210.04 for January 2017 for total income
9    on the profit and loss statement that was produced
10   in discovery as Exhibit -- I think -- I don't recall
11   the exhibit, but the profit and loss statement that
12   we've been referencing throughout.
13            It's same number, right?
14        A    That's correct.
15        Q    And if we look at 2016, that number is
16   $352,992.59 for a Total Income on the profit and
17   loss statement that was produced in discovery.
18            And that number should coincide with the
19   revenue and sales reflected on the Form C, correct?
20        A    (No audible response)
21        Q    And we will see that that, indeed, is the
22   case.
23        A    Okay.
24        Q    Okay.  So I'm going to move on.
25            (Proceedings paused briefly)

                                                   116

BY MS. HOWERY:

Q   So is the net income, that's the bottom line number that appears on our profit and loss reports, correct?

**A   That is correct.**

Q   Okay.  And these numbers look very similar.  There is some variance, and hopefully you can explain it to me.

Umm, it's not much, but maybe you can shed some light on why there exists variance.

So for the net income on the Form C, for fiscal year end 2017, we have a net loss of $7,370.29.

When you compare that to -- on the profit and loss statement that we have, we show a net loss of $7,367.25.  And I will stop sharing and show that screen.

You see that number, there?

**A   Yes.**

Q   Not very much of a variance, but a few dollars?

**A   Yeah.**

Q   Just -- can you explain that?

**A   No.  It's probably -- I need -- I would need to speak to the bookkeeper.**

117

Q   Okay.

**A   If there's any adjustments, umm, after the fact, I don't know.**

MS. HOWERY:  Okay.  All right.  I'd like to populate one more document.

I'd like to take a break here, Counsel.

MR. SINGH:  For how longs?

MS. HOWERY:  Can we just break for lunch here.

MR. SINGH:  How long do you plan on -- let me ask -- Andrea, I know you are tight on time, and we, you know, showed up promptly.

How long do you need for lunch -- oh, you don't need lunch, correct?

THE WITNESS:  I -- I'm on the east coast.  I'm done with lunch.  I'm looking forward to --

MR. SINGH:  How long do you guys need?

MS. HOWERY:  I'll take 40 minutes.

MR. SINGH:  Okay.  Then how long do you expect to go after lunch?

MS. HOWERY:  Oh, I don't know.  I've got quite a few statements to get through.

MR. SINGH:  Okay.

MS. HOWERY:  I don't know.  I will be as efficient as I can.

118

MR. SINGH:  So you guys are taking until when?

MS. HOWERY:  We can go to 2:45 -- oh, I don't know what time is that, 12:45 your time?

MR. SINGH:  Yeah.  Okay.  We'll be back at 12:45.

MS. HOWERY:  Okay.  Thank you.

THE VIDEOGRAPHER:  The time is 12:09 p.m.  We're now off the record.

(Proceedings recessed from 12:09 p.m. until 12:46 p.m.)

THE VIDEOGRAPHER:  The time is 12:46 p.m., and we are now back on the record.

BY MS. HOWERY:

Q   Okay.  So I'm going to step through these very tedious financial statements.

Let's see.

MR. SINGH:  What exhibit number are we on?

MS. HOWERY:  That would be my next question.

THE REPORTER:  Our next to be marked would be 8.

MR. SINGH:  All right.

MS. HOWERY:  Okay.

THE REPORTER:  Let me grab it.

119

(Deposition Exhibit No. 8 marked)

BY MS. HOWERY:

Q   Ms. Kirschner, I'm sharing my screen.

Can you see that?

**A   (No audible response)**

Q   I cannot hear you if you're speaking.

**A   Can you hear me now?**

Q   I can.

**A   I don't know what's going on with my mic.**

Q   Okay.  We've only had a couple of instances.  You've been great.  Thank you.

**A   All right.**

Q   Uh, so you can see my screen?

**A   I can.**

Q   Good.  So have you seen this document before?

**A   It's been sent to me last night.**

Q   Okay.

**A   By legal counsel.**

Q   Okay.  Well, I will represent to you that this is a balance sheet filed with the Security and Exchange Commission on July 31st, 2020.  And it states that its The Cookie Department's balance sheet as of December 31st, 2019.

120

1    When you reviewed the document, did you
2 have any reason to think that it doesn't represent
3 TCD's balance sheet as of December 31, 2019?
4    MR. SINGH:  Objection --
5    THE WITNESS:  Just --
6    THE REPORTER:  I'm sorry.
7    THE WITNESS:  Just reviewing and, you
8 know, I wasn't able to go into the details because I
9 received it this morning.  It was sent last night,
10 and I received it this morning.  So it looks like
11 it's the right accounts.
12 BY MS. HOWERY:
13    Q    Okay.
14    A    And approximately the right balance --
15 balances.  But I need to validate that exactly.
16    Q    All right.  Let's just kind of take a
17 look -- run through it and at least compare some
18 items that I think we have access to from documents
19 produced in discovery.
20    A    Okay.
21    Q    So I would like to jut down to the section
22 of the statement that shows net income.  And that
23 would be on page 3.
24    A    Yes.
25    Q    Now, is the net income, on this balance

121

1 sheet, would you expect that to be substantially the
2 same as the net income for 2019 on the profit and
3 loss statement?
4    A    It should be, yes.
5    Q    Okay.  So taking a look at the balance
6 sheet obtained from the SEC, umm, for 2019, net
7 income shows a loss of $60,714, correct?
8    A    Correct.
9    Q    When we take a look at the profit -- P&L
10 statements, that was shared in discovery, the net
11 income for 2019 shows a loss of $60,714.23.
12    So those seem to coincide.
13    A    Yes.
14    Q    Moving back to the balance sheet that we
15 got from the SEC, can you share what "retained
16 earnings" represent?
17    A    Retained earnings represents the net
18 income from previous periods -- (audio
19 distortion) -- section.
20    Q    So is it -- what previous periods does it
21 represent?
22    A    Should be since the beginning of the
23 company.
24    Q    So on this balance sheet, it shows a
25 negative retained earnings of $215,970; is that

122

1 correct?
2    A    That's what it says, yes.
3    Q    And so, based on your testimony, that
4 means that it represents earnings from the beginning
5 of -- since Cookie Department incorporated?
6    A    That's correct.
7    Q    Those would be negative retained earnings,
8 correct?
9    A    Correct.
10    Q    So if a company has negative retained
11 earnings, does that mean there are no earnings
12 available for reinvestment into the business?
13    A    So retained earnings, in this sense, is
14 your net income.  So this is your net loss.  Right?
15    So retained earnings in this case is a net
16 loss amount.
17    Q    Okay.
18    A    So from the P&L standpoint it doesn't have
19 any funds that render a profit.  However, the cash
20 availability of a corporation or of the company is
21 based on a combination of the profit and loss
22 statement, which is here, as well as balance sheet
23 activities, which are -- for instance, accounts
24 receivable, when have you received payments; any
25 type of loans; any type of notes; cash injections.

123

1 Those will be recorded on the balance sheet but not
2 necessarily on the P&L, which feeds into this
3 retained earnings line.
4    Q    So if we look at this balance sheet, can
5 we tell if there are funds available from cash that
6 have been infused from -- would you say loans?  Is
7 that what you said?
8    A    Several instruments.
9    So you'll see that accounts receivable --
10 the balance sheet is always a snapshot in time.  So
11 what you see here is the balance sheet at the end of
12 January -- end of the 2019.
13    So the balance sheet on the 1st of
14 January, 2020, can be completely different.
15    Just because of, you know, if, for
16 instance, some of the larger vendors have made the
17 payments for the $56,536, that are currently in the
18 accounts receivable, that we have not or The Cookie
19 Department has not received payments on.
20    If you scroll further down.
21    Q    Okay.
22    A    If you go to the Equity section, from the
23 liability -- I'm sorry.  Here.
24    So you'll see that there is -- the
25 business is also funding itself through credit cards

124

ANDREA KIRSCHNER - April 29, 2022

expense.  So it's using credit cards.  The $47,165 balance is a balance of credit card payments outstanding.

And then there is monies that were, at some point in time, funneled through the company or invested in the company in the form of a loan or, umm, some other instrument, like a convert -- convert the note.  Umm, that's further down in the equity piece.

That's -- no, further down.

Q   Okay.

A   That convertible note, the investments, the long-term liabilities.  Those will also -- amounts that were funding the company's operation.

So, as you can see -- although the net income itself, year to date, was 219,000.  So the business did not generate cash, it did receive cash through these different vehicles that I just called out.

Q   Well, let me ask you something, because it seems to me that you're using the term "net income" and "retained earnings" interchangeably?

A   No, I did not.  Those are accounting terms, and those are financial terms.

So retained earnings, it's accumulation of

125

all the net income prior to the -- (audio distortion)

THE REPORTER:  I'm sorry.  Prior to the what?

MR. SINGH:  What?

THE WITNESS:  It's accumulation.

Yes, Sanjiv?

MR. SINGH:  Yes.  I'm sorry.  I'm doing the hairline traffic directing signal.

You guys are talking over each other.  I couldn't even get my objection in there.

So I wanted to object to form.

However, I don't know exactly where my objection is going to go.

Madam Court Reporter, if you can just put a retroactive objection to form between the last dialogue between the witness.  I don't know what --

Anyway.  Just objection to form.  Retroactively, please.

And if you guys could please not talk over each other so I can get new objections in, that would be helpful.

THE REPORTER:  And so reporter can hear the full question and the full answer would really be helpful, also.

126

MR. SINGH:  I mean, Ms. Kirschner, you're doing great and it's a tough day for you.  So I'm just saying, if you could do that, that would be are helpful.  Thank you.

MS. HOWERY:  Could you repeat the question, the last question, Madam Court Reporter.

(Record read back by the Court Reporter)

THE REPORTER:  Then I asked the witness: Prior to the what?

THE WITNESS:  Prior to the current period, which is reflected in that income.

BY MS. HOWERY:

Q   Thank you.

So if I understood what you just said, although this balance sheet shows a net loss for Yearend 2019 and a combined net loss, the inception of the company of 215,000 -- is that correct? Approximately 215?

A   That was the combined loss prior to 2019, yes.

Q   Okay.  Thank you.

But it's funding its operations with debt. Is that an accurate statement?

MR. SINGH:  Object to form.

THE WITNESS:  It's funding its losses.

127

So it's not funding its entire operation because it is generating cash.

It is just not generating enough cash to cover all the operating expenses of the business.

And that -- that is it -- that is being funded -- or some activities is being funded through debt and through loans and through convertible notes, which is similar to what tons of businesses are doing when you look at their balance sheets.

BY MS. HOWERY:

Q   And it seems that you're making a distinction between the term "debt" and "loans."

Is there a distinction there that you want to clear -- that you can clarify?

A   Both are liabilities.  So let's use that term.

Q   And what is a "liability"?

A   A liability is a form of debt that -- or outstanding amount of money that you need to repay.

So total liability would be your accounts payable.

For instance, if you are invoiced for a service that you received but your payment terms are 45 days, you might not need to pay it right away. You have 45 days to pay that bill.  And then it

128

32 (Pages 125 to 128)

1  might show up in your accounts payable line item
2  here on the balance sheet, which is a debt.  It
3  doesn't mean that you cannot pay it.
4       Then, you have your credit card, which is
5  similar to credit cards for individuals.  That is a
6  balance that you carry that you eventually have to
7  pay down or should pay down.
8       And then you have loans which is similar
9  to individuals as well.  You have loans.  Depending
10  on the loan agreements, they might generate interest
11  as well or not.  And then based on the agreement,
12  there is either a payoff term or there is, you know,
13  a monthly term or you can pay it off in
14  installments.
15       So that -- those are all liabilities.
16       Q   Okay.  I think that's all I have on this
17  document.  Thank you for explaining terms,
18  Ms. Kirschner.
19       A   You're welcome.
20       MS. HOWERY:  Okay.  This will be
21  Defendant's Exhibit 8 -- 9.  Sorry.
22            (Deposition Exhibit No. 9
23            marked)
24  BY MS. HOWERY:
25       Q   Okay, Ms. Kirschner.  Same exercise.  You

129

1  know the drill now.
2       Have you seen this document before?
3       A   I've seen it last night or this morning
4  after it's been sent to me last night.
5       Q   Okay.  And I will represent, for the
6  record, that this is The Cookie Department's Balance
7  Sheet as of December 31st, 2020, that was obtained
8  from the SEC website.
9       Did you prepare this document,
10  Ms. Kirschner?
11       A   I did not, no.
12       Q   Did you assist in its preparation?
13       A   I don't recall, no.
14       It is a canned report in QuickBooks as
15  well.  So as you maintain your financials, it will
16  run you a balance sheet.
17       Q   Are you aware that these SEC filings were
18  occurring in 2020 --
19       A   I --
20       Q   -- 2019?
21       MR. SINGH:  Object to --
22       THE WITNESS:  I was not, no.
23       THE REPORTER:  Was there an objection?
24       MR. SINGH:  Yeah.  But I'll withdraw it.
25  Sorry about that.

130

1  BY MS. HOWERY:
2       Q   Let's take a look at this balance sheet
3  for December 2020.
4       And I'll scroll down to the Liabilities
5  and Equity section.  And we will note that retained
6  earnings, umm, for 2020, are $277,000 -- 277779.54.
7  A loss.
8       Is that correct?
9       A   That is correct.
10       Q   And if I understand your testimony from
11  the prior balance sheet we reviewed, this represents
12  a loss from inception for the prior periods
13  preceding December 2020.
14       Is that an accurate statement?
15       A   That is accurate, yes.
16       Q   And this report also shows a net loss for
17  Yearend 2020 of $42,931.43; is that correct?
18       A   That's what it shows.  Correct.
19       Q   Now, I noticed, on the profit and loss
20  statement that was shared in discovery, that we've
21  been referring to, that there is a variance in the
22  net income reported on this balance sheet and what's
23  reported on the profit and loss.
24       So let's just look at this number again.
25       The net income on the balance sheet for

131

1  Yearend 2020 shows a net loss of $42,931.43,
2  correct?
3       A   That's what it shows, correct.
4       Q   And if we take a look at the net income on
5  the profit and loss report that was shared in
6  discovery, we see a net income for -- or a net loss
7  for 2020 of the amount of $24,984.22.
8       Do you see that?
9       A   I do, yes.
10       Q   Now, by my calculations, that's a nearly
11  18,000-dollar variance.
12       A   Yes.
13       Q   And you --
14       A   I do not know the reason for it.  I'm --
15  those -- the prior documents that were filed with
16  the SEC, it's the first time I saw that last
17  evening, as far as I can tell.
18       So I will need to do some further
19  investigation as to the difference.
20       I don't know offhand.
21       Q   Okay.  Do you think it's just a mistake?
22       MR. SINGH:  Object to form.
23       THE WITNESS:  It may -- it may be, or
24  maybe an accounting journal entry, a bookkeeper --
25  the bookkeeper did an additional journal entry or

132

33 (Pages 129 to 132)

1  corrected something and updated financials were not
2  submitted to the SEC.
3         Again, I'm not -- I personally did not
4  submit those documents to the SEC, so I'm not sure
5  how and why they were submitted.
6  BY MS. HOWERY:
7      Q   Okay.  And, Ms. Kirschner, can you see my
8  screen?
9      A   I can, yes.
10     Q   Have you seen this document before?
11     A   I may have.  I've seen it last night.  It
12 was sent to me from the -- from the attorneys, that
13 it was presented yesterday during Akiva's deposition
14 to look at it.  So I briefly opened it up.  Yes.
15     Q   Okay.  I will represent, for the record,
16 this is Form C-AR, also referred to as the Annual
17 Report as of January 1st, 2021, for The Cookie
18 Department, that was obtained from the SEC website.
19         MS. HOWERY:  And we will mark that as
20 Defendant's Exhibit --
21         Are we at 9, Madam Court Reporter?
22         THE REPORTER:  We're at 10.
23         MS. HOWERY:  10.  Wonderful.
24         (Deposition Exhibit No. 10
25         marked)

133

1  BY MS. HOWERY:
2      Q   Let me ask you:  Do you review SEC filings
3  before they're filed by TCD?
4         MR. SINGH:  Objection.  Object to form.
5         THE WITNESS:  We, personally have not
6  filed anything directly.  This must have gone,
7  again, through Wefunder, as far as I can tell.
8  BY MS. HOWERY:
9      Q   Okay.  Well, let's scroll through this
10 document and see if we can tell who filed it.
11         What in the document would suggest to you
12 that Wefunder filed it?
13         MR. SINGH:  Object to form.
14         THE WITNESS:  I remember filing -- or
15 signing off on a couple of financials to be sent to
16 Wefunder when we did the fundraise -- the
17 convertible note raising.
18 BY MS. HOWERY:
19     Q   And is part of the convertible note on
20 fundraising.
21         MR. SINGH:  I -- I am very sorry to
22 interrupt.  I just learned that there was a shooting
23 at my wife's hospital.  I just want to call her and
24 make sure she's okay.
25         Can we stop for just -- like, literally

134

1  give me two minutes.  I just need to step out of the
2  room and make this phone call, please.
3         MS. HOWERY:  Sure.
4         MR. SINGH:  Sorry about this.
5         THE VIDEOGRAPHER:  The time is 1:12 p.m.
6  We're now off the record.
7         (Proceedings recessed
8         from 1:12 p.m. until 1:14 p.m.)
9         THE VIDEOGRAPHER:  The time is 1:14 p.m.
10 We are now back on the record.
11 BY MS. HOWERY:
12     Q   Okay.  Ms. Kirschner, I'm going to show
13 share my screen again.
14     A   Yes.
15     Q   We're back to this form Annual Report.
16         MS. HOWERY:  Madam Court Reporter, was
17 there a question pending?
18         (Record read by the Court Reporter)
19         THE REPORTER:  There was a part of a --
20         (Record read back by the Court Reporter)
21 BY MS. HOWERY:
22     Q   Okay.  As part of the convertible note
23 fundraising, is there an SEC reporting requirement
24 that follows?
25         MR. SINGH:  Object to form.

135

1         And -- well, you can go ahead and answer.
2         THE WITNESS:  I personally don't know.
3  BY MS. HOWERY:
4      Q   Okay.  So looking at this Annual Report,
5  umm, I note the second paragraph.
6         Can you read that paragraph out loud,
7  please.
8      A   Sure.  Just a second.  Let me move this
9  down.
10         (As read):  "Be careful and precise in
11 answering all questions.  Give full and complete
12 answers so that they are not misleading under the
13 circumstances involved.  Do not discuss any future
14 performance or other anticipated events unless you
15 have a reasonable basis to believe that it will
16 occur -- actually occur with -- within it is
17 foreseeable future.  Any answer requiring
18 significant information is materially inaccurate,
19 incomplete, or misleading, the company, its
20 management, and principal shareholders may be liable
21 to investors based on that information."
22     Q   Thank you.
23         And is your testimony that you did not
24 create this report, right?
25         MR. SINGH:  Object to form.

136

34 (Pages 133 to 136)

137

1    THE WITNESS:  As mentioned before, there
2  were instances where it was -- when we did the
3  fundraising on Wefunder where we had to complete
4  this information, and I have completed it, to the
5  best of my knowledge -- the financial data, to the
6  best of my knowledge at that point in time.
7  BY MS. HOWERY:
8    Q   And you also testified that you authorized
9  the report?
10    Is that the term you used?
11    MR. SINGH:  Object to form.
12    THE WITNESS:  I signed off the numbers,
13  based on the numbers that -- at that point in time,
14  yes.
15  BY MS. HOWERY:
16    Q   Okay.  Let's move down to Section 1.
17    And it says:  "Has the issuer or any of
18  its predecessor previously failed to comply with
19  ongoing reporting requirements of Rule 202 of
20  Regulation Crowdfunding?"
21    Do you see that?
22    A   Yes.
23    Q   And the response there is "Yes," right?
24    A   Not -- not by me, marked by me; but, yes.
25    And the explanation is:  "Missed past

138

1  annual reporting.  Has been resolved."
2    Q   So the only information -- well, help me
3  understand.
4    What -- was there any other information
5  you submitted to Crowdfunder, other than the
6  financial information you suggested?
7    A   It's been a few years.  I don't remember
8  exactly, but I know I've -- I sent information that
9  was financial, the financial data.
10    Q   What about the other data in the report,
11  like the names of the directors?
12    A   I believe that's something that Akiva
13  filed or entered.  I did not have direct access to
14  Wefunder.
15    Q   So how did you submit the financial
16  information?
17    A   I send them to Akiva.  And then, before
18  signing off, I got a screen shot or, you know, a
19  view of those, to verify them at that time.
20    Q   Okay.
21    MR. SINGH:  What exhibit number is this,
22  Monique?
23    MS. HOWERY:  10.
24    MR. SINGH:  Thank you.
25

139

1  BY MS. HOWERY:
2    Q   And I note here that you're identified as
3  a director of the company in Section 2.
4    A   That's correct.  But my principal
5  occupation -- well, nevermind.  Yes.
6    Q   And further down, you're also identified
7  as an officer of the company?
8    A   That's correct.
9    Q   Is there a reason why you're not
10  identified as interim CFO?
11    MR. SINGH:  Object to form.
12    THE WITNESS:  I don't know.
13  BY MS. HOWERY:
14    Q   Do you have voting power?
15    MR. SINGH:  Object to form.
16    THE WITNESS:  I don't -- I don't think so,
17  no.
18  BY MS. HOWERY:
19    Q   So you mentioned -- or testified earlier
20  that, umm, you think that your shares in TCD may
21  have matured this month.
22    At maturity, do you get voting power?
23    MR. SINGH:  Object to form.
24    THE WITNESS:  I should, but they have not
25  been converted as far as I know.

140

1  BY MS. HOWERY:
2    Q   So the convertible notes identified here
3  on page 5, in the amount outstanding, $347,000 --
4  388 [sic].
5    Do you see that?
6    A   I do.
7    Q   Are the convertible notes you're holding
8  included in this amount?
9    A   I believe so, but I'm not sure.  They
10  should.
11    Q   Okay.  Looking at page 7, Financial
12  Condition of the Issuer ...
13    Looking at the Historical Results of
14  Operations section, Revenues and Gross Margin.
15    Is this a P&L metric?
16    MR. SINGH:  Object to form.
17    THE WITNESS:  It is.
18  BY MS. HOWERY:
19    Q   And with revenues, as indicated on this
20  report, if we looked at the profit and loss
21  statement that has been shared in discovery, that
22  we've been referencing here today, what category
23  corresponds to revenues?
24    A   It should be net revenues or total income.
25    Q   Okay.  So in December 2020, according to

1  this Annual Report filed with the SEC as of
2  December 31st, 2020, revenues are $238,291, correct?
3      A  Correct.
4      Q  And when we look at the profit and loss
5  statement shared in discovery that we've been
6  referencing here today, the total income, umm, for
7  January through December 2020 is $237,108?
8        That may just be -- maybe a thousand bucks
9  in variance?
10     A  Yeah.
11     Q  Can you explain that variance?
12     A  Only that it might have been accounting
13  entries or corrections prior to tax filing or
14  afterwards as we were reviewing the numbers for the
15  next year -- or the bookkeeper reviewed the numbers,
16  it may have been that there were some adjustments
17  necessary.
18        Otherwise, I cannot explain it.
19     Q  Okay.
20     MR. SINGH:  (Coughing)  Excuse me.
21  BY MS. HOWERY:
22     Q  And taking a look at the net gain and loss
23  in this same section on the SEC Annual Report, would
24  this correspond to the bottom line number?
25     A  It would, yes.

141

1      Q  Okay.  So if we look at the SEC Annual
2  Report, the company has net losses of $42,931 in
3  2020 and net losses of $60,714 in 2019.
4        Am I reading that correctly?
5      A  You are, yes.
6      Q  Okay.  And if we look at the profit and
7  loss statement shared in discovery, that we've been
8  toggling back and forth with today -- if we get down
9  to the bottom line number, here, net losses for 2020
10  are reported at $24,984.22.
11        Do you see that?
12     A  I do.  Yes.
13     Q  Now, that's a -- we may have talked about
14  this, but that's --
15     A  It's 18,000 or 19,000 difference.  Yeah.
16     Q  Yeah.  Yeah.  And to your knowledge, you
17  don't know why the variance exists?
18     A  To my knowledge, no.
19     Q  I note that 2019 numbers align.  The loss
20  is $60,714 on this report, the same number reported
21  on the balance sheet -- on the Annual Report for the
22  SEC.
23        If you discovered that, uh, perhaps, the
24  numbers in this Annual Report with the SEC are
25  incorrect, is that something you would need to

142

1  modify or amend?
2      A  Now that I know that they're out there,
3  umm, probably yes.  I don't know the process.
4        Like I said, I haven't really been
5  actively involved.  This is something that Wefunder
6  used to, you know, manage for us during the first
7  round.  So it's not something that I believe we
8  maintain ourselves.
9        I don't have an account with the SEC, and
10  I don't know how to file it directly.
11        (Deposition Exhibit No. 11
12        marked)
13  BY MS. HOWERY:
14     Q  Have you seen this document before,
15  Ms. Kirschner?
16     A  It was submitted to me last night,
17  alongside the other documents.
18     Q  I'm going to represent for the record that
19  this is The Cookie Department, Inc.'s profit and
20  loss statement January through December 2020 that
21  Defendants obtained from the SEC website.
22        Did you prepare this document?
23     A  Not to my knowledge.  I -- I can't recall,
24  no.
25     Q  Did you assist in preparing this document?

143

1      A  Again, similar to the other response, is
2  this is a canned report out of QuickBooks.  So it
3  was run out of QuickBooks.
4      Q  Did you review this document before it was
5  filed?
6      A  I didn't even know that we were filing
7  these.  So I don't believe I did, no.
8      Q  All right.  Let's take a look at the Sales
9  category identified on this sheet.
10        The Total Sales reflected here are
11  $56,835; is that correct?
12     A  That is a total sales of the event income
13  and online sales as well as the sales line item.
14        So if you add those three together, that
15  is a subtotal of those three line items.
16     Q  These three, 1, 2 --
17     A  3918, 1475, and 51441.
18     Q  Okay.  And so everything from the Hubba
19  Income down to Online Sales -- no, to Shipping and
20  Delivery Income, make up the total income number
21  reported here; is that correct?
22     A  As well as -- if you include the discounts
23  given as well.  That's correct.
24     Q  All right.  So talk -- let's talk about
25  the Cost of Goods Sold here.

144

1      What is total Cost of Goods Sold?  Is this
2 number, this 176931 number?
3     **A    The 176931 is a total cost of goods sold,**
4 **which is a summation of the total cost of raw**
5 **material, umm, any type of storage and fulfillment,**
6 **as well as any type of, you know, other inventory**
7 **that is needed for the packaging of the finished**
8 **product.**
9     Q   Okay.  So that's 176,931.60?
10     **A   That is correct.**
11     Q   Let's toggle back to our P&L statement
12 shared in discovery.
13      And looking at Total Cost of Goods Sold
14 for 2020, we've got 157,767,01; is that right?
15      Am I reading that correctly?
16     **A   That's correct.  Yes.**
17     Q   And that's also a variance of nearly
18 $20,000, right?
19     **A   157 and -- how much was the other one?**
20     Q   176,931?
21     **A   Yes.**
22     Q   Can you explain?
23     **A   It's probably an adjusting entry after**
24 **the -- or a correction that was done by the**
25 **bookkeepers -- I have not made those entries -- but**

145

1 **after the report that was used for the SEC was**
2 **filed.**
3     **And I believe there was no corrected**
4 **report filed with the SEC afterwards.**
5     **But I will have to further investigate**
6 **that.**
7     Q   Toggling back to the P&L on the SEC
8 website --
9     **A   Yes.**
10     Q   -- gross profit is identified as
11 $61,359.04, correct?
12     **A   That's correct.**
13     Q   And the gross profit reflected on the P&L
14 statement produced in discovery is $79,341.42.
15     **A   That is probably the --**
16     Q   What -- okay.
17     **A   -- Cost of Goods Sold.  That's going to be**
18 **the difference that calculates down to the gross**
19 **profit.**
20     Q   Okay.
21     **A   And that --**
22     Q   There was --
23     (Concurrent conversations)
24     THE REPORTER:  I'm sorry.  Say it again.
25 I didn't hear either one of you.

146

1     THE WITNESS:  I mentioned that that
2 difference will flow down through net income.
3 BY MS. HOWERY:
4     Q   So it's your testimony that if there was
5 an adjustment that made the total income off, that's
6 going to flow all the way down through net income?
7     **A   Yes, because it's all a formula.**
8     **So you start with total sales or total net**
9 **income -- I'm sorry -- total income, which is total**
10 **sales.  Then you have the cost of goods sold.  You**
11 **get your gross profit.  And you -- and you subtract**
12 **operating expenses from the gross profit.**
13     **So if the gross profit is off, it will**
14 **flush down to net income, to the last line in the**
15 **P&L.**
16     Q   Okay.  And looks like that is, indeed, the
17 case.
18     If we take a look here, we show a net loss
19 in 2020 of $24,984 on the profit and loss statement
20 that was shared in discovery, compared -- can you
21 see the P&L from the SEC?
22     **A   No, not yet.**
23     Q   Okay.  As compared to $42,931.43 on the
24 SEC profit and loss statement?
25     **A   That is correct.  That looks like it's the**

147

1 **difference stemming from the gross profit**
2 **calculation.**
3     Q   And as you sit here today, you do not know
4 what that variance is, correct?
5     **A   That's correct.  Not offhand.  I will have**
6 **to further investigate.**
7     Q   When did The Cookie Department first
8 develop the Tough Cookie?
9     **A   The exact date, you will have to ask from**
10 **Akiva, but based on sales, it was -- it was part of**
11 **the launch in 2012.**
12     Q   Were you familiar with the Tough Cookie
13 product before you joined TCD -- well, after you
14 became affiliated?
15     **A   No.  I was not.  I was not aware of the**
16 **brand at all.**
17     Q   When you came on as a consultant, how many
18 products was TCD selling?
19     **A   If I recall correctly, there were five or**
20 **six.**
21     Q   And what were they?
22     **A   Cherry Bomb, Great Full, Chocolate Chip**
23 **Nookie, Snap Back, Awaken Bake, and Tough Cookie.**
24     Q   And how were these products distributed?
25     **A   When?**

148

1  Q   How about in 2012?
2  A   I don't have any knowledge of that.  It
3  was prior to my time.
4  Q   Do you know how they were distributed in
5  2013?
6  A   Prior to my time.
7  Q   2014?
8  A   Same thing.
9      Umm, I'm -- I would assume via the
10 distributors, wholesalers, and dot-com online.
11 Those were the three revenue streams that I was
12 familiar with when I joined.
13 Q   And are those the same distribution
14 channels that exist today?
15 A   Currently, yes.
16 Q   Are there any distribution channels that
17 TCD use, that they are no longer using today?
18 A   I believe they used the, umm -- the
19 Groupon platform; but, again, those were just for
20 some segments.  It was not consistent use.
21     But that -- that's an Internet and online
22 sale as well, I would say.
23     So those are the three that I'm familiar
24 with, umm, that they're still using -- that we're
25 still using today.

149

1  Q   Where were these products distributed
2  geographically?
3  A   That is probably a better question for
4  Akiva.  I know that they were -- because of the
5  online presence, they are distributed nationwide.
6  Q   Is there any international distribution?
7  A   Recently, yes.
8  Q   How recent?
9  A   Last year and this year.
10 Q   What percentage of the sales would you
11 attribute to sales outside the U.S.?
12 A   For what time period?
13 Q   Well, let's start in 2021, right now, as
14 we talk today.
15 A   I believe it's a small amount, under
16 10 percent.
17 Q   What about 2020?
18 A   Without doing further investigations, I
19 couldn't give you a number, an exact number.
20 Q   Can you estimate the percentage?
21 A   But I will be probably wrong.  It's going
22 to be lower than it was in 2021.
23     International was not a revenue stream
24 until probably a year-and-a-half or so ago.
25     Umm, we were looking, umm, to distribute

150

1  in different -- on different continents; but, you
2  know, it -- it took a while for it to bring fruits.
3  Q   And that's right up your alley, right?
4  A   It is.
5  Q   You're -- okay.  International
6  development.  Okay.
7      What -- what is TCD's most popular
8  product?
9  A   I would say currently it's Birthday -- the
10 Birthday Cake keto and the Chocolate Chip -- the
11 Champion -- Chocolate Chip Champion.
12 Q   What was the most popular product when you
13 joined in 2016?
14 A   Huh.  Umm, probably the Chocolate Chip,
15 but I'm -- this is not my forte.  I know which one I
16 liked, which -- So ...
17 Q   Do you know, umm, who TCD has distribution
18 agreements for the sale of the Tough Cookie?
19 A   I do not know.  That's something that
20 Akiva managed.
21 Q   Has The Cookie Department ever received
22 royalties from others, to use its trademarks?
23 A   Not to my knowledge.
24 Q   And why did The Cookie Department stop
25 selling the Tough Cookie in 2019?

151

1  A   It was not necessarily just the Tough
2  Cookie.  It was the whole line.
3      So Akiva wanted to reformulate the flavors
4  of the functional line.  And we were also looking to
5  launch the keto line.
6      So it was a business decision that Akiva
7  made.
8  Q   Who are TCD's largest customers?
9  A   Wholesalers, I'm assuming.
10 Q   Is there a customer -- who's the largest
11 customer for the Tough Cookie, specifically?
12 A   You'll have to ask Akiva.  He took care of
13 all the sales and the customer relation.
14 Q   Okay.  I want to just take a look at the
15 P&L statement one more time because I do have a
16 couple of clarifying questions that I believe we
17 touched on, but ...
18     (Proceedings paused briefly)
19     MS. HOWERY:  I'll move this over so I can
20 see it.
21     It was not this document.
22     (Proceedings paused briefly)
23 BY MS. HOWERY:
24 Q   Okay.  I'm showing you The Cookie
25 Department Bates number 018422, which is the

152

1    document shared in Mr. Resnikoff's deposition
2    yesterday.  I'm not sure of the exhibit number.
3        MR. SINGH:  Wait.  Are you going to remark
4    it for this?
5        MS. HOWERY:  Nope.  I just want to
6    reference it, but if -- (audio distortion) -- we're
7    just referencing.
8        MR. SINGH:  Well, unfortunately, I need
9    some kind of reference, either from the previous --
10       MS. HOWERY:  Right.
11       So I referenced it by Bates number in the
12   transcript.  Let's see.
13       MR. SINGH:  Can I say the Bates number
14   again then, please.  Because we can't see it readily
15   on the screen when --
16       MS. HOWERY:  Okay.
17       MR. SINGH:  -- blowing it up.
18       MS. HOWERY:  It's TCD-018422, and it's
19   Exhibit 5.
20       Is that correct, Madam Court Reporter?
21       THE REPORTER:  I believe so.
22       MR. SINGH:  Oh, it's Exhibit 5 within
23   this --
24       MS. HOWERY:  Yes.
25       MR. SINGH:  I thought -- I thought you

153

1    were bringing in some other -- yeah.  It looks
2    like --
3        MS. HOWERY:  No.  No.
4         (Concurrent conversations)
5        MS. HOWERY:  I'm referencing what we were
6    talking about today.
7        MR. SINGH:  Monique, I was, like, why is
8    she -- why is she fighting me on --
9        MS. HOWERY:  No.  No.  I'm just toggling
10   back to this last.
11       MR. SINGH:  I get it.
12       MS. HOWERY:  Okay.
13       MR. SINGH:  We're all good.
14       MS. HOWERY:  And I'm trying to not to
15   ruffle the papers too much, Madam Court Reporter.
16       MR. SINGH:  Me, too, I'm very quiet over
17   here.
18   BY MS. HOWERY:
19       Q   Yes.  All right.  So I just -- I'm looking
20   at the 2017 tab under the Sales by Product/Service
21   Summary that you provided -- that counsel provided.
22   And I see several entries that say:  "Deleted.
23   Deleted.  Deleted."
24       And we talked about this with respect to
25   one of the other reports or statements.

154

1    items to.
2        Q   Okay.  So I see that in 2016, 2015, 2014,
3    2013, and 2012.
4        Does not appear to be the case -- I think
5    you get things cleared up in 2018, 2019, and 2020.
6        Let me ask you this:  Let's just say that
7    TCD elects not to continue selling the Tough Cookie
8    product.
9        Would that account result in a deleted
10   entry?
11       MR. SINGH:  Object to form.
12       THE WITNESS:  It will not be a deleted
13   entry.  It will be a deactivated account.
14       So if somebody would try to book an
15   invoice to that particular account, they would
16   realize that they shouldn't because we no longer
17   send that -- sell that configuration or that
18   product.
19   BY MS. HOWERY:
20       Q   Okay.  Fair enough.
21       MS. HOWERY:  Counsel, I'd like to just
22   take five to seven minutes.  I think I have reached
23   the end, but just like to confer with my colleague.
24       MR. SINGH:  Halleluiah.
25       THE VIDEOGRAPHER:  The time is 1:54 p.m.

156

1        Can you explain why some of these items or
2    why these items state "Deleted"?
3        A   They didn't delete the items.  The -- the
4    accounts were deleted, meaning that, at the current
5    point in time, since Awaken Bake was not part of
6    our -- when this report was run, was not part of our
7    product line, they pretty much inactivated this --
8    this -- this product or this, uh, product line.
9        If you scroll up and down, you'll see that
10   there is different configurations of the same
11   product, the same five, six, flavors.  But it's in
12   different packaging and the different amount of
13   numbers.
14       And those were inactivated or they were
15   deemed, at some point in time, that they will not be
16   using that configuration any more.
17       Could it be -- it could have been later in
18   years, but because this still has activity or it
19   still had activity in years -- in years prior, it
20   will still show an amount.
21       Q   So if I understand you correctly, this is
22   a consistent practice across statements, just for --
23   discontinued ...
24       A   It -- it should be to let us allow -- to
25   identify the accounts that we no longer should tag

155

1    We're now off the record.
2          (Proceedings recessed
3          from 1:54 p.m. until 2:01 p.m.)
4          THE VIDEOGRAPHER:  The time is 2:01 p.m.,
5    and we're now back on the record.
6          MR. SINGH:  Thank you.
7          MS. HOWERY:  Ms. Kirschner, thank you so
8    much for your time today.  We appreciate your
9    thoughtful answers.
10          And this will conclude my questioning of
11    you today.
12          MR. SINGH:  I have --
13          THE WITNESS:  Okay.
14          MR. SINGH:  Go ahead.  Sorry.
15          MS. HOWERY:  Go ahead.  Are you going
16    to ...
17          MR. SINGH:  Yes.  I have one question.
18    It's, like, one or two questions -- he said.
19
20          EXAMINATION
21    BY MR. SINGH:
22      Q    So, Ms. Kirschner, just one very quick
23    follow-up.
24          Do you remember earlier today, Ms. Howery
25    questioned you -- at various points in time, there

157

1    were references in her questions and, I believe, in
2    your answers to sales of Tough Cookie in 2012?
3      A    Yes.
4      Q    And when did you get engaged by the
5    company again?  Remind me.
6      A    2016.
7      Q    Okay.  So all of your knowledge of, not
8    financials, but some of the related facts, like when
9    things were sold, et cetera, where did you obtain
10    that knowledge when you joined the company?
11      A    From some marketing materials, brand
12    materials, and from, you know, feedback from Akiva
13    and our common friend.
14      Q    Okay.  And so my question is:  In
15    connection with when Tough Cookie was first offered
16    for sale, were you aware, one way or the other, as
17    to whether it was offered for sale in 2011?
18      A    I'm not -- I -- I'm not aware of that.  I
19    just know that he was going -- his beginnings --
20    that's part of any type -- it's also on the website
21    and the -- I believe, all the marketing materials we
22    were having, that his beginnings, he was cooking
23    the -- baking them in his own home and going to
24    bakeries and cafes and selling them.
25      Q    In his van?

158

1      A    In his van, yes.
2      Q    Okay.  The famous van.
3          Okay.  But you don't know -- as you sit
4    here today, because of when you joined the company,
5    you can't say whether that was 2011, 2012 or when
6    that was?
7      A    I don't know for sure, no.
8          MR. SINGH:  Okay.  Thank you.
9          That's the only question I had.
10          MS. HOWERY:  Great.  Well, we'd like to
11    hold the deposition open and reserve our rights to
12    call Ms. Kirschner back subject to further
13    discussion on couple of issues.
14          MR. SINGH:  And we will be cooperative
15    with you all on that, to some extent.
16          I will just let you know, on the record,
17    that we've been investigating the SEC documents
18    because, as you probably heard from your colleague,
19    Mr. Pope, it actually took us by surprise, too.
20          What we have determined so far, I can
21    share with you, is that -- and I can say this now,
22    you know, just since you completed your deposition
23    at least for today, that the filings were made by a
24    third party, which is a funding platform.  This
25    often is the case.

159

1          What we need to investigate is how they
2    determined what they put up there because,
3    obviously -- at least some -- our client was not
4    aware that some of those documents were put up
5    there.
6          But we will work with you all on open
7    issues.  I think I have a fairly good idea what
8    they're going to be.  And whenever you guys would
9    like to meet and confer on it, let us know.
10          MS. HOWERY:  Fantastic.
11          MR. SINGH:  Okay.  Great.
12          Thank you.
13          THE VIDEOGRAPHER:  Transcript orders,
14    Carrie?
15          THE REPORTER:  Mr. Singh, are you ordering
16    a transcript at this time?
17          MS. HOWERY:  Yes, we are.
18          THE REPORTER:  And Mr. Singh?
19          MR. SINGH:  Yes, the usual.  Not rush for
20    us.
21          MS. HOWERY:  Yeah.  We don't need a rush.
22          THE REPORTER:  Good.  Great.  Thank you.
23          THE VIDEOGRAPHER:  Okay.
24          THE REPORTER:  That's it.
25          THE VIDEOGRAPHER:  All right.  This marks

160

40 (Pages 157 to 160)

1    the end of today's deposition of Andrea Kirschner.
2         All media used will be stored with
3    Jan Brown & Associates.
4         We are officially off the record at
5    2:05 p.m.
6    (Proceedings adjourned for the day at 2:05 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

161

DECLARATION UNDER PENALTY OF PERJURY

1
2
3         I, ANDREA KIRSCHNER, do hereby certify
4    under penalty of perjury that I have read the
5    foregoing transcript of my deposition taken on
6    April 29th, 2022; that I have made such corrections
7    as appear noted herein; that my testimony as
8    contained herein, as corrected, is a true and
9    accurate transcription of my testimony.
10
11
12         DATED this _____ day of _____,
13    2022, at _____, California.
14
15
16
17
18
19         _____
20              ANDREA KIRSCHNER
21
22
23
24
25

162

REPORTER'S CERTIFICATE

1
2
3         I certify that the foregoing proceedings in the
4    within-entitled cause were reported at the time and
5    place therein named, that said proceedings were
6    reported by me, a duly Certified Shorthand Reporter
7    of the State of California, and were thereafter
8    transcribed into typewriting.
9         I further certify that I am not of counsel or
10    attorney for either or any of the parties to said
11    cause of action, nor in any way interested in the
12    outcome of the cause named in said cause of action.
13         IN WITNESS WHEREOF, I have hereunto set my hand
14    this 09th day of May, 2022.
15
16
17         _____
         CARRIE HEWERDINE, RDR, CSR #4579
18
19
20
21
22
23
24
25

163

# Exhibit D



# The Cookie Department, Inc. v.

# The Hershey Company and ONE Brands, LLC

# Case No. 3:20-cv-09324 In the United States Northern District of California

## Expert Report of Jeff Anderson

Submitted to:

Sanjiv N. Singh
SNS PLC
1650 South Amphlett Blvd. Suite 220
San Mateo, CA 94402
Phone: (650) 389-2255
Mobile: (415) 816-5548
Fax: (415) 358-4006

Submitted by:

**CONSOR®**

**IP Experts**

7514 Girard Avenue, Suite 1500
La Jolla, CA  92037
Phone:  (858) 800-4950
Fax:  (858) 800-4950

May 31, 2022

HIGHLY CONFIDENTIAL
© 2022 CONSOR®, La Jolla, CA



The Cookie Department, Inc. v.
The Hershey Company and ONE Brands, LLC
May 31, 2022                              Page 2

## I.   INTRODUCTION

### A. The Assignment

SNS PLC ("Counsel") has retained CONSOR® IP Experts ("CONSOR" or "We") on behalf of their client, *The Cookie Department, Inc.* ("Client"), to provide expert witness services pertaining to Case 3:20-cv-09324 in the United States Northern District of California (the "Case").

Specifically, we have been asked to assess damages sustained by Client, as quantified in the following two ways:

1)   The unjust enrichment, as measured by gross profit, of The Hershey Company ("Hershey") and ONE Brands, LLC ("ONE Brands") (collectively, "Infringing Companies"), resulting from unsanctioned use of the "Tough Cookie" mark (the "Tough Cookie Mark").[1]

2)   The potential royalty income of Client, as measured by royalties Infringing Companies would have paid for use of the Tough Cookie Mark.

The relevant time frame for our damages analysis is from 2017 through November 2022 (the "Damages Period"). The analysis detailed in this report is presented as of May 31, 2022 (the "Report Date"). Findings reflect our analysis of the information produced in this Case up to this date, as well as our independent research. We reserve the right to amend, expand, and/or supplement this report should additional information, data, and/or deposition testimony be made available during the course of this litigation.

This report contains two appendices which consist of the qualifications of the named expert, including a list of publications and prior testimony (Appendix A), and a list of the documents reviewed in this matter (Appendix B). Individuals at CONSOR assisted in the preparation of this report under the supervision of the named expert. CONSOR is being compensated for the production of this report at an hourly rate of $500 per hour. The testifying expert's hourly rate for deposition, and trial testimony and preparation, is $750 per hour.

### B. Qualifications of The Named Expert

Jeff Anderson is the Managing Director at CONSOR, an intellectual asset consulting firm specializing in trademark, patent, copyright and right of publicity valuation, licensing, and expert testimony. The firm is headquartered in La Jolla, California, and has offices in New York and London.  Mr. Anderson first earned a B.S. in Economics from Santa Clara University, and later went on to earn an MBA, with a concentration in Finance, from San Diego State University.

Mr. Anderson has a broad view of the world of intellectual property and intangible assets. He has lectured, spoken, and written on the topic of IP valuation, as well as the

---

[1] Doc 4